# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ANTHONY NOVAK<br>1815 Wexford Ave.<br>Parma, OH 44134<br><br>    Plaintiff,<br><br>  vs.<br><br>THE CITY OF PARMA<br>6611 Ridge Road<br>Parma, Ohio 44129,<br><br>KEVIN RILEY<br>THOMAS CONNOR<br>c/o Parma Police Department<br>5555 Powers Blvd.<br>Parma, Ohio 44129<br>(Individually and in their Official Capacities<br>As Employees of the City of Parma, Ohio),<br><br>    -and-<br><br>JOHN DOE<br>(Individually and as a member of the Ohio<br>Internet Crimes Against Children Task Force)<br><br>    Defendants. | Case No. 1:17-cv-02148<br><br>Judge<br><br>Magistrate Judge |

### COMPLAINT WITH JURY DEMAND

### NATURE OF THE ACTION

1.    Mocking our government officials is a fundamental American right. Yet on March 2, 2016, officers of the Parma Police Department launched a sham investigation against a citizen because he made fun of them on Facebook, abusing the State's police powers and enlisting a child-pornography task force to retaliate against and silence his criticism.

2.      By this civil-rights action, brought under 42 U.S.C. § 1983 and Ohio law, plaintiff Anthony Novak seeks to vindicate his First Amendment rights and hold Parma's police officers accountable to the Constitution they swore to uphold.

3.      Defendants targeted Mr. Novak for nothing more than his fully protected speech. That afternoon, Mr. Novak created a farcical Facebook account, lampooning the Parma Police Department's Facebook page by posting obvious parodies of its official releases. Among other sins, his posts criticized the officers' erudition (displaying the misspelt motto "We No [*sic*] Law"), qualifications (passing a hearing test; disdaining civil rights), racial sensitivity (ignoring an armed white robber to hunt an African-American loiterer), and raised other issues of public concern.

4.      Many of Mr. Novak's posts were "false," at least in the lazy, facile sense of the word the officers would use at his criminal trial, flouting the Supreme Court's clearly established distinction between fiction and falsehood. No, the Parma Police Department did not *actually* perform experimental abortions in police vans, one of Mr. Novak's satiric conceits, or pass legislation to starve the homeless out of Parma. Nor could any reasonable police officer have believed any of Mr. Novak's posts were child pornography, or within the jurisdiction of a statewide child-pornography task force. To the contrary, as the officers would admit at trial, they *knew* the posts were parodic, and also *knew* that no reasonable person would believe otherwise.

5.      Nonetheless, under the guise of "falsity," and based on nothing more than the content of Mr. Novak's obviously parodic posts, the City of Parma *did* announce a sham criminal investigation to silence him, and deployed the full force of its police powers to prevent Mr. Novak from exercising his clearly established First Amendment right to criticize the Department. Without a scintilla of evidence that any crime had been committed, much less one involving child pornography, the City immediately deployed a child-pornography specialist and the investigative arsenal of the child-pornography task force to shut him down.

6.     A rogue operation would have been bad enough, but the City's retaliation was calculated and deliberate, authorized and facilitated by final City decision-makers. Parma's law director and chief prosecutor, Timothy Dobeck, not only *should* have understood the clearly established limitations on criminal investigations into protected speech, but (to judge from his publicly filed briefs) in fact *does*. And he nevertheless executed and sanctioned Defendants' unconstitutional retaliation against Mr. Novak. The actions he sanctioned were consistent with Defendants' longstanding policy, custom, and practice of ignoring clearly established legal distinctions between protected and unprotected speech, commencing criminal prosecutions solely on the basis of pure but allegedly "false" speech, and other obviously unconstitutional policies, customs, and practices reflected in appellate reversals of City-led convictions.

7.     The City did not simply fail to incorporate clearly established legal protections into its investigative practices, or provide rudimentary training to officers about constitutional restrictions on policing, but squarely assaulted them. Rather than alter its policies and practices to account for the differences between protected speech, like Mr. Novak's parodic account, and unprotected speech, like child pornography, the City targeted Mr. Novak for prosecution *because* his speech was protected parody, and solely *because* they claimed the Parody Account was "false," as its officers admitted at trial. The City did not simply ignore well-settled constitutional rights, it willfully and intentionally prosecuted Mr. Novak for exercising them.

8.     Defendants have neither excuse nor immunity for violating Mr. Novak's rights. Satirists founded the United States, and our freedom to criticize government officials without fearing jackboots at the door is fundamental to our democracy and secured by our highest law. *Houston v. Hill*, 482 U.S. 451, 461–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

9.      Mr. Novak's ordeal is a chilling reminder that even our clearest and most fundamental rights remain vulnerable to police misconduct. Defendants

    a.  Censored Mr. Novak's criticism by threatening criminal prosecution, violating his clearly established right to be free of unlawful prior restraints on speech;

    b.  Exposed Mr. Novak's identity, violating his right to anonymous speech;

    c.  Misrepresented and omitted material facts to obtain unlawful warrants;

    d.  Conducted unlawful searches and arrested Mr. Novak without probable cause;

    e.  Issued false and misleading statements to Facebook to shut down his account;

    f.  Invaded Mr. Novak's common-law and statutory privacy rights;

    g.  Seized (and retained—even to the present—every communications device Mr. Novak owns, violating his First Amendment right to speak in the medium of his choice;

    h.  Manufactured evidence of a nonexistent crime and coordinated false testimony; and

    i.  Prosecuted Mr. Novak for "disrupting public services" under an unconstitutional application of an unconstitutionally vague statute, Ohio Rev. Code § 2909.04(B).

10.     The City did not stop there. At the City's insistence, the county prosecutors convened and misled a grand jury to obtain an indictment, concealed controlling authority from a judge to avoid dismissal, and attempted to mislead Mr. Novak's petit jury by successfully opposing his request to instruct his peers on his First Amendment rights. Unlike his persecutors, however, Mr. Novak's lay peers needed no instruction to know his speech was lawful. After closing arguments on August 11, 2017, the jury declined additional time to deliberate and swiftly acquitted him.

11.     After months of unconstitutional exertions, and even with the fruits of unlawful searches and *post hoc* documentary contrivances, the State still had no evidence on the most basic element of Mr. Novak's supposed "crime": that the existence of his Facebook page prevented the Parma Police Department from policing.

12.     The evidence *did*, however, confirm the Defendants' unconstitutional motivation: to prevent Mr. Novak from exercising his clearly established right to criticize the police. As the supervising officer who commenced the sham investigation admitted, "we just wanted it down."

### PARTIES

13.     Plaintiff Anthony Novak is a resident of Cuyahoga County, Ohio.

14.     Defendant City of Parma (the "City") is a municipal corporation under Article XVIII of the Ohio Constitution, and a "person" subject to suit within the meaning of 42 U.S.C. § 1983. The City operates and supervises the Parma Police Department (the "Department").

15.     Defendant Kevin Riley is a Parma police officer. At all relevant times, he acted under color of state law and in his capacity as a Parma police officer.

16.     Defendant Thomas Connor is a Parma police officer. At all relevant times, he acted under color of state law and in his capacity as a Parma police officer.

17.     Defendant John Doe is a law-enforcement official employed by an agency other than the Department, and a member of the Ohio Internet Crimes Against Children Task Force.

### JURISDICTION AND VENUE

18.     Under 28 U.S.C. §§ 1331, 1343, and 2201, Mr. Novak asserts jurisdiction over federal claims under 42 U.S.C. §§ 1983, 1985, and 1988, which provide for attorneys' fees in civil-rights claims, and 42 U.S.C. 2000aa-6, which provides statutory damages and attorneys' fees for searches and seizures in connection with communications-based investigations. This Court has supplemental jurisdiction over Mr. Novak's state-law claims under 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over the Defendants, who reside in and conduct business in this District. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to Mr. Novak's claims took place within this District.

## FACTUAL BACKGROUND

20.     Defendants targeted Mr. Novak's protected speech in violation of clearly established law. He has a right to redress because the First Amendment rights they defied were clearly established at the time Defendants retaliated against him for his protected criticism. Therefore, the factual background to this lawsuit begins with the fact that Mr. Novak's rights were and are clearly established.[1]

### The First Amendment protects citizens who criticize the police.

21.     Protected speech cannot lawfully be criminally sanctioned for disrupting police services. This has been clear since at least 1987, when the Supreme Court invalidated a Houston ordinance that (like the statute under which Mr. Novak was charged) sought to criminalize speech that interrupted police business. *Hill*, 482 U.S. at 455. The Sixth Circuit has repeatedly reiterated the "First Amendment limitations on the conduct that state municipalities may outlaw with respect to interruption of police activity," and that prosecution for protected speech that does not "cross the line into fighting words or disorderly conduct" is unconstitutional. *E.g. Patrizi v. Huff*, 690 F.3d 459, 467 (6th Cir. 2012); *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) ("based upon First Amendment jurisprudence that is decades old," "no reasonable police officer would believe" that a disturbance statute could constitutionally apply to protected speech).

22.     Criticism of police officers is protected speech, and the First Amendment right to criticize public officials was clear "[s]ince the day the ink dried on the Bill of Rights." *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001).

---

[1] "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, or case law from other circuits which is directly on point." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997).

23.     Not only is this right "well-established and supported by ample case law," but it is "well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett*, 130 F.3d at 264.

**The First Amendment protects parody, and police ignorance is no excuse.**

24.     Under equally clearly established law, the First Amendment fully protects parodic speech. *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (offensive parody was "not reasonably believable" and fully protected by the First Amendment). As the Supreme Court has repeatedly recognized, parody is not "false," but fictional, as it "cannot reasonably be interpreted as stating facts," *Milkovich v. Lorain Journal*, 497 U.S. 1, 20 (1990), and is valuable because its mimicry tweaks our expectations in creative and thought-provoking ways. *Campbell v. Acuff-Rose*, 510 U.S. 569, 580–81 (1994) ("Parody needs to mimic an original to make its point.").

25.     These principles are not literary niceties. They draw crucial legal lines between liberty and incarceration for persons like Mr. Novak, and police ignorance is no excuse. *Harlow v. Fitzgerald*, 457 U.S. 800, 618–19 (1982) ("A reasonably competent public official should know the law governing his conduct . . . . Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate. . . ").

**The First Amendment protects false speech.**

26.     It is also clearly established that speech cannot be criminalized simply because it is false. *United States v. Alvarez*, 567 U.S. 709, 723 (2012) ("Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."). In *Alvarez*, the Supreme Court vacated a liar's conviction for falsely claiming to be a recipient of the Congressional Medal of Honor, squarely rejecting the proposition that false speech is *ipso facto* unprotected by the First Amendment, and holding that no governmental interest in "truthful discourse" can justify criminal sanctions under the "most exacting scrutiny" required by the First Amendment. *Id.* at 723.

**The First Amendment forbids police officers from punishing protected speech.**

27. Police officers "*may not base . . . probable-cause determination on speech protected by the First Amendment.*" *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) (emphasis supplied).

28. Only narrowly defined categories of speech, like true threats or fighting words, are unprotected by the First Amendment, and neither false, confusing, misleading, critical, juvenile, insulting, nor offensive speech are among them. *Alvarez*, 567 U.S. at 717–18.

29. Under clearly established law, child pornography is not protected speech. *New York v. Ferber*, 458 U.S. 747, 764 (1982). Reasonable police officers know it when they do *not* see it. *E.g. United States v. Hurt*, 808 F.2d 707, 708 (9th Cir.1987) ("Any rational adult person can recognize sexually explicit conduct engaged in by children under the age of 16 when he sees it.").

30. All other speech, whether profound or profane, false or fictional, is fully protected. And within the wide ambit of protected speech, Mr. Novak's Facebook posts are downright restrained and enlightened. *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (signs at soldier's funeral reading "Thank God [f]or Dead Soldiers," "Priests Rape Boys," and "God Hates Fags" were fully protected: "While these messages may fall short of refined social or political commentary, the issues they highlight . . . are matters of public import.").

31. Importantly for Mr. Novak, who was prosecuted for potentially confusing the public, the First Amendment forbids police censorship based on public confusion. *Terminiello v. Chicago,* 337 U.S. 1, 4 (1949) (speech is "protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."). This is crystal-clear in the Sixth Circuit, which sat *en banc* a year before Mr. Novak was charged to admonish police officers against punishing speakers for others' reactions. *Bible Believers v. Wayne County*, 805 F. 3d 228, 247–55 (6th Cir. 2015).

32.     The Sixth Circuit addressed *Bible Believers* directly to police officers, reiterating that they are *not* immune from § 1983 liability for censorship based on an anticipated public response, and the "substantive duties of a police officer not to effectuate a heckler's veto." *Id*. at 252.

33.     Finally, officers must never use their police power to protect their own dignity. This "right to be free from retaliatory arrest after insulting an officer was clearly established" in the Sixth Circuit long before the Department arrested Mr. Novak for insulting the force. *Kennedy v. Villa Hills*, 635 F.3d 210, 219 (6th Cir. 2011); *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998) ("police officers . . . may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity."); *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002) (officer "should have known that an arrest undertaken at least in part as retaliation for a constitutionally protected insult to the officer's dignity would be impermissible."). Rather, "the First Amendment requires that police officers tolerate coarse criticism," "prohibits states from criminalizing conduct that disturbs solely police officers," *Kennedy*, 635 F.3d at 216, and requires officers to "respond with restraint." *Hill*, 482 U.S. at 471.

34.     Under clearly established law, whether Mr. Novak's Facebook posts were offensive, confusing, annoying, or an effective contribution to an important public conversation is not for police to decide. Those judgments are reserved to the Facebook-literate public, where, as in the corporeal realm, "[t]he remedy for speech that is false is speech that is true," "[t]he First Amendment itself ensures the right to respond to speech we do not like," and "for good reason," the State is forbidden from curating public speech:

> Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.

*Alvarez*, 567 U.S. at 727.

**The internet is replete with fully protected anonymous speech and parody.**

35.     It is also clearly established that speech on social-media platforms receives full First Amendment protection, and "the vast democratic forums of the Internet" are fertile soil for civic discourse. *Reno v. ACLU*, 521 U.S. 844 (1997). Online users freely exercise their clearly established rights to remain anonymous, without which lawful speech would remain unspoken. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment."); *Talley v. California*, 362 U.S. 60, 64 (1960) (invalidating ban on anonymous pamphleteering).

36.     You can't believe everything you read on the internet, and the Constitution forbids the occasional ingénue from robbing speakers of parodic freedoms. Police officers must therefore judge parody through the eyes of a *reasonable* reader. *Alvarez*, 497 U.S. at 20. "The test is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)," considering the "post in its context," and the poster's publication history and audience. *Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013). Any other rule would supplant the unlawful "heckler's veto" with an equally unlawful "humorless veto."[2]

37.     Under these clearly established protections, social-media platforms have become a fount of fully protected parodic speech. They are replete with and understood by reasonable users to contain lawful and anonymous parody accounts like Mr. Novak's that mount critiques both trivial and trenchant. Just as Alec Baldwin has a First Amendment right against retaliation by the Commander-in-Chief he lampoons, parody accounts criticize presidents, mayors, and celebrities alike without the specter of unconstitutional criminal prosecution.

---

[2] "As a matter of constitutional law," speech is judged through the lens of the reasonable reader. *Greenbelt v. Bresler*, 398 U.S. 6, 13–14 (1970); *see also Madison v. Frazier*, 539 F.3d 646, 655 (7th Cir. 2008) ("even the most careless reader must perceive that this 'fantasy' was no more than rhetorical hyperbole"); *Mink v. Knox*, 613 F.3d 995, 1007–08 (10th Cir. 2010) (blog mocking professor was parodic as a matter of law).

**Internet platforms lawfully police user content themselves.**

38.     Unlike the police, social-media companies may lawfully curate user content as they wish. *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). Some expressly permit parody accounts.[3]

39.     Others, like Facebook, ask users to provide their real names,[4] allow them to authenticate or "verify" official accounts, avail themselves of "Government" or "Municipality" designations in profile descriptions, or report "fake" accounts to Facebook for further investigation.[5] As their terms of service reflect, these platforms lawfully interpose and enforce their own content-based restrictions on fully protected speech to cultivate particular user experiences for their customers.[6]

40.     Though private companies may regulate platform content as they wish, the government cannot. Content-based regulation of private speech is presumptively unlawful and subject to the First Amendment's "most exacting scrutiny." *Turner v. FCC*, 521 U.S. 622, 641 (1994).

41.     Terms-of-service violations cannot survive that scrutiny, and cannot be prosecuted. *See, e.g., United States v. Nosal*, 676 F.3d 854, 860 (9th Cir. 2012) ("Basing criminal liability on violations of private computer use policies can transform whole categories of otherwise innocuous behavior into federal crimes"); *United States v. Drew*, 259 F.R.D. 449, 465 (C.D. Cal. 2009) ("utilizing violations of the terms of service as the basis" for criminal prosecution "improperly makes the website owner the party who ultimately defines the criminal conduct").

---

[3] *See, e.g., Parody, Commentary, and Fan Account Policy*, TWITTER.COM, *available at* https://support.twitter.com/articles/106373 (last visited Sept. 16, 2017).

[4] *See Terms of Service*, FACEBOOK.COM, at § 4 ("Facebook users provide their real names and information, and we need your help to keep it that way"), *available at* https://www.facebook.com/legal/terms (last visited Sept. 17, 2017).

[5] *See How do I report an account for impersonation?*, FACEBOOK.COM (providing complaint form), *available at* https://www.facebook.com/help/167722253287296 (last visited Sept. 17, 2017).

[6] Facebook "can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies." *Terms of Service*, FACEBOOK.COM, *available at* https://www.facebook.com/legal/terms (last visited Sept. 17, 2017).

42.     Outsourcing criminal law to private platforms in this fashion would violate every applicable precept, including due process requirements of fair notice, and First Amendment prohibitions on vagueness and overbreadth. *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

43.     It is also clearly established that no state interest in curating truthful speech can justify criminal sanctions for protected speech, even if false. *Alvarez*, 567 U.S. at 727. Nor can any state interest in preventing reader confusion. *NYSE v. New York, New York Hotel*, 293 F.3d 550, 555 (2d Cir. 2002) (denying consumer-confusion claim where website's use of the New York Stock Exchange's logo was "so obviously modified that any viewer would understand that the Casino was engaged in a parody," bolstered by other playful uses . . . that would further underline the obvious."). Private companies may disagree about the value of parodic accounts on their platforms, or the appropriate degree of solicitude for digitally illiterate users, and manage their business operations accordingly. Under clearly established law, however, police cannot.

44.     Municipalities that retaliate against internet parodists suffer punishing and widely publicized consequences. In 2015, the city of Peoria, Illinois paid $125,000 to settle a First Amendment lawsuit brought by a resident who, like Mr. Novak, was prosecuted for creating a spoof social-media account that used the Mayor's official portrait as its avatar and declared "I am honored to serve the citizens of our great city."[7] In addition to the settlement payment, Peoria agreed to implement (and distribute to officers at roll call) an ACLU-drafted directive on the constitutional enforcement of the criminal statute at issue, and certify compliance to the ACLU.[8]

---

[7] Dawn Rhodes, *Police raid over fake Twitter account costs Peoria $125,000* (CHICAGO TRIBUNE, Sept. 3, 2015), *available at* http://www.chicagotribune.com/news/local/breaking/ct-twitter-peoria-mayor-lawsuit-20150902-story.html; *see also* Amended Complaint, *Daniel v. City of Peoria*, 14-cv-01232, ECF Dkt. 28 (N.D. Ill. Oct. 9, 2014), at 5 (parody account "juxtaposed the mayor's clean-cut image with a series of tweets conveying in a crude or vulgar manner an exaggerated preoccupation with sex, drugs and alcohol.").

[8] Settlement Agreement, *Daniels v. City of Peoria*, 14-cv-1232, *available at* https://www.aclu-il.org/sites/default/files/field_documents/city_of_peoria_settlement_agreement.pdf.

**Mr. Novak creates a parody Facebook account to criticize the Department.**

45.     Against the backdrop of these clearly established rights, Mr. Novak created a Facebook

page to criticize the Parma Police Department by posting parodies of Department releases (the

"Parody Account"). On March 2, 2016, Mr. Novak published six posts to the Parody Account:

1. An "official stay inside and catch up with the family day" enforced by police curfew: "Anyone's [*sic*] seen outside their home from the hours of 12pm to 9pm will be arrested."

2. A "Pedophile Reform event" with "multiple learning stations including a 'No means no' station filled with puzzles and quizzes," encouraging attendees to "Have fun out there!" and promising pedophiles recognition as "honorary police officer[s]" upon completion.

3. A "Food Drive to benefit teen abortions" at which officers "will be giving out free abortions to teens using an experimental technique discovered by the Parma Police Department" "in a police van in the parking lot at Giant Eagle."

4. An apology for neglecting to inform the public about an armed white male who robbed a Subway sandwich shop, requesting assistance identifying the "African American woman" loitering in front of the shop while it was robbed "so that she may be brought to justice."

5. A recruitment post "strongly encouraging minorities to not apply," announcing a "written exam for basic Police Officer for the City of Parma" comprised of "a 15 question multiple choice definition test followed by a hearing test" that, if passed, guaranteed recognition "as an officer of the Parma Police Department."

6. A "temporary law" introduced by the Department forbidding "residence [*sic*] of Parma from giving ANY HOMELESS person food, money or shelter in our city" as "an attempt to have the homeless population eventually leave our city due to starvation."

46.     Mr. Novak interposed obvious alterations on the Parody Account to make his parody

clear. Unlike the Department's official page, the Parody Account contained obviously parodic

errors, like the satiric logo "We no [*sic*] law." Like all parodists, Mr. Novak *wanted* his readers to

get the joke, so he used Facebook's profile designation for "community" fora, rather than

demarcations that identify accountholders as "Police Stations," "Government Organizations," or

"Law Enforcement Agencies," all of which were designated on the Department's official page.

47.    Mr. Novak did not use Facebook's "verification" feature, which validates authentic accounts.[9] The Department's official website invites users to "Visit us on Facebook," and directs them to the Department's official Facebook account.[10]

48.    Based on its content and context, reasonable readers understood that the Parody Account consisted entirely of parodic speech. No reasonable person could believe the Parody Account was created by, sanctioned by, or affiliated with the Parma Police Department.

49.    All of the content on the Parody Account was protected speech, and constituted political speech and criticism of government officials. Mr. Novak published the Parody Account to voice his criticism and frustration on matters of public concern, including the Department's policing priorities, racial sensitivity, training, qualifications, and respect for civil rights, as is his clearly established First Amendment right. As Defendants would later admit they knew, Mr. Novak used parody to highlight and sharpen his criticism of the Department.

50.    All of the content on the Parody Account constituted expressive speech. Mr. Novak published the Parody Account to create an entertaining and socially conscious presentation for his friends, as is his clearly established First Amendment right.

51.    No content on the Parody Account constituted true threats, fighting words, or any category of unprotected speech. Defendants never believed or claimed that any content on the Parody Account constituted a true threat. No one has ever believed or claimed that any content on the Parody Account constituted a true threat.

---

[9] *See How do I request a gray verification badge for my Page?*, FACEBOOK.COM, *available at* https://www.facebook.com/help/100168986860974/?ref=u2u (last visited Sept. 18, 2017).

[10] *See News Releases,* THE CITY OF PARMA POLICE DEPARTMENT, available at http://www.cityofparmapolice.com/news/index.htm (last visited Sept. 18, 2017).

52.     No content on the Parody Account incited violence. Defendants never claimed that any content on the Parody Account incited violence. No one has claimed that any content on the Parody Account incited violence, or that Mr. Novak intended to incite any.

53.     No one has ever believed or claimed that any content on the Parody Account falls into any unprotected category of speech. None of its content violated any criminal law. None of its content constituted child pornography. No one, other than Defendants, has claimed that its content violated any criminal law.

54.     The Parody Account did not disrupt police services, and Mr. Novak did not intend it to. Defendants knew there was no disruption, and could not have reasonably believed that Mr. Novak intended any.

### Mr. Novak's friends are amused.

55.     Mr. Novak's parody had a modest debut. The Parody Account had no audience at inception, and attracted less than 100 followers during the 12 hours it remained online.

56.     After creating the Parody Account, Mr. Novak used his personal Facebook account to "share" the page with his Facebook "friends," chiefly other Parma residents, who were familiar with the Facebook idiom and Mr. Novak's anti-authoritarian, parodic idiosyncrasies.

57.     Every reasonable individual with whom Mr. Novak shared the Parody Account understood and enjoyed the obviously parodic page.

58.     Comments included "That's the funniest thing ever," and "Oh my god I'm dying."[11]

59.     Mr. Novak's Facebook "friends," in turn, shared the posts with their "friends," but the page still did not achieve wide exposure, attracting only a limited number of comments throughout the afternoon.

---

[11] Trial transcript, *State v. Novak*, No. CR 604767 ("Tr.") p. 127 (attached as Exhibit A).

60.     The Parody Account ultimately reached a few commenters who expressed confusion, but they were swiftly corrected by other commenters, who dutifully stated the obvious in responsive comments, and most thought it was funny.[12] To preserve the integrity of his parody, Mr. Novak deleted a small number of pedantic comments that belabored the joke, knowing that the parody was obvious from its content, but ruined, like all comedy, by clumsy explication.[13] *See Campbell*, 510 U.S. at 583, n.17 ("Parody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived).").

61.     Neither Mr. Novak nor the Parody Account altered the content or availability of the Department's official Facebook page, which remained fully accessible to its nearly 8,000 followers, including the few commenters who did not immediately recognize the obvious parody.

62.     Throughout the afternoon of March 2, 2016, Mr. Novak's anonymity remained intact. Throughout that period, the Parody Account remained available to readers on Facebook.

**Outraged, the Department mobilizes to shut down the Parody Account.**

63.     On March 2, 2016, Defendants discovered the existence of the Parody Account.

64.     Based solely on the Parody Account's content, Defendants took official action to identify and punish its anonymous author. As one officer testified, "we all stopped what we were doing to take a look at it, and a couple of us tried to figure out who did it and where it started."

65.     No reasonable observer could have reasonable believed that the Parody Account disrupted any police services. The Defendants did not, and took no action whatsoever to protect any of the law-enforcement concerns they would later falsely invoke. They did not fear unrest at the two locations identified in the parodic posts, and dispatched neither officers nor squad cars.

---

[12] Tr. 78, 132, 185, 207.

[13] Tr. 202.

66.     They did, however, spend ample on-duty free time hunting the anonymous author who dared to importune them online.[14]

67.     Defendants sought to identify and punish the Parody Account's author because its content offended them. Some Facebook commenters (not Mr. Novak) published profane responses to his parodic posts, including "Fuck the Parma Police." A report created later that day revealed no disruption in policing, focusing exclusively on vulgar remarks about the Department.

68.     Based on nothing more than a cursory review of its content, Defendants communicated about the Parody Account, and agreed and resolved to shut it down. As one officer testified at Mr. Novak's trial, "We just wanted it down."[15]

69.     To achieve that unlawful purpose, and in his supervisory capacity as a Lieutenant in the Department, Defendant Riley opened a sham criminal investigation and assigned Defendant Connor to the "case," based on Connor's experience with child-pornography investigations.

70.     Defendant Riley believed that Connor could leverage his experience combating child pornography, which any reasonable officer would know is *unprotected* speech, to force Facebook to shut down the Parody Account.[16] No reasonable officer could have believed that there was any child pornography, or any unprotected speech whatsoever, on the Parody Account.

71.     Nonetheless, Riley instructed Connor to deploy the full range of child-pornography investigative resources and techniques to identify and punish the Parody Account's author, despite his knowledge that the Parody Account was parodic, and, as he would testify at trial, that any reasonable reader would know and believe the same.

---

[14] This was time that these officers could have better spent investigating Parma's problems with meth labs and domestic violence. *See*, *e.g.*, "Parma State of Mind," (available at https://www.youtube.com/watch?v=SuVmmawmFXY, last accessed Oct. 10, 2017) (parodic)).

[15] Tr. 79.

[16] Tr. 66.

72.    Daniel Heinz, an officer not assigned to the "case" but also with nothing better to do, identified Novak as the potential author and provided Connor with screen shot "evidence."[17]

73.    Defendant Connor spent that day and the next "monitoring" Facebook and drafting a preliminary investigation report (the "Connor Report").[18] The Connor Report contains no evidence, indication, or allegation that any police services were disrupted, or that the author of the Parody Account intended to disrupt any police services.

74.    No reasonable officer could have believed that the Parody Account's author intended to disrupt any police services, or that any police services were in fact disrupted. There was no evidence that the author intended to disrupt police services, or evidence of any such disruption.

75.    Rather, Defendants targeted Mr. Novak's lawful speech because they found it insulting. They decided to expose Mr. Novak's identity, stop his speech, and punish him. Within the space of an afternoon, they mobilized in retaliation, even though no reasonable officer could have believed a crime had been committed.

### The Department "warns" Parma about the Parody Account, and Parma warns the Department that it is protected speech.

76.    That afternoon, the Department posted an announcement on its official Facebook page to "warn the public" about the Parody Account:

> The Parma Police Department would like to warn the public that a fake Parma Police Facebook page has been created. This matter is currently being investigated by the Parma Police Department and Facebook. This is the Parma Police Department's official Facebook page. The public should disregard any and all information posted on the fake Facebook account. The individual(s) who created this fake account are not employed by the police department in any capacity and were never authorized to post any information on behalf of the department.

---

[17] Tr. 95, 159.

[18] Tr. 165–67.

77.     The good people of Parma responded with swift derision. As the comments posted in response to the Department's "warning" demonstrate, Parma's Facebook users were not remotely confused about the parodic nature of the Parody Account. By the end of that day, there were dozens of comments mocking the Department for its inability to take a joke and urging the officers to focus on real police work.

78.     The Department, including Defendant Connor, who was still "monitoring" the Parody Account, received these admonitions. Rather than heeding them, or considering their warnings about unconstitutional action, the Department *deleted approximately 40–50 negative comments of this nature.*

79.     Now, the first comment that remains posted on the Department's "warning" post (which remains online as of this filing) was posted the next day, on the afternoon of March 3, 2016.

80.     Despite having used its Facebook platform to "warn" its thousands of followers about the fake account (and drive more traffic to it—indeed, the first remaining comment asks the Department to provide a link to the Parody Account), the Department was just getting started.

**The Department threatens Facebook to shut down Mr. Novak's speech.**

81.     After Defendant Riley assigned him to the "case," Connor sent a letter to Facebook, stating that the Parody Account was under criminal investigation and requesting that the account be suspended and the page shut down immediately (the "Takedown Letter").

82.     Connor followed the policies, procedures, and customs employed by the Department in child-pornography investigations, notwithstanding that any reasonable officer would know that the Parody Account consisted entirely of pure and fully protected speech.

83.     Connor transmitted the Takedown Letter to Facebook, even though he knew it contained material misrepresentations and omissions. For example, it did not apprise Facebook that the Parody Account was parodic. It did not apprise Facebook that there was no evidence of any

criminal activity in the Parody Account. It referred to the Department's official Facebook page and suggested that the Parody Account was infringing. Any reasonable officer would have known that these representations were materially misleading, and that no crime had been committed. Nonetheless, the Takedown Letter conveyed an implicit threat of adverse governmental action against Facebook and Mr. Novak, and demanded that Facebook shut down the Parody Account.

84.     Connor sent the Takedown Letter solely on the basis of the Parody Account's content. Neither he nor the Department had any evidence of disruption in public services or any unlawful activity associated with the Parody Account.

### The Department conspires with a child-pornography task force to shut down the Parody Account.

85.     Defendant Connor promptly contacted Defendant John Doe, a member of the Ohio Internet Crimes Against Children Task Force, to obtain non-public contact information for a Facebook official known to the Task Force as the employee responsible for shutting down accounts engaged in illegal activity, such as child pornography. Connor told Doe about the Parody Account and about the Parma Defendants' desire to shut down the Parody Account.

86.     In furtherance of Defendants' objective to shut down the Parody Account, Defendant John Doe provided Connor with a non-public Facebook email address known to and used by the Task Force to shut down Facebook accounts containing child pornography.

87.     Connor promptly sent an email to that address, reiterating the Department's demand that the Parody Account be suspended and its content removed (the "Takedown Email").

88.     Connor did so solely on the basis of the Parody Account's content, even though any reasonable officer would have known that it was protected parodic speech, and without any evidence of disruption in public services, crimes against children, or any unlawful activity.

89.     The Takedown Email repeated the same material misrepresentations and omissions as the Takedown Letter.

### The Department issues an unlawful subpoena to compromise Mr. Novak's anonymity.

90.     Defendant Connor also prepared and issued a subpoena to Facebook for the IP address of the Parody Account's author (the "Identity Subpoena"). Once again, he did so solely on the basis of the Parody Account's content, without any evidence of any disruption in public services or any unlawful activity associated with the Parody Account, and in derogation of clearly established law recognizing the right to anonymous speech.

91.     As in the Takedown Letter and Email, Defendant Connor materially misrepresented the nature of the Parody Account in his application for the Identity Subpoena, concealing its lawful and fully protected nature.

### The Department threatens Mr. Novak with criminal prosecution

92.     Later that same day, the Department issued a press release to dozens of news outlets, announcing that it had opened a criminal investigation into the Parody Account.[19] Again, it did so solely on the basis of the Parody Account's content, and without any evidence of any disruption in public services or any unlawful activity associated with it. As one officer would testify at Mr. Novak's criminal trial, the Department's only concern was its supposed "falsity."[20]

93.     The Department also announced the criminal investigation into the "fake" page on its official Facebook page (the "Facebook Notice").

94.     To deepen his satire, Mr. Novak re-posted the Facebook Notice on the parody account.[21]

---

[19] Tr. 74.

[20] Tr. 76.

[21] Tr. 183.

95.     The Department's public threats gave the Parody Account wide exposure, and at least one news report would correctly identify the "Streisand effect" created by the Department's unlawful overreaction.[22]

96.     Increased exposure only reinforced the parodic nature of the posts. Mr. Novak, who was working and without consistent access to his smartphone, became unable to keep up with the deluge of pedantic comments reiterating that the page was "fake," and the Parody Account became a platform for a wide range of citizens to air their grievances about the Department.

97.     That evening, the Department's press release and its threat of criminal prosecution were broadcast on the nightly news, including Cleveland's Fox 8 station. After one of his Facebook friends brought the threat to his attention, and reasonably fearing unlawful retribution, Mr. Novak promptly took down the Parody Account. In total, it was up for less than twelve hours.

**The Law Department invents a crime and obtains its first unlawful warrant.**

98.     The Department continued its campaign to identify and punish Mr. Novak. On or about March 3, 2017, Defendant Riley sought and obtained a search warrant from Facebook based on nothing more than the Parody Account's content. Reasonable officers would have known that, under clearly established law, mere falsity is not a crime, and that there was no probable cause for a search. There was still no evidence of any disruption in public services, nor of any intent to disrupt them, and no reasonable officer would believe that any services had been disrupted.

---

[22] John Harper, *The felony Parma Facebook page and Barbra Streisand have something in common*, CLEVELAND.COM (May 25, 2016), *available at* http://www.cleveland.com/court-justice/index.ssf/2016/05/the_felony_parma_facebook_page.html.

"Named after the American singer and actress Barbra Streisand, the Streisand Effect describes how efforts to suppress a juicy piece of online information can backfire and end up making things worse for the would-be censor." Staff, *What is the Streisand Effect?* The Economist (April 13, 2016), *available at* https://www.economist.com/blogs/economist-explains/2013/04/economist-explains-what-streisand-effect (last visited September 26, 2017).

99.     Nonetheless, after discussing the Parody Account with Timothy Dobeck, Parma's law director and city prosecutor, Defendants sought a warrant under Ohio's disrupting-public-services statute, Ohio Rev. Code § 2909.04(B), which purports to prohibit the use of the internet "to disrupt, interrupt, or impair the functions of" police operations.

100.    No reasonable officer or lawyer would have believed that § 2909.04(B) could constitutionally apply to the Parody Account's author. No reasonable officer could believe that § 2909.04(B) could constitutionally apply to the Parody Account's publication. Nonetheless, applying the City's custom, policy, or practice of refusing to distinguish between protected and unprotected speech, and its custom, policy, or practice of treating insulting or allegedly "false" speech as unprotected speech, Defendant Riley directed Connor to prepare a search warrant and affidavit against Facebook (the "Facebook Warrant").

101.    Defendant Connor made material misrepresentations and omissions in those writings, which he submitted in Parma municipal courts and to Facebook.

102.    Connor's affidavit, required by law to provide all known material facts supporting probable cause, did not identify a single function or service that Mr. Novak supposedly disrupted. The only facts contained in the affidavit concerned the Facebook page itself and its content, but it did not disclose the posts' clearly parodic nature.

**The Department unlawfully charges and wrongfully arrests Mr. Novak.**

103.    On March 18, 2016, Defendant Connor received nearly 3,000 pages of records in response to the Facebook Warrant, including the Parody Account's entire content history. These records confirmed that Mr. Novak was the Parody Account's author.

104.    Shortly thereafter, Defendants Connor and Riley consulted Parma's law director and chief prosecutor, Timothy Dobeck, and consistent with the City's custom, policy, or practice of conflating protected and unprotected speech, and erroneously treating insulting or allegedly

"false" speech as unprotected, decided to file criminal charges against Mr. Novak under Ohio Rev. Code § 2909.04(B). They decided to base charges solely on the claim that the Parody Account was "false," even though any reasonable officer or lawyer would have known that its content was clearly parodic, and that even false speech cannot lawfully be prosecuted on that basis alone. They did so to punish Mr. Novak for his parodic criticism.

105.    No reasonable person could have believed that § 2909.04(B) could constitutionally apply to the Parody Account. Nonetheless, by criminal Complaint filed on March 18, 2016, Mr. Novak was charged with a single felony count of violating § 2909.04(B).

106.    The Complaint stated only that "ANTHONY C. NOVAK CREATED A FAKE FACEBOOK ACCOUNT, PURPORTING IT TO BE A LEGITIMATE PARMA POLICE FACEBOOK PAGE, IMPAIRING THE FUNCTIONS OF THE PARMA POLICE DEPARTMENT IN THEIR GOVERNMENTAL OPERATIONS."

107.    Also on March 18, 2016, under Defendant Riley's supervision, and based upon similar misrepresentations and omissions (stating only that Mr. Novak "CREATED A FAKE FACEBOOK ACCOUNT, PURPORTING IT TO BE A LEGITAMATE [*sic*] PARMA POLICE FACEBOOK PAGE"), Connor applied for and obtained from Magistrate Edward J. Fink of the Parma Municipal Court a warrant to arrest Mr. Novak (the "Arrest Warrant").

108.    On March 25, 2016, several weeks after Mr. Novak took down the Parody Account, Defendants arrested him as he was exiting a store. Surprised, Mr. Novak asked why, and one of the officers effecting the arrest told him he was being arrested for his Facebook page.

109.    Parma police officers took Mr. Novak into custody and drove him to the Parma Police Station. Defendant Connor attempted to interrogate him, but Mr. Novak requested counsel. Mr. Novak spent the next four days in jail, three in the general population of Cuyahoga County's jail alongside persons facing charges for murder, rape, and other violent crimes.

**Parma cries foul and attempts to educate the Department.**

110.    The public immediately recognized—and cried out in alarm at—the Department's assault on constitutionally protected speech. Representative comments on the Department's official Facebook page included the following:

- "This whole thing reeks of a few cops getting all butt-hurt because somebody called them names. Charges will not stick. This speech is satire and it doesn't even come close to yelling fire in a crowded theater."[23]

- "NAZI Thought Police ever hear of the Constitution?"[24]

- "I guess it's true that there's an intelligence cap on police officers in Parma, because only a bunch of stupid bullies would do this to an OBVIOUS SATIRIST and claim themselves to be victims. Good luck with that police state!"[25]

- "I hope this man sues the f*** out of you! Your [sic] a joke go fight real crime and not mess with people's First Amendment right[s]. This is fascism at its best . . ."[26]

- "By arresting the author of the fake Fa[c]ebook page on inapplicable grounds, you have demonstrated that you are a collection of mean-spirited chickenshits. You are also violating his First Amendment rights to free speech, which have, on a number of occasions, been held to include the right to parody and satire."[27]

- "I haven't served this country 12 years in the military to have fascist like those in your department press fraudulent charges against man for exercising free speech. Satire is free speech, as established by the oldest of legal precedents in this country."[28]

---

[23] Andrew Cook, March 26, 2016, 8:50 a.m. Crying "fire" in a crowded theater entered the vernacular after the Supreme Court's unanimous opinion in *Schenck v. United States*, 249 U.S. 47 (1919) (Holmes, J.). Parma's recognition of the line between protected and unprotected speech is heartening. The Department's disregard for the same is a chilling affront to the rule of clearly established law.

[24] Bob O Conchobhair, March 26, 2016, 10:49 a.m.

[25] Craig Cobb, March 26, 2016, 11:16 a.m.

[26] William A Roberts, March 26, 2016 11:25 a.m.

[27] Graham Shevlin, March 29, 2016, 3:45 p.m.

[28] Joe Chignola, March 31, 2016 4:13 a.m.

111. Some commenters were more restrained, but also critical of the Department's persecution

of a satirist for what Parmanians immediately recognized as constitutionally protected expression:

- "What he did was very stupid but a felony? Are you kidding right now? I'm very interested to see the laws they try to use to make this stick. I respect the police and am grateful for what they do but this is just silly."[29]

- "Satire and free speech are apparently not on the menu at the police academy. Get sued."[30]

- "Satire is free speech. Have fun living on the wrong side of history folks."[31]

- "The Parma officials should be jailed for infringing on free speech."[32]

- "You get Facebook to take down the page, sure. Arresting the man who put it up is tyrannical, full stop. Arresting someone who mocked you in public is the very essence of a free speech violation. I sincerely hope and pray that the legal blowback from your unconstitutional action ruins both your department and your careers."[33]

112. Still others supplemented the Department's palpable training deficiencies with helpful

suggestions:

- "If you don't know what Monell v. Department of Social Services of the City of New York is, you might want to look it up when Mr. Novak sues you in federal court under 42 USC 1983 for violating his civil rights."[34]

- "Parma police would do well read the Hustler Magazine v. Jerry Falwell supreme court decision."[35]

- "Arresting someone for free speech is never a good idea. Arresting someone for creating a parody Facebook page (free speech), is going to make your department the laughing stock of the state, if not the country.

---

[29] Nicholas R. Misch, March 25, 2016, 9:18 p.m.

[30] Erik Jensen, March 26, 2016, 12:25 a.m.

[31] Miten Soni, March 26, 2016, 10:50 a.m.

[32] Kenneth Westby, March 26, 2016, 11:27 a.m.

[33] John H. Long, March 26, 2016, 11:52 a.m.

[34] Joe Hunt, March 28, 2016, 3:51 p.m.

[35] Ray Randolph, March 31, 2016, 12:17 p.m.

"Oh, and don't forget what it's going to end up costing with the victim sues and wins for false arrest."[36]

- "We would like to warn everyone that the Parma PD is a danger to the community at large and does not support our Constitution. Remove and replace with qualified personnel, starting from the top and working our way down."[37]

113.    The general public in Parma instantly recognized Defendants' efforts as an unlawful assault on Mr. Novak's free-speech rights. These principles are clearly established not just in Supreme Court doctrine but in Parmanian parlance.

114.    Despite the deluge of public outrage at the Department's persecution of Mr. Novak, which further put any reasonable officer on notice that there was no probable cause to believe that any crime had been committed, Defendants persisted in their retaliatory campaign.

**The Department lies to obtain a search warrant for Mr. Novak's apartment.**

115.    Having violated Mr. Novak's constitutional rights to speech, anonymity, and liberty, Defendants began to look for evidence of a crime.

116.    On or about March 25, 2016, under Defendant Riley's supervision, Connor submitted an application for a warrant to search Mr. Novak's residence (the "Apartment Warrant"). The application was based solely on the Parody Account's content, claiming that "The user has disrupted and impaired the function of the Parma Police Department by knowingly posting false information,"[38] and Connor would testify that he sought the Apartment Warrant solely because the Parody Account was "fake."[39]

---

[36] Marni Leigh, March 26, 2016, 11:44 a.m.

[37] Brian Hood, March 29, 2016 12:39 p.m.

[38] Tr. 237.

[39] Tr. 237.

117.    Connor knew that the Parody Account was not "false," but fully protected parodic speech. As he admitted at Mr. Novak's trial, "once you start reading the posts, the absurd nature of the actual content of the posts come through."[40]

118.    Connor also knew that the Department's function was not "disrupted" or "impaired," and that no probable cause existed to search or arrest Mr. Novak. No reasonable officer would have believed that probable cause existed to search or arrest Mr. Novak. Defendants still had no evidence of any disruption in police services.

119.    Nonetheless, Defendants omitted these and other material facts in the application for the Apartment Warrant. In his affidavit, Connor knowingly misrepresented

    a.  That the "fake Facebook account . . . appeared to match the real Facebook account[] used and maintained by the Parma Police Department," even though he knew from his month-long review of the Parody Account that it did not "appear to match" the official Facebook account because it made obvious and parodic alterations, did not categorize itself as a government page, contained none of the authenticating markers Facebook provides, and contained wildly different and obviously farcical content.

    b.  That posts "indicated that the Parma Police would be arresting residents who attempted to help homeless people" and "would be holding an event sponsoring teen abortions," even though he knew that its posts were clearly parodic, and notwithstanding that, as he knew, those posts did not "indicate" any such outrageous facts, and no reasonable person would believe they did.

    c.  That "the user who was posting this information purported himself to be a representative of the Parma Police Department."

    d.  That Mr. Novak altered or affected the Department's official page.

    e.  That Mr. Novak "disrupted and impaired the function of the Parma Police Department by knowingly posting false information," even though he knew that no disruption occurred and no speech was false.

---

[40] Tr. 239.

f.   That "the Northeast Ohio Internet Crimes Against Children's Task Force" was properly involved in the sham investigation, notwithstanding his knowledge that no crimes against children had been alleged.

g.   That Mr. Novak was responsible for offensive comments on the page, averring that "[t]here were also numerous amounts of comments posted on the fake page, including 'fuck the Parma Police," omitting that Mr. Novak did not post that or any vulgarity, and notwithstanding Connor's knowledge that even vulgar criticism is not a crime.

120.   On the basis of these knowingly misleading statements, Connor averred that pure speech was being "unlawfully" kept on the premises, and requested issuance of the Apartment Warrant.

121.   On March 25, 2016, the Parma Municipal Court issued the City-prepared Apartment Warrant, authorizing a broad search for electronic devices, including "any and all information pertaining to social media," and all records, documents, and other materials "relating to social media," which, according to template language in the warrant, were "unlawfully kept, concealed and possessed" at Mr. Novak's apartment in supposed violation of Ohio law.

**Defendants unlawfully search Mr. Novak's apartment and seize his communications devices.**

122.   On March 25, 2016, Defendants executed the Apartment Warrant. Mr. Novak had already been arrested, but his roommate was home in the bathroom when the Department's SWAT team—*its SWAT team*—breached the premises.

123.   The executing officers seized every electronic device in Mr. Novak's residence, including a two laptops, two hard drives, PlayStation and Xbox videogaming consoles, a Samsung smartphone, a Kyocera cell phone, and a computer tablet (the "Seized Devices"), and impounded them at its headquarters.

124.   By confiscating and retaining the Seized Devices, Defendants prevented Mr. Novak from speaking on the medium and manner of his choosing even after he was released from prison.

125.    The Seized Devices contained "very personal" private communications, as well as content and materials he used to disseminate his parodic speech on matters of public concern.[41]

126.    *To this very day, over a year after Mr. Novak was acquitted in a criminal trial, Defendants continue to retain and deprive Mr. Novak of his property, including his computer and cellular phone.*

### Defendants obtain another unlawful search warrant and search the Seized Devices.

127.     Defendants then sought a warrant to search the Seized Devices (the "Device Warrant"). As with the applications for the Facebook, Arrest, and Apartment Warrants, no reasonable officer would have believed there was probable cause for the Device Warrant. Nonetheless, Defendant Connor prepared an affidavit in support of the Device Warrant, repeating the material misrepresentations and omissions in his application for the Apartment Warrant.

128.    Connor further averred that he knew "from training and experience" that persons "who commit crimes by utilizing the Internet, do so by utilizing computers, cellular phones or other equipment that have a means to connect to the internet. These persons are also known to store or memorialize their crimes in electronic storage devices." Connor simply replicated form language he used from his training and experience with child-pornography investigations, notwithstanding his knowledge that there was no child pornography on the Parody Account, and that even though no reasonable officer would believe that there was any unprotected speech on the Parody Account, and would know that protected speech is not a crime. Nonetheless, he misrepresented that unprotected speech was "stored or memorialized" in the Seized Devices.

129.    Based on these and other material misrepresentations, Defendants obtained and executed the Device Warrant, and began searching the Seized Devices.

---

[41] Tr. 129, 142.

130.    The Department's forensic-computing specialist disassembled his videogame consoles, imaged and searched their contents, and captured contents from his smartphone. The specialist also searched Mr. Novak's laptop, camera flash cards, and the other Seized Devices.

131.    Nothing incriminating was found.

### The Department launches a sham prosecution against Mr. Novak.

132.    The Department caused state prosecutors to have a grand jury empaneled and return a one-count indictment on the City's criminal complaint.

133.    Applying the City's custom, policy, or practice of ignoring clearly established law as to what constitutes protected speech and persecuting insulting or allegedly "false" protected speech mercilessly, Defendants caused the sham prosecution to proceed solely on the basis that Mr. Novak's speech was "false."

134.    The criminal complaint pled only falsity and claimed that Mr. Novak's speech was an *ipso facto* violation of Ohio criminal law if the *Department* thought it was false.

135.    Incredibly, the State advanced this canard in open court, opposing a First Amendment-based motion to dismiss the criminal complaint by arguing that the City's pursuit of criminal sanctions against Mr. Novak's speech was not content-based because the City sought to punish the alleged *falsity* of the content, not whether the content was positive or insulting.

> THE COURT:    So, you're saying that the content of what was posted isn't relevant, what is relevant is the fact that there was a Facebook page made that was fake to the Parma Police Department. So, even if it was, if there were positive comments made, it still disrupted the Parma Police Department?
>
> [THE STATE]:    Exactly. [42]

----

[42] Tr. 16.

136.    Not exactly. *Alvarez* and other clearly established law compel the opposite conclusion.

137.    Defendants caused the State to advance the City's custom, policy, or practice of unconstitutionally investigating and prosecuting protected speech. By representing in court that falsity can be criminally punished *per se,* that false speech is *ipso facto* criminally disruptive, and that analyzing speech for falsity does not implicate its content, the State flouted clearly established law and either professional duties of candor or competence.

138.    The State's prosecution of Mr. Novak confirmed that the City's pursuit of Mr. Novak was based solely on his protected speech. As the prosecutor would introduce the case to the jury: "The State is accusing Anthony Novak of creating a fake Facebook page."

139.    Defendants caused the State to prosecute Mr. Novak even though there was no evidence of any disruption in police services, and no reasonable person would believe that any services were disrupted. Instead, at motion hearings and at trial, the State propounded the City's unconstitutional policing policy, attempting to persuade the court and the jury that no such evidence was needed because the "falsity" of Mr. Novak's speech alone made it a crime.

**Defendants conspire to manufacture evidence and give false testimony.**

140.    Defendants did, however, attempt to backstop their retaliation by manufacturing evidence of disruption and vindicate their persecution of Mr. Novak.

141.    The conspirators' footprints were unsubtle. At trial, Defendant Connor testified on direct examination that he had nothing to do when he was assigned to the sham investigation:

[THE STATE]:        Were you working on any of your other active cases at this time?

CONNOR:        No.

142.    After the court sat in recess for a lunch break, however, Connor altered his testimony. Returning, he stated that "there were three higher priority cases that I was working on at the

time" and claimed that he had to reschedule a buccal swab for three days to spend more time on Facebook because Mr. Novak's Facebook page was a "high priority."

143.    Defendant Riley falsely testified that he sought to shut down the Parody Account because he had "grave concerns" about officer safety at the two locations referenced in the parodic posts, and was concerned that disrupting protests might occur at those locations.

144.    No reasonable officer would have had any such concerns, and Riley had none. None of the extensive submissions he supervised in connection with the Warrants, subpoenas, or charging documents reflect any such concern, and he expressed none until the City's failure of proof was challenged at trial.[43]

145.    The State's evidence at trial confirmed that Defendants were motivated by a desire to prevent and retaliate against Mr. Novak's critical speech. Their testimony focused on "inflammatory information" and "socially contentious issues" in the Parody Account.[44]

146.    The officers' trial testimony also revealed their attempt to conceal that ugly motivation. They sought to recharacterize their retaliatory attempt to punish Mr. Novak's perceived assault on their dignity as an equally unlawful attempt to punish its supposed falsity. Though they knew and admitted that any reasonable person would understand its parodic nature, the officers falsely testified that at the time they discovered the Parody Account, they worried it would disrupt police services by causing confusion among Parma residents,[45] and testified that they believed, from the "nature or content of those pages," that the "likely result is that people would call."[46]

---

[43] Tr. 65–66.

[44] Tr. 65.

[45] Tr. 80.

[46] Tr. 270.

147.    A tiny number of Parma's 80,000 residents did call the Department, mostly to complain about the perceived affront to its officers, notify the Department that it existed, or enquire whether it was authorized. There was no evidence of any "disruption" in police services.

148.    Defendants ginned up "evidence" of disruption—twelve minutes of total call time—that was belatedly "documented" on April 5, 2016, after Mr. Novak was arrested and after the warrants were obtained and executed without any evidence or indication of any disruption.[47]

149.    Defendants falsely testified about subjective beliefs that they never expressed at any of the opportunities that, if genuinely held, would have been required to be expressed, beginning with the Takedown Letter and Email, through the Identity Subpoena, the Apartment, and Device Warrants, and Mr. Novak's unlawful arrest.

## Mr. Novak is acquitted.

150.    Unsurprisingly, the State opposed Mr. Novak's request to instruct the jury on his clearly established First Amendment rights,[48] and prevailed, concealing from the jury any instruction on the clearly established rule announced by the Supreme Court in *Alvarez* that protected speech may not be criminally sanctioned simply because it is false. The State's closing arguments focused solely on the supposedly "false" "nature or content" of the Parody Account.

151.    The jury was not fooled and promptly acquitted Mr. Novak. At close of trial, the evidence established only what had been clear from the outset: Defendants sought to censor and punish Mr. Novak for exercising his clearly established right to anonymously publish parodic speech, without any reasonable belief or credible evidence that any crime had been committed.

---

[47] Tr. 77–90.

[48] Tr. 259–60.

**CAUSES OF ACTION (FEDERAL)**

**CLAIM 1**
**FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—PRIOR RESTRAINT**
**(AGAINST DEFENDANTS RILEY AND CONNOR)**

152.    Plaintiff incorporates all previous allegations.

153.    At all material times, Mr. Novak was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to anonymously propound obviously parodic criticisms of the Parma Police Department.

154.    Defendants sought to effect unlawful prior restraints on Mr. Novak's lawful speech through a series of adverse actions, including issuing a threatening press release, issuing the Facebook Takedown Letter and the Takedown Email, and confiscating and retaining the Seized Devices.

155.    Defendants' adverse actions injured Mr. Novak by restraining, preventing, and impairing his lawful speech in a way likely to chill a person of ordinary firmness from propounding further lawful speech. *See Reno v. ACLU*, 521 U.S. 844, 872 (1997) ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.").

156.    In fact, Defendants' adverse actions directly prevented him from continuing to engage in his fully protected constitutional activity on the medium of his choosing. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 896 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process," including "subjecting the speaker to criminal penalties" (citing *Brandenburg v. Ohio*, 395 U.S. 444, 445 (1969) (per curiam)); *see also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 596 (7th Cir. 2012) (there is no fixed First Amendment line between the creation of speech and the speech itself); *Potts v. City of Lafayette, Ind*. 121 F.3d 1106, 1111 (7th Cir. 1997) (seizure of recording equipment implicates First Amendment).

157.    Defendants were motivated to take these adverse actions in whole or in part because of Mr. Novak's constitutionally protected speech.

158.    Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights in light of clearly established law, including the Supreme Court's recognition that the threat of legal action or prosecution is a prior restraint on speech. *Bantam Books, Inc. v. Sullivan*, 372 US 58, 66–67 (1963); *see also ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 423 (W.D. Pa. 1984) (mayor's letter threatening prosecution for display of *Hustler* was unconstitutional prior restraint); *Pilchesky v. Miller*, 2006 WL 2884445 (M.D. Pa. Oct. 10, 2006) (First Amendment was violated when District Attorney and police officer told webhost its customer was being criminally investigated and court order would be sought).

159.    No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

160.    Defendants' actions violate the First and Fourteenth Amendments via 42 U.S.C. § 1983.

161.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

162.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 2
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—ANONYMOUS SPEECH
### (AGAINST DEFENDANTS RILEY AND CONNOR)

163.    Plaintiff incorporates all previous allegations.

164.    At all material times, Mr. Novak was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to anonymously propound obviously parodic criticisms of the Parma Police Department.

165.     Defendants sought to unlawfully interfere with Mr. Novak's clearly established right to anonymous speech through a series of adverse actions, including issuing a threatening press release, issuing the Facebook Takedown Letter and the Takedown Email, the IP Subpoena, and the application for and execution of the Search Warrants.

166.     Defendants' adverse actions injured Mr. Novak by restraining, preventing, and impairing his right to anonymous speech in a way likely to chill a person of ordinary firmness from anonymously propounding further lawful speech. In fact, Defendants' adverse actions unveiled his identity in violation of clearly established law, prevented him from speaking anonymously.

167.     Defendants were motivated to take these adverse actions in whole or in part because of Mr. Novak's constitutionally protected speech.

168.     Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations. Defendants are liable under 42 U.S.C. § 1983.

169.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

170.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 3
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—CRITICISM OF POLICE OFFICERS
### (AGAINST DEFENDANTS RILEY AND CONNOR)

171.     Plaintiff incorporates all previous allegations.

172.     At all material times, Mr. Novak was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to criticize the Parma Police Department.

173.    Defendants sought to unlawfully interfere with Mr. Novak's clearly established right to criticize the Department through a series of adverse actions, including, but not limited to,

    a.  issuing a threatening press release,

    b.  issuing the Facebook Takedown Letter,

    c.  issuing the Takedown Email,

    d.  issuing the Identity Subpoena,

    e.  applying for and executing the Search and Arrest Warrants, and

    f.  making knowingly false statements in connection with public writings and criminal proceedings.

174.    Defendants' adverse actions injured Mr. Novak by restraining, preventing, and impairing his right to criticize the Department in a way likely to chill a person of ordinary firmness from propounding further lawful criticisms. In fact, Defendants' adverse actions caused him to cease further criticisms of the Department.

175.    Defendants were motivated to take these adverse actions in whole or in part because of Mr. Novak's criticisms.

176.    Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations. Defendants are liable under 42 U.S.C. § 1983.

177.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

178.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 4
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RIGHT TO RECEIVE SPEECH
### (AGAINST DEFENDANTS RILEY AND CONNOR)

179.    The above allegations are incorporated.

180.    "[T]he Supreme Court has long recognized that, in addition to the right to speak, the

First Amendment demands a corollary right to *receive* information and ideas." *Phillips v. DeWine*,

841 F.3d 405, 422 (6th Cir. 2016) (emphasis in original); *see also Virginia State Bd. of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (citing "numerous" Supreme

Court decisions acknowledging the right to receive speech); *Allentown Mack Sales & Serv., Inc. v.*

*N.L.R.B.*, 522 U.S. 359, 386–87 (1998) (Rehnquist, J., concurring) ("Our decisions have

concluded that First Amendment protection extends equally to the right to receive information");

"The right to receive information 'follows ineluctably' from the speaker's right to communicate

information and, '[m]ore importantly . . . is a necessary predicate to the *recipient's* meaningful

exercise of his own rights of speech, press, and political freedom." Phillips, 841 F.3d at 422

(emphasis in original) (quoting *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982)).

181.    At all material times, Mr. Novak was engaged in constitutionally protected activity,

exercising his clearly established First Amendment rights to anonymously propound obviously

parodic criticisms of the Parma Police Department, and receive responses from willing speakers.

182.    Defendants sought to violate Mr. Novak's right to receive lawful speech through a series

of adverse actions, including deleting comments from willing speakers on the Departments

official Facebook account (a public forum) expressing understanding, appreciation for, or

explanations of the clearly parodic nature of his posts on the Parody Account.

183.    Defendants' adverse actions injured Mr. Novak by chilling him from exercising his right

to propound obviously parodic speech by distorting his audience's reasonable reaction to his

speech, and impairing the necessary predicate to his own speech—an unimpaired audience.

184.    Defendants' adverse actions violated his right to receive speech from willing speakers.

185.    Defendants were motivated to take these adverse actions in whole or in part because of Mr. Novak's constitutionally protected speech.

186.    Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

187.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

188.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 5
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—DESIGNATED PUBLIC FORUM
### (AGAINST DEFENDANTS RILEY AND CONNOR)

189.    The above allegations are incorporated.

190.    At all material times, Mr. Novak was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to anonymously propound parodic criticisms of the Parma Police Department, and receive speech from willing speakers in response.

191.    The City operated the Department's "official" Facebook page as a designated public forum.

192.    Under clearly established law, "[o]nce it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995) (noting that the same principles apply to metaphysical fora).

193.    Defendants unlawfully censored lawful speech on that designated public forum using content and viewpoint discrimination, and contrary to the purpose of the forum to allow citizens to speak about matters concerning the Department, violating Mr. Novak's clearly established right to receive it.

194.    Defendants sought to violate Mr. Novak's right to receive lawful speech through a series of adverse actions, including deleting comments from willing speakers on the Departments official Facebook account (a public forum) expressing understanding, appreciation for, or explanations of the clearly parodic nature of his posts on the Parody Account.

195.    Defendants' adverse actions injured Mr. Novak by chilling him from exercising his right to propound obviously parodic speech by distorting his audience's reasonable reaction to his speech, and impairing the necessary predicate to his own speech—an unimpaired audience.

196.    Defendants' adverse actions directly violated Mr. Novak's clearly established right to receive speech from willing speakers.

197.    Defendants were motivated to take these adverse actions in whole or in part because of Mr. Novak's constitutionally protected speech.

198.    Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights in light of clearly established law

199.    No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

200.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

201.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 6
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RETALIATORY ARREST
### (AGAINST DEFENDANTS RILEY AND CONNOR)

202.    Plaintiff incorporates all previous allegations.

203.    At all material times, Mr. Novak was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to criticize the Department.

204.    Defendants arrested Mr. Novak without probable cause in retaliation for exercising his clearly established right to criticize the Department.

205.    Defendants' retaliatory arrest injured Mr. Novak by restraining, preventing, and impairing his right to criticize the Department in a way likely to chill a person of ordinary firmness from propounding further lawful criticisms.

206.    Defendants were motivated to execute the wrongful arrest by Mr. Novak's criticism.

207.    Defendants' adverse actions violated Mr. Novak's clearly established First and Fourteenth Amendment rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations. Defendants are liable under 42 U.S.C. § 1983.

208.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

209.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 7
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—WRONGFUL ARREST
### (AGAINST DEFENDANTS RILEY AND CONNOR)

210.    Plaintiff incorporates all previous allegations.

211.    "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."

*Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) (quoting *Ingram v. City of Columbus*, 185 F.3d 579,

592–93 (6th Cir. 1999)) (no qualified immunity where police officers arrested § 1983 plaintiff for

intemperate speech on charges of obstructing official business).

212.    Defendants arrested Mr. Novak based solely on the content of the Parody Account.

213.    Mr. Novak had a Fourth and Fourteenth Amendment right to be free from wrongful

arrest under the circumstances in which he was arrested.

214.    No officer could have reasonably believed there to be probable cause to arrest Mr. Novak

for publishing the Parody Account.

215.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C.

§ 1983.

216.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered

and continues to suffer economic and non-economic damages for which Defendants are liable.

217.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 8
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—UNLAWFUL SEARCH
### (AGAINST DEFENDANTS RILEY AND CONNOR)

218.    Plaintiff incorporates all previous allegations.

219.    Defendants' actions constituted searches within the meaning of the Fourth Amendment,

as applied to the states by the Fourteenth Amendment.

220.    Defendants' actions were unreasonable in light of the surrounding circumstances.

221.    No probable cause existed to search Mr. Novak's apartment or devices.

222.    Mr. Novak suffered humiliation and personal damage from Defendants' unlawful search.

223.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C.

§ 1983.

224.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered

and continues to suffer economic and non-economic damages for which Defendants are liable.

225.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 9
### FOURTH AMENDMENT RETALIATION, 42 U.S.C. § 1983—PROPERTY SEIZURE
### (AGAINST DEFENDANTS RILEY AND CONNOR)

226.     Plaintiff incorporates all previous allegations.

227.     Defendants' actions, including the impoundment of the Seized Devices, constituted

seizures within the meaning of the Fourth and Fourteenth Amendment. "The Fourth

Amendment protects against a seizure of property even if it occurs in a context in which privacy

or liberty interests are not implicated." *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994).

228.     Defendants' actions were unreasonable in light of the surrounding circumstances.

229.     No probable cause existed to seize Mr. Novak's devices.

230.     No probable cause existed to retain Mr. Novak's devices.

231.     Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C.

§ 1983.

232.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered

and continues to suffer economic and non-economic damages for which Defendants are liable.

233.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 10
### FOURTH AMENDMENT RETALIATION, 42 U.S.C. § 1983—PROPERTY RETENTION
### (AGAINST DEFENDANTS RILEY AND CONNOR)

234.     Plaintiff incorporates all previous allegations.

235.    Defendants' actions, including the post-impoundment retention of Mr. Novak's cellular phone and laptop, constituted seizures and wrongful retentions of property under the Fourth and Fourteenth Amendments. *Bush v. Banks*, Nos. 95-6370, 96-5015, 1996 WL 668551 (6th Cir. Nov. 18, 1996).

236.    Defendants' actions were and are unreasonable in light of the surrounding circumstances.

237.    No probable cause existed or exists to retain Mr. Novak's devices.

238.    Defendants continue to this day to unlawfully hold Mr. Novak's property including his computer and cellphone, not only without probable cause, but knowing that he was acquitted at trial.

239.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C. § 1983.

240.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

241.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 11
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—MALICIOUS PROSECUTION (AGAINST DEFENDANTS RILEY AND CONNOR)

242.    Plaintiff incorporates all previous allegations.

243.    "[T]he constitutional tort of malicious prosecution . . . is actionable in our circuit as a Fourth Amendment violation under § 1983." *King v. Harwood*, 852 F.3d 568, 584 (6th Cir. 2017).

244.    Absolute immunity does not bar Mr. Novak's suit against law-enforcement officers, even where they have testified before a grand jury and an indictment has been returned.[49]

---

[49] Mr. Novak is aware of *Sanders v. Jones*, 845 F.3d 721 (6th Cir. 2017), which this Court previously provided to the parties, and its discussion of § 1983 claims based solely on grand-jury testimony after

245.    Mr. Novak was criminally prosecuted for publishing the Parody Account.

246.    Defendants made, influenced, or participated in the decision to prosecute Mr. Novak, including by falsifying evidence, drafting and submitting misleading investigative reports and affidavits, and omitting key and material facts, including the parodic and protected nature of the Parody Account.

247.    There was no probable cause for the criminal prosecution of Mr. Novak.

248.    Mr. Novak suffered a deprivation of his liberty and irreparable harm.

249.    The prosecution was resolved in his favor.

250.    Defendants' conduct violated the Fourth and Fourteenth Amendments.

251.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

252.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

---

*Rehberg v. Paulk*, 132 S. Ct. 1497 (2012). "Crucially," as the Sixth Circuit has since clarified, "*Rehberg* does not affect the thin but conspicuous line between, on the one hand, law-enforcement officers who only provide grand-jury testimony . . . [and] law-enforcement officers who either (1) 'set the wheels of government in motion by instigating a legal action,' or (2) 'falsify affidavits' or 'fabricate evidence.'" *Harwood*, 852 F.3d at 584; *Rehberg*, 132 S. Ct. at 1507, n.1 ("we do not suggest that absolute immunity extends to all activity that a witness conducts outside the grand jury room.").

Rather, "where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies and fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony. . . the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive." *Harwood*, 852 F.3d at 587–88. This Court correctly applied *Harwood* as recently as August 22, 2017. *Wheatt v. City of East Cleveland*, 2017 WL 3599187, at *2 (Aug. 22, 2017).

## CLAIM 12
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—AUTHORIZED ACTION
### (AGAINST THE CITY OF PARMA)

253.    Plaintiff incorporates all previous allegations.

254.    "A single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a county to liability." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 260–61 (6th Cir. 2015) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)) (holding county liable where county corporation counsel directed and authorized police officers to threaten arrest for protected speech because audience might react adversely, because corporation counsel "possesse[d] final authority to establish municipal policy.").

255.    Parma's law director and chief prosecutor Timothy Dobeck was authorized to issue and implement official policy on criminal investigations and prosecutions by the Department. *Pembaur*, 475 U.S. at 483 (county was subject to municipal liability for county prosecutor's instructions to officers).

256.    Dobeck's direction to issue the Facebook correspondence, seek and obtain the Arrest Warrants, and ultimately arrest Mr. Novak was not limited to providing mere "legal advice," but instead instructed them to act in accordance with the policy he established regarding the subject matter, including his direction to propound threatening correspondence to Mr. Novak, the public, and Facebook, search Mr. Novak's home, and arrest him.

257.    No reasonable officer or attorney could believe that the actions Defendants took at Dobeck's instruction were lawful or permitted by the Constitution.

258.    The City is liable under the First, Fourth, and Fourteenth Amendments via 42 U.S.C. § 1983.

259.    As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

260.     The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

### CLAIM 13
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—UNCONSTITUTIONAL POLICY (AGAINST THE CITY OF PARMA)

261.     Plaintiff incorporates all previous allegations.

262.     Law director Timothy Dobeck authorized and implemented an unconstitutional custom, policy, or practice of refusing to distinguish between protected and unprotected speech in criminal investigations and prosecutions. Dobeck also authorized and implemented an unconstitutional policy of authorizing and instructing criminal investigation and prosecution for speech solely on the basis of its alleged falsity. Dobeck also authorized and implemented an unconstitutional policy of seeking criminal sanctions on the basis of perceived offenses to police officers' dignity.

263.     Dobeck was authorized to make official policy for the City on these issues.

264.     The City is liable under the First, Fourth, and Fourteenth Amendments via 42 U.S.C. § 1983.

265.     As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

266.     The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

### CLAIM 14
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—FAILURE TO TRAIN (AGAINST THE CITY OF PARMA)

267.     Plaintiff incorporates all previous allegations.

268.     "[A] city can be liable under § 1983 for inadequate training of its employees." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1969).

269.     The City failed to provide adequate training to its officers on clearly established First Amendment rights, including basic distinctions between protected and unprotected speech.

270.     In light of clearly established law requiring police officers to tolerate coarse criticism, as well as the City's direct experience, the City's failure to train its officers displays deliberate indifference to the rights of persons they may encounter. In 2001, for example, the Eighth District Court of appeals, in an opinion by current Ohio Supreme Court Justice Terrence O'Donnell, vacated criminal convictions for obstructing official business in a case handled by Parma's then-chief prosecutor. *City of Parma v. Campbell*, 2001 WL 1352657 (Ohio Ct. App. Nov. 1, 2001) (conviction for making "boisterous statements to police" would "run afoul of the constitutionally protected right of freedom of speech.").[50]

271.     Law director Dobeck has been amply exposed to controlling law regarding First Amendment rights, and has acknowledged *to this Court* the City's responsibility to adequately train its officers regarding them. He appeared before this Court in 2006 to defend a § 1983 action alleging that the City and the Department "fosters, maintains and enforces a widespread atmosphere of overt disregard for the citizens," Compl., *Bunch v. City of Parma*, No. 06-cv-2207, at 37 (N.D. Ohio Sept. 13, 2006) (Polster, J.). After denying that allegation in the Answer he signed as law director, he admitted "that the City of Parma has a duty to train its police officers regarding constitutional law." Answer, *Bunch v. City of Parma*, No. 06-cv-2207, at 37 (N.D. Ohio Jan. 18, 2007).

272.     Likewise, in a brief filed before then-Chief Judge Oliver, law director Dobeck acknowledged that "deprivation of a substantive First or Fourth Amendment right may be

---

[50] This Court relied on *Campbell* in denying qualified immunity under § 1983. *Kaylor v. Rankin*, 356 F.Supp.2d 839, 848 (N.D. Ohio 2005).

grounds for relief under Section 1983." Mot. Summ. J., *Quinn's Auto v. City of Parma*, No., 96-cv-620, 2006 WL 5244368, at 5 (Oct. 2, 2006). And Dobeck *personally briefed* the question of when speech crosses the constitutional threshold to unprotected conduct in *City of Parma v. Fonte*. App. Br., 2013 WL 7873409, at 7 (Ohio App. 8th Dist. May 6, 2013).

273.    Defendant Riley was last trained on First Amendment rights at the police academy nearly 15 *years* before the Supreme Court decided *Alvarez*, in 1997. The City had a duty to train its officers on the clearly established law pronounced in *Alvarez*. It did not, even though any reasonable municipality would know that *Alvarez* impacted the boundaries of lawful policing under a variety of criminal statutes investigated and prosecuted by the City, including the statute under which Mr. Novak was charged.

274.    Defendant Riley was last trained on First Amendment rights nearly 20 years before he and law director Dobeck authorized and instructed the Department's officers to pursue Mr. Novak in violation of the Supreme Court's holding in *Alvarez*.

275.    Though Defendant Connor held himself out as experienced with internet crimes, he conducted the sham investigation into Mr. Novak's *protected* speech no differently than investigations into *unprotected* child pornography, evincing the City's decision not to train officers empowered to deploy its investigative arsenal against speech crimes without any regard for clearly established distinctions between protected and unprotected speech.

276.    The City is liable under the First, Fourth, and Fourteenth Amendments via 42 U.S.C. § 1983.

277.    As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

278.    The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

## CLAIM 15
### CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 U.S.C. § 1985(3)
### (AGAINST DEFENDANTS RILEY, CONNOR, AND JOHN DOE)

279.    Plaintiff incorporates all previous allegations.

280.    Defendants Riley and Connor conspired with John Doe to violate Mr. Novak's

constitutional rights.

281.    Defendants and John Doe came to a mutual agreement and understanding to shut down

Mr. Novak's Facebook page, even though no reasonable officer would believe his speech was a

crime. In furtherance of this conspiracy, John Doe and Defendants undertook acts that would

not have been undertaken without the agreement. Those included furnishing and using non-

public contact information used by a child-pornography task force to shut down Facebook

accounts and unveil anonymous speakers.

282.    Mr. Novak's constitutional rights were violated as a result of this conspiracy, causing him

irreparable harm.

283.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered

and continues to suffer economic and non-economic damages for which Defendants are liable.

284.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 16
### FEDERAL PRIVACY PROTECTION ACT (42 U.S.C. § 2000AA-6)
### (AGAINST DEFENDANTS RILEY, CONNOR, AND THE CITY OF PARMA)

285.    Plaintiff incorporates all previous allegations.

286.    Under 42 U.S.C. § 2000aa(a), it is "unlawful for a government officer or employee, in

connection with the investigation or prosecution of a criminal offense, to search for or seize any

work product materials possessed by a person reasonably believed to have a purpose to

disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce."

287.    42 U.S.C.A. § 2000aa(b) establishes similar protections for documentary materials.

288.    The Seized Devices contained work-product materials possessed by Mr. Novak.

289.    The Seized Devices contained documentary materials possessed by Mr. Novak in connection with his efforts to disseminate public communications to the public on Facebook.

290.    Defendants believed Mr. Novak possessed these materials to disseminate to the public a public communication in or affecting interstate commerce, including his criticisms of the Department on the Parody Account.

291.    There was no probable cause to believe that Mr. Novak possessed these materials to commit a criminal offense. No reasonable person could believe that Mr. Novak possessed them to commit a criminal offense.

292.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

293.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 17
### OHIO REV. CODE § 2909.04(B) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD
### (AGAINST DEFENDANTS RILEY, CONNOR, AND THE CITY OF PARMA)

294.    Plaintiff incorporates all previous allegations.

295.    Ohio Rev. Code § 2909.04(B) provides that "No person shall knowingly use any computer, computer system, computer network, telecommunications device, or other electronic device or system or the internet so as to disrupt, interrupt, or impair the functions of any police, fire, educational, commercial, or governmental operations."

296.    § 2909.04(B) is a criminal statute, and substantially overbroad. As written, it reaches a

substantial amount of constitutionally protected conduct. As written, it fails to give a person of

ordinary intelligence fair notice that his conduct is forbidden. As written, it authorizes and

encourages arbitrary and discriminatory enforcement, and impermissibly delegates basic policy

matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.

297.    Under Rule 5.1 of the Federal Rules of Civil Procedure, Mr. Novak has

contemporaneously filed and served a notice of constitutional question upon the Attorney

General of the State of Ohio.

298.    Mr. Novak is entitled to a declaration that Ohio Rev. Code § 2909.04(B) is

unconstitutionally vague and overbroad, and unenforceable against him.

### CLAIM 18
### OHIO REV. CODE § 2909.04(B) IS UNCONSTITUTIONAL AS APPLIED
### (AGAINST DEFENDANTS RILEY, CONNOR, AND THE CITY OF PARMA)

299.    Plaintiff incorporates all previous allegations.

300.    The Parody Account is protected speech, as would any reasonable reader would know.

301.    No substantial or compelling governmental interest exists in criminally punishing Mr.

Novak for publishing the Parody Account.

302.    No governmental interest in proscribing his speech outweighs Mr. Novak's First

Amendment right to publish the Parody Account.

303.    § 2909.04(B) cannot be constitutionally applied to the publication of the Parody Account.

304.    Mr. Novak is entitled to a declaration that Ohio Rev. Code § 2909.04(B) cannot be

constitutionally applied to his speech on the Parody Account.

### CLAIM 18
### SUPERVISORY LIABILITY
### (AGAINST DEFENDANT RILEY)

305.    Plaintiff incorporates all previous allegations.

306. Defendant Riley played an active role in Defendants' unconstitutional actions, including Defendant Connor's First and Fourth Amendment retaliation. He encouraged and condoned Defendant Connor's actions, including his issuance of the Facebook Letter and Email, the Identity Subpoena, the issuance and execution of the Apartment, Device, and Arrest Warrants, and the retroactive efforts to procure and manufacture evidence of a crime.

## CAUSES OF ACTION (STATE)

### CLAIM 19
### FALSE WRITINGS, OHIO REV. CODE § 2921.03(C)
### (AGAINST DEFENDANTS RILEY AND CONNOR)

307. Plaintiff incorporates all previous allegations.

308. Ohio Rev. Code § 2921.03(A) provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

309. Ohio Rev. Code § 2921.03(C) provides a civil cause of action for violations of § 2921.03(A), and for the recovery of attorneys' fees and other expenses in bringing the civil claim.

310. Defendant Connor, at the instruction and under the supervision of Defendant Riley, filed or submitted false writings in a reckless manner in an attempt to influence public servants to prosecute and convict Mr. Novak, including by drafting the misleading Connor Report, the Takedown Letter and Email, the Identity Subpoena, the application materials for the Apartment, Device, and Arrest Warrants, and the Press Release.

311. Defendants caused damage to Mr. Novak including forcing him to incur legal expenses defending himself from prosecution.

312. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

313.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 20
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60 (A)(1) AND 2921.03(A)—FALSE WRITINGS
### (AGAINST DEFENDANTS RILEY AND CONNOR)

314.    Plaintiff incorporates all previous allegations.

315.    Under Ohio Rev. Code § 2307.60 (A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorneys' fees and punitive damages.

316.    Criminal statute Ohio Rev. Code § 2921.03(A) provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

317.    Defendant Connor, at the instruction and under the supervision of Defendant Riley, filed or submitted false writings in a reckless manner in an attempt to influence public servants to prosecute and convict Mr. Novak, including by drafting the misleading Connor Report, the Takedown Letter and Email, the Identity Subpoena, the application materials for the Apartment, Device, and Arrest Warrants, and the Press Release.

318.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

319.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 21
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.12—TAMPERING WITH EVIDENCE
### (AGAINST DEFENDANTS RILEY AND CONNOR)

320.    Plaintiff incorporates all previous allegations.

321.     Criminal statute Ohio Rev. Code § 2921.12 provides that no person, knowing official proceedings are likely to be initiated, shall (1) "[a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation," or (2) "[m]ake, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

322.     Defendants knew official proceedings were imminent, including the prosecution of Mr. Novak for publishing the Parody Account.

323.     Defendants knowingly presented false and misleading records to mislead public officials and corrupt the outcome of the sham investigation, including by presenting false and misleading reports and affidavits to Law Director Dobeck to initiate a criminal prosecution, and to courts to obtain the Apartment, Device, and Arrest Warrants.

324.     Defendants' purpose was to procure an unlawful criminal verdict against Mr. Novak for publishing the Parody Account.

325.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

326.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 22
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.45—INTERFERENCE WITH CIVIL RIGHTS
### (AGAINST DEFENDANTS RILEY AND CONNOR)

327.     Plaintiff incorporates all previous allegations.

328.    Criminal statute Ohio Rev. Code § 2921.45 forbids public servants from depriving any person of a constitutional or statutory right.

329.    Defendants acted under color of office, employment and authority to knowingly deprive Mr. Novak of his civil rights, including his constitutional rights under the First and Fourth Amendments to the U.S. Constitution.

330.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

331.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 23
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.13—FALSIFICATION
### (AGAINST DEFENDANTS RILEY AND CONNOR)

332.    Plaintiff incorporates all previous allegations.

333.    Criminal statute Ohio Rev. Code § 2921.13 prohibits any person from making or swearing to previous false statements.

334.    Defendants knowingly made false statements in official proceedings, with the purpose to incriminate Mr. Novak, and with a purpose to mislead public officials in the course of their official duties.

335.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

336.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 24
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.11(A)—PERJURY
### (AGAINST DEFENDANTS RILEY AND CONNOR)

337.    Plaintiff incorporates all previous allegations.

338.    Under criminal statute Ohio Rev. Code § 2921.11(A), "[n]o person, in any official proceeding, shall knowingly make a false statement under oath or affirmation, or knowingly swear or affirm the truth of a false statement previously made, when either statement is material."

339.    Defendants Riley and Connor knowingly made false statements under oath or affirmation, including in affidavits in support of the Apartment, Device, and Arrest Warrants, and at Mr. Novak's criminal trial.

340.    Those false statements were material to the prosecution of Mr. Novak.

341.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

342.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 25
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.32(A)—OBSTRUCTION OF JUSTICE
### (AGAINST DEFENDANTS RILEY AND CONNOR)

343.    The above allegations are incorporated.

344.    Under Ohio Rev. Code § 2921.32(A), "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime" may destroy or conceal evidence of the crime or act, or "[p]revent or obstruct any person, by means of force, intimidation, or deception, from performing any act to aid in the discovery, apprehension, or prosecution of the other person."

345.    With purpose to hinder the discovery of the other's crimes, including falsification and

false writings that concealed the clearly parodic nature of the Parody Account, Defendants

destroyed evidence on Facebook demonstrating that reasonable persons widely knew the Parody

Account was parodic, and prevented or obstructed the commenters from publicly displaying

evidence that would aid in the discovery of their false representations and other criminal acts.

346.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered

and continues to suffer economic and non-economic damages for which Defendants are liable.

347.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 26
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.44(E)—DERELICTION OF DUTY
### (AGAINST DEFENDANTS RILEY AND CONNOR)

348.    Plaintiff incorporates all previous allegations.

349.    Ohio Rev. Code § 2921.44(E) provides that "[n]o public servant shall recklessly fail to

perform a duty expressly imposed by law with respect to the public servant's office, or recklessly

do any act expressly forbidden by law with respect to the public servant's office."

350.    Defendants recklessly failed to perform duties expressly imposed on them by law,

including providing full and complete information in warrant applications, adequately

establishing probable cause before executing the Apartment, Device, and Arrest Warrants,

providing full and accurate information to judicial officers, and abstaining from violating

constitutional rights.

351.    Defendants recklessly performed acts expressly forbidden by law, including imposing

unlawful prior restraints on Mr. Novak's speech, violating his constitutionally protected right to

anonymity, and retaliating against Mr. Novak for criticizing the Department.

352.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

353.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 27
### MALICIOUS CRIMINAL PROSECUTION
### (AGAINST DEFENDANTS RILEY AND CONNOR)

354.    Plaintiff incorporates all previous allegations.

355.    Defendants maliciously instituted the criminal prosecution of Mr. Novak, without probable cause, and it was terminated in Mr. Novak's favor.

356.    Defendants maliciously continued to prosecute Mr. Novak in the absence of probable cause, and it was terminated in Mr. Novak's favor.

357.    Defendants' malicious prosecution of Mr. Novak caused him irreparable harm.

358.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

359.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 28
### TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST DEFENDANTS RILEY AND CONNOR)

360.    Plaintiff incorporates all previous allegations.

361.    Mr. Novak was party to a terms-of-service contract with Facebook.

362.    Defendants knew he was a party to that contract.

363.    Defendants procured Facebook to breach that contract, including by issuing threats and misleading statements to compromise his anonymity and procure his private messages.

364.    Defendants had no lawful justification for doing so, and their actions were malicious, reckless, wanton, and in bad faith.

365.    Mr. Novak was damaged by Defendants' interference, including when his anonymity was compromised and his personal messages were disclosed.

366.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

367.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 29
### REPLEVIN
### (AGAINST THE CITY OF PARMA)

368.    Plaintiff incorporates all previous allegations.

369.    Mr. Novak is the owner of the Seized Devices, including his cellular phone and laptop.

370.    Notwithstanding the termination of criminal proceedings against him by acquittal at trial, the City did not return them to him.

371.    Mr. Novak is entitled to possession of his cellular phone and laptop, and a declaration that continued impoundment of his property is unlawful.

372.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

373.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### PRAYER FOR RELIEF

For the foregoing reasons, Mr. Novak respectfully requests that the Court:

1.      Enter judgment in Mr. Novak's favor on all claims for relief;

2.      Declare that Defendants' acts and conduct constitute violations of the First, Fourth and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983; and 42 U.S.C. 2000aa-6.

3.      Award injunctive relief enjoining Defendants from further unlawful application of Ohio law;

4.      Order Defendants to return Mr. Novak's property, including his computer and cellphone;

5.      Declare that Defendants are liable for damages on all claims for relief;

6.      Award actual damages under 42 U.S.C. § 2000aa-6(f), or the statutory minimum liquidated damages of $1,000, and award reasonable attorney's fees and costs under 42 U.S.C. § 2000aa-6(f);

7.      Award full compensatory damages, including but not limited to damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Novak has suffered and is reasonably certain to suffer;

8.      Award punitive and exemplary damages for the individual Defendants' intentional, malicious, and egregious acts and callous and reckless disregard of Mr. Novak's constitutional rights;

9.      Award pre- and post-judgment interest at the highest lawful rate;

10.     Award Mr. Novak his reasonable attorneys' fees and all other costs of suit available under 42 U.S.C. § 1988 and Ohio Rev. Code 2921.03(C);

11.     Award all other relief in law or equity, including injunctive relief, to which Mr. Novak is entitled and that the Court deems equitable, just, or proper.

## JURY DEMAND

Mr. Novak demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

*/s/ Subodh Chandra*
Subodh Chandra (OH Bar No. 0069233)
Ashlie Case Sletvold (OH Bar No. 0079477)
Patrick Kabat (NY Bar No. 5280730)
Marvin Brown IV (OH Bar No. 0096128)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Patrick.Kabat@ChandraLaw.com
Marvin.Brown@ChandraLaw.com

*Attorneys for Plaintiff Anthony Novak*