1

```
 1    THE STATE OF OHIO,      )
                             )    SS:        Judge Maureen Clancy
 2    COUNTY OF CUYAHOGA.     )

 3                    IN THE COURT OF COMMON PLEAS
                            (CRIMINAL BRANCH)
 4
      THE STATE OF OHIO,               )
 5                                     )
                        Plaintiff,     )
 6                                     )
         vs.                           )    Case No. CR-604767
 7                                     )
      ANTHONY NOVAK,                   )        Vol. 1 of 2
 8                                     )
                        Defendant.     )
 9
                                 - - -
10                    TRANSCRIPT OF PROCEEDINGS
                                 - - -
11

12

13

14

      APPEARANCES:
15
           Timothy J. McGinty, Prosecuting Attorney, by:
16         Anna M. Woods, Assistant Prosecuting Attorney,
                and
17         Anthony T. Miranda, Assistant Prosecuting Attorney,

18              On behalf of the State of Ohio.

19         Connick Law, LLC, by:
           Gary A. Vick, Jr., Esq.,
20              and
           Edward A. Proctor, Esq.,
21
                On behalf of the Defendant.
22

23
      Cindy M. Eiben, RMR
24    Jeniffer L. Tokar, RMR
      Marguerite A. Phillips, RMR
25    Official Court Reporters
      Cuyahoga County, Ohio
```

EXHIBIT A

2

```
 1  THE STATE OF OHIO,      )
                           )  SS:          Judge Maureen Clancy
 2  COUNTY OF CUYAHOGA.     )

 3                  IN THE COURT OF COMMON PLEAS
                         (CRIMINAL BRANCH)
 4
    THE STATE OF OHIO,               )
 5                                   )
                      Plaintiff,     )
 6                                   )
         vs.                         )      Case No. CR-604767
 7                                   )
    ANTHONY NOVAK,                   )
 8                                   )
                      Defendant.     )
 9
                          -  -  -
10                TRANSCRIPT OF PROCEEDINGS
                          -  -  -
11

12          BE IT REMEMBERED, that at the

13      MAY, A.D. 2016 Term of said Court, this

14      cause came on to be heard before the

15      Honorable Maureen Clancy, and a jury, in

16      Courtroom No. 20-B, The Justice Center,

17      Cleveland, Ohio, on Wednesday, August 10, 2016,

18      upon the indictment filed heretofore.

19

20                          -  -  -

21

22

23

24

25
```

Official Court Reporters

3

I N D E X

Voir Dire Examination:      Not Transcribed

State's Witnesses:

|  | Direct | Cross | Redirect |
|---|---|---|---|
| Kevin Riley | 58 | 67 | 78 |
| Daniel Heinz | 93 | 101 | |
| Lisa Jerman | 107 | 111 | 115 |
| Michael Klein | 116 | 137 | 144 |
| Thomas Connor | 149 | 226 | 245 |

- - -

E X H I B I T S

State's Exhibits:

|  | Received |
|---|---|
| No. 1 - official Parma Police Department Facebook pages | 249 |
| No. 2-B - isolated text messages from Novak | 249 |
| No. 7 - screen shot of posts | 251 |
| No. 8 - screen shot of post on Facebook, re: Subway robbery | 251 |
| No. 9 - disk of dispatch calls | 251 |
| No. 10 - two Facebook banners | 251 |
| No. 11 - Novak's personal Facebook page | 251 |
| No. 12 - Novak's personal Facebook page | 251 |
| No. 13 - Novak's pages that he likes or follows | 251 |
| No. 16 - records from Facebook of fake page | 251 |
| No. 17 - screen shot of Novak's posts | 251 |
| No. 18 - screen shot of Novak's posts | 251 |
| No. 19 - CD of images from Novak's computer | N/A |
| No. 20 - complete Facebook record of Novak | 251 |
| No. 21 - screen shot of fake homeless post | 251 |
| Nos. 22-32 - photos from search warrant Novak's house | 251 |

- - -

Defense Exhibits:

|  | Received |
|---|---|
| B - Affidavit and Search Warrant | 265 |
| F - news release about fake Facebook page | 265 |

- - -

1

2                                                   Page

3   Motion Hearing of August 2, 2016-------------- 5-18
    Motion hearing of August 5, 2016-------------- 19-39
4   Motion hearing 404(B) and motion in limine---- 40
    Opening Statements by the State-------------- 50
5   Opening Statements by the Defense------------- 52
    Defendant's Motion for Directed Verdict------- 253/264
6   Closing Arguments by the State---------------- 269
    Closing Arguments by the Defense-------------- 275
7   Final Arguments by the State------------------ 286
    Charge of the Court--------------------------- 291
8   Verdict--------------------------------------- 317

9
                            - - -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          TUESDAY, AUGUST 2, 2016

2              MORNING SESSION

3                 - - - -

4          THE COURT:          We're here today in the

5    case of State of Ohio versus Anthony Novak, 604767.

6    Present in court is the Defendant, Anthony Novak, with

7    his counsel, Mr. Vick.  And here representing the State

8    of Ohio is assistant county prosecutor Mr. Anthony

9    Miranda.

10          We're here today on State's motion to allow

11   video testimony and on the Defendant's motion to

12   dismiss.  I'm going to first proceed on the Defendant's

13   motion to dismiss.  Okay, Mr. Vick, on behalf of the

14   Defendant.

15          MR. VICK:          Thank you.  May it please

16   the Court.  Good morning, Your Honor.

17          THE COURT:          You can stay at the table.

18   You don't have to be formal.

19          MR. VICK:          Your Honor, this case was

20   indicted alleging that Mr. Novak used a computer to

21   disrupt, interrupt or impair the function of the police.

22   The use of the computer that's alleged to have committed

23   that crime was the Defendant creating a Facebook profile

24   that mimicked the Facebook profile of the Parma Police

25   Department.

6

1          When he set that Facebook profile up, he

2    then sent out six, one could call them comedic; one

3    could call them asinine; one could call them absurd; one

4    could give any type of adjective or descriptive term

5    they want to those Facebook postings.

6          I think the first one was that the City of

7    Parma was holding a Pedophile Reform event in a Catholic

8    church.

9          The content of those Facebook postings is

10   what's going to be important for this Court's

11   determination as to whether to grant or deny the motion

12   to dismiss.

13         I think both sides have done a very good job

14   briefing this issue.  I don't want to recite the lengthy

15   words, lengthy pages that were contained in the motion

16   to dismiss and brief in opposition to the motion to

17   dismiss.  I would just like to clarify, point out a few

18   things.

19         The first amendment doesn't just protect

20   speech.  The first amendment also protects a handful of

21   other types of behavior; that's the right to assemble,

22   the right to protest, the right of free expression and

23   the right to practice the religion of your choice.

24         This case just deals with the speech aspect

25   of it.  The difficult part for the law is, as this Court

7

1  is well aware, in trying to get text messages admitted

2  into evidence or trying to get things that are placed

3  out of line into evidence, that the courts are somewhat

4  slow to catch up on the evolving technological systems

5  that exist in 2016.

6            What do you do with text messages, Facebook

7  profiles, Instagram snapshots, ton of different avenues

8  for people to engage in protected speech?  There is a

9  litany of avenues for people to engage in speech that

10  isn't protected; fighting words, incitement to unlawful

11  actions, bullying.

12            But, I think what is important to note is

13  that this analysis starts in 1997, with the Reno versus

14  ACLU case.  In that case, the Court deemed that speech

15  that is broadcast over the Internet or speech put in

16  Facebook or Twitter, is constitutionally protected.  Not

17  only is it constitutionally protected under the first

18  amendment, it is given the highest level of

19  constitutional scrutiny.

20            There is, as this Court knows, there is

21  three tiers of constitutional scrutiny; low,

22  intermediate and strict scrutiny.  And, we would submit

23  to this Court that when the Court analyzes subsection B

24  of this statute under which Mr. Novak was charged, that

25  it engage in strict scrutiny analysis.  That is what

1   Reno held.   Reno held on line communications and on line

2   speech, when afforded the highest level of

3   constitutional protections, are akin to print media;

4   it's akin to news media; it's akin to reporting.

5           Your Honor, we would suggest that this case

6   is remarkably similar, if not identical, to the United

7   States of America's Supreme Court decision in Houston

8   versus Hill.  In that case, it dealt with words that are

9   very similar and identical to the words used in this

10  statute.

11          The argument there was a person was using

12  vulgarity and obscene words and speech and phrases to a

13  police officer.  And, they charged that person with

14  unlawful use of a computer system and other criminal

15  offenses.  And, the Supreme Court of the United States

16  held that statute was overbroad and the statute was

17  overbroad because it punished and criminalized

18  constitutionally protected speech and that speech then

19  is constitutionally protected under Reno versus ACLU.

20          From there, the Defendant, Mr. Novak, is

21  cited to a handful of other cases.  All of this deals

22  with speech and all of which the courts have protected

23  the speech and held that the statute's attempting to

24  criminalize that speech, unconstitutionally, either

25  because they were overbroad or because they were vague.

1         And, there is no real need to go over the

2   elements or analysis of how this Court is going to hold

3   the statute is overbroad.  It's more than well briefed

4   in the motions.

5         I would like to take a quick opportunity to

6   address the State of Ohio's brief in opposition.  In the

7   State of Ohio's brief in opposition, they urge this

8   Court to use the medium or middle standard of

9   intermediate scrutiny to the O'Brien test, to hold this

10   statute is constitutional and that it is not overbroad.

11         The cases, though, I think they're very

12   important, distinct cases cited by the State of Ohio;

13   City of Erie v Pap's A.M., Rice v Paladin, U.S. v

14   Barnett, U.S. v Varani, those aren't speech cases.

15   They're first amendment cases, but they're not speech

16   cases.  They're expression cases.

17         And, expression is given different scrutiny

18   under the constitutional framework and analysis than is

19   speech.

20         City of Erie v Pap's A.M., that was a strip

21   club, attempting to hold the statute unconstitutional,

22   that did not permit women to take all their clothes off.

23   The argument that was set forth by the strip club in

24   that case was that there was some type of artistic

25   expression going on in a strip club.

1    The Court held the O'Brien test applies.

2  It's not afforded strict scrutiny and that the statute

3  was not overbroad and it didn't criminalize protected

4  speech.

5    The other cases that were cited, Rice v

6  Paladin, that dealt with a person that put forth

7  material, in a written word, to actually entice someone

8  else to commit murder.  U.S. v Varani dealt with IRS

9  lawsuits.  And, the Barnett case dealt with a

10  manufacturer of PCP.

11    Those cases deal with expression.  They

12  don't deal with speech.  This case deals with speech

13  which is absolutely protected under the highest level of

14  protections pursuant to Reno v ACLU.

15    The most important aspect of these cases is

16  that the statute, the general assembly could have

17  narrowly tailored this statute only to apply to on line

18  communication that can be classified as fighting words

19  or that can be classified as, it's someone inciting

20  someone else to commit unlawful imminent action or any

21  of the other two ways of speech or manners of speech

22  that are not protected at all.  And, those four are

23  listed in Mr. Novak's motion to dismiss.

24    I think the most important aspect in this

25  holding of the statute unconstitutionally overbroad is

1   the notion in the United States Supreme Court that it

2   provides police officers with complete, unfettered

3   discretion as to how to apply this and complete,

4   unfettered discretion as to how to charge someone with

5   using a computer system to interfere or interrupt with

6   police actions.

7           The statute is certainly preempted by

8   physical actions.  You cannot engage in physical actions

9   or engage, using a computer, to commit disorderly

10  conduct.  Those types of behaviors are covered by other

11  statutes in the Ohio Revised Code, which leads to the

12  conclusion that this statute generally prohibits and

13  criminalizes speech that is the speech which is

14  protected under the first amendment pursuant to United

15  States Supreme Court precedent, particularly the Houston

16  v Hill case.

17          Judge, we would ask when the Court conducts

18  its analysis and documents have been brought forth

19  before this Court and the arguments which have been

20  adequately raised in all of the briefing, that the Court

21  finds that Mr. Novak engaged in speech on the Internet,

22  that that speech, pursuant to Reno v ACLU, is afforded

23  the highest level of constitutional protection.  And,

24  when it conducts its strict scrutiny analysis, that the

25  Court does not find that the government has or is able

12

1  to put forth a compelling interest which would somehow

2  make it okay for the City of Parma or State of Ohio to

3  stop people's rights to engage in first amendment

4  protected speech.

5          We would ask this Court to find that statute

6  is unconstitutional, not the whole statute, just

7  subsection B of the statute, find that it is

8  unconstitutional as it is overbroad.  And, we would

9  submit to this Court that it's also vague because the

10 words it uses are not sufficient to place a person in

11 Mr. Novak's position or a reasonable member of society

12 on notice as to what types of actions can constitute a

13 violation of that section.

14          And then we would ask this Court to dismiss

15 this case and dismiss the indictment against Mr. Novak.

16          Thank you for your time, Your Honor.

17          THE COURT:        Okay, thank you.  So,

18 you're saying each of these postings that he made on the

19 Parma Police Facebook page, none of those are fighting

20 words or inciting any type of crimes; is that you're

21 saying?

22          MR. VICK:        That is correct, Your

23 Honor.

24          THE COURT:        Okay.  All right.

25          On behalf of the State.

1           MR. MIRANDA:       Thank you, Your Honor.

2 May it please the Court. Anthony Miranda on behalf of

3 the State.

4           Mr. Novak is charged with his conduct in

5 creating the fake Parma Police Facebook page. I know

6 the Court has a brief in opposition which we've copied

7 and pasted. The image is nearly an identical image of

8 the Parma Police banner at the top of the page.

9           We believe the evidence will show Mr. Novak

10 was deleting comments that were highlighting the fact

11 that the page was fake. And so just in brief reference

12 to this argument that this was a parody page, we think

13 those facts distinguish this case from those cases, from

14 Hustler, for example, in which the Supreme Court noted

15 that there was an actual parody disclaimer in the

16 article at issue in Hustler. So, we think this is not a

17 protected parody, protected contents.

18           Additionally, this is not, the statute is

19 not geared towards contents. We would be here if the

20 same page had been created and said none of the negative

21 things about police and instead just listed the actual

22 phone number of the Parma Police. That would have the

23 same disruptive effect on Parma Police services. They

24 wouldn't be receiving calls. They would have to expend

25 law enforcement resources in order to end that

14

1   disruption and it wouldn't implicate any of the content.

2   It wouldn't result from the contents of the page.

3            This prosecution is not about what was said

4   in the comments.   It's not about whether or not Parma

5   Police was disparaged, but instead about the effect.

6   That's why we think that the case on point is the

7   O'Brien case, those lines of cases that talk about how

8   just because some criminal acts committed via speech,

9   does not mean that it is protected speech.

10           And, we cite the Paladin case in which the

11  person made the "How to Commit a Murder" book.   That is,

12  obviously, not protected speech.   If you threaten to

13  kill someone, that's not protected speech.   We are

14  prosecuting you for the noncommunicative effect of your

15  speech.   Or, another way of saying that is, it's not a

16  content based statute or regulation.

17           So, that's why we, first of all, don't think

18  that this is subject to strict scrutiny.   We think it is

19  subject to lesser scrutiny.   But, we also think that we

20  passed scrutiny.   And, I don't think it can be argued

21  that the State does not have compelling governmental

22  interests here in insuring that these services are not

23  interrupted, that police resources are not wasted.

24           And, we think that it is narrowly tailored

25  to only criminalize those knowing acts that disrupt

1   police services.

2   And, Mr. Novak is citing this Houston v Hill

3   case, but the statute in that case dealt with anyone who

4   opposes police.  So, that is obviously a different

5   scenario because it is involving mere criticism of

6   police.  Our statute is dealing with the effect of the

7   disruption, the impairment.  And, we cite in our brief

8   the footnote in Hill, footnote 11, that the Court in

9   Hill recognized that it would be a different case if

10  someone was following an officer in pursuit and speaking

11  in such way that actually disrupted the pursuit.  And in

12  that case, that would be lawfully prohibited because

13  that is disrupting the legitimate police function of

14  pursuing an individual.  So, we think that we do satisfy

15  strict scrutiny.

16  Additionally, I don't think that those cases

17  that we cite are making a distinction between expression

18  and speech.  I think they're making a distinction

19  between content and known content based regulations.

20  Mr. Novak argues that there is unfettered

21  discretion but there has been no showing that the State

22  has been arbitrarily enforcing the statute.  The State

23  has inherent discretion on charging a crime.  I think

24  there is a real evidentiary burden here upon the State.

25  It can't be said that this just imposes every innocent

1  citizen to the arbitrary discretion of the State.

2          And then lastly, just with vagueness, I

3  would say that we cite to this case, State v Smith, in

4  the brief.  The 2nd District has addressed this exact

5  statute on the question of whether or not the statute is

6  facially vague.  And, they concluded it was not facially

7  vague through their addressing subsection A instead of

8  section B.

9          But, there has been no meaning of difference

10 between subsection A.  Both of them include a knowledge

11 requirement.  Both of them include verbs like interrupt.

12 Ours includes disrupt.  I mean, they're very similar

13 subsections.  So, I think that's the best case on point

14 in terms of the vagueness discussion.

15         And then lastly, as applied, I don't think,

16 for all the reasons we stated in the brief, that any of

17 these terms are vague, as it is applied to Mr. Novak's

18 conduct.  But, I would also encourage the Court to allow

19 for the facts at trial to come out before granting a

20 vagueness as an applied claim, because I think there has

21 to be some evidentiary showing.

22         THE COURT:       So, you're saying that the

23 content of what was posted isn't relevant, what is

24 relevant is the fact that there was a Facebook page made

25 that was fake to the Parma Police Department.  So, even

1  if it was, if there were positive comments made, it

2  still disrupted the Parma Police Department?

3            MR. MIRANDA:     Exactly.  I think the same

4  effect could occur even without the negative contents

5  and we would still be here today because it would still

6  have caused that disruption.

7            THE COURT:     Okay.  And so, even if you

8  looked at the contents of what was posted, is your

9  argument, you have any argument on that, as to the

10  contents of what was posted?

11            MR. MIRANDA:     Well, I guess the reason

12  why I'm making this content based restriction is because

13  it affects the review, if the Court agrees with the

14  State it's not a content based regulation, that it

15  doesn't apply strict scrutiny.

16            But, if it does, this is conduct and content

17  mixed, then it would apply strict scrutiny, I think we

18  would pass that test as well.

19            THE COURT:     Okay, thank you.  Anything

20  further?

21            MR. VICK:     No, Your Honor, thank you.

22            THE COURT:     All right.  So, I'm going

23  to mark it heard and submitted.

24            Now, the State has a motion to allow video

25  testimony.  Is there any, I don't know that I've seen

18

1  any brief in opposition filed.

2          MR. VICK:        We have no objection to

3  that, Your Honor.

4          THE COURT:       No objection, okay.

5          MR. VICK:        No, Your Honor.

6          THE COURT:       State's motion is granted.

7  And then I just received notice of intent to use,

8  introduce other acts evidence pursuant to 404(B).

9          Did you see that yet?

10         MR. VICK:        I have not.  I would like

11 a chance to respond in writing to that motion, please.

12         THE COURT:       Okay.  Anything further?

13         MR. MIRANDA:     Nothing on behalf of the

14 State, Your Honor.

15         MR. VICK:        No, nothing, Your Honor.

16         THE COURT:       Have there been any plea

17 negotiations in this case?

18         MR. VICK:        No.

19         THE COURT:       All right.  I'll see you

20 next week for trial.

21         (Thereupon Court adjourned.)

22             -  -  -  -

23

24

25

1  FRIDAY MORNING SESSION, AUGUST 5, 2016

2          THE COURT:        We can go on the

3  record.

4          We're here today in the case of the

5  State of Ohio vs. Anthony Novak, case number

6  604767.  Present in court is the defendant,

7  Anthony Novak, with his counsel, Mr. Vick.

8  And here from the Cuyahoga County Prosecutor's

9  Office is Assistant Cuyahoga County

10  Prosecutor, Mr. Anthony Miranda.

11          We are here today on the State of

12  Ohio's motion for the Court to issue a

13  material witness warrant.

14          Mr. Miranda.

15          MR. MIRANDA:        Thank you, your

16  Honor.

17          First chair Assistant Prosecuting

18  Attorney Anna Woods filed a motion for the

19  Court to issue a material witness warrant.

20  She attached to that motion her affidavit

21  indicating that she believes it is necessary

22  to this case for us to obtain a material

23  witness warrant for a representative of

24  Facebook.

25          Obviously the charge in this case

1  revolves around the creation of a fake
2  Facebook account.  And we think that a
3  representative's testimony would be important.
4  One, to authenticate the records of the fake
5  page.  And two, also to establish whether or
6  not any information was deleted from that page
7  which might help us at trial to establish
8  knowledge.

9        We've presented the Court with a
10 proposed order that would, one, find that the
11 representative is material.  And two, would
12 order their appearance either via video, or if
13 they choose to appear personally, the State
14 would arrange for the travel costs.

15        THE COURT:          All right.  Mr.
16 Vick, on behalf of the defendant.

17        MR. VICK:          Thank you.  May
18 it please the Court, your Honor.

19        Judge, as this Court has been aware,
20 we've been trying to streamline a lot of the
21 witnesses and testimony and evidence in this
22 case.  And I trust that I have enough goodwill
23 with the Court to know, I don't just take
24 unreasonable positions or just object just to
25 object.

21

1          But with this foreign witness
2   warrant, it's not just, Court grants the
3   order, witness stands in front of a
4   videocamera, video is shown to the jury.
5   First they have to show that it's necessary
6   and material.

7          With respect to it being necessary
8   and material, I was given a proposed entry to
9   stipulate to the admissibility -- excuse me,
10  authenticity and admissibility of these
11  records.  I said yes.  Okay.

12         Two days later we're now dangerously
13  close to this trial, it's getting under a week
14  of trial, they then tell me -- and you heard
15  the words used by Mr. Miranda -- whether or
16  not there is material that has been deleted.

17         Well, if this material has been
18  deleted, how do I get my hands on it?  I don't
19  know what it is.  They've never told me if
20  there's deleted stuff or what there's deleted
21  stuff.  It's getting dangerously close to an
22  expert, an expert on Facebook, and an expert
23  on how they manage their online accounts.

24         And it is dangerously close to an
25  expert, I have not been given an expert

22

1  report, I didn't have an ability to determine

2  if stuff was deleted, whether it's material,

3  what was deleted, or whether to hire my own

4  computer forensic analyst expert in this case.

5      With respect to the procedure for

6  this thing, again, we've already offered to

7  admit or stipulate to the authenticity and

8  admissibility.  It's not just this Court cuts

9  an order.  Okay.  Once this Court cuts an

10  order it has to go to -- excuse me if I'm

11  wrong -- I think it's San Mateo County in

12  California.  Okay.

13      That Court just doesn't grant this.

14  The Court has to do haul this witness into

15  court, schedule a hearing, okay, to determine

16  whether they think that the witness is

17  necessary and material.  It's not a quick

18  process.  It's not a painless process for

19  these people out there.  There's multiple

20  courts that are going to get involved with

21  this.

22      So we would argue based upon what we

23  have stated that it's not necessary, and it's

24  not material, because we've offered to

25  stipulate to these records.  And to the extent

23

1  that there is stuff in there that's been

2  deleted, the fact that it's been deleted means

3  I don't have it.

4           THE COURT:          Well, let me ask

5  this.

6           So what is the need to have a

7  representative if he's going to stipulate to

8  the records?

9           MR. MIRANDA:          So, the argument

10  is that there are posts that are in the

11  Facebook records which have been disclosed in

12  discovery, which we argue was deleted but

13  still is within the Facebook records, because

14  we believe Facebook retains deleted

15  information for a period of time, 30 days.

16           THE COURT:          So Mr. Vick has

17  seen that?

18           MR. MIRANDA:          Correct.  There

19  is not information that has not been

20  disclosed.

21           In addition to that, Mr. Vick has in

22  discovery a text message Mr. Novak sent

23  representing that he had been deleting

24  comments which were calling attention to the

25  fact that the Facebook page was fake.  So we

24

1  anticipate a Facebook representative is
2  necessary to establish that even though these
3  comments are in the records, that doesn't mean
4  they weren't deleted.
5        And I don't think that's an expert
6  opinion.  We're just asking for someone to
7  testify as to how Facebook works.  And if Mr.
8  Vick's prepared to stipulate to that today,
9  there is no need for the material witness
10 warrant, I would agree.
11       Secondly, I would say that it's true
12 that San Mateo would have to have a hearing
13 under the normal course of how things work
14 under this material witness statute.  But I
15 talked to the San Mateo County, they indicated
16 that Facebook does not require that step, that
17 they will just honor material witness warrants
18 issued directly from out of -- directly from
19 foreign states, essentially, without that
20 additional step.
21       So really we're just here to
22 determine whether or not this is material to
23 the case.  I think it is material to the case
24 because it's going to establish whether or not
25 Mr. Novak was knowingly deleting information

1   and purposely presenting the page to be the

2   official Parma Police page.

3            THE COURT:          So are you

4   willing to stipulate to what he has indicated?

5            MR. VICK:           To the

6   authenticity and admissibility of these

7   records, yes.

8            THE COURT:          But also that

9   there were posts that were posted that you

10  obviously have the records for to see.

11           MR. VICK:           Okay.

12           THE COURT:          And that they

13  were then deleted.

14           I believe he is saying that if you're

15  willing to stipulate to that, that he wouldn't

16  need a representative.

17           MR. VICK:           If I knew what

18  posts were deleted, then we can take a look at

19  them and stipulate that, yes, they were

20  deleted.

21           I mean, how many are we talking

22  about?

23           MR. MIRANDA:        Well, we don't

24  know the answer to that.

25           MR. VICK:           There's my

26

```
1   problem.
2              THE COURT:           Why don't you
3   know the answer?
4          MR. MIRANDA:             Because, if
5   we're correct under how Facebook works, the
6   records we have contain even deleted posts.
7   So, I don't know that we can determine which
8   ones were deleted or which ones weren't.
9              We're asking that we be allowed to
10  call a representative to testify to the fact
11  that merely because the post is in the records
12  does not mean it wasn't deleted.
13             THE COURT:           So you don't
14  have any evidence that you've not turned over
15  to Mr. Vick, right?
16             Is it a matter of interpreting what
17  those records are that you have?
18         MR. MIRANDA:             Correct.
19         THE COURT:               Okay.
20         MR VICK:                 I disagree.  I
21  disagree, because they're getting into, we
22  have complete Facebook records, but now
23  they're saying that there may be records that
24  have been deleted, but they can't point to
25  those records.  So there may be nothing.
```

27

1    THE COURT:              I don't think
2  that's what he's saying.
3        MR. MIRANDA:        Right.
4        MR. VICK:           That's exactly
5  what he's saying.
6        MR. MIRANDA:        No, I'm saying a
7  post may be deleted from the Facebook page,
8  but still appear in the printout of Facebook
9  records.  So a viewer at the time the incident
10 occurred would not see that comment any
11 longer.  But it is going to show up in the
12 Facebook records we introduce.
13       MR. VICK:           I would
14 stipulate to that.
15       THE COURT:          It sounds to me
16 like you -- the records that you have, have
17 all of the posts in them, there is no other
18 posts out there, but what the issue is, that
19 some of those posts that you have were
20 deleted, and that's what the representative
21 would testify to.
22       Is that what you're saying?
23       MR. MIRANDA:        Yes.
24       THE COURT:          There aren't any
25 posts out there that he's not seen, right?

1    MR. MIRANDA:        That's my

2    understanding, correct.

3         And so just, if the stipulation can

4    be clear, Mr. Novak will stipulate that

5    deleted items will still -- will still be

6    represented in Facebook records for up to 30

7    days.

8    MR. VICK:        For the record,

9    I don't want this to act as a waiver of

10   attorney/client privilege, I'm just putting

11   consent of my client on the record because it

12   does affect substantive rights and

13   stipulations.

14        I have no problem stipulating to

15   that.

16   THE COURT:        Why don't you

17   write out though what the stipulation would be

18   so that we don't have any misunderstanding.

19   MR. MIRANDA:        Okay.

20   THE COURT:        Or, you know, it

21   gets to be next Wednesday, and their witness

22   isn't here because you agreed to stipulate,

23   but your understanding of the stipulation is

24   not the same as his understanding.

25        So, maybe what you need to do is sit

1  down and write out what you are going to
2  stipulate to, so that that's clear.
3       Because it sounds to me that you'll
4  stipulate, and then when you introduce your
5  records, the stipulation would be something to
6  the effect that there have been posts that are
7  deleted.
8       But would you be able to identify
9  those posts?
10       MR. MIRANDA:        I don't think
11  there is any way to identify those posts.
12       THE COURT:        Even the
13  Facebook representative, could that person
14  identify the posts?
15       MR. MIRANDA:        I would be
16  speculating, but I don't think so.
17       THE COURT:        Okay.  So, the
18  fact of the matter is, though, that posts were
19  deleted, correct?
20       Is that what you're saying?
21       MR. MIRANDA:        That's our
22  understanding based upon text messages that
23  were sent from Mr. Novak.
24       THE COURT:        Okay.  So maybe
25  what you can do then is sit down and formulate

1  what you want the stipulation to be, so that

2  there is no misunderstanding regarding this

3  deletion of posts and whatever else might be

4  included in your stipulation.

5       MR. MIRANDA:     The State is

6  happy to work out the language with opposing

7  counsel.

8       MR. VICK:     Mr. Novak is

9  happy to work out language.

10       THE COURT:     Okay.

11       Now since we won't be on the record

12  again before Wednesday, is there any -- have

13  there been any plea negotiations in this

14  matter?

15       MR. VICK:     No.

16       THE COURT:     So the file is

17  not marked to anything?

18       MS. WOODS:     Your Honor, at

19  this point -- I'm sorry, Anna Woods, for the

20  record.

21       At this point, I have had discussions

22  with Prosecutor McGinty who is the authorized

23  marker on this file.  He is willing to mark

24  the file; however, there has been -- the

25  request from counsel has been for dismissal,

31

```
 1  which the office is not willing to do.
 2          So the mark is to the indictment as
 3  it stands.
 4          THE COURT:        Just so we're
 5  clear, the defendant has been indicted in
 6  count one, one -- only one count, right?
 7          MS. WOODS:        This is a
 8  one-count indictment, your Honor.
 9          THE COURT:        Disrupting
10  public service, a felony of the fourth degree.
11          MS. WOODS:        That's correct,
12  your Honor.
13          THE COURT:        So, right now,
14  there is no plea negotiations; is that
15  correct, Mr. Vick?
16          MR. VICK:        That's correct,
17  your Honor, for the reasons we put in our
18  motion.  There is a Supreme Court of the
19  United States precedent on this issue.  This
20  isn't a crime.
21          THE COURT:        Okay.  So, all
22  right, that's all I want to know.
23          MR. VICK:        I'm not
24  difficult just to be difficult.  But I do have
25  to represent my client zealously, and I do
```

32

1  feel he has constitutional rights here that

2  are being violated.

3          THE COURT:          Okay.  All

4  right.

5          So then you understand that you've

6  been indicted under disrupting public service,

7  a felony of the fourth degree, in violation of

8  2909.04(B).

9          Is that right?  You understand that,

10  Mr. Novak?

11          THE DEFENDANT:          Yes.

12          MR. VICK:          Yes, your Honor.

13          THE COURT:          And so at this

14  point you are not interested in any plea

15  bargaining; is that correct?

16          THE DEFENDANT:          Yes.

17          THE COURT:          Okay.  So you

18  understand that felonies of the fourth degree

19  carry with them a potential prison sentence of

20  anywhere from 6 months to 18 months, and a

21  fine of up to $5,000?

22          THE DEFENDANT:          Yes.

23          THE COURT:          Okay.  All

24  right.

25          So if you two want to just sit down

33

```
 1   and work out some sort of stipulation, and
 2   then if not, let me know then we'll go back on
 3   the record.
 4              MR. VICK:              That's fine.
 5              THE COURT:             Great.  Thank
 6   you.
 7              MR. MIRANDA:           Thank you.
 8              MS. WOODS:             Thank you, your
 9   Honor.
10                    - - - -
11        (Thereupon, a recess was had.)
12                    - - - -
13              THE COURT:             We're back on
14   the record in case number of 604767.  Present
15   again in court is the defendant, with his
16   counsel.  And here from the State of Ohio, Mr.
17   Miranda.
18              Now the parties have handed to me a
19   stipulation.  Would one of you like to read
20   it.
21              MR. VICK:              May I approach,
22   your Honor?
23              THE COURT:             Sure.
24              MR. VICK:              Thank you.
25              For the record, the State of Ohio and
```

1  counsel for the defendant with defendant's

2  knowledge and consent have negotiated and

3  agreed to the following notice of stipulation:

4          The State of Ohio and counsel for the

5  defendant do stipulate and agree that the

6  records obtained from Facebook are true and

7  accurate copies of the records kept in the

8  ordinary course of business.

9          The State and counsel for the

10  defendant do further agree and stipulate that

11  the records provided are admissible.

12          The State of Ohio and counsel for the

13  defendant do stipulate that Facebook maintains

14  in their records deleted comments and posts

15  for a period of time after deletion.

16          There are two signature lines under

17  this document, one with my name, Gary Vick,

18  Jr., and bar number.  I have signed that and

19  that is my signature.

20          There is also another one for first

21  chair Anna Woods, second chair Anthony

22  Miranda.  Anna Woods signed that, and both

23  myself and Attorney Miranda were here and

24  witnessed her signature on there.

25          Is that correct?

35

1        MR. MIRANDA:       That's correct,
2  your Honor.
3        MR. VICK:       Your Honor, we
4  would propose that the Court accept this
5  jointly negotiated notice of stipulation and
6  stipulation to help with trial.
7        THE COURT:       All right. So
8  now as a result of this stipulation, now the
9  parties agree that the State of Ohio's motion
10 for Court to issue a material witness warrant
11 is no longer necessary?
12       MR. MIRANDA:       Yes. The State
13 would withdraw the motion or the Court can
14 deny that motion.
15       THE COURT:       I'll just mark
16 it as withdrawn.
17       MR. VICK:       Of course, no
18 objection.
19       THE COURT:       Now, based on
20 that stipulation, though, there will be no
21 issue regarding the State questioning
22 representatives from the police department --
23 and I don't know all the facts of this case,
24 but just the little bit that I do know there
25 is no issue with the State then questioning

36

1  the representative from the police department
2  who read or saw these posts, right?
3            You don't have any objection to that?
4            MR. VICK:            No.
5            THE COURT:            Right?
6            MR. MIRANDA:            That's my
7  understanding, correct.
8            THE COURT:            All right.  So
9  just so we don't have any issues.
10            MR. VICK:            I would never
11  backdoor the Court like that.
12            THE COURT:            Not backdooring
13  me, just to avoid any objections and, you
14  know, what questions are permitted or not.
15            Obviously there may be objections to
16  some of the questions that are asked, and I
17  can't anticipate that because that's for the
18  trial.  So those would be dealt with at the
19  time.
20            But just so we understand, you will
21  not have a representative from Facebook, and
22  you're agreeing to the authenticity of those
23  records, so there shouldn't be any issue with
24  someone from the police department testifying
25  as to what's in those entries.

```
 1          MR. VICK:              Correct.

 2          THE COURT:             Is that correct?

 3          MR. VICK:              That is correct.

 4          Yeah, it's a Facebook page.  We've

 5   got postings and 5,000 pages of comments.

 6          THE COURT:             Correct.

 7          MR. VICK:              Of course based

 8   upon this I would not make a hearsay objection

 9   to those comments.  But, if they try to start

10   speculating or putting things out there based

11   upon this or making leaps of faith, I do

12   reserve the right to challenge that.

13          But on hearsay objection, based upon

14   the written words in the documents, of course

15   not.  The documents are what they are.  They

16   would speak for themselves.  The detective can

17   testify to them, that he has knowledge that

18   one was deleted.

19          He can say, post five on page 2,485

20   was deleted on such and such a date.  No

21   problem.

22          THE COURT:             Okay.

23          MR. VICK:              Of course.

24          THE COURT:             So anything else

25   that you would like to place on the record?
```

1    MR. MIRANDA:                Nothing on

2  behalf of the State, your Honor.

3        THE COURT:              And I'm not

4  saying there shouldn't be objections.  I mean,

5  obviously there could be.  I don't know what

6  questions will be asked and what manner they

7  will be asked.  So there may be objections

8  based on that, and those we'll deal with at

9  the time of trial.

10        But just so we're clear about there

11  not being a representative, and that the

12  police officer will be testifying to what the

13  posts are, and you're not objecting to that?

14        MR. VICK:                That's correct.

15        THE COURT:              Okay.

16        MR. VICK:                One other

17  housekeeping matter.

18        Normally when I've dealt with this in

19  the past -- I don't know what the Court's

20  preference is -- we usually send these back as

21  joint exhibits.  We would ask it be sent back

22  as a joint exhibit.

23        MR. MIRANDA:              No objection.

24        THE COURT:                I don't have an

25  issue with that.  That you two can work out.

| | | |
|---|---|---|
| 1 | MR. VICK: | Correct. |
| 2 | THE COURT: | All right.  So I |
| 3 | intend to start Wednesday at 9:00 o'clock. | |
| 4 | All right. | |
| 5 | MR. VICK: | Very good. |
| 6 | THE COURT: | Okay, thanks |
| 7 | everyone. | |
| 8 | MR. VICK: | Thanks, Judge. |
| 9 | MR. MIRANDA: | Thank you, your |
| 10 | Honor. | |
| 11 | - - - - | |
| 12 | (Thereupon, Court was adjourned.) | |
| 13 | - - - - | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1    WEDNESDAY MORNING SESSION, AUGUST 10th, 2016

 2         THE COURT:  Okay.  We are here today in the

 3    case of State of Ohio versus Anthony Novak, Case

 4    No. 604767.  Present in court today is the

 5    Defendant, Anthony Novak, with his counsel Mr. Vick.

 6    And also present in court is --

 7         MR. VICK:  Ed Proctor.

 8         THE COURT:  -- Mr. Proctor, representing the

 9    Defendant.  Representing the State of Ohio is

10    Assistant County Prosecutor Miss Anna Woods and

11    Mr. Anthony Miranda.

12         This case is set for trial today.  Are you

13    prepared to go forward with trial today?

14         MS. WOODS:  Yes, Your Honor, the State is

15    prepared to go forward with trial today.

16         THE COURT:  And representing the Defendant?

17         MR. VICK:  Gary Vick for the Defendant.  We

18    are, Your Honor.

19         THE COURT:  Okay.  So there have been some

20    motions that have already been ruled on.  Now,

21    regarding the notice of intent to introduce other

22    acts evidence pursuant to 404(B), okay, on behalf of

23    the State.

24         MS. WOODS:  Thank you, Your Honor.  The State

25    is seeking to introduce a prior criminal conviction
```

Official Court Reporters

41

1      of the Defendant, in which it was a robbery case.

2      In that case it was a shoplifting event; however,

3      upon the shoplifting and being stopped by the

4      off-duty officer, who was in full uniform working at

5      a secondary employment, he began to assault the

6      police officer.  The assault was perpetuated by

7      Mr. Novak on the officer, and it didn't just go on

8      for a minute or two, this was a prolonged assault,

9      including a fight over a gun, Your Honor.

10           Case law permits 404(B) evidence to be

11     admitted for motive, bias, not to go to the event,

12     this is an old case, it's still within the time

13     frame of a felony conviction, and it would allow the

14     State to show that this Defendant has a bias against

15     cops, and which would relate back to the Facebook

16     case that is before the Court now.

17           So for that reason, You Honor, and the

18     reasons more fully set forth in the motion, the

19     State would request the admission of the prior

20     conviction for 404(B) evidence.

21           THE COURT:  Okay, Mr. Vick.

22           MR. VICK:  Thank you, Your Honor.  In

23     opposition to the notice of intent to use 404(B)

24     evidence, that robbery conviction is almost nine

25     years ago, it's almost stale, but more importantly,

1    Your Honor, he was convicted of -- he pled guilty to

2    robbery.  There's no plea to anything with respect

3    to the gun, there's no plea to anything with respect

4    to the assault on an officer, or any types of

5    further crimes.  So you're limited to the robbery

6    case.  But I think the evidence rule is very careful

7    to say, and the cases we cited are very careful to

8    say that it is character evidence, and they're using

9    it to assassinate his character because he created a

10   Facebook page.  That's what this case is all about.

11   It's a Facebook page.

12       The evidence, if that comes in, all it's

13   going to do is prejudice the jury and they're going

14   to convict him just because of that.  He's not going

15   to get a fair trial.  There's enough Constitutional

16   issues floating around this case with respect to the

17   First Amendment and his right to do what he did.  I

18   don't think we need to confuse the issues or set up

19   any more appellate issues than already potentially

20   exist if we lose this case.

21       Motive is never an element of the crime.

22   Assault is not an element of this crime.  Bias

23   against police is not an element of this crime.  His

24   intent against the police is not an element in this

25   crime.  The elements of this crime is that he

Official Court Reporters

1     intended to use a computer system to intend to

2     disrupt or impair or interfere with the operations

3     of the police.

4          And kind of looking at the cases I cited in

5     our opposition to that, those are cases where

6     someone was on trial, say, for gross sexual

7     imposition or a sex crime against anybody, and what

8     they did is they used 404(B) other acts evidence of

9     other instances either where the guy downloaded

10    child porn or the guy had committed a previous gross

11    sexual imposition against another person or a

12    previous sex crime against another person.

13         And the distinction here is that they want to

14    use this in their case in chief.  This isn't with

15    respect to if Anthony decides to take the stand,

16    whether they can impeach him with just the

17    conviction and nothing more.  They want to cloud the

18    record with all of these other facts, something that

19    happened when he was 18 years old.  And we would

20    submit that all that's going to do and all that's

21    going to serve to do is confuse the jury and make

22    them convict him based upon what he did eight or

23    nine years ago.  And we would ask this Court to deny

24    their intention to use other acts evidence.

25         And then kind of for the same argument, not

44

1     to take up too much time, we would also, under

2     Evidence Rule 609, if Anthony does decide to take

3     the stand, we would ask this Court to hold in limine

4     that that prior conviction does not come in to

5     impeach his credibility, because what the Court has

6     to do is it has to state that he does have a prior

7     conviction, and under 609(A)(2), the Court has to

8     determine in our case in chief, if he does take the

9     stand, that the probative value of that evidence is

10    not outweighed by the danger to confuse, mislead, or

11    prejudice the jury.

12        THE COURT:  All right.  So regarding -- is

13    there anything further regarding the State's notice

14    to use 404(B) evidence?

15        MS. WOODS:  Nothing as it relates to the

16    404(B), but to the motion in limine.

17        THE COURT:  Okay.

18        MS. WOODS:  If you want us to address that as

19    well, because the issues are kind of intertwined.

20        THE COURT:  All right.  So regarding the

21    State's notice of intent to introduce other acts

22    evidence, that is denied.

23        Now, regarding the motion in limine, you

24    would like to argue that?

25        You've argued it already.

45

```
 1          MR. VICK:  Yeah.  Yeah.  I don't want to
 2     repeat myself, Judge.
 3          MS. WOODS:  Your Honor, this is a criminal
 4     conviction and, yes, this is a double-edged sword
 5     for the Defendant, but it is a criminal conviction,
 6     a felony, and it is a choice he would have to weigh
 7     that the State could get into his prior criminal
 8     conviction if he chooses to take the stand.
 9          This has been a test that is used on all
10     witnesses if they have a criminal conviction,
11     regardless if they are for the State or for the
12     Defendant.  This is why it's turned over in
13     discovery early on.
14          This Court has had victims come in with
15     criminal histories, and it would go to the
16     truthfulness of the Defendant the same way that it
17     would go towards the truthfulness of any of the
18     State's witnesses.  609 is clear that it is for the
19     crimes accusing of dishonesty of the accused.
20     Robbery is a -- although it is an assault of
21     violence, it is also an offence of dishonesty, he
22     took something from the store, and the assault
23     portion of the robbery was on a police officer.
24          THE COURT:  And it's within ten years,
25     correct?
```

 1            MS. WOODS:  It is within ten years, Your

 2      Honor.

 3            MR. VICK:  It is.

 4            MS. WOODS:  It was a 2007 case, I believe, of

 5      which he pled in late 2007.  So it was a nine-year-

 6      old conviction.  It is within the time frame.

 7            THE COURT:  So your motion in limine is

 8      denied.

 9            MR. VICK:  Thank you, Your Honor.

10            THE COURT:  So your notice of intent to use

11      other acts evidence is denied.  Your motion in

12      limine is denied.

13            Now, obviously, you know, there could be

14      testimony from witnesses where doors are opened and

15      then at that time, then some rulings may be

16      reconsidered.

17            MR. VICK:  I completely understand that one,

18      yes.

19            THE COURT:  All right.  So we are waiting for

20      our jury.

21            MR. VICK:  Great.

22            Judge, may I be excused to use the rest room?

23            THE COURT:  Yes.

24            MR. VICK:  Thank you.

25                        -  -  -

Official Court Reporters

1          (Thereupon, proceedings were resumed within

2          the presence of a jury panel as follows:)

3               - - -

4          THE COURT:  Okay.  Good morning, ladies and

5     gentlemen.

6          THE JURY PANEL:  Good morning.

7          THE COURT:  Welcome to Courtroom 20-B.  Now

8     that we all are sitting in our correct spots, I am

9     Judge Maureen Clancy, and I will be presiding over

10    the proceedings for which you've all been summoned.

11         You have met my bailiff, Maria, and she is

12    sitting in for my real bailiff, so that's why there

13    was a little bit of confusion this morning in just

14    where you're sitting in your spots today.

15         The first question, in welcoming you to

16    Common Pleas Court and welcoming you to my

17    courtroom, and I always like to ask, is for people

18    to raise their hands if they were so excited to

19    receive a jury summons in the mail for jury duty?

20         THE JURY PANEL:  (Indicating.)

21         THE COURT:  Okay.  So we have a few.

22    * * * * * * * * * *

23         (Thereupon, voir dire commenced.)

24              - - -

25

48

```
 1         WEDNESDAY AFTERNOON SESSION, AUGUST 10th, 2016
 2                          - - -
 3                 (Thereupon, a jury of 12 plus one
 4                 alternate was duly selected and sworn in.
 5                 Proceedings were as follows:)
 6                          - - -
 7              THE COURT:  All right.  You may be seated.
 8              Ladies and gentlemen, at this time I'm going
 9         to give you the admonition to a new jury.
10              Members of the jury, it is important that you
11         be fair and attentive throughout this trial.  You
12         are not to discuss this case among yourselves or
13         with anyone else, and you are not permitted to have
14         anyone discuss it with you or in your presence, and
15         you are not to form any or express any opinion on
16         this case until it is finally submitted to you.  You
17         are not permitted to read or discuss any news media
18         accounts of this case or research any prior media
19         accounts of this case.
20              You are also not permitted to place anything
21         on Facebook, Twitter, Snapchat, Instagram, whatever
22         means that you communicate with the outside world
23         through social media.  And you're not permitted to
24         conduct any research.  You cannot research anything
25         that you hear about in this courtroom whatsoever.
```

49

1     Perhaps most difficult for you to understand

2  is that you may not discuss this case among

3  yourselves until it is finally submitted to you.

4  The jury will receive opening statements, evidence,

5  arguments, and the law in that order, and it would

6  be unfair to discuss this case among yourselves

7  before you receive everything necessary for your

8  decision.

9     You must explain this rule to your family and

10  friends.  When the trial is over, you will be

11  released from this instruction and at that time you

12  may discuss the case and your experiences as a

13  juror, but you are not required to do so.  So until

14  that moment, please control your natural desire to

15  discuss the case both here and at home.  You are not

16  permitted to talk with the attorneys, parties, or

17  witnesses during this trial.  Likewise, the

18  participants are not permitted to talk to you.  If

19  anyone should attempt to discuss this case with you,

20  you must report the incident immediately to the

21  Court or the bailiff.

22     And, again, I have already instructed you,

23  you are not permitted to conduct any investigation

24  or attempt to obtain any additional information on

25  this case outside of the courtroom.

1    Any violation of these orders may cause a new

2  trial or may require a penalty for disobedience.

3  And I will repeat these admonitions to you at each

4  recess in an abbreviated form, and if overlooked,

5  they apply to your conduct throughout the trial.

6    In the event that you experience a personal

7  problem, you should explain the matter to the

8  bailiff.  And, again, if during this trial you

9  cannot hear or understand a witness or a lawyer,

10  please indicate -- please let us know.

11    Also, you are not permitted to take any

12  notes.  You are not permitted to ask any questions.

13  And even though we have a court reporter, you are

14  not permitted to have any of the trial transcript

15  read back to you.  All right?

16    Okay.  So at this time we will start with

17  opening statements.

18    All right.  On behalf of the State.

19    MS. WOODS:  Thank you, Your Honor.

20      - - -

21 OPENING STATEMENT ON BEHALF OF THE STATE OF OHIO

22    MS. WOODS:  May it please the Court.  Ladies

23  and gentlemen of the jury, thank you for your

24  attention so far.  It's been a long process to get

25  here with a lot of boring questions and things that

1    might not seem relevant, but your attention is

2    greatly appreciated.

3          Ladies and gentlemen, the State is accusing

4    Anthony Novak of creating a fake Facebook page.

5    That Facebook page was titled "The City of Parma

6    Police Department."  And you will hear from several

7    people that this website went up, this Facebook page

8    went up and it created disruption in the city.

9    Several residents saw posts about homeless having to

10   be evacuated from the city, or if you fed the

11   homeless you'd be punished by 60 days in jail.  New

12   laws were created, new programs were created when

13   they weren't posted by the City of Parma.

14         The City of Parma had to assign a detective

15   and resources were spent trying to find out who was

16   posting on a fake page that was confusing the

17   public.

18         Ladies and gentlemen, after you hear all of

19   the evidence in this case, you will be able to find

20   that the Defendant created the fake Facebook page

21   with the intention to confuse the public and disrupt

22   Parma Police's ability to do their job.

23         Thank you, Your Honor.

24         THE COURT:  Oh, thank you.

25         All right.  On behalf of the Defendant.

Official Court Reporters

52

```
1            MR. VICK:   Thank you, Your Honor.
2                         - - -
3   OPENING STATEMENT ON BEHALF OF THE DEFENDANT
4            MR. VICK:   It's not what the evidence will
5   show, but what the evidence won't show in this case.
6            Ladies and gentlemen, again, Gary Vick, on
7   behalf of Anthony Novak.  And we, too, would like to
8   thank you.  Thank you for sitting here and being
9   attentive and listening to our story.  Okay.
10           And, again, I want to reiterate, it's not
11  what the evidence will show, but it's going to be
12  what the evidence is not going to show.  Okay.
13           This is a case about a fake Facebook page.
14  Big shock, now that you've heard it, right, we've
15  been talking about it for four hours.
16           Back on March 1st and 2nd, Anthony created a
17  fake Facebook page.  He was sitting at the bus stop
18  waiting to go home from work.  He doesn't drive.  He
19  pulled his cell phone out and made a fake Facebook
20  page.  He pretended to be the Parma Police
21  Department.  Okay.  He used a photograph from the
22  Parma Police Department's Facebook page.  The pages
23  were not identical.  And the evidence is going to
24  show that there were very subtle differences between
25  the two pages.
```

53

1  The evidence is also going to show that this

2  Facebook page was geared towards and meant for his

3  small circle of friends.  Okay.  Once the page was

4  created, he linked it to his personal Facebook page.

5  All of his goofy friends, Look at what I did.

6  What I want to talk to you about is the posts

7  that Anthony put on there, because you heard about

8  one of them, that Anthony allegedly created a fake

9  law.  Okay.  The first post was a post that it was

10  now unlawful in the City of Parma to feed the

11  homeless or to give the homeless shelter.  The post

12  went on to say that anyone who was found giving the

13  homeless shelter or feeding the homeless would be

14  sent to jail for 60 days, and then it said, Be

15  advised.

16  That post then was up for a few hours, and a

17  second post went up.  The second post was -- and

18  there's six of them, so bear with me.  The evidence

19  is going to show that one of the next posts that

20  went up was that the City of Parma was conducting a

21  civil service exam for people that wanted to be

22  police officers.  One of the tests was going to be a

23  hearing test, it was only 15 minutes long, and if

24  you passed the test, you were a cop.

25  Okay.  Post number three, and this is where

54

1   it may get a little offensive.  The evidence is

2   going to show that, thanks to Anthony, the City of

3   Parma would now be hosting a pedophile reform event

4   at a Catholic church.  The post went on to say that

5   all the pedophiles can come and the Parma Police

6   will give them a little test, and they're going to

7   focus on 'no means no,' and once you pass the test,

8   you're no longer a pedophile, welcome to the police

9   force.

10      The next post that went up is going to be a

11  post where Anthony said that the Parma Police

12  Department were giving all teenage girls, with no

13  parental permission needed, free abortions out of

14  the back of a van.

15      One of the next posts was a picture of an

16  armed robbery occurring in Parma -- comedy is

17  offensive to some, it's a personal choice -- with an

18  African American woman standing in front of a store.

19  And the post will -- the evidence will show that the

20  post said, We forgot to tell you that the Speedway,

21  or the Subway was robbed.  Don't worry about that.

22  There was an African American woman loitering,

23  that's who we want.

24      Those were the posts that went up on the fake

25  Facebook page.  That's what the evidence will show.

1    Okay.  The evidence is also going to show that

2    Anthony is not a sportsman.  Anthony is not a chess

3    player.  Anthony is not a classically trained

4    intellectual.  Okay.  Anthony has a job, and he

5    makes fake Facebook pages.  That's what he enjoys

6    doing.  That's how he has fun.

7         What the evidence is never going to show is

8    that Anthony had any intention to disrupt anything.

9    None.  And what the evidence is not going to show is

10   that anything was disrupted.

11        On March 2nd, Anthony is texting back and

12   forth with his friends.  And Anthony catches wind

13   that, oh-oh, I'm on the news.  And apparently he

14   catches wind that the Parma Police Department issued

15   a statement on their website that there's this fake

16   website going around and everyone should ignore it.

17   And he put it on the fake Facebook page.

18        The evidence is also going to show that the

19   page was taken down.  Anthony took it down.  Okay.

20   The joke was getting out of hand.  Okay.  People

21   were taking this absurd Facebook page seriously, and

22   he took it down.

23        As a result of the fake Facebook page with

24   the six absurd posts that were up, the evidence is

25   going to show that the City of Parma Police took

1    great offense at the content of those posts.

2    Nothing was disrupted.   They hated what was in the

3    posts.

4         The evidence is also going to show that they

5    arrested him, put him in handcuffs, threw him in the

6    back of the car, for a Facebook page, and took him

7    to jail.   Then they started executing search

8    warrants, not one, but two.   They executed a search

9    warrant at his house where he and his roommate live.

10   Okay.   This was after they executed a search warrant

11   to Facebook and Facebook returned about 4,000 pages

12   of documents, giving them the entire Facebook pages,

13   but they had to go to the house and take out every

14   single computer.

15        The evidence is going to show they took out

16   every single cell phone.   The evidence is going to

17   show they took out every single thumb drive.   The

18   evidence is going to show that they took out any

19   type of electronic they could get their hands on.

20   The evidence is going to show -- oh, I'm sorry.   The

21   Xbox and the Play Station, because those had to go,

22   too, because there somehow was going to be evidence

23   of a crime in an Xbox and a Play Station.

24        The evidence is going to show that in about a

25   12-hour time period dispatch had to field eleven

1      whole calls on this thing.  The total amount of time

2      that it took dispatch to deal with the eleven calls

3      was under 12 minutes.  And I submit to you that

4      that's what's going to be the disruption, eleven

5      calls, 12 minutes, in 12 hours for dispatch to do

6      what dispatch does.

7            What you are not going to hear is any

8      evidence that the posts incited violence; that they

9      urged anyone to call the police.  There's going to

10     be no evidence that the police's website was hacked,

11     that their Facebook was hacked, that their security

12     systems went down, that anything in the City of

13     Parma was harmed by either Anthony Novak or his

14     Facebook page.  Nothing.  Yet, they want you to find

15     him guilty that he disrupted public services.

16            There's a lot at the end of the case that the

17     evidence is going to show in this case, and, again,

18     there's a lot that the evidence is not going to

19     show.  And at the end of the day when the evidence

20     is all in, we're going to sincerely ask, after

21     Anthony gets done fighting, that you find him not

22     guilty.  Thank you.

23            THE COURT:  All right.  Thank you.

24            You may call your first witness.

25            MS. WOODS:  Thank you, Your Honor.  The State

```
 1              of Ohio calls Lieutenant Riley.

 2                      THE COURT:  I will swear you in.

 3                          Thereupon, the STATE OF OHIO, to

 4                          maintain the issues on its part

 5                          to be maintained, called as a

 6                          witness, KEVIN RILEY, who, being

 7                          first duly sworn, was examined

 8                          and testified as follows:

 9                      THE COURT:  You may have a seat.  And just

10          make sure you speak loudly and clearly and into the

11          microphone.

12                      THE WITNESS:  Yes, ma'am.

13                      THE COURT:  Thank you.

14                      Okay, Mr. Miranda.

15                          - - -

16              DIRECT EXAMINATION OF KEVIN RILEY

17   BY MR. MIRANDA:

18   Q.    All right.  Can you state your name for the record.

19   A.    Kevin Riley, R-i-l-e-y.

20   Q.    And where are you employed?

21   A.    Parma Police Department.

22   Q.    And how long have you been with Parma?

23   A.    I have been with the Parma Police Department for

24   18 years.

25   Q.    And were you employed before the Parma Police
```

1  Department?

2  A.    Yes.

3  Q.    And how long have you been employed as a police

4  officer?

5  A.    I've been involved with law enforcement for 27 years.

6  Q.    And what's your current title with the Parma Police

7  Department?

8  A.    I am currently a lieutenant assigned to the detective

9  bureau.   I am the public information officer and

10  spokesperson for the police department.

11  Q.    So one of your responsibilities as a lieutenant is to

12  supervise the detective bureau?

13  A.    That is correct.

14  Q.    And how big is that bureau?

15  A.    We have 15 detectives, three supervisors.  I supervise

16  14 -- well, 13 people total.

17  Q.    Okay.  And you said you're also -- another hat you wear

18  is public information officer?

19  A.    That is correct.

20  Q.    And so what do you do as part of that position?

21  A.    As the public information officer, it is my job to

22  respond to inquiries from the news media, prepare news

23  releases, put information out to the public through the news

24  media.

25  Q.    And is there any method of communication that you use

1 | to communicate with the public or the news media?
2 | A.    We use primarily forms of news release that we send out
3 | via email, we also use a Facebook page by the Parma Police
4 | Department and a Twitter page as well.
5 | Q.    Okay.  So as public information officer you sort of
6 | supervise the use of that Facebook page?
7 | A.    That is correct.
8 | Q.    Are there people within the bureau that also have
9 | access to it?
10 | A.    Yes.  I have -- when I became the public information
11 | officer in July of 2013, there were two detectives already
12 | assigned by the previous administration to be the official
13 | posters, so-to-speak, for the Facebook page; so when I took
14 | over that position, I saw no need to make any changes
15 | whatsoever.  So I kept the same two detectives on to make
16 | the postings on there.  They just have to get authority or
17 | permission from myself before they put something on there.
18 | Q.    And who are those detectives?
19 | A.    It would be Detective Jeff Wells and Detective Amanda
20 | Kaniecki; she spells it K-a-n-i-e-c-k-i.
21 | Q.    So if someone is to use the Parma Facebook Police page,
22 | it would be yourself, Detective Wells or Detective Kaniecki.
23 | A.    Correct.  If there's a request to put something on the
24 | Facebook page, it would go -- generally, people would either
25 | ask Detective Wells or Detective Kaniecki or myself and then

1  they would come to me and say, is it okay if we put this

2  information on the Facebook page, and I would tell them yes

3  or no, and then they would go ahead and put that posting on

4  there.

5  Q.   All right.   Lieutenant, how do you use the Parma Police

6  Facebook page?

7  A.   We use our Facebook page -- we don't really have a

8  policy on how we exactly use it, but the main purpose for

9  using it is just to give the public information on wanted

10 persons, solicit tips, you know, on say an unsolved robbery,

11 unsolved homicide, or something like that.  We don't really

12 use it for a lot of other things right now because we're

13 still -- you know, just because of the manpower issue in our

14 department, but generally we use it to alert the public, you

15 know, solicit tips and alert the public when we have

16 emergencies and things like that.

17 Q.   So when you say solicit tips, how might you solicit

18 information?

19 A.   We also maintain a crime tip line which comes in,

20 people can call in phone tips, they can also email.  So what

21 will happen is, say we get an armed robbery at a local

22 business and there's surveillance video, we'll post that on

23 there and ask the public for help in helping us identify who

24 that person is, and we'll post a clip of the surveillance

25 video or photograph of the person, whoever we're looking

62

```
1    for, and we'll post it on there with a phone number that
2    they can call and leave a tip.
3    Q.    And do you know, has that resulted in tips before, the
4    use of that Facebook account?
5    A.    Yes.  Yes, it has.
6    Q.    Did there come a time when you were aware of a fake or
7    imposter Facebook account?
8    A.    Yes, I do.
9    Q.    And do you recall when that was?
10   A.    It would have been on March 2nd, 2016.
11   Q.    And do you recall how you became aware of it?
12   A.    I came into work that morning and I believe my
13   supervisor came into my office and told me he had received a
14   phone call from our dispatch center indicating that they
15   were receiving numerous phone calls from people asking about
16   information that was posted on our Facebook page that seemed
17   a little bit controversial and strange.
18   Q.    And, Lieutenant, did you ever view the fake page?
19   A.    I did.
20   Q.    Okay.
21              MR. MIRANDA:  Your Honor, may I approach the
22         witness?
23              THE COURT:  You may.
24   Q.    Showing you what's been marked as State's Exhibit 10,
25   can you identify that exhibit?
```

Official Court Reporters

1   A.    This is a side-by-side photograph of what our real

2   Facebook page looks like, and then in the photograph next to

3   it here would have been the fake Facebook page that I

4   observed on March 2nd, 2016.

5   Q.    So there are two images in Exhibit 10, one the fake

6   page and one the real page?

7   A.    That is correct.

8   Q.    And the exhibit that you have in front of you, is that

9   the same exhibit or image that you see in a moment here on

10  our large screen?

11  A.    That is correct.

12  Q.    Okay.  So can you describe in more detail what's

13  depicted in this image?  What is this a snapshot of?

14  A.    This is a snapshot of exactly what I'm looking at right

15  here.  The left side would be what our Facebook page looked

16  like on March 2nd, 2016.  It says Parma Police Department,

17  and it has our patch, it has an image of our detective's

18  badge, and it says City of Parma Police Department, it says

19  Police Station - Government Organization.  On the right you

20  see an identical image, Parma Police Department, our patch,

21  a badge, City of Parma Police Department and Community.

22        I should note, though, that on March 2nd when I

23  observed this originally, what would have been on the right,

24  the fake Facebook page, actually said The City of Parma

25  Police Department, because I believe that is what I put in

1   my first news release that I put out to the news media that

2   day.

3   Q.    Just so I can understand, the background image with the

4   words Parma Police Department, those are similar you're

5   saying?

6   A.    They look exact.

7   Q.    And the profile picture, those are similar as well?

8   A.    Yes.

9   Q.    Okay.  And so you were saying the header of the

10  Facebook page may have changed since March 2nd on the fake

11  page with the deletion --

12  A.    That is correct.

13  Q.    Sorry to interrupt.

14          -- with the deletion of the word "The"?

15  A.    Yes.

16  Q.    So the fake page one said The City?

17  A.    That is correct.

18  Q.    So other than that -- okay, so that's Exhibit 10.  And

19  is the exhibit I have handed you, is that a true and

20  accurate depiction, with the caveat that the article "The"

21  had been removed?

22  A.    Yes.

23  Q.    So you become -- on March 2nd you become aware of this

24  fake page.  What is the concern for Parma Police at that

25  point?

1  A.   At that point, after discussion with my supervisor,

2  there were several concerns.  There were two postings I

3  recall that had racially inflammatory information on them,

4  and there were three other postings on there that had, what

5  I would consider, socially contentious issues.

6        My concern at that point, in viewing these postings,

7  coupled with the fact that dispatch was receiving phone

8  calls from people asking about this, and some people even

9  believing some of what was said on there, my concern was

10  two-fold.  One, I was concerned that we would get either

11  protesters showing up at the police department and either

12  causing physical harm, attempting physical harm to the

13  department, or causing disturbances at the police station.

14  And my second concern was for the locations that were

15  specified in two of the postings.  One was 7400 Broadview

16  Road, it's a Giant Eagle in Parma, and the other one was

17  St. Anthony's of Padua Church on State Road.  I was

18  concerned that people may show up there and cause a

19  disturbance.

20        So at that point the priority came to get this

21  Facebook page removed and taken down as soon as possible.

22  Q.   So, Lieutenant, I just want to make sure I understand

23  what you're saying.  Your concern was with the result of

24  this fake page, or was your concern with the criticism

25  within the fake page of the Parma Police?

1  A.    At that point, not as much as just a public safety

2  issue and the safety of our officers.

3  Q.   Okay.  And you had indicated that you learned at that

4  time that people were calling in to the Parma Police

5  Department?

6  A.   Yes.

7  Q.   Okay.  So what action did you take upon learning this

8  information from your supervisors?

9  A.   I contacted Detective Connor, asked him to look into

10  it, assigned the case to him, so he would begin

11  investigating it, and that would involve him, you know,

12  reaching out to our law department and beginning his

13  investigation.  And then after that, I sent out a generated

14  news release.  I sent that out to all the major news outlets

15  here in the greater Cleveland area and waited for response

16  from the news media to see if anybody would come out and do

17  a story on this.

18  Q.   So you assigned a detective?

19  A.   That is correct.

20  Q.   And what was the purpose of assigning a detective?

21  A.   The purpose of assigning a detective was to, one,

22  contact, reach out to Facebook and see if they would remove

23  this as soon as possible; and secondly, contact the law

24  department and determine if this was going to be, if they

25  believed that this would be a criminal act or not.

1  Q.   Okay.  And then you said, second, you had drafted a

2  news release?

3  A.   That is correct.

4  Q.   And then you disseminated the news release?

5  A.   Yes, I did.

6  Q.   And then did you do any other further contact with the

7  media regarding the fake post?

8  A.   That afternoon I was contacted by a reporter from Fox 8

9  and I did an on-camera interview with them that evening in

10  reference to the fake Facebook page.

11              MR. MIRANDA:  Can I have a moment, Your

12         Honor?

13              THE COURT:  You may.

14              MR. MIRANDA:  Nothing further.

15              THE COURT:  All right.  Thank you.

16         Cross-examination.

17              MR. VICK:  Thank you.

18                   - - -

19         CROSS-EXAMINATION OF KEVIN RILEY

20  BY MR. VICK:

21  Q.   Hello, Lieutenant.

22  A.   Hello, sir.

23  Q.   How are you?

24  A.   Doing well.  How about yourself?

25  Q.   Fine.  Thank you.

68

1        Lieutenant, there were differences between the two
2   websites though, correct?
3   A.    The first time I observed it -- you're talking about
4   the header right here?
5   Q.    Correct.
6   A.    Yes, there was a difference.
7   Q.    And it was something with the word "The", right?
8   A.    That's correct.
9   Q.    And this is your official Facebook page picture?
10  A.    Yes, sir.
11  Q.    And it says Police Station - Government Organization,
12  correct?
13  A.    Yes.
14  Q.    I think, it's real blurry.
15        And this is Anthony's page?
16  A.    Yes, sir.
17  Q.    And his lists Community, correct?
18  A.    Yes.
19  Q.    It doesn't list Police Station?
20  A.    That is correct.
21  Q.    Or Government Organization?
22  A.    Correct.
23  Q.    And are you aware there was also something posted on
24  Anthony's page, the statement, We No Crime?
25  A.    I'm not aware of that, sir.

69

1  Q.    Did you review Anthony's page?

2  A.    I don't recall that particular thing you just said.

3  Q.    Maybe it would jog your memory if it was We, w-e, No,

4  n-o, Crime, instead of the proper spelling of the know?

5  A.    I'm sorry, I don't recall that.

6  Q.    That's fine.   Thanks, Lieutenant.

7         You stated in your direct examination that you were

8  concerned for your officers and for really the Giant Eagle

9  and the St. Anthony Church, right?

10  A.    Yes, sir.

11  Q.    Did you review the eleven dispatch calls that came in?

12  A.    I've listened to some of them, but that particular day

13  we more or less wanted to get the information out to the

14  news media and to have Detective Connor get in touch with

15  Facebook to get this page taken down.

16  Q.    And that's great, but that's not responsive to my

17  question.   Did you listen to the dispatch tapes on that day?

18  A.    I listened to some of them, yes.

19  Q.    And you're a trained officer, correct?

20  A.    Yes.

21  Q.    And had grave concern for your officers in these

22  locations, correct?

23  A.    Yes.

24  Q.    And you're aware that about half of the phone calls

25  that came in knew that this site was fake?

1   A.    Yes, some of them did know right away that it was fake.

2   They were advising us that the page was fake.

3   Q.    Correct.  Because nobody really reasonably thinks that

4   the police are going to perform abortions in that parking

5   lot, correct, Lieutenant?

6   A.    I would hope so.

7   Q.    Right, you would hope so.

8         And nobody really thinks that the police are going

9   to reform pedophiles at St. Anthony's Church?

10  A.    I'm sorry.  Can you repeat your question, please?

11              (Short interruption, fire alarm went off)

12              THE COURT:  That's okay.

13  Q.    Nobody really thinks that you guys were reforming

14  pedophiles in the Catholic church, right?

15  A.    Again, you would certainly hope so.

16  Q.    Yeah, I know.

17        You understand I have a job to do, I have to

18  represent my client, right, Lieutenant?

19  A.    Yes, sir.

20  Q.    And we know each other, right?

21  A.    Yes, sir.

22  Q.    Anybody show up at Giant Eagle?

23  A.    Not that I know of.

24  Q.    Did anybody show up at the church saying, Hey, I'm a

25  pedophile, let me take the 'no means no' test and I can

```
 1  become a police officer?

 2  A.    Not that I'm aware of.

 3  Q.    Any police officers get hurt because of the Facebook

 4  page?

 5  A.    I don't believe so.

 6  Q.    And your internal computer systems were never altered,

 7  correct?

 8  A.    No.

 9  Q.    They were always intact, correct?

10  A.    Yes.

11  Q.    Functioned appropriately, right?

12  A.    Yes.

13  Q.    The real Facebook page, there's no allegations that

14  Anthony hacked that page, is there?

15  A.    I'm sorry, what was that?

16  Q.    Maybe that was a bad question.  I'm sorry.

17         There's no allegations with respect to your Facebook

18  page that Anthony hacked or went into your Facebook page?

19  A.    I don't believe that our actual Facebook page was

20  tampered with on that particular day.

21  Q.    Right.  Anthony didn't put anything on the real page,

22  right?

23  A.    No.

24  Q.    And you have security systems in the police department,

25  correct?
```

```
 1   A.    Yes.

 2   Q.    Especially in the jail?

 3   A.    Yes.

 4   Q.    Those were always functional during March 1st to March

 5   3rd, correct?

 6   A.    Yes.

 7   Q.    Was 9-1-1 ever disabled?

 8   A.    No.

 9   Q.    And Anthony never used his Facebook page to tell

10   people, Hey, start flooding the police department with

11   telephone calls, right?

12   A.    I don't believe there's any postings on that fake

13   Facebook page relative to what you just stated.

14   Q.    Right, not on the fake page.  Right.

15         There were no threats in those posts against any

16   Parma Police officer, correct?

17   A.    No.

18   Q.    And -- again, I grew up in Parma, okay.  So when you

19   say racially sensitive information, Parma has a history of

20   being racially insensitive, whether right or wrong, correct?

21   A.    Yes.

22   Q.    Yeah.  And you know, based upon all your training and

23   experience and education classes, it's not a crime to poke

24   fun at a police officer, is it?

25   A.    No.
```

```
 1                    MR. VICK:  May I approach, Your Honor?

 2                    THE COURT:  You may.

 3                    MR. VICK:  Thank you.

 4   BY MR. VICK:

 5   Q.    Lieutenant, can you take a moment to look at that

 6   document.

 7   A.    Okay.

 8   Q.    Is this the press release you issued?

 9   A.    This is the second press release I issued.

10   Q.    I apologize.  The second press release, right?

11   A.    Yes.

12   Q.    This is the one that you sent out to all the media?

13   A.    This is the one I sent out to all the media after

14   Mr. Novak was arrested.

15   Q.    And contained within the body of this press release is

16   that Novak created a fake Facebook page, correct?

17   A.    Yes.

18   Q.    No secret, everybody knows that.  And you state that it

19   was set up in a manner that was similar to the Department's

20   official Facebook page, correct?

21   A.    That's what I wrote, yes.

22   Q.    Yeah, you don't state that it was identical or exactly

23   the same as your Facebook page, correct?

24   A.    Correct.

25   Q.    And then you state that after creating the page he
```

1  posted derogatory and inflammatory information that

2  purported to be from the Parma Police Department; is that

3  correct?

4  A.    Yes.

5  Q.    And that's really what you thought, right, that's why

6  you put it in the press release?

7  A.    Yes.

8  Q.    Okay.  When you say derogatory and inflammatory

9  information, you're talking about the posts that he wrote,

10  right?

11  A.    That is correct.

12  Q.    And there were -- I want to be correct -- six posts,

13  but there were ultimately seven posts, because he took one

14  of yours warning the public about his page and put it on his

15  page.

16  A.    Okay.

17  Q.    Right?

18  A.    I believe so.

19  Q.    Okay.  But all of those posts were written words with a

20  computer, or a cell phone, correct?

21  A.    I'm sorry.  Could you --

22  Q.    Strike that.  Horrible question.

23        All of those six posts were placed on his fake

24  Facebook page?

25  A.    Yes.

1  Q.    And they were words, words were used to comprise those

2  posts, correct?

3  A.    They were mostly words.  I think one of the posts may

4  have had a picture, some photographs.

5  Q.    A couple of them?

6  A.    A couple had photographs on them.

7  Q.    There were a couple pictures on them.

8         Can you point to me --

9              MR. VICK:  And I apologize for the record.  I

10             handed the Lieutenant what's been previously marked

11             as Defendant's Exhibit F.  And it was a press

12             release for immediate release on March 25th of 2016.

13             THE COURT:  Okay.  You have to talk a little

14             bit more slowly.

15             MR. VICK:  Thank you.

16  BY MR. VICK:

17  Q.    Lieutenant, is this a true and accurate copy of the

18  press release that you issued?

19  A.    Yes, sir.

20  Q.    And is that press release, is that how it would be kept

21  in the normal and ordinary course of business in the Parma

22  Police Department?

23  A.    Yes, sir.

24             THE COURT:  I'm sorry.  Was that Defendant's

25             Exhibit F?

1      MR. VICK:  Yes, Your Honor.

2   Q.   And the date of this is on March 25th, correct,

3   Lieutenant?

4   A.   Yes, sir.

5   Q.   From the time of March 2nd until March 25th, you had

6   conversations with Detective Connor, right?

7   A.   I'm sure I did.

8   Q.   And you put Detective Connor on the case; is that

9   correct?

10  A.   That is correct.

11  Q.   Was that your decision?

12  A.   Yes.

13  Q.   And just so we're clear, with the actual respect of

14  charging Anthony, that came from the law department though,

15  correct?

16  A.   That is correct.

17  Q.   Yeah.  In Defendant's Exhibit F can you point out in

18  your news release to the media each and every function of

19  your department that was disrupted?

20  A.   You know, other than attempting to confuse people with

21  the actual Facebook page that we have in our department and

22  the fake Facebook page there's nothing else listed on here.

23  Q.   Are you aware of the statute that you indicted him on?

24  A.   Yes.

25  Q.   Confusing the public is not part of that, correct?

1 A.     I would have to look at the statute in front of me.    I

2 don't --

3 Q.     Fair enough.

4 A.     I don't know it verbatim, so -- I'm sorry.

5 Q.     You also made comment to, I think, Cleveland.com or a

6 couple other media outlets, verbal comments, are you aware

7 of that?

8 A.     I spoke with a reporter from Cleveland.com and I spoke

9 to Melissa Reid from Channel 8.

10 Q.     And the same information that you gave them was roughly

11 the same information in the press release that the content

12 and the information that Anthony posted was inflammatory and

13 derogatory, correct?

14 A.     Yes.

15 Q.     And you felt that you were cognizant of his First

16 Amendment right, but you felt he went too far?

17 A.     That's correct, I believe he did.

18 Q.     How many classes on the First Amendment have you taken?

19 A.     In the police academy there's some brief discussions in

20 there, but nothing formal, nothing like what you would have

21 had in law school.

22 Q.     Thanks, Lieutenant.

23         How long ago were you in the police academy?

24 A.     1993 and 1997.

25 Q.     Did you participate in the execution of the search

1    warrant?

2    A.    No, sir.

3    Q.    Did any protesters show up at the police department?

4    A.    I don't believe so.

5    Q.    Didn't shut down a driveway or anything?

6    A.    No.

7              MR. VICK:  May I have one moment, Your Honor,

8         please?

9              THE COURT:  You may.

10             MR. VICK:  Thank you.  No further questions,

11        Your Honor.

12             THE COURT:  Okay.  Thank you.

13             Redirect.

14             MR. MIRANDA:  Thank you, Your Honor.

15                        - - -

16             REDIRECT EXAMINATION OF KEVIN RILEY

17   BY MR. MIRANDA:

18   Q.    Lieutenant, if you know, did everyone who called the

19   Parma Police about this fake page, did everyone know it was

20   fake?

21   A.    I think some people thought it could have been real.

22   Q.    Okay.  So -- and you didn't listen to every call,

23   correct?

24   A.    I didn't listen to each and every call.  I listened to

25   some of them that day.

1  Q.   And I think I heard you say to Mr. Vick that

2  criticizing the police is not a crime; did I understand that

3  right?

4  A.   Yes.

5  Q.   So you've been an officer for 28 years?

6  A.   Yes, 27 years.

7  Q.   Have you been criticized before?

8  A.   Yes.

9  Q.   Okay.  And you haven't arrested people just for

10  criticizing?

11  A.   No.

12  Q.   But you said that you were worried about this

13  particular post because it was inflammatory; is that right?

14  A.   Yes.

15  Q.   So why was this post different than just the criticism

16  you expect as a police officer?

17  A.   Well, there were several posts that we were worried

18  about in particular, just because of the, you know, the

19  racial sensitivity of -- Mr. Vick mentioned about Parma, and

20  we didn't want people thinking that this stuff was being put

21  out by the Parma Police Department, because, like I said, it

22  looked like it possibly could have been coming from the

23  department, as I stated in the news release.  And that was

24  the concern, we just wanted it down.  And then we were

25  concerned for the places where these, the two events said

80

1  that they were going to be held, one was at a Giant Eagle

2  and one was at St. Anthony's Church.

3  Q.    Lieutenant, if I am understanding your answer, you

4  think this is different because this is being done in the

5  name of the Parma Police; is that right?

6  A.    That's correct.  I believe that this page was set up to

7  mimic and impersonate the Parma Police Department's page to

8  look almost identical to it.

9  Q.    And you were worried because if people thought that it

10  was coming from a real page it could lead to an event

11  requiring police response?

12                 MR. VICK:  Objection, Your Honor.

13                 THE COURT:  It's overruled.

14  A.    We were worried that people were going to look at this

15  fake Facebook page and confuse it with the real Parma Police

16  Department Facebook page and either take action against the

17  police department or take action at the locations where

18  these events said that they were going to be held.

19  Q.    And why would that be a problem?

20  A.    Well, like I said earlier, two of the postings I felt

21  were racially inflammatory, and three of the postings I felt

22  dealt with socially contentious issues and we were just

23  concerned for public safety and the safety of our police

24  department.

25  Q.    Lieutenant, I guess my question is, why would it be a

```
 1  problem that people would gather, say, at Giant Eagle?
 2  A.    I think the event at Giant Eagle was for the fund
 3  raiser or something for teen abortions and, you know, if we
 4  have anti-abortion groups showing up at Giant Eagle or
 5  protesting outside of Giant Eagle, we were just concerned
 6  about the potential for physical harm that could occur or
 7  the potential harm that could happen to our officers because
 8  of these postings.  I was concerned that there would be
 9  people that would see that and, yeah, though the majority
10  may believe that and know that it's fake, there would be
11  some people that may see that and believe it's real and take
12  action based on that.
13                  MR. MIRANDA:  Nothing further, Your Honor.
14                  THE COURT:  Okay.  Thank you.
15                  Recross?
16                  MR. VICK:  No, nothing further, Your Honor.
17            Thank you.
18                  THE COURT:  All right.  Detective -- or
19            Lieutenant, you may step down.
20                              -  -  -
21                  (Thereupon, the witness was excused.)
22                              -  -  -
23                  THE COURT:  All right.  Will the lawyers
24            approach for a minute.
25                              -  -  -
```

Official Court Reporters

```
 1                    (Thereupon, a discussion was had between
 2               Court and Counsel at sidebar outside the
 3               hearing of the jury and off the record.)
 4                         - - -
 5               THE COURT:  All right.  Ladies and gentlemen,
 6          this will conclude our session for this evening.
 7               Again, you are not to discuss this case
 8          amongst yourselves.  You are not permitted to
 9          discuss it with anyone, or permit anyone to discuss
10          it in your presence.  You are not permitted to form
11          or express an opinion on this until it is finally
12          submitted to you.  In addition, you are not
13          permitted to read any articles or any media accounts
14          of this case as well.  You are not permitted to post
15          anything on Twitter, Facebook, SnapChat, Instagram,
16          whatever means that you use to communicate with the
17          outside world through social media.  And you are not
18          permitted to conduct any research of your own about
19          this case.  And you are not permitted to read the
20          newspaper or anything like that.  Is that clear?
21               THE JURY:  Yes.
22               THE COURT:  Okay.  All right.  So I hope you
23          have a really great evening tonight.  And we are
24          going to start at 9 o'clock tomorrow.  So if I can
25          have you here reporting to the fourth floor at like
```

ten to 9, and I will have you up as close to
9 o'clock as possible.

Now, tomorrow I would like to see if we could
go a little later.  Would 5:30 be okay?

THE JURY:  Yes.

THE COURT:  And I'm anticipating that we may
not be in session on Friday.  That's why we can go a
little longer tomorrow, and you may have Friday off.
I'll let you know for sure tomorrow.  And that means
that we would come back Monday to continue with the
trial.  All right?

So just so you sort of know what our schedule
may be.  All right.  So 5:30 tomorrow would be okay?

THE JURY:  Yes.

THE COURT:  And raise your hand and let me
know when you need a break.  We will be taking a
break in the morning, and we will take a break in
the afternoon, and probably a little sooner than we
did today.  All right?

And I do permit you to have any beverages
with you in the courtroom.  You may bring those in
with you as well.  All right.  I hope you have a
great night, and I will see you tomorrow.

All rise for the jury.  You can head on out.
Have a good night.

```
1                         - - -
2              (Thereupon, the jury was excused from the
3         courtroom and the following was held:)
4                         - - -
5              THE COURT:  The only issue we need to put on
6         the record is with regard to cause with the one
7         juror.
8              MS.  WOODS:  That's correct.
9              THE COURT:  Would you like to make your
10        argument?
11             MS.  WOODS:  Thank you, Your Honor.  As it
12        relates to initial Juror No. 11, who was excluded by
13        a peremptory challenge, the State moved to have her
14        excused for cause.  She was a social media expert
15        who had done, had worked for Channel 19 and had a
16        hand in the reporting of the story.  She was the one
17        who designed the layout of the page and then posted
18        the story.  She was familiar with the posts on the
19        page and had formed an opinion.  For that reason the
20        State asked to have her removed for cause.
21             THE COURT:  Thank you.  Mr. Vick?
22             MR. VICK:  Thank you, Your Honor.  The
23        Defendant, we put forth an argument that upon
24        adequate questioning she stated that she could be
25        fair and impartial and unbiased, and that that would
```

```
 1        not affect her ability to sit.  Thank you.

 2             THE COURT:  Okay.  And so my ruling is that

 3        she was not going to be removed for cause, and then

 4        the State exercised their peremptory challenge.

 5        Okay.

 6             Anything else we need to put on the record?

 7             MR. VICK:  No.

 8             MS. WOODS:  No.

 9             THE COURT:  Okay.  Thanks everyone.  We will

10        see you tomorrow.

11             MR. MIRANDA:  Thank you.

12             THE COURT:  Now, do the lawyers want to just

13        come up for a second.  We're done, Peggy.

14                       -  -  -

15                  (Thereupon, proceedings were

16                  adjourned until 9:00 a.m., on

17                  Thursday, August 11th, 2016, at

18                  which time the following

19                  proceedings were had:)

20                       -  -  -

21

22

23        THURSDAY MORNING SESSION, AUGUST 11th, 2016

24             THE COURT:  Okay.

25             MS. WOODS:  Your Honor, there's a stipulation
```

1    between the parties that the dispatch calls are

2    authentic and admissible.  The calls were taken by

3    several dispatchers and they're recorded in the

4    ordinary course of business.  Detective Connor

5    listened to all the calls received and, as noted,

6    it's signed by all parties.

7            MR. VICK:  That is accurate, Your Honor.

8            THE COURT:  So what you want to do, and I

9    will leave it up to you, is you'll notice in the

10   instructions there's a section for stipulations, so

11   if you would like to read it into the record prior

12   to the jury going to deliberate, you may, or if you

13   want me to read it.

14           MS. WOODS:  I think both parties agree that

15   it should come from you.

16           MR. VICK:  All the instructions are coming

17   from you.

18           THE COURT:  Well, I'll do it either way.  It

19   doesn't matter to me.  So what I'll do then is I'll

20   have my secretary write that stipulation into the

21   written version.

22           MS. WOODS:  The same with the Facebook

23   records.

24           THE COURT:  Do you want to read that one in

25   the record as well?

Official Court Reporters

```
 1                    MS. WOODS:  Yes, Your Honor.
 2                    THE COURT:  Is that one lengthy?
 3                    MR. VICK:  No, I think it is two paragraphs.
 4                    THE COURT:  Okay.
 5                    MR. VICK:  I believe you have the signed
 6          copies as well.
 7                    THE COURT:  I do.
 8                    MR. VICK:  Correct.
 9                    THE COURT:  Why don't we do that one at --
10          we'll do that one before we take a break.  Okay.
11                    All right.  Let me get them lined up.
12                    MS. WOODS:  And I believe that stipulation
13          was put in the record at the last hearing.
14                    THE COURT:  It was.  Okay.  So we don't have
15          to put that one on.
16                              -  -  -
17                    (Thereupon, proceedings were resumed within
18                    the presence of the jury as follows:)
19                              -  -  -
20                    THE COURT:  All right.  You may be seated.
21                    Good morning, ladies and gentlemen.  I hope
22          you had a really nice evening.  And we are ready to
23          continue with our trial.
24                    On behalf of the State, would you like to
25          call your next witness, please.
```

Official Court Reporters

```
1              MS. WOODS:  Your Honor, the State calls
2    Daniel Heinz.
3              THE COURT:  Okay.  You can come on up and
4    raise your right hand.
5                        Thereupon, the STATE OF OHIO, to
6                        further maintain the issues on its
7                        part to be maintained, called as a
8                        witness, DANIEL HEINZ, who, being
9                        first duly sworn, was examined
10                       and testified as follows:
11             All right.  You may have a seat, and just
12   make sure that you do speak loudly and clearly and
13   into the microphone.
14             JUROR NO. 6:  I know him.  Does that affect
15   this?
16             THE COURT:  Why don't the lawyers approach
17   for a minute.
18                        -  -  -
19             (Thereupon, a discussion was had between
20             Court and Counsel at sidebar outside the
21             hearing of the jury and off the record.)
22                        -  -  -
23             THE COURT:  You know what, why don't you
24   approach the bench, the juror, and Miss Peggy, too.
25                        -  -  -
```

```
 1              (Thereupon, a discussion was had between
 2          Court and Counsel at sidebar outside the
 3          hearing of the jury as follows:)
 4                         - - -
 5          THE COURT:  Okay.  If you want to come
 6      forward.  Now, you just indicated you know the
 7      witness?
 8          JUROR NO. 6:  Uh-huh.
 9          THE COURT:  How do you know him?
10          JUROR NO. 6:  He's my daughter's best
11      friend's father.
12          THE COURT:  So how much interaction do you
13      have with him?
14          JUROR NO. 6:  Not a lot.
15          THE COURT:  Do you socialize with him?
16          JUROR NO. 6:  Not really.
17          THE COURT:  And it's really just your
18      children?
19          JUROR NO. 6:  Yeah, they're both on the same
20      softball team.  I mean, minor chatting at the game,
21      but that's about it.
22          THE COURT:  Okay.  And will this affect the
23      way that you assess this case?
24          JUROR NO. 6:  No.
25          THE COURT:  And do you feel that you could
```

1   still be fair and impartial to both the State and

2   the Defense?

3          JUROR NO. 6:  Yes.

4          THE COURT:  Now, do you know what he does?

5          JUROR NO. 6:  Yes.

6          THE COURT:  And what does he do?

7          JUROR NO. 6:  He's a detective.

8          THE COURT:  Does he ever discuss his work

9   with you?

10         JUROR NO. 6:  No.

11         THE COURT:  And it sounds to me like your

12  contact with him is minimal?

13         JUROR NO. 6:  Pretty minimal.

14         THE COURT:  So how often is your daughter

15  with his daughter?

16         JUROR NO. 6:  Two, three times a week.

17         THE COURT:  So the daughters are close?

18         JUROR NO. 6:  Yes.

19         THE COURT:  Okay.

20         JUROR NO. 6:  Best friends.

21         THE COURT:  And how long have they been best

22  friends?

23         JUROR NO. 6:  Fifteen years, 14 years.

24         THE COURT:  So a long time.  But you as the

25  parents never socialized?

```
 1              JUROR NO. 6:  The parents are divorced, so I
 2    don't really interact with him.  For the past few
 3    years now she's been staying with him, not with her
 4    mother.
 5              THE COURT:  Oh, I see.  She lives with the
 6    dad?
 7              JUROR NO. 6:  Now.  And that's happened in
 8    the past few years maybe.
 9              THE COURT:  And you don't feel in any way his
10    testimony would have any affect on you and that you
11    couldn't be fair to both the State and the
12    Defendant?
13              JUROR NO. 6:  I can be fair.
14              THE COURT:  Okay.  And on behalf of the
15    State?
16              MS. WOODS:  You said your contact with him is
17    minimal?
18              JUROR NO. 6:  Uh-huh.  I said it was just
19    like at the softball games or for parent events at
20    school.
21              I've been to his house, but I just drop my
22    daughter off and pick her up, I don't interact.  If
23    I do, I just say, Hi, what's going on, that kind of
24    thing.
25              MS. WOODS:  Do you know which department he
```

1     works for inside the detective bureau?

2           JUROR NO. 6:  No.

3           MS. WOODS:  Did he ever discuss this case

4     with you?

5           JUROR NO. 6:  No.

6           THE COURT:  And you could be fair to both the

7     Government and the Defendant?

8           JUROR NO. 6:  Yes.

9           MS. WOODS:  Nothing further.

10          THE COURT:  Mr. Vick?

11          MR. VICK:  I want to say thanks, man, you

12    didn't have to do that.  That action goes a long

13    way.

14          Let me just ask you this.  If after the Judge

15    gives you the law you just think that they didn't

16    prove their case, are you okay if you come back with

17    a not guilty verdict and, say, you saw him at a

18    sporting event?

19         JUROR NO. 6:  Yeah.

20         MR. VICK:  You don't feel you would have an

21    obligation to say, I got to see this guy, I don't

22    want him to think I screwed his case up?

23         JUROR NO. 6:  No.

24         MR. VICK:  That's fine.  Nothing more.

25         THE COURT:  Okay.  And thank you very much

```
 1              for bringing that to our attention.  This is how the
 2              system should work.
 3                       MR. VICK:  Absolutely.
 4                       THE COURT:  Okay.  And you don't feel
 5              uncomfortable?
 6                       JUROR NO. 6:  It was quite a shock for me.
 7                       THE COURT:  And you don't feel uncomfortable
 8              at all?
 9                       JUROR NO. 6:  No.
10                       THE COURT:  Are we okay?
11                       MS. WOODS:  All right.
12                       MR. VICK:  Yes.
13                              - - -
14                       (Thereupon, proceedings were resumed within
15                       the hearing of the jury as follows:)
16                              - - -
17                   DIRECT EXAMINATION OF DANIEL HEINZ
18       BY MR. MIRANDA:
19       Q.   Good morning.
20       A.   Good morning.
21       Q.   State your name for the record.
22       A.   Daniel Heinz.
23       Q.   And how do you spell your last name?
24       A.   H-e-i-n-z.
25       Q.   Where are you employed?
```

1   A.    City of Parma Police Department.

2   Q.    How long have you been with them?

3   A.    Twenty-six years.

4   Q.    And were you ever employed with any other police

5   agencies before them?

6   A.    No.

7   Q.    What's your title with the Parma Police Department?

8   A.    I am a detective with the narcotics unit.

9   Q.    Okay.  So as a detective in the narcotics unit, what

10  are sort of your duties or responsibilities?

11  A.    We investigate all drug complaints and follow up on all

12  drug arrests.

13  Q.    How many cases would you say you handle at a given

14  time?

15  A.    More than I can count.  Probably, I would say that I

16  have 50 open cases right now.

17  Q.    Okay.  Did you ever become aware of a fake Parma Police

18  Facebook page?

19  A.    Yes, I did.

20  Q.    Do you recall how you became aware?

21  A.    I believe it was a discussion, I'm not sure if it

22  was in roll call or at some point on March 2nd that somebody

23  had started a fake Parma Police Facebook page.

24  Q.    And roll call is what?

25  A.    It's where we gather in the morning to get our

1  assignments.

2  Q.    So you heard it somewhere at the office, at the

3  department?

4  A.    Correct.

5  Q.    Okay.  And did you have any role in that investigation?

6  A.    Yes, I did.

7  Q.    What was your role?

8  A.    Once we were made aware that there was a fake page,

9  of course we all started looking at it, and I began to look

10  at the page and tried to figure out how it had spread so

11  quickly.  So what I did is I went to the fake page, I

12  looked at the very first post that was made on that page and

13  saw that it had numerous shares.  I went through the shares,

14  I went down to the first share, which would be the first

15  person that shared this post, and it returned to a profile

16  of Anthony Novak.

17        So from that point I went to Anthony Novak's

18  Facebook page and started reading the comments on his page,

19  and there was strong indication that if he did not make the

20  page, he knew who did make the page.

21  Q.    And did you do anything to document the Anthony Novak

22  page?

23  A.    Yes, I took a couple screen shots, and being that

24  Detective Connor was assigned to the case, I gave the screen

25  shots to him.

1    MR. MIRANDA:   May I approach, Your Honor?

2    THE COURT:   You may.

3    Q.   Showing you what's been marked as State's Exhibit 17,

4    do you recognize that exhibit?

5    A.   Yes.

6    Q.   And can you describe the exhibit?

7    A.   It's a post made by Anthony Novak the morning that this

8    page, we first were aware of the page saying that, "I'm just

9    going to say I woke up and feel very satisfied by my actions

10   right now."

11   Q.   Okay.  And is that the screen shot you described

12   earlier?

13   A.   Yep.  I can't say definitely if I took this screen

14   shot.  I did share the screen shots with Detective Connor.

15   I don't know if he used my screen shot or if he took his

16   own.

17   Q.   Okay.  Let me ask you this.  Is that the information

18   you recall observing?

19   A.   Yes, it looks like it is my screen shot.

20   Q.   So that's a true and accurate description of what you

21   observed that morning?

22   A.   Correct.

23   Q.   And is that exhibit I have showed you consistent with

24   what's shown on this screen up here?

25   A.   Yes.

1   Q.   Okay.  And can you just describe again what's that top

2   post?

3   A.   "I'm just going to say I woke up and feel very

4   satisfied by my actions right now."

5   Q.   Okay.  And then is there a second post on this?

6   A.   The second post is I believe the original post that was

7   made in reference to the Parma Police Department where he

8   wrote a story about homeless people and shared that, and

9   that would be the first share of that story.

10   Q.   So that second post is the sharing of the story that

11   sort of tipped you off?

12   A.   Correct.

13   Q.   I am showing you what's been marked as State's Exhibit

14   11, do you recognize that exhibit?

15   A.   I do not.  I don't believe I took this one.

16   Q.   Can you take a look at all the pages of that exhibit.

17   A.   No, I do not recall seeing this or taking these shots.

18   Q.   Okay.  If I can direct you to a specific portion here.

19               MR. VICK:  Objection, Your Honor.

20               THE COURT:  Overruled.

21               MR. VICK:  May we approach?

22               THE COURT:  You may.

23                   - - -

24               (Thereupon, a discussion was had between

25               Court and Counsel at sidebar outside the

1          hearing of the jury and off the record.)

2                         -  -  -

3          MR. MIRANDA:  May I approach, Your Honor?

4          THE COURT:  You may.

5    BY MR. MIRANDA:

6    Q.    Showing you what's been marked as State's Exhibit 18,

7    do you recognize that document?

8    A.    Yes.

9    Q.    And how do you recognize it?

10   A.    It's the one that we went over earlier, where he says

11   he's very satisfied by his actions right now.

12   Q.    And you personally observed that?

13   A.    Yes, I did.

14   Q.    Okay.  And that's a true and accurate depiction of what

15   you observed?

16   A.    Yes.

17   Q.    And this version contains comments on it, correct?

18   A.    Yes.

19   Q.    This exhibit.

20          And can you describe what about that document was

21   important to you?

22   A.    Once again, it's comments over saying he woke up

23   feeling very satisfied about what he did.  And there were

24   some comments from, I guess, followers and friends of his,

25   Do you have any food or money or cigarettes and drugs; and

1   he responds, I'm not willing to do time for this guys.

2   He'll be leaving this city in a body bag.

3   Q.   And is what you just read, is that accurately depicted

4   on the screen here?

5   A.   Yes.

6   Q.   And so you viewed these posts on Anthony Novak's

7   personal Facebook page.  Why was that relevant to your sort

8   of investigation?

9   A.   Well, it's relevant to me being that it appears he

10  knows he did something wrong.

11              MR. VICK:  Objection, Your Honor.

12              THE COURT:  That's sustained.

13  A.   And that --

14  Q.   Let me give you a different question.

15              MR. VICK:  Your Honor, I move to strike the

16         responsive portion of that.

17              THE COURT:  Okay, your motion is granted.

18  BY MR. MIRANDA:

19  Q.   Based on the information you discovered, what did you

20  provide to Detective Connor?

21  A.   I provided him with a screen shot.

22  Q.   And why did you provide him that information?

23  A.   Because the comment about leaving in a body bag.

24  Q.   Okay.

25              MR. MIRANDA:  Can I have a second, Your

1    Honor?

2              THE COURT:  You may.

3    Q.   And, Detective, could you just describe the atmosphere

4    of the office that morning?

5    A.   Once we --

6              MR. VICK:  Objection, Your Honor.

7              THE COURT:  Overruled.

8    A.   Once we were made aware of the Facebook page, I believe

9    we all stopped what we were doing to take a look at it, and

10   a couple of us tried to figure out who did it and where it

11   started, and that's how I came across this.

12   Q.   And are you talking about the whole department or the

13   bureau?

14   A.   The bureau.

15   Q.   Okay.

16             MR. MIRANDA:  Nothing further, Your Honor.

17             THE COURT:  Okay.  Cross-examination.

18             MR. VICK:  Thank you, Your Honor.

19                          -  -  -

20

21

22

23

24

25

```
 1              CROSS-EXAMINATION OF DANIEL HEINZ
 2    BY MR. VICK:
 3    Q.    Good morning, Detective.   How are you?
 4    A.    Good morning.
 5    Q.    You stated on the morning of March 2nd you were made
 6    aware that there was a fake Facebook page, correct?
 7    A.    Yes.
 8    Q.    And you viewed the first posting on there about the
 9    homeless, correct?
10    A.    I did.
11    Q.    Did you look at the other five postings on there?
12    A.    I don't know if I saw all of them.   I did look and see
13    something about some abortions and things like that.   I
14    don't know if I read every post.
15    Q.    So your job as a detective is to take information in a
16    case and fully investigate it, correct?
17    A.    When I am assigned a case, yes.
18    Q.    Correct, when you're assigned to a case.   So a drug
19    case, you get assigned a drug case and you start doing your
20    investigation, looking at who may have done the crime,
21    correct?
22    A.    Correct.
23    Q.    Looking at what substance or what drug is involved in
24    the crime, correct?
25    A.    Sure.
```

102

1  Q.   And you do everything you feel like you need to do to

2  fully educate yourself and get familiar with the allegations

3  of that crime, correct?

4  A.   Sure.

5  Q.   And you were made aware that there was a fake Facebook

6  page, correct?

7  A.   Correct.

8  Q.   Your testimony is you did not look at the entire

9  contents of the fake page?

10 A.   As I stated earlier, I wasn't assigned the case and all

11 I did was just pass an investigative lead on to the

12 detective that was assigned to the case.

13 Q.   Okay.  So you weren't assigned the case, so you had no

14 official function in the case, correct?

15 A.   I think we all have an official function in the case if

16 it deals with our police department.

17 Q.   But you weren't assigned to the case?

18 A.   No, I wasn't assigned to it.

19 Q.   Thank you.  Now, you also mentioned that you looked at

20 posts about the police department offering teenage abortions

21 in the back of a van, correct?

22 A.   I did see a post with some language like that.  I don't

23 recall exactly what it stated.

24 Q.   Okay.  And did you see the post about the pedophile

25 reform event at a Catholic church?

1   A.    I believe I did see it.

2   Q.    And you would agree with me that no reasonable police

3   department would offer a pedophile reform event at a

4   Catholic church, correct?

5   A.    I would have to agree with that.

6   Q.    And the same thing with the abortion one, right,

7   Detective?

8   A.    I don't recall if some people actually believed that

9   one.  I know that there were people that believed that

10  homeless post.

11  Q.    And that's great, because that wasn't in response to my

12  question either.

13        Did you ever have any knowledge of a police

14  department offering abortions?

15  A.    No.

16  Q.    So you knew that this page was fake the minute you

17  looked at it, didn't you?

18  A.    By looking at it visually, it appeared to be the same

19  as ours.  The posts obviously -- the only way you could tell

20  the difference between me looking at, briefly, ours and this

21  page were the posts.

22  Q.    Correct.  And the content of the posts, correct?

23  A.    Correct.

24  Q.    And that's really what separated or set it apart from

25  the real Facebook page?

104

1  A.  Yes.

2  Q.  And the real Facebook page wasn't altered in any way,

3  correct?

4  A.  Our department page?

5  Q.  That's correct.

6  A.  I can't answer that because I really have nothing to do

7  with it.

8  Q.  That's fair enough.  Okay.

9       The comment on State's Exhibit 17, which is also

10  duplicated on State's 18, "I am just going to say I woke up

11  and feel very satisfied by my actions right now," you took

12  that screen shot and that's what that document says,

13  correct?

14  A.  Correct.

15  Q.  That document doesn't have any indication or any

16  description as to what actions that post is talking about,

17  correct?

18  A.  His actual post, no, the comments do, that's correct.

19  Q.  The comments do?

20  A.  Yes.

21  Q.  What, in your opinion, is the comments talking about?

22  A.  The comments, in my opinion, are responses to his post

23  about the homeless people and not feeding homeless people

24  and the comments obviously had to do with feeding and I'm

25  hungry and food.

105

1  Q.    That's correct, isn't it?

2          This is a joke between Jeremy Orges, Thomas

3  Weishampel, Anthony Novak, and Ash Cilantro Torres, where

4  the two posts above that are saying, Hey, I'm hungry, I need

5  cigarettes, I don't have any money, and Anthony's going, I'm

6  not willing to do time for this; is that what the posts say?

7  A.    Well, I don't see -- Yes.

8  Q.    So you see that's what they say.  And the first post

9  about the homeless was, In the City of Parma you're not

10  allowed to, the citizens are not allowed to feed the

11  homeless anymore, and if you do, you're going to do 60 days

12  in jail, correct?

13  A.    Correct.

14  Q.    And that is on Anthony Novak's personal Facebook page?

15  A.    Correct.

16  Q.    This is not on the fake Facebook page?

17  A.    This is -- no, it's on his personal page.

18  Q.    And it's not on the City of Parma's real Facebook page,

19  correct?

20  A.    No.

21  Q.    And it's not on the City of Parma's real website,

22  correct?

23  A.    Correct.

24  Q.    Thank you.

25              MR. VICK:  I have nothing further, Your

106

1  Honor.

2  THE COURT: All right. Redirect?

3  MR. MIRANDA: No redirect, Your Honor.

4  THE COURT: Okay. You may step down.

5  - - -

6  (Thereupon, the witness was excused.)

7  - - -

8  THE COURT: You may call your next witness.

9  MS. WOODS: Thank you, Your Honor. The State

10  calls Lisa Jerman.

11  THE COURT: You can come on up and I'll swear

12  you in. Raise your right hand, please.

13  Thereupon, the STATE OF OHIO, to

14  further maintain the issues on

15  its part to be maintained, called as

16  a witness, LISA JERMAN, who,

17  being first duly sworn, was examined

18  and testified as follows:

19  All right. You may have a seat up in the

20  witness chair. And just make sure you do speak

21  loudly and clearly so that our court reporter can

22  take down all of your information. Okay?

23  THE WITNESS: Okay.

24  THE COURT: And your seat is not adjustable,

25  but your microphone is.

Official Court Reporters

107

1            THE WITNESS:  All right.

2            THE COURT:  Thank you.

3            - - -

4          DIRECT EXAMINATION OF LISA JERMAN

5 BY MS. WOODS:

6 Q.    Good morning.

7 A.    Good morning.

8 Q.    For purposes of our jury, could you please identify

9 yourself, and then for our court reporter spell your name.

10 A.    Lisa Jerman, and that's J-e-r-m-a-n.

11 Q.    And where are you employed, Miss Jerman?

12 A.    City of Parma.

13 Q.    And what is your job title for the City of Parma?

14 A.    Safety forces dispatcher.

15 Q.    And what does your job entail?

16 A.    It entails many things, answering phones, 9-1-1 and

17 non-emergency calls, fire and police; answering the radio;

18 keeping track of where our officers are at all times, and

19 our medical units; entering warrants, entering missing

20 persons and stolen vehicles.

21 Q.    Sounds like a very full-time job?

22 A.    Very full time, yes.

23 Q.    How much down time do you get in a regular day?

24 A.    How much what?  I'm sorry.

25 Q.    How much down time do you get to just sit around and

1  chat with your co-workers?

2  A.    No time at all.

3  Q.    On a regular weekday during the day, how many people

4  are working with you?

5  A.    Our minimum is at five right now.  We are in the

6  process of hiring more.  We are taking on -- we are a

7  regional dispatch center now, so --

8  Q.    What is a regional dispatch center?

9  A.    Several cities involved, we dispatch for Parma, Parma

10  Heights and Brooklyn, police and fire.

11  Q.    So you get calls from all of those cities?

12  A.    Exactly.

13  Q.    How is the work divided?

14  A.    Well, when we come into work, we are assigned certain

15  spots; there are a couple call takers, two call takers at a

16  time, there's going to be a fire dispatcher, there will be a

17  Parma Police dispatcher, and there's a Parma Heights and

18  Brooklyn dispatcher, they're on the same band.

19  Q.    So if a person calls in to a Parma Heights dispatcher,

20  the same person could be calling in from Brooklyn Heights as

21  well; is that correct?

22  A.    From Brooklyn?

23  Q.    I'm sorry.  From Brooklyn.

24  A.    You mean when the phone calls come in?

25  Q.    Yes.

109

1   A.   Yeah, phone calls come in, we determine what city it
2   is, take the call, and that call will be sent over to the
3   dispatcher for dispatch.
4   Q.   Were you working on March 2nd of this year?
5   A.   I don't have that information with me, whether I was or
6   not.
7   Q.   Did you take any calls as it related to a fake Facebook
8   page?
9   A.   Yes.
10  Q.   If I played that call for you, would you be able to
11  identify it?
12  A.   Yes.
13  Q.   I am going to play for you what's now marked as State's
14  Exhibit 9-I.

15                  MS. WOODS:  If my technology works.
16              I'll bring it up here so you can hear it.
17                          -  -  -
18              (Playing dispatch call - 9-I)
19                          -  -  -
20  BY MS. WOODS:
21  Q.   Do you recognize 9-A?  I'm sorry.  9-I?
22  A.   9-I?
23  Q.   Do you recognize the voices in that?
24  A.   In this?
25  Q.   Yes.

```
 1   A.    My voice.

 2   Q.    Do you recognize your voice in that?

 3   A.    Yes.  Yes.

 4   Q.    So you took this call?

 5   A.    Yes.

 6              (Playing dispatch call - 9-I)

 7   Q.    Was that the entire call?

 8   A.    Yes.

 9              THE COURT:  Could everyone hear that?

10              A JUROR:  No.

11              A JUROR:  No.

12              MS. WOODS:  They will all be replayed later.

13              THE COURT:  Okay.

14              MS. WOODS:  I will get them in later.  They

15         will all come in again with a different witness.

16              THE COURT:  Okay.

17   BY MS. WOODS:

18   Q.    How were you made aware that this was floating around,

19   this fake Facebook page was floating around out there?

20   A.    We had -- we had another call taker taking calls that

21   day, and we're all in the same room, so you're hearing

22   things that are going on about this fake Facebook page, and

23   people are calling in about it.

24              And one of our dispatchers took a lot of -- you

25   know, a lot of calls were coming through, so when I took
```

1   that call, I already knew that it was being taken care of.

2                   MS. WOODS:  No further questions for this

3          witness, Your Honor.

4                   THE COURT:  Okay.  Cross-examination?

5                   MR. VICK:  Yes.  Thank you, Your Honor.

6                         -  -  -

7                   CROSS-EXAMINATION OF LISA JERMAN

8   BY MR. VICK:

9   Q.    Good morning.  How are you?

10  A.    Fine.  How are you?

11  Q.    Good.  Thank you.

12        Your job is to take phone calls, right?

13  A.    Correct.

14  Q.    I apologize.  Part of your job?

15  A.    Part, yeah.

16  Q.    From what you had described to the prosecutor, you have

17  a very involved job, correct?

18  A.    Very.

19  Q.    Very important?

20  A.    Yes.

21  Q.    And entering warrants is probably really important,

22  correct?

23  A.    Yes, it's part of the job.

24  Q.    Correct.  You had said that the department is hiring

25  more dispatchers?

112

1  A.    Yes.  We're in the process of training and hiring, yes.

2  Q.    Is that because you don't have enough to field the

3  volume of answering calls, emergency, non-emergency, where

4  the officers are, handling the warrants, or you just need

5  additional help?

6  A.    We're taking on another city.  Soon we're taking on

7  Brook Park, so we need more dispatchers.

8  Q.    So the reason for hiring additional ones is for

9  Brook Park coming on board?

10  A.    Brook Park, yes.

11  Q.    And you testified that you handled that phone call,

12  right?

13  A.    Yes.

14  Q.    How long was that call?

15  A.    It wasn't very long at all.

16  Q.    Ten seconds?

17  A.    Yeah.  I already knew that the calls were coming in, we

18  were getting calls already and we were handling them.

19  Q.    And part of your job duties and responsibilities is to

20  get information out or answer questions to people that call,

21  correct?

22  A.    Uh-huh.

23  Q.    And people call with pretty absurd things sometimes,

24  don't they?

25  A.    Yes.

1  Q.   Cat in a tree?

2  A.   Yes.

3  Q.   Other types of incidents like that?

4  A.   Uh-huh.

5  Q.   And on the flipside, you have maybe domestic violence

6  victims calling where they're screaming for help?

7  A.   Yes.

8  Q.   And that probably is really stressful dealing with

9  those people, right?

10  A.   Oh, yes.

11  Q.   Trying to keep them calm?

12  A.   Exactly.

13  Q.   Letting them know help is on its way?

14  A.   Yes.

15  Q.   Do you handle 9-1-1 calls as well?

16  A.   Yes, we do.

17  Q.   And you said you answer the phones all the time; is

18  that correct?

19  A.   I mean, if it's my assigned duty for the day, I would

20  be answering the phones.  If we have over -- you know, if

21  the call takers are busy, you may pick up a phone call, you

22  know, if my radio's not busy, you know, we'll just pick up

23  and answer.

24  Q.   But it's not a function where you answer a call, pick

25  up, boom, answer another call, hang up, answer another call,

1 hang up, answer another call, hang up, I mean, there's time

2 in between your day where you're not answering calls,

3 correct?

4 A.    Could be, maybe on radio.

5 Q.    And when you took this call, were you prevented from

6 answering another call?

7 A.    I cannot tell you that for sure.

8 Q.    When you took this call, were you prevented from

9 sending an officer's car out to a victim?

10 A.    I cannot tell you yes or no on that.

11 Q.    So there's no evidence that you were; is that what

12 you're telling us?

13 A.    I have no idea.  That would need to be further

14 investigated if it was.

15 Q.    And you didn't get any calls from Anthony Novak, did

16 you?

17 A.    No.

18 Q.    And you're aware that there was a fake Facebook page,

19 correct?

20 A.    At that point, at the time of that call, yes, I did.

21 Q.    Did that fake Facebook page make any calls to you?

22 A.    I don't understand your question.

23 Q.    Did you receive any calls from the Internet?

24 A.    No.

25           MR. VICK:  Thank you, Your Honor.  Nothing

1    further.

2              THE COURT:  All right.  Thank you.  Redirect?

3                        - - -

4         REDIRECT EXAMINATION OF LISA JERMAN

5    BY MS. WOODS:

6    Q.   You told Mr. Vick that your job isn't to just answer

7    phones, that sometimes you don't get call after call.  Are

8    there times where you get call after call?

9    A.   Certainly, a lot of times.

10   Q.   And when you get calls about the cat in the tree or a

11   fake Facebook page, could your time have been spent doing

12   something better?

13             MR. VICK:  Objection.

14             THE COURT:  Sustained.

15             MS. WOODS:  No further questions, Your Honor.

16             THE COURT:  Okay.  Thanks.  Recross?

17             MR. VICK:  Oh, nothing, Your Honor.

18             THE COURT:  Thank you.  You may step down.

19                        - - -

20             (Thereupon, the witness was excused.)

21                        - - -

22             THE COURT:  All right.  You may call your

23        next witness.

24             MS. WOODS:  The State calls Detective Klein.

25             THE COURT:  Okay.  Detective, if you would

116

1  come up and I will swear you in.

2  Thereupon, the STATE OF OHIO, to

3  further maintain the issues on its

4  part to be maintained, called as a

5  witness, MICHAEL KLEIN, who,

6  being first duly sworn, was examined

7  and testified as follows:

8  Okay.  You may have a seat.  And please just

9  make sure that you speak loudly and clearly into the

10  microphone.

11  THE WITNESS:  Yes, ma'am.

12  THE COURT:  Your seat is not adjustable, but

13  your microphone is.

14  MS. WOODS:  Your Honor, may I approach so I

15  can grab those exhibits?

16  THE COURT:  You may.

17  MS. WOODS:  Thank you.

18  - - -

19  DIRECT EXAMINATION OF MICHAEL KLEIN

20  BY MS. WOODS:

21  Q.  Good morning, Detective.

22  A.  Good morning.

23  Q.  For purposes of our jury, could you please introduce

24  yourself, and for purposes of our court reporter, please say

25  your name -- spell your name and your badge number, please.

117

1  A.    Detective Michael Klein, that's K-l-e-i-n, badge 743,

2  with the Parma Police Department.

3  Q.    Detective, you said you're with the Parma Police

4  Department, where are you with the Parma Police Department?

5  A.    Currently, I'm assigned to the criminal investigation

6  division, which is our detective bureau.

7  Q.    And how long have you been with the detective bureau?

8  A.    Since 1997, so 19 years.

9  Q.    How long have you been with the police department, with

10 Parma as a whole?

11 A.    Going on 31 years now.

12 Q.    Did you have any training to be a police officer or a

13 detective?

14 A.    During my initial employment they sent us down to the

15 OSP Academy for the initial certification, so I had the

16 training through the uniform patrol part of it way back

17 then.  When I got into the detective bureau, I received some

18 specialized training in regards to felony investigations,

19 interview techniques.  And currently I have some training in

20 regards to some forensic analysis of digital evidence.

21 Q.    What are your daily duties as a detective?

22 A.    My primary duty assignment is case investigation.  I

23 get my own case load of anything from assaults to thefts

24 that I investigate.

25 Q.    Do you assist any other detectives in their

1  investigations?

2  A.    Yes.  I received some training for some forensic cell

3  phone, computer, and image work that I assist other

4  detectives with.

5  Q.    What kind of training is that?

6  A.    Training through several different -- a lot of it is

7  vendor specific training; like with the cell phone analysis,

8  the system we use is called Celebrate, so I received

9  training from them, but then we get a lot of training

10  through the Ohio Bureau of Criminal Investigations, the FBI,

11  several other law enforcement type entities that teach

12  investigators how to correctly analyze computers, cell

13  phones and video images.

14  Q.    Are you Parma's defacto in-house computer guy?

15  A.    Computers, cell phones, video images, yeah, pretty much

16  that stuff.

17  Q.    If a detective in your bureau gets a case with video or

18  a cell phone that needs extraction, is that something that

19  you would assist with?

20  A.    Yes.

21  Q.    Did you assist Detective Connor as it relates to items

22  relating to Anthony Novak or a fake Facebook page?

23  A.    Yes.

24  Q.    And what did you do?

25  A.    Detective Connor presented me with a list of items,

1  some cell phones, some computers, some flash memory, even a

2  couple of game consoles that were seized at the Defendant's

3  house during a search warrant of the house.  Detective

4  Connor had obtained a search warrant to search those items

5  for any type of digital evidence related to the case.

6  Q.    And what did you do with those items?  We'll start with

7  the game consoles first.

8  A.    I examined them, I basically took them apart to get to

9  the memory cores.  I ran them through our software, FTK, for

10  the computer's AccessData product, to analyze them to see if

11  there were any images, communications, anything related to

12  the Facebook investigation.

13  Q.    For those that might not know, you said there's a

14  memory card in those game consoles.  What is usually stored

15  there?

16  A.    Potentially, as far as game systems go, the most I ever

17  found on any of those have been -- with a lot of the game

18  systems you can log online with them and actually

19  communicate with other people during live playing of games.

20  It's almost like, it could be an Internet server basically,

21  so you can do a lot of the same stuff you can do on a

22  computer, with a lot of the newer game consoles.

23          So usually I'm looking for any type of

24  communications, chats, you know, back and forth between

25  people, that type of thing.

120

1   Q.    And as it relates to this case, did you find anything

2   in those game consoles?

3   A.    Nothing significant or connected with the

4   investigation, no.

5   Q.    If I showed you physical evidence, would you be able to

6   recognize them?

7   A.    I should, yes.

8   Q.    I'm going to show you what's been marked as State's

9   Exhibit 4.

10                  MS. WOODS:   Your Honor, may I approach?

11                  THE COURT:   You may.

12  BY MS. WOODS:

13  Q.    Do you recognize that item, Detective?

14  A.    Yes.

15  Q.    And how do you recognize that item?

16  A.    It's got one of our evidence tags on it that describes

17  what the contents are, along with the No. 6, which is off,

18  probably off the inventory from the search warrant from the

19  house, and my name and initials are down here, too, which

20  indicates when I was done processing the phone.

21  Q.    And when you process a phone, what do you do?

22  A.    I take a look at it, see what the make and model of it

23  is, who the carrier is for it, to determine if my equipment

24  and software can analyze it, because not all cell phones can

25  be analyzed.

Official Court Reporters

121

1  Q.   Was this phone able to be analyzed?

2  A.   Oh, yes.  Yeah.

3  Q.   And what's the make and model on that phone?

4  A.   It's a Samsung Galaxy S5, a very popular model.

5  Q.   So when you analyze a phone, or analyze a Samsung in

6  this case, what do you do?

7  A.   I have the software interrogate the phone to pull off

8  anything that's recoverable on the phone.  Most of the time

9  it's your contact list, like most people have on their

10 phone, text messages, phone records, if they're available on

11 the phone, as far as who you talked to over the past X

12 number of days.  Nowadays I get a lot of, very similar to a

13 computer, I'll get all your web surfing history, what sites

14 you would have accessed through your Internet server on the

15 phone, power on, power off, a bunch of administrative

16 information.

17 Q.   And once you get this information, what do you do with

18 it?

19 A.   Depending on the investigator and what they're

20 requesting off the phone, I analyze the evidence that got

21 pulled off of it to see if there's anything related to the

22 investigation.  If it's a drug case, obviously I'm looking

23 for anything that shows any type of drug activity, pedophile

24 stuff on kiddy porn cases.  With this it was obviously a

25 Facebook issue, communications referencing Facebook, that

1  type of thing.

2  Q.    Do you save all of the information that you pull off of

3  a phone?

4  A.    Correct.

5  Q.    And where do you save it?

6  A.    The primary collection point is our computer back at

7  the office that I do all the analyzing on.  I always keep

8  the raw data right there in its original form in case it's

9  requested.  What I do for the investigators, because they

10 can't work with all the raw data I pull off from the

11 software, I have to provide it to them in a standardized

12 format that they can scroll through.  Most of the time

13 that's an Excel spreadsheet, because Excel is real easy to

14 click through when you're examining a large amount of data.

15 Q.    I am going to show you what's been marked as State's

16 Exhibit 2, do you recognize it?

17 A.    Yes, this would have been the end product for my exam

18 that I would have presented to Detective Connor on the

19 Samsung Galaxy S5.

20 Q.    With the information that you pull off of the phone --

21 what kind of information do you pull off?

22 A.    As I stated, whatever data is available on the unit

23 that the software recognizes and categorized.  Primarily,

24 I'm usually targeting text messages, chat records, images, a

25 lot of times pictures, videos that are stored on the phones.

```
 1   Nowadays, phones are basically mini computers, so it can
 2   have a lot of different information on it.
 3   Q.    I'm going to show you what's been marked as State's
 4   Exhibit 2-A, do you recognize this document?
 5   A.    Yes.
 6   Q.    And how do you recognize it?
 7   A.    It's our standard format, if you print it out of the
 8   Excel spreadsheet that I provide to the investigators.
 9   That's a summary of my processing of an individual unit.
10   Q.    And is that the same processing you did on State's
11   Exhibit 4?
12   A.    This one actually documents the processing of the
13   Kyocera cell phone, not the Samsung.
14   Q.    How many cell phones did you do a forensic analysis on
15   in this case?
16   A.    As I recall, there were two cell phones and one like a
17   tablet, more like a smallish touch screen tablet I worked
18   on.
19   Q.    As it relates to the Samsung, were you able to pull any
20   text messages?
21   A.    Oh, yes.
22   Q.    How many text messages about were you able to pull?
23   A.    If I recall, the end report was something in the 2,000
24   range.
25   Q.    And in those -- did you read through all of those text
```

1   messages?

2   A.    Yes.

3   Q.    Was there anything that relates to the creation of a

4   fake Parma Police Department Facebook page?

5   A.    Yes.

6   Q.    At any point during the course of your forensic

7   analysis, did you create a separate list of just those text

8   messages?

9   A.    Yes.

10  Q.    I'm going to show you what's been marked as State's

11  Exhibit 2-B, and see if you recognize it.

12              MS. WOODS:   Your Honor, may I approach?

13              THE COURT:   You may.

14  A.    Yes, I recognize it.

15  Q.    And how do you recognize that?

16  A.    It's the text messages I isolated, per your request

17  actually, related to this case off of that phone.

18  Q.    I'm showing you what's up on the Mondopad, is that the

19  same as State's Exhibit 2-B that is in your hand?

20  A.    Yes, it is.

21  Q.    And in your view of those text messages, what did you

22  find?

23  A.    There were numerous conversations or texting between

24  the Defendant and other persons referencing the Facebook

25  page, what was going on with it, responses he was getting

1  about the Facebook page, and basically how it was hitting
2  the news and how famous he was going to be or they were
3  going to be.
4  Q.    In those messages, Detective -- why don't you give us a
5  sampling of some of those text messages.  And I can zoom in
6  here so the jury can read that a little better.
7         Let's start from the oldest one.
8  A.    The oldest one I have is from, it looks like March 2nd,
9  2016, where someone named Jeremy, it starts with Jeremy
10  saying, "I hope you don't get shut down, Novak."  Novak
11  obviously referring to the Defendant.  And then Novak sends
12  back to Jeremy, "Nope it's up and running."  And then the
13  records show that they shared a link to the Fox 8 News
14  website where they were covering the --
15              MS. WOODS:  Your Honor, may I approach the
16          witness with a mouse so that he can direct the
17          screen so that it's matching what he's discussing?
18              THE COURT:  You may.
19  A.    I'm basically just going to scroll all the way to the
20  bottom of the screen, which is going to show us the oldest
21  one that I'm referring to.  Yeah, right here at the bottom.
22  This is the one that I was first talking about.  If you read
23  these columns across, it says "From," and it gives you the
24  target number, and this information is drawn from the
25  phone's contact list.  I don't know who Jeremy is or if it's

126

1  really a Jeremy, it's just how it's recorded in the phone's
2  contact list.

3      So when the software pulls it off, it says that
4  phone number is Jeremy, and on the 2nd of March at 9:46 --
5  "Read" means obviously that the holder of the phone accessed
6  it and read the text message.  And that's where it starts
7  with, "Novak did you create that Parma Police Department
8  Facebook page?"  And then he gets a second text from Jeremy
9  right after that that he read that said, "MAYBE I'm just
10 jumping to conclusions but I wanna say it was you."

11     Now, as you can see with the next one up, this is
12 sent to Jeremy's phone at this date and time.  It's sent,
13 which means someone who's using the Samsung phone to send a
14 text to Jeremy, and that says, "Yes hahah and that post has
15 been shared 203 times hahah."

16     And then as you continue reading up, the phone
17 received a text from Jeremy.  Jeremy says, "That's the
18 funniest thing ever."  And then another one that was read on
19 the phone that says, "You made that page ten years ago?"
20 Then there was one that was sent to Jeremy's phone from the
21 Samsung phone that says, "When I woke up the post had 3000
22 views about 10 minutes later it had six thousand views
23 hahah."

24     Then Jeremy sends him a text saying, "I'm dying
25 right now I was like damn I can't believe these police."

1    Then the phone sent out a text saying, "Hahahah."

2    Then it continues on.  "And then I was like...

3  NOVAKKK" gets sent to the phone.  There's more laughing

4  about the 8000 views, that the phone sent to Jeremy.  Then

5  they ask, Jeremy sends a text to the phone, which was read,

6  and the text says, "How did you differentiate it from the

7  actual Parma police page?"  And then a second text comes

8  into the phone, which was read, and that text was from

9  Jeremy again and it says, "Or did you somehow hack into it."

10  And then the holder of the phone sends a text to Jeremy, "I

11  just made a page and gave it the same name and pictures and

12  shared the post on my wall.  It just grew from me sharing it

13  once hahah."

14    Then Jeremy sends, "That's awesome."  And then

15  Jeremy sends another one, "You have the best ideas man."

16  And then Jeremy sends another one, "Oh my god I'm dying

17  laughing right now in a silent class room of people taking a

18  test."  Jeremy sends another one, "About the written exams

19  and shit how minutes should not apply."  And then the holder

20  of the phone texts to Jeremy, "Hahahah."

21    And then another text is sent to Jeremy, "Did

22  everyone look at you?"  Jeremy sends a text back saying,

23  "Yeah like why are you laughing."  Then Jeremy sends another

24  text, "People who are sharing it are getting real upset."

25  And then Jeremy sends another text, "So I shared it too."

1   And then Jeremy sends another text, "And got real upset."

2   Then the holder of the phone texts back to Jeremy saying,

3   "Hahahah."

4         Then the holder of the phone gets a text from

5   someone identified as Drew with a specific telephone number

6   that says, "I like someone commented that it's so inhumane

7   and that other cities are doing it too. Hahah."

8                   MR. VICK: Judge, may we approach?

9                   THE COURT: You may.

10                  - - -

11                  (Thereupon, a discussion was had between

12                  Court and Counsel at sidebar outside the

13                  hearing of the jury and off the record.)

14                  - - -

15  BY MS. WOODS:

16  Q. Detective, these are just a small sample of the texts

17  that were pulled that regarded to this. How many texts over

18  all were sent or received regarding this fake Facebook page

19  that you were able to determine?

20  A. Well, I don't have an official count on the number of

21  texts, but there's about ten or eleven pages worth that I

22  isolated for you.

23  Q. And when you isolated these text messages, what

24  criteria were you looking for?

25  A. In the software you're able to search target words, so

1  obviously my target words here were police, Facebook, that

2  type of thing, and that brought me to the locations on the

3  text records, and then I would have to start reviewing to

4  see, I still had to follow the whole line.  Like with these

5  texts, there was actually texts in between that had nothing

6  to do with the case, talking about picking up a

7  prescription, I think there was a family illness.  There

8  were some texts that just had nothing to do with this, so I

9  eliminated those and just compiled the ones that looked like

10  they were conversational, part of the Facebook

11  investigation.

12  Q.    And in these text messages, in your training and

13  experience, you didn't change any of the words; this is

14  exactly how it appeared on the phone?

15  A.    Correct.  If you examine the raw data that was

16  presented to Detective Connor, all these texts are present

17  in their exact same context and form, just out of order,

18  because I eliminated all the un-involved stuff.

19  Q.    What other actions did you take with the Samsung phone?

20  A.    With the Samsung phone, once I did my exam, I isolated

21  the pertinent text messages obviously, I went through the

22  images because I figured somebody who built a web page would

23  need images to work off of to see if I had anything that

24  matched up with, you know, a Parma PD patch or something

25  like that.

130

1  Q.   Did you pull any images from the phone that were

2  responsive to the Facebook page?

3  A.   Not that I recall from the phone itself, no.

4          MS. WOODS:   Your Honor, may I approach?

5          THE COURT:   You may.

6  Q.   Detective, I am handing you what has been marked as

7  State's Exhibit, we'll start with 5-B, do you recognize

8  that?

9  A.   Yeah.  This would have been the Toshiba laptop that was

10 submitted for exam.

11 Q.   Did you do a forensic exam on that computer?

12 A.   Yes, I did.

13 Q.   I'm also going to show you what's been marked as

14 State's Exhibit 5-A, do you recognize that?

15 A.   This is a second Toshiba laptop submitted for exam.

16 Q.   Are there any markings on these exhibits that indicate

17 how you're able to identify those?

18 A.   Each one of them has an evidence sticker that describes

19 what the item is.

20 Q.   And are your initials on these as well?

21 A.   On the outside packaging I did not initial anywhere.

22 Q.   Did you do a forensic analysis of these two laptops?

23 A.   Yes, I did.

24 Q.   And is your forensic analysis of the laptop the same as

25 if, same as a cell phone, or is it different?

1   A.    It's different software, slightly different procedure.

2   You have to isolate the hard drive and apply a write block

3   to make sure that your software and computer doesn't

4   contaminate the target hard drive, but then the software

5   takes over after that, pulls off the information, and then

6   you examine it off of what you took off the hard drive.

7   Q.    Did you find -- what did you find as it relates to the

8   laptops; anything about a fake Facebook page?

9   A.    Yeah, there were images specifically that I took off of

10  it and provided to Detective Connor that look like they

11  might have been related to the case.

12  Q.    What did you do with those images that you pulled off?

13  A.    I archived them to a disk and provided them to

14  Detective Connor.

15              MS. WOODS:  Your Honor, may I approach?

16              THE COURT:  You may.

17  Q.    I am handing you what has been marked as State's

18  Exhibit 19, do you recognize it?

19  A.    Yes.

20  Q.    How do you recognize it?

21  A.    It's marked, it's on one of our Parma Police evidence

22  disks, and it's marked with the case information.

23  Q.    And what is that?

24  A.    The case information?

25  Q.    What is the disk of?

1  A.    Images from Novak's computer.

2  Q.    Are those images you took from the laptops?

3  A.    Yes.

4  Q.    I am showing you what's been marked as State's Exhibits

5  7, 8 and 21.

6              MS. WOODS:  Your Honor, may I approach?

7              THE COURT:  You may.

8  Q.    Take a look at those, Detective, and see if you

9  recognize those.

10  A.    Yes, I do.

11  Q.    And how do you recognize those?

12  A.    They appear to be the copies of the images that I took

13  off the computer and provided to Detective Connor.

14  Q.    Let's start with Exhibit 7.  State's Exhibit No. 7, is

15  that the same as what is showing up here on the Mondopad?

16  A.    Yes.

17  Q.    And what is that an image of?

18  A.    It appears to be a screen capture of comments posted on

19  the Internet from the Facebook page.

20  Q.    And did you create this screen shot or was it already

21  on the laptop?

22  A.    It was already on the laptop.

23  Q.    And it can't be read -- what are the comments on there?

24  A.    Starting at the top where it's Scarlett Calvert,

25  comments, "Shame on you parma police.  No wonder people are

1    turning against police.  You need your heads examined."

2         And then just below that an Allison Virgili says,

3    "This is a fake page."

4         And then the same Scarlett Calvert responds, "I sure

5    hope so.  But I went on parma police page and it says the

6    same."

7    Q.   Let's turn to State's Exhibit 8.  Is this the same up

8    on the Mondopad that you're holding in your hand?

9    A.   Yes.

10   Q.   And what is that of?

11   A.   Again, a screen shot of a posting from the Facebook

12   page indicating that the Parma Police are looking for a

13   subject involved in a robbery.

14   Q.   And for purposes of the record, can you read what that

15   post says?

16   A.   At the top it's titled, "The City of Parma Police

17   Department," and then it says, "We have forgotten to post

18   that on September 30, 2015 at approximately 10 a.m. the

19   Parma Subway Sandwich Shop located at 5890 Broadview Rd.

20   was robbed at knife point.  The white male offender got away

21   with a small amount of money and did not harm the clerk.

22   Moments after an unrelated African American women was seen

23   loitering for over 20 minutes in front of the store despite

24   their no loitering policy.  If you have any information

25   regarding this African American womans whereabouts please

1  contact The City Of Parma Police Department so that she may

2  be brought to justice.  This is the best still photo we have

3  of the offender.  Mentor Police and Middleburg Hts. Police

4  have reported similar loitering offenses which may be the

5  same female.  The Parma Police Department is seeking

6  assistance identifying the individual in the picture.

7  Please contact Detective Joe Tremble."

8  Q.    Does a Detective Joe Tremble work for the Parma Police

9  Department?

10  A.    No.

11  Q.    Was there an armed robbery that you were aware of in

12  Parma?

13  A.    Not that I'm aware of, no.

14  Q.    And on page 2 of State's Exhibit 8, does that match

15  what you have in your hand?

16  A.    Correct.  It's the bottom half, which would have

17  included the pictures from the surveillance video.

18  Q.    Were these screen shots that you prepared or were they

19  already on the laptop?

20  A.    They were already on the laptop.

21  Q.    I am showing you what's been marked as State's Exhibit

22  21, is this, what's up on the screen, the same as what is in

23  your hand?

24  A.    Yes.

25  Q.    Do you recognize it?

1  A.    Yes.

2  Q.    And how do you recognize it?

3  A.    It appears to be one of the screen shots from the

4  computer that I archived for Detective Connor.

5  Q.    Did you prepare this screen shot or was it already on

6  the laptop?

7  A.    It was recovered off the laptop.

8  Q.    And what is this a screen shot of?

9  A.    Again, it appears to be a posting from the City of

10  Parma Police Department Facebook page.

11  Q.    And what does this post, this screen shot post say?

12  A.    Starting at the top it says, "Due to the slow increase

13  of a homeless population in our city, The Parma Police

14  Department is pleased to announce that it will be

15  introducing a new temporary law that will forbid residence

16  of Parma from giving ANY HOMELESS person food, money, or

17  shelter in our city for 90 days.  This is in an attempt to

18  have the homeless population eventually leave our city due

19  to starvation.  Residents caught giving the homeless

20  population food, shelter, or water will be sentenced to a

21  minimum of 60 days in jail.  You have been warned."

22  Q.    To your knowledge, is that an actual law that Parma has

23  on its books?

24  A.    No, it's not.

25  Q.    Was this ever a law on Parma's books, to your

136

1  knowledge?

2  A.    Not for the 31 years that I have been there.

3  Q.    Did you do a forensic analysis of any other items?

4  A.    Yes.   There were some, as I recall, USB memory devices,

5  USB hard drives, that type of thing, a couple flash cards

6  like from cameras that I examined, but there wasn't anything

7  pertinent recovered from them that I recall.

8  Q.    You mentioned earlier that there was a Kyocera phone?

9  A.    Yes.

10  Q.    Did you do a forensic analysis on that?

11  A.    Yes.

12  Q.    I am going to show you what's been marked as State's

13  Exhibit 3 and 3-B.

14              MS. WOODS:   Your Honor, may I approach?

15              THE COURT:   You may.

16  Q.    Do you recognize State's Exhibits 3 and 3-B?

17  A.    State's Exhibit 3 would be the end product I provided

18  to Detective Connor after I processed the Kyocera cell

19  phone.   So on here would be the Excel spreadsheet and the

20  files from that phone.   And then Exhibit 3-B is like what I

21  did to the Samsung, I isolated the text messages related to

22  this case, eliminated all the personal and unrelated stuff,

23  and compiled it in a sheet for you.

24  Q.    I'll take those.

25              Everything that you did a forensic analysis of, do

1    you change any of the data?

2    A.    No.   The practices involve using write blockers and

3    processes that do not contaminate the evidence that we're

4    examining.

5    Q.    So everything that you examined matches exactly the way

6    it appears if we were to plug in these laptops or start up

7    the cell phones?

8    A.    Correct.   If an independent examiner would take a look

9    at it, they should end up with the same results.

10   Q.    How many years have you been doing forensic analysis?

11   A.    The cell phones for going on three years now, the

12   computers for two.

13              MS. WOODS:   Thank you, Your Honor.   No

14          further questions.

15              THE COURT:   Okay.   Cross-examination?

16              MR. VICK:   Thank you, Judge.

17                   - - -

18          CROSS-EXAMINATION OF MICHAEL KLEIN

19   BY MR. VICK:

20   Q.    Good morning, Detective.   How are you?

21   A.    Very well, sir.   Yourself?

22   Q.    You're very well versed and educated in technology,

23   correct?

24   A.    I've been trained, yes.

25   Q.    You've been trained.   I mean, you know a heck of a lot

1  more about this stuff and how to get into phones than I do;

2  is that a fair statement?

3  A.    That's probably safe to say, yes.

4  Q.    Safe to say.  And a lot of your investigation -- strike

5  that.

6         Some of your investigation deals with child

7  pornography, correct?

8  A.    Yes.

9  Q.    I mean, it's just amazing these days what types of

10  things people hide on cell phones, isn't it?

11  A.    Correct.

12  Q.    Okay.  When did you become involved in this case?

13  A.    I was advised of the search warrant that they were

14  executing over at the Defendant's residence the date of the

15  search warrant.  I actually stopped by and helped identify

16  items that they would want to recover for further analysis.

17  I think I was coming down to court, so I had to leave before

18  they were done.  So that whatever the day of the search

19  warrant would have been my first involvement.

20  Q.    So that would have been like March 20th, or the week of

21  the 20th to the 25th, if you recall?

22  A.    That sounds accurate.

23  Q.    Were you aware that when the search warrant was

24  executed for the residence, that Facebook had already

25  responded to the search warrant that Detective Connor sent

1  to Facebook?

2  A.    I was not aware of that.

3  Q.    So you weren't aware that Detective Connor already had

4  over 3,000 documents from Facebook?

5  A.    No, I was not.

6  Q.    Okay.  How many items did you analyze?

7  A.    As I recall, I'd have to take a look at the original

8  search warrant for the electronic evidence to be a hundred

9  percent accurate, but the ones I was focusing on were the

10  two cell phones, there was a touch pad item that I had to

11  use the Celebrate on because the computer software wouldn't

12  touch it, and the two laptops, and I believe three other

13  items that were classified as flash memory, the USB drives

14  and the flash memory.

15  Q.    Were you aware that the majority of those items

16  actually weren't Anthony's?

17  A.    I did not establish ownership at that time, no.

18  Q.    Gotcha, okay.

19        You made a statement that the software you use goes

20  into a phone or a computer or something that you want to

21  analyze, correct?

22  A.    It pulls the information off the phone, yes.

23  Q.    And I think you said your software interrogates the

24  cell phone?

25  A.    That's a good word.

```
 1   Q.   It is a good word, I like it.  I got to be honest with
 2   you, I've never heard that described that way.
 3            But in all of the text messages that you reviewed,
 4   like from Anthony, you know, and there were thousands of
 5   them, from Anthony, to Anthony, all of those text messages,
 6   did you find any use of the N word?
 7   A.   Not that I recall.
 8   Q.   And we're all familiar with various racial slurs and
 9   epithets, right?
10   A.   Yes.
11   Q.   Did you find any racial slurs or epithets in there?
12   A.   Not that I recall, no.
13   Q.   And you looked at thousands of text messages, correct?
14   A.   Yes.
15   Q.   And for the sake of judicial economy we focused on like
16   March 2nd and 3rd, correct?
17   A.   Correct.  I --
18   Q.   I'm sorry?
19   A.   Yes.
20   Q.   And I think you took some out that went back to like
21   February or January --
22   A.   Yes.
23   Q.   -- of 2016?
24   A.   Correct.
25   Q.   Longer than March 2nd of 2016?
```

1  A.    Correct.

2  Q.    When you analyzed the text messages, and you stated you

3  had read all of them, right?

4  A.    Yes.

5  Q.    Most of 'em?

6  A.    Yes.

7  Q.    For purposes of --

8  A.    I do a lot of scanning to find the relative things,

9  yeah.

10  Q.    I didn't read them all either.

11  A.    It gets old.

12  Q.    Did you find any text messages where Anthony was

13  saying, Go out and tell people to start calling the Parma

14  Police?

15  A.    No.

16  Q.    Did you find any evidence -- strike that.

17       If there were evidence on the computer or the cell

18  phone that Anthony, and I think we even called it the user

19  or holder of the cell phone, had accessed any of the Parma

20  websites or the Facebook pages, like maybe hacked it or went

21  into it, would you have been able to determine that?

22  A.    There should have been some evidence of that, I would

23  think.  I've had other cases where I showed people accessing

24  things and copying 'em.  It doesn't always show up, but

25  there should have been some evidence of any type of hacking

142

1  going on.

2  Q.  So you have had cases where you did find evidence?

3  A.  Yes.

4  Q.  And that sometimes maybe they're just good or it just

5  didn't show up on some documents?

6  A.  Correct.

7  Q.  Or some electronics?  I apologize.

8  A.  Correct.

9  Q.  And you found no evidence of that in this case?

10  A.  No.

11  Q.  And you looked at two cell phones, correct?

12  A.  Yes.  The Kyocera and the Samsung, yes.

13  Q.  And you noticed, and you even said as you were going

14  through there, there were texts from Anthony or the holder

15  of the phone discussing a serious family illness, correct?

16  A.  I recall there was something about a family member

17  being ill, yes.

18  Q.  And there were some very personal text messages in

19  there, aren't there?

20  A.  Yes.

21  Q.  Maybe between friends and family members?

22  A.  Yes.

23  Q.  And you took the roommate's phone, too, correct?

24  A.  Yeah, I believe that was the Kyocera.

25  Q.  And the roommate was never arrested, was he?

1   A.   Not that I'm aware of, no.

2   Q.   And you gave the same interrogation to the roommate's

3   phone?

4   A.   Correct.

5   Q.   And you did a tablet?

6   A.   Yes.

7   Q.   Two computers?

8   A.   Yes.

9   Q.   Did you do all the externals?

10  A.   If I was able to.  As I recall, I believe one of the

11  game systems didn't have a, basically, a removable memory

12  for me to interrogate, so I couldn't do anything with it.

13  Q.   Were there thumb drives?

14  A.   Yes.  The USB memories?

15  Q.   Correct.

16  A.   Yes.

17  Q.   Did you analyze those?

18  A.   Yes.

19  Q.   And there was no evidence which, in your professional

20  law enforcement opinion, you thought was pertinent to the

21  detective's investigation?

22  A.   Correct.

23  Q.   Do you know approximately how many -- I mean, is it

24  gigabytes or terabytes of information you extracted?

25  A.   There was a lot.  I don't have an exact number for you.

144

```
1   Q.    That's okay.
2         And at least for purposes of your investigation, you
3   were operating under authority of a validly issued search
4   warrant?
5   A.    Correct.
6   Q.    And you need a search warrant to get into people's
7   phones like that, correct?
8   A.    Or consent.  If I got --
9   Q.    He didn't consent in this case, did he?
10  A.    Not that I'm aware of, no.
11                MR. VICK:  Thank you, Your Honor.  Nothing
12          further.
13                THE COURT:  Okay.  Thank you.  Redirect?
14                           - - -
15          REDIRECT EXAMINATION OF MICHAEL KLEIN
16  BY MS. WOODS:
17  Q.    Detective, when you began your forensic analysis of
18  these items, what were you looking for?
19  A.    Evidence related to the Facebook page that Detective
20  Connor was investigating, the establishing of it or
21  conversations about it.
22  Q.    And did you find such evidence?
23  A.    Yes.
24  Q.    Were you able to determine from your forensic analysis
25  who set up the page?
```

```
 1   A.    Yes.

 2   Q.    And who was that?

 3   A.    The Defendant, Mr. Novak.

 4   Q.    Do you see -- did you ever meet the Defendant prior to

 5   your doing the search warrant?

 6   A.    No.

 7   Q.    I'm sorry.  Not the search warrant, the forensic

 8   analysis?

 9   A.    No.

10   Q.    Did you have any interactions with him after you did

11   the forensic analysis?

12   A.    Not that I recall, no.

13                MS. WOODS:  Nothing further, Your Honor.

14                MR. VICK:  Nothing further, Judge.  Thank

15         you.

16                THE COURT:  Okay.  Thank you.

17                          - - -

18                (Thereupon, the witness was excused.)

19                          - - -

20                THE COURT:  Ladies and gentlemen, we are

21         going to take a ten-minute break at this time.  So

22         I'm going to have you back here at 11 o'clock.  You

23         are not to discuss this case amongst yourselves.

24         You are not to discuss it with anyone.  You are not

25         permitted to have anyone discuss it in your
```

```
1              presence.   You are not permitted to form or express

2              an opinion on this case until it is finally

3              submitted to you.

4                     In addition, you are not to conduct any

5              research of your own.   You are not to post anything

6              on Facebook, Twitter, Instagram, SnapChat, whatever

7              means you use to communicate with the outside world

8              through social media.   All right?

9                     You are not to read any newspaper or any

10             other news accounts of this case as well.

11                    All right.   I'll see you in ten minutes.

12                    All rise for the jury.

13                            - - -

14                         (Thereupon, the jury was excused

15                          from the courtroom).

16                            - - -

17             THE COURT:   Okay.   You may be seated.

18             Anything that we have to put on the record?

19             MS. WOODS:   Nothing from the State, Your

20             Honor.

21             THE COURT:   Okay.

22             MR. VICK:   Nothing from the Defense at this

23             point in time.

24             THE COURT:   Okay.   So I'll see you in ten

25             minutes.
```

Official Court Reporters

1     Oh, who's your next witness?

2     MS. WOODS:  Our next and final witness, Your

3 Honor, will be Detective Connor.  And he'll be long.

4     THE COURT:  Okay.  Like all day, the rest of

5 the afternoon?

6     MS. WOODS:  We have a lot of documents to go

7 through, Your Honor.

8     THE COURT:  Okay.  And then what's your -- do

9 you know what your schedule is?

10    MR. VICK:  I don't right now, to be perfectly

11 honest with you.  And I'm not hiding anything.  A

12 lot of this is going to come down to how he goes.

13    THE COURT:  Okay.  So maybe we'll finish with

14 the evidence today and then do closing on Monday.

15    MR. VICK:  Yeah.

16    THE COURT:  Potentially.  Because I intend to

17 go to 5:30 today, so I don't know.  Will the

18 detective be on the stand for four, five hours?

19    MS. WOODS:  I don't anticipate five hours,

20 but I also don't know how long the cross is going to

21 be.

22    THE COURT:  All right.  We will see.

23       -  -  -

24     (Thereupon, a recess was taken.)

25       -  -  -

1        (Thereupon, proceedings were resumed within

2        the presence of the jury as follows:)

3                    - - -

4        THE COURT:  All right.  You may be seated.

5   You may call your next witness.

6        MS. WOODS:  Okay.  The State calls Detective

7   Tom Connor.

8        THE COURT:  All right.  Detective.

9

10                  Thereupon, the STATE OF OHIO, to

11               further maintain the issues on its

12               part to be maintained, called as a

13               witness, THOMAS CONNOR, who, being

14               first duly sworn, was examined

15               and testified as follows:

16   All right.  You may be seated.

17   And please just make sure you speak loudly

18   and clearly into the microphone.  Your seat is not

19   adjustable, but your microphone is.

20        THE WITNESS:  I will.

21        THE COURT:  Okay.  Thank you.

22                    - - -

23

24

25

DIRECT EXAMINATION OF THOMAS CONNOR

BY MS. WOODS:

Q.   Good morning, Detective.

A.   Good morning.

Q.   For purposes of our jury, can you please reintroduce
yourself, and for purposes of our court reporter, please say
and spell your last name and your badge number, please.

A.   Sure.  My name is Thomas Connor, spelled C-o-n-n-o-r.
I'm a detective with the Parma Police Department, badge
number is 764.

Q.   How long have you been a detective with the Parma
Police Department?

A.   Since October of '99.

Q.   And where were you employed before that?

A.   I was employed with the United States Marine Corps.

Q.   Were you ever a patrol officer?

A.   I was, yes.  I was hired in 1996 and I spent three
years on the road in the uniformed patrol division.

Q.   Of what agency?

A.   Of the Parma Police.

Q.   Were you a patrol officer for anywhere else?

A.   No.

Q.   What training and experience do you have as a police
officer?

A.   I went to the Ohio State Highway Patrol Academy in

1  1999. When I went to the detective bureau, I received

2  training through OPOTA, the Ohio Peace Officers Training

3  Association. At that particular time, when I went into the

4  detective bureau, I worked in the youth and sex crimes

5  division from 1999 to 2008. During that time I was also a

6  member of the Internet Crimes Against Children Task Force,

7  so you can imagine there's plenty of follow-up training

8  working on sexual crimes with interviewing and interrogation

9  of victims, both child victims, and yet more training in

10  regards to Internet crimes.

11  Q.  Were you working on March 2nd of this year?

12  A.  I was, yes.

13  Q.  And what were you -- what were your plans on March 2nd;

14  did you have any open cases on your docket at that point?

15  A.  I did, absolutely. At any given time I have, I would

16  say, 20 to 25 open cases on my desk. Unfortunately, we call

17  them back burner cases, other things take priority. On that

18  particular day, I know that just a day or two before I was

19  working on a case involving an harassment by an inmate, it

20  wasn't probably but a week before that I was working on an

21  aggravated robbery from State and Snow Roads at a Marathon,

22  and I was still working on a case from December of 2015

23  which was a home invasion. So those three really come to

24  mind as cases that were up at the top.

25  Q.  Were those your high-priority cases --

```
 1   A.    For sure.
 2   Q.    -- at that time?
 3         What types of cases do you usually handle for the
 4   Parma Police Department?
 5   A.    In 2008, as I said, I left the youth and sex crimes
 6   division, so now I work in the general felony unit, so we
 7   handle all felonies from, you know, your F-5s to your F-1s,
 8   your aggravated murders all the way down to felony thefts.
 9   Q.    Is this different than, Detective Heinz testified that
10   he's in the narcotics branch?
11   A.    Yes.
12   Q.    What are the differences?
13   A.    Clearly, narcotics works drug investigations, sometimes
14   they'll work corruption cases.  We work -- I don't work any
15   narcotics cases, so that's a difference.  I don't work -- no
16   longer do I work any sexual crime cases.  I don't work in
17   the Internet Crimes Against Children Task Force anymore.
18   It's just basic -- you know, not basic felonies, anything
19   other than drugs and sex crimes the general unit handles.
20   Q.    And what county is Parma, Ohio located in?
21   A.    Cuyahoga County.
22   Q.    And what state?
23   A.    State of Ohio.
24   Q.    At some point during the day of March 2nd, did it come
25   to your attention that there was a fake Parma Police
```

1  Department Facebook page?

2  A.    Yes.

3  Q.    How did that come to pass?

4  A.    Lieutenant Riley came over to my desk, he advised me of

5  it, and he told me I was assigned to it.

6  Q.    Is that typical of assignments?

7  A.    Yes.  Assignments come from supervisors.  Usually we

8  get our assignments in roll call, so I guess this was a

9  little different, but things happen in the course of a day.

10 Q.    If a case comes up that has or requires specialized

11 training, are cases then assigned based off of specialized

12 training?

13 A.    Typically, yes.

14 Q.    Were you made aware of any reason that this case was

15 assigned to you, or was it just that your name was next in

16 the hopper?

17 A.    No.  My name wasn't in a hopper, but I believe it was

18 assigned to me because of my years of experience working in

19 Internet crimes.

20 Q.    What did you do first, once being assigned?

21 A.    I was advised of the fake post and I pulled it up

22 immediately, read through it.  I had to really figure out

23 what we had here, what was going on.  So I went through

24 that.  I looked at our, the actual Parma Police Department's

25 Facebook page, and I looked at the two of them, what

1  actually do we have here.

2             MS. WOODS:  Your Honor, may I approach?

3             THE COURT:  You may.

4  Q.   Detective, I'm showing you what has been marked as

5  State's Exhibit 1, do you recognize that?

6  A.   I do, yes.

7  Q.   And how do you recognize that?

8  A.   This is a printed-out copy of the actual Facebook page

9  for the Parma Police Department, the real one.

10 Q.   Is what is up on the screen the same as what you have

11 in your hand?

12 A.   Yes.

13 Q.   And if you're aware, what does the Parma Police

14 Department use their Facebook page for?

15 A.   To my knowledge, it's to seek, you know, help from the

16 public.  Oftentimes detectives will ask that a video

17 surveillance be posted on there asking for public

18 assistance, has anybody seen or if anybody can identify this

19 person.  I know that in reading this and in working this

20 case, I know that we had posted about a civil service exam,

21 things like that.

22             MS. WOODS:  Your Honor, may I approach?

23             THE COURT:  You may.

24 Q.   Detective, I am showing you what has been marked as

25 State's Exhibit No. 10, do you recognize that?

1  A.    I do, yes.

2  Q.    And how do you recognize that?

3  A.    These are the, for lack of a better term, banners, if

4  you will, and the real page is the page on the left, and the

5  fake page that was created is the page on the right, or the

6  banner on the right.

7  Q.    And is this an image you captured?

8  A.    That's correct.

9  Q.    Is this the same page, the fake page, is that how it

10 looked on the day that you captured this image?

11 A.    Yes.

12 Q.    When you opened the fake page, what did you see?

13 A.    Well, right away what jumped out at me was the banner,

14 the patch, the badge, all that appeared to be the same.  I

15 did notice the subtle difference with Community instead of

16 Police Station - Government Organization.  Then I saw a post

17 that appeared to mirror the same post that we would use, or

18 that, I shouldn't say we, because I don't use it, or I don't

19 post, but either Detective Wells, Detective Kaniecki, or

20 Detective Riley, the same type of posts that they would put

21 on there.

22 Q.    In those posts, what -- do you recall what they said?

23 A.    I do, yes.

24 Q.    What posts do you recall?

25 A.    The first one I recall was the Parma Police Department

1 announcing a new law that anybody caught feeding the

2 homeless or doing whatever with the homeless would receive

3 60 days in jail, you have been warned.

4 Q. Do you recall any other posts?

5 A. I do, yes.

6 Q. What other posts do you recall?

7 A. There was a post about -- in fact, I had mentioned it

8 with regards to one of the three authorized users of the

9 Facebook had posted about us giving a civil service exam,

10 and I saw a post about the civil service exam on the fake

11 account, minus a change in a couple words in that entire

12 post.

13 I also saw one in regards to police sponsoring, or

14 something to the effect with regards to teen abortions. I

15 saw one on pedophile reform up at, I believe it was at

16 St. Anthony's where that was going to occur allegedly. And

17 I believe there were a couple others. I don't remember

18 right off the top of my head.

19 Q. What did you do after viewing this page with these

20 posts?

21 A. Sure. I viewed the page, at that point what I did was

22 I sent a preservation letter over to Facebook to preserve

23 this fake account.

24 Q. And what does a preservation letter do?

25 A. It notifies the company that that account is under

1  investigation, to preserve that account so no changes can be

2  made; nothing can be done to do anything to that account the

3  way it is once they receive that preservation letter.

4  Q.    Have you used preservation letters in other

5  investigations?

6  A.    Yes, numerous.

7  Q.    Is this standard on the part of trying to preserve

8  documents?

9  A.    Yes.

10 Q.    After you sent the preservation letter, what did you do

11 next?

12 A.    At that time I met or -- I'm sorry, I also obtained a

13 subpoena through the prosecutor's office for subscriber

14 information for the IP address for that particular account.

15 Q.    Is that standard when you deal with Internet crimes?

16 A.    Yes.

17 Q.    And what did you do then?

18 A.    I'm sorry?

19 Q.    What did you do next?

20 A.    Continued to monitor that.  I had printed out different

21 pages, different things going on through the course of the

22 day with regards to this case.  The next day I had spoken to

23 our law department, and at that point we applied for a

24 search warrant for the contents, the Facebook contents, so a

25 search warrant could be served upon Facebook.

157

1   Q.   You said you monitored the page throughout the day, did

2   you notice any changes to the page?

3   A.   Yes.

4   Q.   What type of changes did you notice?

5   A.   Initially, and under the URL for the fake page, it

6   said, The City of Parma.  Let me make sure I'm seeing this.

7   It said, The City of Parma Police Department.  And it wasn't

8   shortly after the first time that I saw that, shortly, I'm

9   saying within an hour or so, maybe two hours, "The" was

10  removed from the banner.  You can't change the URL, but the

11  word "The" was removed from the banner.

12  Q.   On the official City of Parma Facebook page, does the

13  word "The" appear anywhere in the banner?

14  A.   It does not.

15  Q.   Did you notice any additional posts come up throughout

16  the day?

17  A.   Yes.

18  Q.   So as you're monitoring this, you get a search warrant

19  for Facebook; is that correct?

20  A.   The next day, that's correct.

21  Q.   The next day.  Is getting a search warrant for Facebook

22  records standard practice?

23  A.   If you're investigating a complaint in regards to

24  Facebook, yes.

25  Q.   And what did you do next?

1   A.    I prepared the search warrant and affidavit.  A copy of

2   each were sent to the law department for review.  That was

3   approved through the law department, if you will.  I

4   appeared in front of Judge Spanagel, I was sworn in and

5   explained the facts of the case to him, that I had at that

6   particular time, I signed the affidavit, and he signed the

7   affidavit and search warrant.

8   Q.    When you get a search warrant, what is standard

9   practice?

10  A.    Every search warrant that I've ever applied for is

11  reviewed by the law department, and then once that is

12  okayed, whether there's changes that need to be made or

13  there's things that we need to add or there's oftentimes

14  where they say, you know what, there's not enough here; but

15  once that's approved, then, you know, we appear in front of

16  a judge or a magistrate where we're sworn in, where we

17  explain the case, where they read the affidavit, where we

18  sign the affidavit, and they sign the affidavit and search

19  warrant.

20  Q.    And you followed those same procedures for this case?

21  A.    Yes.

22  Q.    Upon receiving the search warrant, what did you do

23  next?

24  A.    Facebook's protocol, I guess it would be protocol, we

25  have to upload that particular search warrant into their

1   system, it's received by them, and then they process it at

2   that point.

3   Q.    Did there come a time that you received a response from

4   Facebook?

5   A.    Yes.

6   Q.    And what type of response did you receive?  What

7   records did you seek a search warrant for?

8   A.    Sure.  I sought records for the fake Facebook page for

9   the Parma Police Department, and I also sought records for

10  Mr. Novak's Facebook page.

11  Q.    And how did you land on Mr. Novak?

12  A.    Sure.  Detective Heinz had come to me earlier, almost,

13  I don't want to say immediately, maybe a half hour after I

14  got assigned to the case.  I learned that I should focus in

15  on Mr. Novak as he was the first one to share this page.  So

16  I did.  Through my investigation I went to his page and I

17  saw the comment of -- I'm trying to remember exactly what

18  the comment was, I am very satisfied by my actions this

19  morning.  So I saw that.  We went to Mr. Novak's page.

20  Q.    I'm going to show you what's been marked as State's

21  Exhibits 17 and 18.

22              MS. WOODS:  Your Honor, may I approach?

23              THE COURT:  You may.

24  BY MS. WOODS:

25  Q.    Do you recognize State's Exhibits 17 and 18?

1  A.    I do, yes.

2  Q.    And how do you recognize, we'll start with State's

3  Exhibit 17?

4  A.    On 17, this is the -- this was on Mr. Novak's personal

5  Facebook page.

6  Q.    And was this given to you by Detective Heinz?

7  A.    That's correct.

8  Q.    And for purposes of the record, what does this show?

9  A.    It shows a post by Mr. Novak and then it shows four

10  comments, but one of them including Mr. Novak's comment.

11  Q.    Is there anything further down that page that it begins

12  to show?

13  A.    Yes.

14  Q.    And what is that?

15  A.    That's a post, again, under Mr. Novak's page and it

16  says, "Thanks Parma," but then it repeats the story of the

17  homeless.

18  Q.    And he is -- is that a shared, is that a shared link

19  that he's -- the story of the homeless?

20  A.    Yes.

21  Q.    For those that might not be familiar, what is a

22  Facebook share?

23  A.    To my knowledge, it's where you share a story, a post,

24  a whatever, from your page and you share it to your friends'

25  pages.

1  Q.   Does the person who's sharing that information claim

2  authorship of it during a share?

3  A.   No.

4  Q.   So it would show where they had gotten the information

5  from?

6  A.   I don't know.

7  Q.   What is the significance of under where it says,

8  "Thanks Parma," it says "City of Parma Police Department,"

9  if you know?

10             MR. VICK:   Objection.

11             THE COURT:   Overruled.  If you know.

12             MR. VICK:   Thank you, Judge.

13  A.   I'm sorry, can you repeat that?

14  BY MS. WOODS:

15  Q.   If you know, what is the significance of where it says,

16  "City of Parma Police Department"?

17  A.   I don't know.

18  Q.   And I've also handed you State's Exhibit 18.  Let's

19  take a look at State's Exhibit 18.  Do you recognize State's

20  Exhibit 18?

21  A.   I do, yes.

22  Q.   And how do you recognize it?

23  A.   It appears to be just a zoomed-in screen shot of

24  State's Exhibit 17.

25  Q.   Was this useful information to you in the course of

162

```
 1   your investigation?
 2   A.    Yes.
 3   Q.    And why was it useful?
 4   A.    Well, again, the comment right at the top, and again,
 5   this was brought to my attention by Detective Heinz, that
 6   Mr. Novak was the first to share this.  When you look at
 7   this, "I am just going to say, I woke up and feel very
 8   satisfied by my actions right now," that tends to point in a
 9   direction --
10                    MR. VICK:  Objection, Your Honor.
11                    THE COURT:  Sustained.
12   Q.    Did, at some point, during the course of your
13   investigation, did you make a printout of Anthony Novak's
14   page?
15   A.    Yes.
16   Q.    I am going to show to you what's been marked as State's
17   Exhibits 12 and 13.
18                    MS. WOODS:  Your Honor, may I approach?
19                    THE COURT:  You may.
20   Q.    Take a look at State's Exhibit 12.  Do you recognize
21   State's Exhibit 12?
22   A.    Yes.
23   Q.    And how do you recognize it?
24   A.    This is a printed-out copy of Mr. Novak's personal
25   Facebook page.
```

1  Q.    And did you create this printout?

2  A.    Yes.

3  Q.    And if you know, when did you create this printout?

4  A.    The date at the top left indicates March 2nd, 2016.

5  Q.    And the item that we are viewing on the screen is the

6  same as what is in your hand; is that correct?

7  A.    It appears to be, yes.

8  Q.    Why, in your investigation, did you print out Anthony

9  Novak's personal Facebook page?

10  A.    Because I thought it necessary.

11  Q.    Was there anything that caught your eye when you

12  reviewed it?

13  A.    Yes.

14  Q.    And what was that?

15  A.    The first post, which was posted to Parma, the fake

16  Parma Police Facebook page, was posted on Mr. Novak's

17  personal page.

18  Q.    I'm sorry.  Can you see on the screen from where you're

19  sitting?

20  A.    I can see it, but not enough to --

21  Q.    Let me zoom in a little bit.

22       Is that better?

23  A.    Much.

24  Q.    So is this the post that you were just referring to?

25  A.    Yes, it is.

1    Q.    And what is -- is this a share again of the -- what is

2    this a shot of?  I'm sorry.

3    A.    This is one of the posts, if you will, that appeared on

4    the fake Parma Police Department Facebook page, and then

5    Mr. Novak posted that particular post on his personal page.

6    Q.    Were there other such posts on Anthony Novak's personal

7    page?

8    A.    I don't recall, without going through it.

9    Q.    Do you have the record in front of you?

10   A.    I do.

11   Q.    Take a moment and refresh your recollection.

12   A.    Okay.

13   Q.    After reviewing the document, does that refresh your

14   recollection as to if there were other such posts on Anthony

15   Novak's personal page?

16   A.    Yes.

17   Q.    Were there other -- did Anthony Novak share other City

18   of Parma Police Department posts on his personal page?

19   A.    Of the record I just reviewed, no.

20   Q.    I've also handed you what's been marked as State's

21   Exhibit No. 13, take a look at that one.

22          Do you recognize State's Exhibit 13?

23   A.    I do, yes.

24   Q.    And how do you recognize State's Exhibit 13?

25   A.    These are the likes.  That's a tab under a Facebook

1  page, so these are likes that a particular user has on their

2  page, some do, some don't.

3  Q.    I'm showing you what's up on the screen, is that the

4  same document that is in your hand?

5  A.    Yes.

6  Q.    Why did you search Anthony Novak's page to see who he

7  liked on Facebook?

8  A.    I was just trying to make a copy of the entire page,

9  everything that's on his personal page, make a copy of the

10  entire thing.

11  Q.    And when did you make such a copy?

12  A.    Again, in the upper left it says March 2nd, 2016.

13  Q.    And from your review, did you see what or who the

14  Defendant was liking on Facebook?

15  A.    Yes.

16  Q.    In your review and in your training and experience as

17  an officer, what did this tell you?

18  A.    Not much, just that -- I mean, these are pages that he

19  likes; so information gleaned from that, not much.

20  Q.    Did you monitor Anthony Novak's page throughout the

21  day?

22  A.    Yes.

23  Q.    And you also monitored the fake Facebook page

24  throughout the day?

25  A.    Yes.

1    MS. WOODS:  Your Honor, may I approach?

2    THE COURT:  You may.

3  BY MS. WOODS:

4  Q.   I am showing you what's been marked as State's,

5  previously marked as State's Exhibit No. 11, do you

6  recognize it?

7  A.   I do, yes.

8  Q.   And how do you recognize it?

9  A.   This, again, is a printed-out copy of Mr. Novak's

10  personal Facebook page.

11  Q.   Was this printed at the same time as the old one?

12  A.   No.  This indicates that it was printed on March 4th,

13  2016.

14  Q.   And for purposes of your investigation, why was this

15  relevant?

16  A.   I noticed the first comment, if you will, which would

17  have again been March 4th, 2016, stating, "I think I won at

18  Facebook."

19  Q.   And that's the zoomed-in version here on the Mondopad?

20  A.   That's correct.

21  Q.   And why was that relevant to you?

22  A.   Again, still part of my investigation in regards to

23  Mr. Novak.

24  Q.   While you're monitoring these two pages, what else had

25  you done in the course of your investigation?

167

```
 1   A.   At that particular time, the search warrant had been
 2   sent over to Facebook, so really it was a matter of time
 3   waiting on those records return.   I don't recall anything
 4   other than between the 2nd and 3rd as heavy days, if you
 5   will.
 6   Q.   At any time did you ask Facebook to have the fake page
 7   taken down?
 8   A.   Yes, that was included in my preservation letter.
 9   Q.   When you received -- when did you receive records back
10   from Facebook?
11   A.   I believe it was March 18th, 2016.
12   Q.   And did you review those records?
13   A.   Yes.
14   Q.   I am going to show you what's been marked as State's
15   Exhibit 16.
16                MS. WOODS:   Your Honor, may I approach?
17                THE COURT:   You may.
18   Q.   State's Exhibit 16, take a moment to review it.
19        Do you recognize that?
20   A.   I do, yes.
21   Q.   And how do you recognize that?
22   A.   These are a copy of the records I received in regards
23   to the search warrant served upon Facebook.
24   Q.   Are those the complete records from Facebook?
25   A.   It appears here that this is pages 1 through 130.   When
```

168

1   I applied for the search warrant, I applied for two

2   accounts, the total was 2,796 pages.  So this is the total,

3   this appears to be the total record of the fake Parma Police

4   page.

5   Q.   In reviewing those documents, can you tell when the

6   page was created?

7   A.   Yes.

8   Q.   And when was the page created?

9   A.   I apologize.  This is going to take me a minute to pick

10  out the exact date and time here.

11  Q.   Take your time.

12  A.   So we're clear, on the first page -- now, I believe

13  this is -- this is in regards to when Facebook printed this

14  particular record, and here it says March 17th, 2016, that's

15  not when this page was created, but that's the generated

16  information from the Facebook records.

17  Q.   That's the responsive date to your search warrant?

18  A.   That's correct.

19  Q.   What else is on that first page?

20  A.   It shows at the top, again, Facebook Business Record,

21  page 1.  It lists Service, and it identifies Facebook.

22  Target, I'm not certain what that means.  Generated, as I

23  just discussed, that's the date that Facebook generated or

24  printed this out, or sent it.  Date range is what was listed

25  in the search warrant.

1 Q. And what date range was that that you had asked for?

2 A. From February 1st, 2016 to March 3rd, 2016.

3 Q. And why did you pick those dates?

4 A. I picked those dates because the incident occurred, or

5 at least we became aware of this on March 2nd, 2016. In

6 every computer case that I've ever worked, we have backed it

7 up, we don't know when -- going into this, we don't know

8 when this was actually started to be created, when he

9 started going down that road.

10 Q. So you arbitrarily picked a date?

11 A. Yes.

12 Q. What else is on that first page?

13 A. Underneath that it says Creator, and it says Anthony

14 Novak. It lists, I believe, a friend ID number. It says

15 Vanity Name, anthony.h.novak. It says Registered,

16 anthony.h.novak@facebook.com. And Email address of

17 sueandhubby@gmail.com.

18 Q. Does that information tell you who created the page?

19 A. No.

20 Q. What does that information tell you?

21 A. That information tells me -- and, again, registered as

22 anthony.h.novak@facebook.com and also an e-mail address, so

23 it gives us as investigators a tool, a road to go down to

24 continue to follow your investigation.

25 Q. When you get Facebook records back -- I'm going to open

```
 1   my copy so I can follow along a little bit.
 2            Are the records broken into sections?
 3   A.    Yes.
 4   Q.    What sections appear?  We'll start with page 1.
 5   A.    On page 1 of this record, as I just explained from the
 6   Service on down to the Email, so that's a particular
 7   section.  Then the next section, and I have seen this in
 8   each and every record from Facebook, they start off with the
 9   friends, excuse me, so you'll get pages upon pages upon
10   pages of friends, and then it will go into content.
11   Q.    Is there any significance to the order of the friends
12   that you're aware of?
13   A.    Not that I'm aware of.
14   Q.    And in this case, how many pages of friends are there
15   for this Facebook business record?
16   A.    On this particular record, it goes to page 16 and it
17   comes almost all the way down, so almost three-quarters of
18   the way, so almost 16 full pages of friends.
19   Q.    And what is the next section?
20   A.    The next section, which starts right below friends, is
21   wall posts.
22   Q.    And what is a wall post on Facebook, if you are aware?
23   A.    I don't know.
24   Q.    Is that a section of content that would appear on
25   Facebook?
```

1    A.    Yes.

2    Q.    Were you able, after reviewing the records, to

3    determine which posts went up by the page or the

4    administrator of the page?

5    A.    Can you repeat that?

6    Q.    I'll rephrase my question.  It was a bad question.

7    When you look at the section titled wall posts, does it tell

8    you who posted it?

9    A.    Yes.

10   Q.    And how does it identify who posted it?

11   A.    So in the first wall post, as an example, it says,

12   To: City of Parma Police Department, From: -- and in this

13   particular one it says, Cameron Vanderhorst, it lists an ID,

14   the time, and then what the text, what the content is of

15   that, so what the words are that they posted to that

16   particular page.

17   Q.    When you reviewed this record when you got it from

18   Facebook, could you determine which posts were made by the

19   page?

20   A.    Yes.

21   Q.    So if you turn your attention to page 26 of the record;

22   what do you notice?

23   A.    On page 26 of this particular record is a post which

24   was the post made by Lieutenant Riley in regards to, this is

25   a fake account, this is a fake Facebook page going around.

172

1   Q.    And what is the text of that post?

2   A.    And it states:  "The Parma Police Department would like

3   to warn the public that a fake Parma Police Facebook page

4   has been created.  This matter is currently being

5   investigated by the Parma Police Department and Facebook.

6   This is the Parma Police Department's official Facebook

7   page.  The public should disregard any and all information

8   posted on the fake Facebook account.  The individuals who

9   created this fake account are not employed by the police

10  department in any capacity and were never authorized to post

11  information on behalf of the department."

12  Q.    Is that the same warning that -- you mentioned that

13  Lieutenant Riley issued a warning.  What did Lieutenant

14  Riley's warning say, if you recall?

15  A.    The same thing.

16  Q.    Was that copied word for word, to your knowledge?

17  A.    To my knowledge, yes.

18  Q.    When Facebook sends you records, how are they ordered

19  in time, is it newest first or oldest first?

20  A.    Oldest is last.  So newest first.

21  Q.    So this would have been a later post or a newer post in

22  the day?

23  A.    Correct.

24  Q.    So to follow, this is a reverse chronological order?

25  A.    Yes.

1   Q.   So if we were to follow chronologically, we would have

2   to start at the back of the records and work our way

3   forward?

4   A.   Yes.

5   Q.   What was the first post that you became aware of?

6   A.   I recall it being the homeless post.

7   Q.   If you turn to page 48 of the record from Facebook,

8   what is that?  What is on that page?

9   A.   On page 48 is the post regarding the homeless.

10  Q.   And what does, what is the text of that post?

11  A.   And it states:  "Due to the slow increase of a homeless

12  population in our city, the Parma Police Department is

13  pleased to announce that it will be introducing a new

14  temporary law that will forbid residence of Parma from

15  giving ANY HOMELESS person food, money, or shelter in our

16  city for 90 days.  This is in an attempt to have the

17  homeless population eventually leave our city due to

18  starvation.  Residents caught giving the homeless population

19  food, shelter, or water will be sentenced to a minimum of 60

20  days in jail.  You have been warned."

21  Q.   And to your knowledge, did the City of Parma have a law

22  like this on its books?

23  A.   No.

24  Q.   Has there ever been a law in the City of Parma like

25  this on the books?

1   A.   Not since I've been employed there.

2   Q.   Working our way backwards, the next post is on page 45.

3   Can you describe what is on page 45?

4   A.   Yes.   There was another post that was posted to this

5   fake account.

6   Q.   What is the text of that post?

7   A.   And that states:   "POLICE OFFICER City of Parma.   The

8   Parma Civil Service Commission will conduct a written exam

9   for basic Police Officer for the City of Parma to establish

10  an eligibility list.   The exam will be held on March 12th,

11  2016.   Applications are available February 14th, 2016

12  through March 2nd, 2016.   Parma is an equal opportunity

13  employer but is strongly encouraging minorities to not

14  apply.   The test will consist of a 15 question multiple

15  choice definition test followed by a hearing test.   Should

16  you pass you will be accepted as an officer of the Parma

17  Police Department.   By order of Parma Civil Service

18  Commission John L. Kirk, Jr., Chairman Timmy Baycock, Dan

19  Coffee.   An Equal Opportunity Employer."

20  Q.   To your knowledge, and if you know, was Parma offering

21  a civil service exam?

22  A.   I do recall -- yes, I do recall that being on our real

23  Facebook page.

24  Q.   And do you recall what the original post said off of

25  the real Parma Police Department page?

1  A.    You know, absolutely word for word, no, but very

2  similar to what was posted here on the fake page.

3  Q.    Do you still have Exhibit 1 in front of you?

4        I know you have a lot of paper up there.  I can take

5  some of it, if necessary.

6                    MS. WOODS:  Your Honor, may I approach?

7                    THE COURT:  You may.

8  A.    I do, yes.

9  Q.    Take a moment to review State's Exhibit 1.

10  A.    Okay.

11  Q.    Is there a post about a civil service exam?

12  A.    Yes, there is.

13  Q.    And what is the text of the real civil service exam?

14  A.    In this particular text, and this is dated February

15  22nd, "Police Officer City of Parma.  The Parma Civil

16  Service Commission will conduct a written exam for basic

17  Police Officer for the City of Parma to establish an

18  eligibility list.  The exam will be held on March 12th,

19  2016.  Applications are available February 14th, 2016

20  through March 2nd, 2016.  Parma is an equal opportunity

21  employer and strongly encourages minorities to apply.

22  Applications and further information obtainable at the Civil

23  Service Office located in Memorial Hall directly" -- and

24  then it cuts off.

25  Q.    So the post on the fake page, what is significant about

1   that, in your training and experience as an officer?

2   A.    Sure.   There's a couple things that were changed on the

3   post on the fake page.  On the real page it says here that,

4   Parma is an equal opportunity employer and strongly

5   encourages minorities to apply.  On the fake page it says,

6   Parma is an equal opportunity employer but is strongly

7   encouraging minorities to not apply.

8         Other than -- other than that, the only thing, and,

9   again, this is cut off here, but I see the difference, those

10  are not our civil service -- I'm sorry -- our, yeah, our

11  civil service commission, those are not the names of the

12  commissioners of the civil service in our city.

13  Q.    Without a close reading of that, do they look similar?

14  A.    Yes.

15  Q.    We'll move on to the next post on the fake page, which

16  is on Facebook's record, which is State's Exhibit 16, page

17  44.  Do you see the post?

18  A.    I do, yes.

19  Q.    What is the text of that post?

20  A.    It states, "We have forgotten to post that on September

21  30th, 2015 at approximately 10 a.m. the Parma Subway

22  Sandwich Shop located at 5890 Broadview Rd. was robbed at

23  knife point.  The white male offender got away with a small

24  amount of money and did not harm the clerk.  Moments after

25  an unrelated African American women was seen loitering for

1  over 20 minutes in front of the store despite their no

2  loitering policy.  If you have any information regarding

3  this African American womans whereabouts please contact the

4  City of Parma Police Department so that she may be brought

5  to justice.  This is the best still photo we have of the

6  offender.  Mentor Police and Middleburg Hts. Police have

7  reported similar loitering offenses which may be the same

8  female.  The Parma Police Department is seeking assistance

9  identifying the individual in the picture.  Please contact

10  Det. Joe Tremble."

11  Q.    Was there an incident in Parma -- was there a similar

12  post on the Parma Police Department page that is an official

13  post?

14  A.    Yes.

15  Q.    So referring back to State's Exhibit 1, what is the

16  text of that post?

17  A.    It states, "On September 30, 2015 at approximately

18  10:00 a.m. the Parma Subway Sandwich Shop located at 5890

19  Broadview Rd. was robbed at knife point.  The white male

20  offender got away with a small amount of money and did not

21  harm the clerk.  These are the best still photos we have of

22  the offender.  Mentor Police and Middleburg Hts. Police have

23  reported similar robberies which may be the same male.  The

24  Parma Police Department is seeking assistance identifying

25  the individual in the pictures.  Please contact Det. Joe

1   Duganier at (440)887-7337, or joseph.duganier@

2   parmajustice.net."

3   Q.    What was significant about the fake post?

4   A.    What's significant about the fake post is that

5   everything was copied over but just a couple subtle changes,

6   and then putting in there about this African American female

7   loitering in front of the business.  That's not on our real

8   post, but this is what was on the fake post.  So the story

9   reads true up until that part.  Then we get into Parma

10  Police is seeking information identifying the individual.

11  We do not have a Joe Tremble, but we do have a Joe Duganier,

12  who's a detective.

13  Q.    Would the detective bureau investigate a woman

14  loitering?

15  A.    No.

16  Q.    What types of crimes would the detective bureau

17  investigate?

18  A.    Again, going back to what I said initially, we have a

19  narcotics division, we have a youth and sex crimes division,

20  we have a general felony unit who goes from felonies, so

21  felony five all the way up to felony one.

22  Q.    Would aggravated robbery be one of those felonies that

23  you would investigate?

24  A.    Yes.

25  Q.    In looking at these Facebook posts, do they give a time

1  that they're posted?

2  A.    On the official records from Facebook, so -- again, the

3  records that Facebook provided in regards to the search

4  warrant, yes.

5  Q.    And what -- we'll stay with the robbery.  What is the

6  date and time of that post?

7  A.    It said, "posted 2016-03-02, 05:03:15 UTC."

8  Q.    And what does that string of numbers mean?

9  A.    To me that means it was posted at 5:03:15 a.m.,

10  universal time code.

11  Q.    On what day?

12  A.    On March the 2nd, 2016.

13  Q.    Are you familiar with universal time code?

14  A.    Yes.

15  Q.    How does that translate to eastern standard time?

16  A.    Well, it's been awhile, but we used to refer to it in

17  the military as Zulu time, but that's how, to my knowledge,

18  that is like zero time, if you will; so we on the east coast

19  are X-amount of hours behind Zulu time.

20  Q.    Do you know the exact number of hours behind?

21  A.    I don't.

22  Q.    Does each post have a time code on it?

23  A.    Yes.

24  Q.    So you can see the exact time frame when it is posted?

25  A.    Yes.

1  Q.   We'll move on to the next post.   The next post appears

2  on page 36.

3        Do you see the post?

4  A.   I do, yes.

5  Q.   And what is the time of that post?

6  A.   The time of the post is 16:04:11 UTC.

7  Q.   And just to be clear, so that the 2016-03-02 is the

8  date?

9  A.   Yes.

10  Q.   And the 16:04:11 UTC is the time?

11  A.   Yes.

12  Q.   And UTC again is what?

13  A.   Universal time code.

14  Q.   What is the text of that post?

15  A.   It states:  "The Parma Police Department & Parma

16  Auxiliary Police Food Drive to benefit teen abortions will

17  take place on Saturday.  We will be giving out free

18  abortions to teens using an experimental technique

19  discovered by the Parma Police Department.  All teens must

20  bring a note from their parent to be part of the experiment.

21  The abortions will be held Saturday 4/19/2016 from noon to

22  4pm in a police van in the parking lot at Giant Eagle (7400

23  Broadview Rd.)"

24  Q.   Is 7400 Broadview Road an actual address in Parma?

25  A.   It is, yes.

```
 1   Q.   And what is at that address, if you know?
 2   A.   Giant Eagle.
 3   Q.   Has Parma ever conducted teen abortions, that you are
 4   aware of?
 5   A.   Never.
 6   Q.   Has the police ever offered teen abortions?
 7   A.   Never.
 8   Q.   Has the police department ever done a food drive?
 9   A.   Yes.
10   Q.   If you know, when was the food drive offered by the
11   Parma Police?
12   A.   Without reading the Facebook record, I don't know.
13   Q.   Does it appear in the Facebook record?
14   A.   I believe it does, yes.
15   Q.   If you turn your attention to State's Exhibit 1, is it
16   in there?
17   A.   It is, yes.
18   Q.   And what does that post there say?
19   A.   It states, "The Parma Police Department & Parma
20   Auxiliary Police Food Drive to benefit the Parma Hunger
21   Center will take place on Saturday 12/19/2015 from noon to
22   4pm at Giant Eagle (7400 Broadview Rd.)  Non-perishable food
23   & cash donations will be accepted."
24   Q.   What is the significance of the fake post?
25   A.   Well, again, the story was taken from the real page,
```

1  posted to the fake page with changes made to the real story.

2  Q.    We'll move to page 30 of the Facebook business record.

3  Is there a post that appears on page 30?

4  A.    There is, yes.

5  Q.    What is the date and time of that post?

6  A.    It states: 2016-03-02, time 17:41:05 UTC.

7  Q.    And so that would be March 2nd, 2016 at -- excuse me --

8  17:41?

9  A.    Yes.

10  Q.    And what does the text of that post say?

11  A.    And it states:  "Update:  The City of Parma Police

12  Department will enact a Pedophile Reform event outside of

13  St. Anthony Of Paduas Church on 5-1-16 in an attempt to

14  reform pedophiles to normality.  We will have multiple

15  learning stations including a 'No means no' station filled

16  with puzzles and quizzes.  Anyone who passes all of the

17  stations will be removed from the sex offender registry and

18  accepted as an honorary police officer of the Parma Police

19  Department.  Have fun out there!"

20  Q.    Does Parma offer such programs?

21  A.    No.

22  Q.    Would Parma accept somebody who passes a course on not

23  to be a sex offender onto their police department?

24  A.    No.

25  Q.    And the post time is 17:41?

183

1   A.   That's correct.

2   Q.   17:41 -- 17 doesn't appear on a standard clock, does

3   it?

4   A.   No.

5   Q.   How would you figure out what time 17 is?

6   A.   It's 5:41 p.m.

7   Q.   So that is -- they use a -- Facebook then uses a

8   24-hour format?

9   A.   That's right.

10  Q.   There is only a couple more posts.

11       Going to page 26, I believe we reviewed this post

12  already, but I want to be sure.  What is the date and time

13  of that post?

14  A.   It states here:  Posted 2016-03-02, at 21:52:29 UTC.

15  Q.   And what is the text of this post?

16  A.   And it states:  "The Parma Police Department would like

17  to warn the public that a fake Parma Police Facebook page

18  has been created.  This matter is currently being

19  investigated by the Parma Police Department and Facebook.

20  This is the Parma Police Department's official Facebook

21  page.  The public should disregard any and all information

22  posted on the fake Facebook account.  The individuals who

23  created this fake account are not employed by the police

24  department in any capacity and were never authorized to post

25  information on behalf of the department."

Official Court Reporters

1   Q.    And I believe we discussed this post already.   Was this

2   posted -- was this the real Parma Police Department Facebook

3   page?

4   A.    This was posted on the real page by Lieutenant Riley.

5   Q.    And it also appeared on the fake page?

6   A.    That's correct.

7   Q.    And then, I believe, we've already discussed this post

8   as well, on page 19.   Do you see the post on page 19?

9   A.    I do, yes.

10   Q.    What is the date and time?

11   A.    It states here: 2016-03-03, at 00:59:41 UTC.

12   Q.    And 00 doesn't appear on a clock, what time would that

13   be?

14   A.    That is 59 minutes after midnight.

15   Q.    And UTC is not the same as eastern standard time?

16   A.    It is not.

17   Q.    And what do we here in Cleveland, Ohio use?

18   A.    Eastern standard time.

19   Q.    And what is the text of that post?

20   A.    And it states:   "Parma:   Tuesday will be our official

21   stay inside and catch up with the family day in Parma!   The

22   Parma Police Department has set this day to allow families

23   to come together in an effort to reduce future crime by

24   having children have well balanced communication with their

25   families.   Anyone's seen outside their home from the hours

1   of 12pm to 9pm will be arrested.  Thank you."

2   Q.    And I know we jumped a lot of pages at a time, what

3   fills the rest of the page?

4   A.    Comments posted by other users.

5   Q.    Without having to read all of them, because there's a

6   lot of comments, do the comments fall into any particular

7   types of comments?

8   A.    Oh, sure.

9   Q.    What types would you classify them as?

10  A.    I would say the first classification is where there

11  were comments that, I believe it's funny.  There's other

12  commenters who are appalled that the Parma Police are doing

13  this.  And then there's, I would say, commenters who believe

14  that this is real, this is really going on.

15  Q.    Did there come a time that you got complaints about

16  what was posted on this fake page?

17  A.    Yes.

18  Q.    And how did those come to pass?

19  A.    There was calls placed to our dispatch center.  After

20  talking with our law department, I was made aware that there

21  was calls and emails that were made to both the law

22  department and the safety department, and to my knowledge,

23  Lieutenant Riley received emails also.

24  Q.    Did you receive any emails or calls?

25  A.    Directly, no.

1   Q.   Do you have access to the call logs from the dispatch

2   center?

3   A.   Yes.

4   Q.   Were you able to log in and find all of those calls?

5   A.   I was, yes.

6   Q.   Would you be able to recognize them as calls that you

7   had saved from the dispatch center?

8   A.   Yes.

9   Q.   I am going to show you what's been marked as State's

10   Exhibit 9.

11                 MS. WOODS:   Your Honor, may I approach?

12                 THE COURT:   You may.

13   Q.   Do you recognize State's Exhibit 9?

14   A.   Yes, I do.

15   Q.   And how do you recognize it?

16   A.   This is a -- when I logged into the dispatch system, if

17   you will, I was able to take the recorded calls from that

18   day that were relevant to this case and then save it to a

19   file and then copy them to a disk.

20   Q.   Do you know how they are titled?

21   A.   No.

22   Q.   Did you make any notes that would tell you how they

23   were titled and saved?

24   A.   Yes.

25   Q.   If I showed you your notes, would that help refresh

187

1  your recollection?

2  A.    Yes.

3              MS. WOODS:   Your Honor, may I approach?

4              THE COURT:   You may.

5  Q.    I'm showing you what's been marked as State's Exhibit

6  34, do you recognize that?

7  A.    I do, yes.

8  Q.    And how do you recognize that?

9  A.    These are my handwritten notes that I wrote down when I

10  was taking the calls from the system and saving it to a

11  folder.

12  Q.    And do they tell you what the title of the call would

13  be?

14  A.    Not a title so much; I wrote down the date, the time,

15  and what console that the call came in to, and the duration

16  of that call.

17  Q.    So let's look at console No. 3.

18              (Thereupon, playing CD)

19  Q.    Do you recognize that call?

20  A.    Yes.

21  Q.    And how do you recognize it?

22  A.    I've heard it before.

23  Q.    Is this one of the calls that you pulled off of the

24  system?

25  A.    Yes.

188

```
 1                    (Thereupon, playing CD)

 2   Q.    Is that the duration of the call?

 3   A.    Yes.

 4   Q.    And how many calls were there in total?

 5   A.    Ten.   Eleven.

 6   Q.    Now we'll go to console 4A, do you recognize this call?

 7                    (Thereupon, playing CD)

 8   A.    Yes.

 9   Q.    And how do you recognize it?

10   A.    Without listening to it right now, but I have it

11   written down in my notes.

12                    (Thereupon, playing CD)

13   Q.    Was that the entirety of that call?

14   A.    No, I thought there was more to that call.

15                    (Thereupon, playing CD)

16   Q.    Do you recognize that?

17   A.    Yes.

18   Q.    And how do you recognize that?

19   A.    That would be the second half of the phone call.

20                    (Thereupon, playing CD)

21   Q.    Is that the duration of that call?

22   A.    Yes.

23   Q.    What is the date and time of that call?

24   A.    That was March 2nd, 2016, at 11:33:51.

25   Q.    When did you start your investigation?
```

Official Court Reporters

1    A.    I'm sorry.   I believe that you said that was 4B; is

2    that correct?

3    Q.    4A and 4B.

4    A.    Okay.   And I apologize, I read you 4C.   So to correct

5    the record, March 2nd, 2016, at 10:24:28.

6    Q.    And what time did the call come in on Console 3?

7    A.    That was March 2nd, 2016, at 9:32:11.

8    Q.    What time were you assigned to start investigating

9    this?

10   A.    It was between 8:30 in the morning and 9 o'clock in the

11   morning.

12   Q.    And what time do you usually start?

13   A.    8 a.m.

14   Q.    Look at console 4C.   Is this also a call that you

15   pulled in relation to this case?

16   A.    Yes, it is.

17   Q.    And what is the date and time on this call?

18   A.    That's March 2nd, 2016, at 11:33:51.

19                    (Thereupon, playing CD)

20   Q.    Do you recognize this?

21   A.    I do, yes.

22   Q.    And how do you recognize this?

23   A.    Because I've listened to it before and I, again,

24   downloaded it from the system to a folder to the disk.

25                    (Thereupon, playing CD)

1  Q.  Is that the duration of the call?

2  A.  Yes.

3  Q.  And how long is that call?

4  A.  Again, that was 4D or 4C?

5  Q.  4C.

6  A.  That was 55 seconds.

7  Q.  And these are all part of State's Exhibit 9, they're

8  all on the disk you prepared, correct?

9  A.  Yes.

10           (Thereupon, playing CD)

11  Q.  This is console 4D.  Is that a call that you prepared?

12  A.  Yes.

13  Q.  And what is the date and time on this call?

14  A.  That's March 2nd, 2016, and that's at 11:37:18.

15  Q.  Do you recognize the call, that brief second that was

16  played?

17  A.  Not without hearing the whole call.

18           (Thereupon, playing CD)

19  Q.  Is that the complete call?

20  A.  Yes.

21  Q.  Do you recognize it?

22  A.  Yes, I do.

23  Q.  And how do you recognize it?

24  A.  Again, another call that I listened to and I saved to a

25  folder and saved it to the disk.

1   Q.   We're on console 4E.

2                (Thereupon, playing CD.)

3   Q.   Do you recognize this?

4   A.   Yes.

5   Q.   And how do you recognize this?

6   A.   Because I believe it is a dispatcher contacting one of

7   the shift supervisors.

8   Q.   Is this a call that you downloaded from the system and

9   put on the disk?

10  A.   That's correct.

11  Q.   This is also part of State's Exhibit 9?

12  A.   Yes.

13  Q.   And what time was this?

14  A.   That was, again, March 2nd, 2016, at 11:38:38.

15               (Thereupon, playing CD)

16  Q.   Is that the complete call?

17  A.   Yes, it is.

18  Q.   And what time was that at?

19  A.   That, again, was at 11:38:38.

20  Q.   What is going on at your end while these calls are

21  coming in?

22  A.   Well, again, I got notified of this, or I got assigned

23  to this case between 8:30, 9 o'clock in the morning, so I'm

24  clearly working on trying to figure out what we have here,

25  what's going on, while these calls are coming in during that

```
 1    time period.

 2    Q.   Were you working on any of your other active cases at

 3    this time?

 4    A.   No.

 5    Q.   What was your primary responsibility then on March

 6    27nd?

 7    A.   After I got assigned to this case, it was this case,

 8    that was the primary thing.

 9    Q.   I'm going a little cross-eyed over here.

10         Console 4E, is that also a call you pulled?

11    A.   Yes.

12    Q.   I'm sorry.  Console 4F, we just listened to E.

13    A.   4F, yes.

14    Q.   Console 4F, what time was that at?

15    A.   That was at 11:42:22.

16    Q.   And if I played it, would you recognize it?

17    A.   Yes.

18              (Thereupon, playing CD)

19    Q.   And how do you recognize this?

20    A.   Because I have heard it before.

21    Q.   And that's -- not to beat a dead horse, but you were

22    the detective assigned?

23    A.   Yes, I was.

24              THE COURT:  All right.  I think this is a

25         good place to stop for our lunch break.  So, ladies
```

Official Court Reporters

```
 1          and gentlemen, at this time we're going to go to
 2          lunch.  I'm going to have you back at about 20 after
 3          1, and we will start at 1:30.
 4                  Again, you are not to discuss this case
 5          amongst yourselves.  Do not permit anyone to discuss
 6          it with you or in your presence.  Do not form or
 7          express an opinion on this case until it is
 8          submitted to you.  Again, you are not permitted to
 9          read any media or newspaper accounts of this case.
10          You are not permitted to post anything on Facebook,
11          Twitter, SnapChat, Instagram, whatever means you use
12          to communicate with the outside world through social
13          media.  All right.  Do you understand?
14                  THE JURY:  Yes.
15                  THE COURT:  Okay.  Have a great lunch.  I'll
16          see you in an hour.  All rise for the jury.
17                          -  -  -
18                  (Thereupon, the jury was excused.)
19                          -  -  -
20                  THE COURT:  Okay.  You may be seated.  And I
21          will see you back here in about -- you-all, let's
22          say 1:15, because I would like you to go over the
23          jury instructions.  All right?
24                  MR. VICK:  On that, Your Honor, we had
25          prepared late last night and filed this morning --
```

```
 1        we believe, based on the evidence that's been
 2        presented so far, pursuant to Criminal Rule 30, as
 3        well as Supreme Court of Ohio precedent, that this
 4        case requires a jury instruction on the First
 5        Amendment.  And we had filed a motion for a proposed
 6        jury instruction with a drafted jury instruction on
 7        the First Amendment, based on the facts of this case
 8        as they've already come in.
 9             MS. WOODS:  Your Honor, a copy was handed to
10        me just prior to Detective Connor taking the stand.
11        The State has not had a chance to fully read, nor
12        research what was being proposed.  The State
13        requests a little bit of time to get through this
14        and do our own research and, if needed, do a written
15        response.
16             THE COURT:  And, obviously, I'm being handed
17        a copy of this right before we take a lunch break on
18        day two of our trial as well.  So I have not had an
19        opportunity to review it.  All right.  So you can
20        also review this over the lunch break.  All right?
21             MR. VICK:  Thank you.
22             MS. WOODS:  Thank you, Your Honor.
23                      -  -  -
24        (Thereupon, the luncheon recess was taken.)
25                      -  -  -
```

```
 1            THURSDAY AFTERNOON SESSION, AUGUST 11th, 2016
 2                 THE COURT:  Okay.  You may be seated.
 3                 All right.  The detective may resume his
 4        position.  And I will remind you that you are still
 5        under oath.
 6                 THE WITNESS:  Yes, Your Honor.
 7                 THE COURT:  And you may proceed.
 8                 MS. WOODS:  Thank you, Your Honor.
 9                      - - -
10            DIRECT EXAMINATION OF THOMAS CONNOR (Continued)
11   BY MS. WOODS:
12   Q.    Detective, when we left off before the lunch break we
13   were reviewing 9-1-1 calls, or the calls that came into the
14   non-emergency dispatch line; is that correct?
15   A.    Yes, it is.
16   Q.    To your knowledge, is there a difference between the
17   9-1-1 number and the non-emergency dispatch line number?
18   A.    9-1-1 is that -- I think we all know what that is,
19   that's emergency calls only.  Typically somebody will call
20   the 1234 number for something other than an emergency.
21   Q.    You said the 1234 number, do you know that number
22   offhand?
23   A.    Yes.
24   Q.    And what is that number?
25   A.    It's 440-885-1234.
```

1  Q.  And those calls are recorded as well?

2  A.  Yes, they are.

3  Q.  And that's where these calls have all been pulled from?

4  A.  Yes.

5  Q.  If memory serves me correct, we left off on console 4-F

6  on one of the calls, is that where your memory is as well?

7  A.  Yes.

8  Q.  So we move on to console 4G, did you pull that call?

9  A.  I did, yes.

10  Q.  If I played it for you, would you be able to recognize

11  it?

12  A.  Yes, I would.

13  Q.  When was the date and time of this call?

14  A.  March 2nd, 2016, 12:48:27.

15                  (Thereupon, playing CD)

16  BY MS. WOODS:

17  Q.  Detective, is that the entirety of the call?

18  A.  It is, yes.

19  Q.  Console 4H, is that also a call that you pulled?

20  A.  Yes, it is.

21  Q.  And what was the date and time of this call?

22  A.  March 2nd, 2016, 9:21:10.

23                  (Thereupon, playing CD)

24  Q.  Detective, is that the entirety of the call?

25  A.  It is, yes.

1   Q.   We'll move on to console 5A, is that also a call that

2   you heard, you'd recognize it if you heard it?

3   A.   Yes.

4                      (Thereupon, playing CD)

5   BY MS. WOODS:

6   Q.   Detective, do you recognize that call?

7   A.   I do.

8   Q.   How do you recognize that call?

9   A.   Again, another one of the phone calls that I listened

10  to and downloaded from the system to a disk.

11  Q.   And the last one is console 5B, did you pull this call

12  as well?

13  A.   Yes.

14  Q.   What is the date and time of the call?

15  A.   March 2nd, 2016, 7:40:16.

16                     (Thereupon, playing CD)

17  Q.   Detective, is that the entirety of that call?

18  A.   I don't believe so.

19  Q.   Reviewing the contents of the disk, do you see any

20  other phone calls that were brought in?

21  A.   No.

22  Q.   Or do you have any others in your notes?

23  A.   No.

24  Q.   Did that call just get cut off and the remainder did

25  not get recorded?

1  A.    I don't know what happened to the call.  Clearly that

2  wasn't the end of the call from what we heard, but if that's

3  what was on the system, that's all I could download.

4  Q.    So by the time all of these calls come in, Detective,

5  you were already assigned to start investigating; is that

6  correct?

7  A.    Yes.

8  Q.    If you can recall, how many open cases did you have on

9  your docket or on your caseload when this came in?

10  A.    As I stated earlier, at any given time there's 20, 25

11  cases.  I know that there were three higher priority cases

12  that I was working on at the time.

13  Q.    Because of your reassignment onto this case and this

14  becoming high priority, did you have to move or rearrange

15  your schedule at all?

16  A.    I did, yes.

17  Q.    What did you have to do?

18  A.    In particular, I was working on the case that I

19  mentioned earlier in regards to a home invasion.  There was

20  a defendant that we were trying to obtain buccal swabs from.

21  In fact, we had obtained a warrant a month earlier that he

22  refused to comply with the warrant, and I was supposed to

23  come down that particular day and get the buccal swabs and

24  the consent, and I had to switch it from that day to that

25  next Friday.

1  Q.    And what is a buccal swab?

2  A.    It's just a cotton swab and it ultimately gets

3  submitted to BCI for DNA testing.

4  Q.    Were you previously scheduled to take that buccal swab

5  on March 2nd?

6  A.    Yes, I was.

7  Q.    And were you able to obtain the buccal swab on March

8  2nd?

9  A.    I was not.

10  Q.    What date were you able to obtain that buccal swab?

11  A.    On March 5th.

12  Q.    You had mentioned earlier that you had received

13  numerous pages from Facebook.  We had looked at State's

14  Exhibit 16 as it relates to the pages as a result of the

15  fake City of Parma Facebook page.  Did you also receive

16  pages from Anthony Novak's page?

17  A.    I did, yes.

18  Q.    And if you recall, how many pages from the official

19  record did you receive there?

20  A.    That would be approximately 2500 pages.

21                 MS. WOODS:  Your Honor, with this large

22            number of exhibits, may I use this small table for

23            the detective?

24                 THE COURT:  You may.

25                 MS. WOODS:  Thank you.

1  Q.   Detective, we're showing you what has been marked as

2  State's Exhibit No. 20, do you recognize this voluminous

3  file?

4  A.   As it is here, I'm guessing that's the 2500 pages,

5  approximately, of Mr. Novak's personal Facebook account.

6  Q.   Did you take the time to read that record?

7  A.   I did, yes.

8  Q.   In that record, did you see any statements from the

9  Defendant about creating this fake Facebook page?

10  A.   I did, yes.

11  Q.   If you could, give us a sampling from the record as to

12  what -- if you need to pick through the record, go ahead.

13  I've marked out some pages.  That should be --

14       Do you recall reading that section?

15  A.   I do, yes.

16  Q.   What pages are you looking at of the entire record?

17  A.   What I have with me here is page 2381 through 2386.

18  Q.   And in that section, what is it?

19  A.   These are comments, if you will, but it's Mr. Novak

20  communicating with other users, Facebook users.

21  Q.   Is it a messaging service similar to instant message?

22  A.   Yes.

23  Q.   And what is the nature of those, of that message?

24  A.   Well, on page 2381 a person by the name of Ben Palmer

25  sent a message to Mr. Novak, pardon me, and the body of

1  that, so that's the content of what was sent, says:  "Is

2  that your page - the City of Parma police dept. page?"

3        Mr. Novak sends a reply to Mr., or Ben Palmer, and

4  the body of that is, "Yes haha."

5  Q.   Do they have a discussion about the page throughout

6  those records, those pages of the record?

7  A.   Yes.

8  Q.   In reviewing that section, is there anything else that

9  the Defendant says that would stand out to you?

10  A.   Yes.  Pardon me.  On page 2383 Ben Palmer sends to

11  Mr. Novak, "Not sure if this is stepping into criminal

12  activity or not."  Again, a second message sent from Ben

13  Palmer to Mr. Novak, "but I have an idea."  Mr. Novak

14  responds to Ben Palmer with, "Hahah what is it."

15  Mr. Palmer -- or I'm sorry, Ben Palmer sends to Mr. Novak,

16  "just make a carbon copy of the post they just made...and

17  switch it around."

18        Ben Palmer sends another one to Mr. Novak, "so

19  basically you're calling their page an imposter."

20  Q.   Detective, which post, if you can tell from that

21  snippet, is the Defendant and this Mr. Palmer character

22  referring to?

23  A.   The record shows that it would be referring to the

24  announcement that Lieutenant Riley made with, This is a fake

25  Facebook account.

202

1  Q.   And does the Defendant post Lieutenant Riley's warning

2  to his fake Facebook page?

3  A.   Yes.

4  Q.   We'll continue on to another section of the record

5  there.

6         Detective, do you recall reading that section of the

7  records provided by Facebook?

8  A.   I do, yes.

9  Q.   And what pages are those?

10  A.   Hold on a second.  This is page 993 and page 994.

11  Q.   And in reviewing those, are there any statements from

12  the Defendant in those pages as it relates to the fake Parma

13  Police Department Facebook page?

14  A.   Yes.

15  Q.   And what are those statements?

16  A.   I'm just going to start out at the top of the page, and

17  he is now communicating with a person by the name of Danny

18  Rock.  Mr. Novak is communicating with a person by the name

19  of Danny Rock.  And what we see on the first one, 993, is,

20  "hahah."  Danny Rock sends to Mr. Novak, "People believe

21  it."  Mr. Novak responds to Danny Rock, "it has 20 shares

22  and only 3 of them are my friends."  Mr. Novak again sends

23  to Danny Rock, "Yeah the ones who figured it out I just

24  deleted there posts haha."  Danny Rock sends to Mr. Novak,

25  "Ok lol."

1  Q.    I'll pause you right there, Detective.   The Defendant

2  told his friend in this message that he is deleting what, if

3  you can tell?

4  A.    And, again, it says, "Yeah the ones who figured it out

5  I just deleted there posts haha."

6  Q.    Can you tell what was figured out?

7                    MR. VICK:   Objection.

8                    THE COURT:   That would be sustained.

9  BY MS. WOODS:

10  Q.    Detective, drawing your attention to State's Exhibit

11  16, in State's Exhibit 16, are there posts in that that call

12  this a fake page?

13  A.    Yes.

14  Q.    And can you tell from the official Facebook record if

15  posts have been deleted, or which posts have been deleted?

16  A.    No.

17  Q.    And why is that?

18  A.    Well, posts that were deleted prior to Facebook

19  receiving my preservation letter, they're gone, they're not

20  there.

21  Q.    And once the preservation letter was sent, what does

22  that accomplish again?

23  A.    It lets the company know to preserve that account

24  exactly the way it is, that nothing more is to be done with

25  that account as far as changes being made or, you know,

1  deletions or anything like that.

2  Q.   So if there had been comments, if you know, if there

3  had been comments deleted after the preservation, would they

4  show up in the official Facebook record?

5  A.   Can you say that again?

6  Q.   If you know the answer.  If comments were deleted after

7  you sent the preservation letter, would they show up in that

8  official record?

9  A.   I don't know.

10  Q.   We'll turn our attention back to State's Exhibit

11  No. 20, the large voluminous file.

12       Did you send a preservation letter for Mr. Novak's

13  account as well?

14  A.   I did, yes.

15  Q.   Detective, what pages are you holding in your hand?

16  A.   I have pages 156 through 163.

17  Q.   Did you review those documents before today?

18  A.   Yes.

19  Q.   Did you review them in the course of your

20  investigation?

21  A.   Yes.

22  Q.   Do those contain any statements from the Defendant?

23  A.   Yes.

24  Q.   Do they relate to the creation of the fake Parma Police

25  Department Facebook page?

1  A.   Yes.

2  Q.   Would you give us a short snapshot of what that section

3  contains?

4  A.   Sure.   Starting on page 156, at this particular time

5  Mr. Novak's sending back and forth with a recipient being

6  Seth Kopchu, that's K-o-p-c-h-u.

7  Q.   Is this through the same type of direct messaging

8  system?

9  A.   Yes.

10       So Mr. Novak sends -- and, again, I'm just going to

11  start at the top here.   Mr. Novak sends to Seth Kopchu, "I

12  thought it would be big for like a second I didn't realize

13  it would end up on the news haha."   Seth responds, or sends

14  to Mr. Novak, "What can detectives even do here hahaha."

15  Seth again sends a message to Mr. Novak, quote, "Please

16  stop," unquote.   Another message that Seth sent to

17  Mr. Novak, "Did you break a law."

18  Q.   I'll stop you there, Detective.   Did you ever ask the

19  creator of the page to stop the messaging or to take down

20  their site?

21  A.   No.

22  Q.   And why not?

23  A.   At the particular time we didn't know who the person

24  was.

25  Q.   And so what was your primary goal on March 2nd as it

1  relates to these Facebook pages?

2  A.    Sure.    The primary goal was to have the page removed

3  because of what it was creating, and then also to preserve

4  that account and attempt to identify who that person was

5  that created that account.

6  Q.    Detective, the sections that we've looked at, are those

7  the only sections in that entire record that deal with the

8  creation of this page?

9  A.    No.

10  Q.    That's just a brief summary of some conversations that

11  are in there?

12  A.    Yes.

13              MS. WOODS:    Your Honor, if I may have a

14        moment?

15              THE COURT:    You may.

16  BY MS. WOODS:

17  Q.    As you were watching the Defendant's page live, at that

18  point did you notice on his page any statements that were

19  public rather than in a private messaging system?

20  A.    I saw comments that were public, yes.

21              MS. WOODS:    Your Honor, may I approach?

22              THE COURT:    You may.

23  Q.    I'm approaching with what has been marked as State's

24  Exhibit 11.    Take a look at that and tell me if you

25  recognize that.

207

1   A.   Yes, I do.

2   Q.   How do you recognize that document?

3   A.   This is, again, the printed-out version of Mr. Novak's

4   personal Facebook page that I printed out on March 4th,

5   2016.

6   Q.   And is this document showing on the Mondopad the same

7   as what you're holding in your hand?

8   A.   It is, yes.

9   Q.   What statements or comments did you see or admissions

10  from the Defendant did you see when you were monitoring this

11  page live?

12  A.   On page 2 of 5, pardon me, at the bottom right of

13  Mr. Novak's page, he is -- a person by the name -- well, at

14  least the icon of Andrew Mann, M-a-n-n, asks, "Is this a

15  legit site?"  Mr. Novak responds, "Ya."  Mr. Mann responds,

16  "No it is not.  Just found the real one.  If you want to

17  find the real site look up City of Parma Police Department.

18  It's basically the same minus the word The."

19  Q.   So, Detective, you had mentioned earlier that there was

20  a slight difference in the two banners, one included the

21  word "The"?

22  A.   Yes.

23  Q.   When did you say you noticed the change to remove the

24  word "The"?

25  A.   It was after I initially viewed the page on March 2nd;

1   so, again, between 8:30, 9 o'clock in the morning the word

2   "The" was there, afterwards I noticed that it was gone.

3   Q.   Detective, after you got all of the Facebook records

4   and reviewed them, what did you do next?

5   A.   Sure.  I met with the law department, went over the

6   records and what I learned from the records, and it was at

7   that time that the law department said, move forward with an

8   arrest warrant.

9   Q.   Is this standard procedure before you get an arrest

10  warrant?

11  A.   Yes.

12  Q.   And what is an arrest warrant?

13  A.   It's a warrant that's issued to place somebody into

14  custody.

15  Q.   What did you do next?

16  A.   I went to -- the prosecutor's office prepares the

17  warrants.  I appeared in front of a judge or magistrate, I

18  can't remember which one, where I was sworn in, explained

19  the facts to that judge or magistrate, and signed the

20  complaint and warrant, and the judge or magistrate signed

21  the complaint and warrant as well.

22  Q.   Was this the Cuyahoga County Prosecutor's office or the

23  City of Parma Prosecutor's office?

24  A.   City of Parma.

25  Q.   And was the judge a Court of Common Pleas judge or a

1  City of Parma judge or magistrate?

2  A.    Parma municipal court judge or magistrate.

3  Q.    Is that your standard procedure when you get search

4  warrants or arrest warrants?

5  A.    It is, yes.

6  Q.    So after you got the warrant, what do you do next?

7  A.    The warrant then is filed with the clerk of court's

8  office, and at that particular time it's waiting until

9  another officer either spots the person wanted or another

10  agency picks him up, or whatever the case may be.

11  Q.    You don't go breaking down doors at that point?

12  A.    No.

13  Q.    Did there come a time that you were able to move

14  forward?

15  A.    Yes.  And I don't remember the exact date off the top

16  of my head, but I did come into work, whatever morning that

17  was and -- I'm saying it's around March 25th time frame,

18  again, I don't know the exact date, but I was advised that

19  Mr. Novak was in custody and he had been arrested the night

20  before.

21  Q.    And at that time, upon receipt of that knowledge, what

22  did you do in the course of your investigation?

23  A.    I did a processing of Mr. Novak, typical in any type of

24  arrest that we have, we process everybody, and that's what I

25  did.

1  Q.    At that point, or at what point did you get a search

2  warrant for Mr. Novak's house?

3  A.    Based on what I learned, Mr. Novak was living on

4  Wexford Avenue, had been since October of 2015, but he had a

5  roommate.  He had a roommate by the name of Mr. Kozelka, I

6  believe it's Andrew Kozelka.  I believe he goes by Drew

7  Kozelka.  So based on that, and here, I had not treated this

8  case any different than any other computer crime case that

9  I've ever worked on.

10        Computer crimes are very standard inasmuch as, yes,

11  we have records from Facebook, yes, we did, but I still have

12  to put a perpetrator, an offender behind the computer.  So

13  it's not so much that I can base everything on the records,

14  I have to put them behind the computer.  And then with the

15  information that I've learned that he had a roommate,

16  Mr. Kozelka, I had to keep in mind that I also have to

17  remove Mr. Kozelka as the possible offender in this case.

18  Q.    Just so I'm clear, just because you have these records,

19  your investigation wasn't complete?

20  A.    It was not.

21  Q.    Is that because I could have said, I'm Anthony Novak

22  and I created that page?

23  A.    Not necessarily.

24  Q.    Okay.  When did you -- what is your process for

25  obtaining a search warrant for a house; is it any different

1   from the other search warrants to search Facebook, or

2   anything like that?

3   A.   No, it's exactly the same.  We'll prepare the search

4   warrant affidavit, that goes to the law department for

5   review.  Again, whatever changes need to be made or if

6   something needs to be added, whatever the case may be, they

7   review the entire documents of the search warrant affidavit.

8   After that is approved by the law department, then I, in

9   this particular case, went to the municipal court judge and

10  applied for the search warrant.

11  Q.   And did you execute a search warrant upon Mr. Novak's

12  house?

13  A.   Yes, I did.

14  Q.   When you execute a search warrant on a house, any

15  house, are your procedures the same?

16  A.   Yes.

17  Q.   And what are those procedures?

18  A.   As far as the entire execution goes?

19  Q.   Yes.

20  A.   Sure.  We take a copy of the search warrant with us,

21  it's called a service copy.  You know, for officer safety

22  purposes, we take a good amount of officers with us.  We

23  don't know what we're getting into when we're executing a

24  search warrant on a home.  So we will knock and announce,

25  Police, search warrant.  And in this particular case we did

1  that, there was no answer at the door, we waited a

2  particular amount of time, we entered the residence.  We

3  found Mr. Kozelka inside the house, and unfortunately he was

4  using the rest room at the time, so he couldn't come to the

5  door.

6         At that point though, we have a detective or an

7  officer assigned to take photographs; photographs are taken.

8  Pursuant to the search warrant then, what's listed in there

9  ends up being seized.  We leave a copy of the inventory

10  sheet with a copy of the search warrant.  And then, you

11  know, when we come back, we have to file what's called a

12  search warrant return.  We also have to file that paperwork

13  with a judge or another judge of the court that issued the

14  particular warrant, and then those ultimately get filed with

15  the clerk of courts.

16  Q.   And you followed -- did you follow that procedure for

17  this warrant?

18  A.   I did, yes.

19  Q.   And what was the address of that house, if you can

20  recall?

21  A.   I don't -- it's 18 something Wexford Avenue.  I don't

22  remember the full numericals.

23  Q.   What city is that in?

24  A.   Parma, Ohio.

25  Q.   And what county?

```
 1   A.    Cuyahoga.
 2   Q.    Were photos taken during the execution of this search
 3   warrant?
 4   A.    Yes, they were.
 5   Q.    Detective --
 6                    MS. WOODS:   Your Honor, may I approach?
 7                    THE COURT:   You may.
 8   BY MS. WOODS:
 9   Q.    Detective, I'm showing you what's been marked as
10   State's Exhibits 28 through 32.   Take a moment and review
11   those.
12   A.    Yes.
13   Q.    Do you recognize those photos, Detective?
14   A.    I do, yes.
15   Q.    How do you recognize them?
16   A.    These are the photographs that -- and I didn't take
17   pictures that day, but another officer took pictures that
18   day of the house, Mr. Novak's residence.
19   Q.    Are they true and accurate representations of what the
20   house looked like that day?
21   A.    Yes, they are.
22   Q.    And, Detective, do the pictures on the Mondopad match
23   what you have in your hand?
24   A.    Yes.
25   Q.    Is there an exhibit sticker on that document?
```

1   A.    This one is State's Exhibit 32.

2   Q.    And what is State's Exhibit 32?

3   A.    It shows the exterior of a double, a duplex home.

4   Q.    Moving on to the next picture.  Do you recognize this

5   picture?

6   A.    I do, yes.

7   Q.    I believe this is State's Exhibit 31?

8   A.    It is, yes.

9   Q.    And how do you recognize State's Exhibit 31?

10  A.    Again, same thing, an outside photograph of the

11  residence.

12  Q.    Is this the residence that you executed the search

13  warrant on?

14  A.    It is, yes.

15  Q.    Is this a true and accurate depiction of how the house

16  looked on the day of the search warrant?

17  A.    Yes.

18  Q.    Moving on to State's Exhibit 30.  Do you recognize

19  State's Exhibit 30?

20  A.    I do, yes.

21  Q.    How do you recognize State's Exhibit 30?

22  A.    Again, this is just showing, again, the outside of the

23  house, but it's just showing the address on the mailbox.

24  Q.    And what is that address?

25  A.    1812.

215

1   Q.   Is this a true and accurate depiction of how the house

2   looked on that day?

3   A.   Yes, it is.

4.  Q.   In order to not repeat myself for the remaining

5   pictures, have you looked through all of those pictures?

6   A.   I have, yes.

7   Q.   Are they all true and accurate as to when you executed

8   the search warrant that day?

9   A.   Yes, they are.

10  Q.   I believe this next photo is State's Exhibit 29?

11  A.   It is, yes.

12  Q.   Do you recognize State's Exhibit 29?

13  A.   Again, another photograph from the exterior at the back

14  of the home.

15  Q.   Is it common to photograph the exterior of a home when

16  you do a search warrant?

17  A.   Yes.

18  Q.   And why is that?

19  A.   Just to show the way the home was at the time, the day

20  that we executed the search warrant.

21  Q.   This should be State's Exhibit 28.  I could be wrong

22  with my numbering.

23  A.   I'm showing State's Exhibit 22.

24  Q.   Then your numbering is correct.  State's Exhibit 22, do

25  you recognize it?

```
1    A.    Yes.

2    Q.    And how do you recognize it?

3    A.    Those were two of the, if I recall correctly, ten items

4    seized, which on the photographs show a cell phone and a --

5    Detective Klein alluded to it -- an AirPad, or something to

6    that effect.

7    Q.    A tablet computer?

8    A.    Yes.

9    Q.    And why do you photograph, why did you photograph these

10   items?

11   A.    We photograph all items that are seized.

12   Q.    Were these items that were seized?

13   A.    Yes.

14   Q.    We'll move on to the next, and since my numbering seems

15   to be off in my head, what's the exhibit number on the next

16   one you have?

17   A.    State's Exhibit 23.

18   Q.    Do you recognize State's Exhibit 23?

19   A.    Yes.

20   Q.    And how do you recognize State's Exhibit 23?

21   A.    This is one of the Toshiba laptops that were seized.

22   Q.    And the purpose for seizing the laptops, why were the

23   laptops seized?

24   A.    Well, again, as I stated earlier, in computer crimes

25   it's not so much based upon records, certainly you could use
```

1   those, but ultimately in my training and experience we still

2   have to put the perpetrator or the offender behind the

3   computer.  So records are one thing, but actually putting

4   that person behind the computer is something else.

5   Q.   And this next picture, Detective, State's Exhibit 24

6   maybe?

7   A.   24, yes.

8   Q.   Do you recognize State's Exhibit 24?

9   A.   Yes.  Again, another laptop that was seized in the

10  search warrant.

11  Q.   The next exhibit, State's Exhibit 25?

12  A.   It is.

13  Q.   And what does State's Exhibit 25 show?

14  A.   It's very difficult to tell.  It's blurry.  I'm not

15  going to pretend to know and say what I think it is.

16  Q.   Not a problem.

17       Was it an item in the household?

18  A.   It was, yes.

19  Q.   State's Exhibit 26, you have the hard copy?

20  A.   26, yes.

21  Q.   Do you recognize State's Exhibit 26?

22  A.   Yes, this shows two gaming systems in the photograph,

23  the Xbox on what appears to be -- I believe the Xbox on the

24  bottom shelf and another gaming system on top.

25  Q.   Were these items that were seized?

218

1   A.    Yes.

2   Q.    Why would gaming consoles be seized?

3   A.    Again, in my training and experience, gaming consoles

4   also have the ability to connect to the Internet.  So if

5   they're Internet cabled, people can communicate and they can

6   use these systems to access the Internet.

7   Q.    Next exhibit, Detective, is which exhibit number?

8   A.    This is State's Exhibit 27.

9   Q.    Do you recognize State's Exhibit 27?

10  A.    I do, yes.

11  Q.    And how do you recognize State's Exhibit 27?

12  A.    In the middle on the note pad is a cell phone that was

13  also seized.

14  Q.    This should be State's Exhibit No. 28, do you recognize

15  that?

16  A.    It is State's Exhibit 28.  Yes, I do.  And that appears

17  to be a router in that photograph.

18  Q.    And was that seized as well?

19  A.    I don't recall the router being seized.  It could have

20  been, but I don't recall that.

21  Q.    Once you had seized the phones and the Internet capable

22  devices, what did you do next?

23  A.    Once we left the house, all that property was taken

24  back to the Parma Police Department detective bureau, and at

25  that point I applied for yet another search warrant to

 1  access those electronic devices.

 2  Q.    So just because you have the devices, does that mean

 3  you're able to go into them?

 4  A.    No.

 5  Q.    What did you do next?

 6  A.    Again, prepared a search warrant affidavit, presented

 7  that to the law department, who also reviewed it, after it

 8  was approved by them, appeared in front of a municipal court

 9  judge, I was sworn in, went over the facts of the case, I

10  signed the affidavit, and the judge signed the affidavit and

11  search warrant.

12  Q.    Detective, I'm going to show you what has been

13  previously marked as State's Exhibit 6.  I'm sorry.  State's

14  Exhibit 4.

15              MS. WOODS:   Your Honor, may I approach?

16              THE COURT:   You may.

17  Q.    Do you recognize that, Detective?

18  A.    Yes, I do.

19  Q.    And how do you recognize that?

20  A.    This is one of the items, a Samsung Galaxy S5 that was

21  seized pursuant to the search warrant.

22  Q.    Was all the property that was seized returned?

23  A.    No, not all of the property.

24  Q.    Is there additional property that is still in police

25  lock-up or police evidence?

1   A.   Yes, there is.

2   Q.   I am going to show you what has been previously marked

3   as State's Exhibit 5-A and 5-B.

4                MS. WOODS:  May I approach, Your Honor?

5                THE COURT:  You may.

6   Q.   Detective, I am showing you what is marked as State's

7   Exhibit 5-A.  Do you recognize State's Exhibit 5-A?

8   A.   Yes.

9   Q.   And what is State's Exhibit 5-A?

10  A.   This is a Toshiba laptop with power cord, and it's

11  search warrant item No. 10, that was seized pursuant to the

12  search warrant.

13  Q.   And State's Exhibit 5-B, do you recognize that?

14  A.   I do, yes.

15  Q.   And how do you recognize State's Exhibit 5-B?

16  A.   This is a Toshiba laptop, item No. 3, and again that

17  was seized pursuant to the search warrant.

18  Q.   How were these items labeled?

19  A.   On the search warrant inventory sheet you list items

20  one through however many blocks there are on one page, say

21  there's 1 through 15, so you go to a second page and then

22  list 16 through 25, whatever there is.  So each item then is

23  listed, so you have item No. 1, item No. 2, 3, 4, 5, and on

24  this particular one it says search warrant item No. 3.  So

25  that would have been listed as No. 3 on the search warrant

1   inventory sheet.

2                   MS. WOODS:  Your Honor, may I approach?

3                   THE COURT:  You may.

4   BY MS. WOODS:

5   Q.   Detective, I am showing you what's been marked as

6   State's Exhibits 35 and 36, do you recognize these items?

7   A.   I do, yes.

8   Q.   And how do you recognize State's Exhibit 35?

9   A.   35 is a Western Digital hard drive.  Again, it states

10  here search warrant item No. 2, and that would have been

11  seized pursuant to the search warrant.

12  Q.   And what, in your training and experience, is the

13  purpose behind a hard drive?

14  A.   Sure.  A hard drive stores the most amount, at least to

15  my knowledge, stores the most amount of information, so it's

16  important.  That's the best I can explain it.  The most

17  amount of information, to my knowledge, goes on a hard

18  drive, not a disk or a thumb drive or anything like that,

19  it's the hard drive that contains the most information.

20  Q.   So is it an external storage for a computer?

21  A.   Sure.

22  Q.   And what is State's Exhibit 36?

23  A.   State's Exhibit 36 is another hard drive with power

24  cord.  This is labeled search warrant item No. 1, and this

25  again was seized pursuant to the search warrant.

1  Q.   Were all of the items, after they were seized, passed

2  on for further inspection?

3  A.   Yes.  As I stated, I applied for a search warrant to

4  actually have the internal things then be examined, and

5  that's where that search warrant then was given to Detective

6  Klein for execution.

7  Q.   When Detective Klein was finished with his review of

8  the data, did you review his work as part of your job?

9  A.   I did, yes.

10  Q.   I am showing you --

11              MS. WOODS:   Your Honor, may I approach?

12              THE COURT:   You may.

13  Q.   Detective, I am showing you what's been marked as

14  State's Exhibits 7, 8 and 21.  Tell me if you recognize

15  these.

16          Do you recognize those, Detective?

17  A.   I do, yes.

18  Q.   Start with State's Exhibit 7, how do you recognize it?

19  A.   I recall that this was a screen shot that Detective

20  Klein was able to provide.

21  Q.   And is this a screen shot that you reviewed yourself?

22  A.   Yes, it is.

23  Q.   State's Exhibit 8, do you recognize State's Exhibit 8?

24  A.   I do, yes.

25  Q.   And how many pages are there to State's Exhibit 8?

1   A.    There are two.

2   Q.    And what is State's Exhibit 8?

3   A.    This is a post that was on the fake Parma Police

4   Department's Facebook page, and this is in regards to the

5   Subway robbery with the woman loitering, you know, and if

6   you have information about her, you know, call the Parma

7   Police Department.

8   Q.    To your knowledge, was there a real robbery at that

9   Subway?

10  A.    There was, yes.

11  Q.    Do you recall what images were used on that, images

12  that were used on that post?

13  A.    Yes, it was a capture of surveillance video.

14  Q.    Let's look at page 2 of State's Exhibit 8, do you

15  recognize page 2?

16  A.    I do, yes.

17  Q.    And how do you recognize Exhibit 8 page 2?

18  A.    That's the capture from the surveillance video that was

19  actually on the real page.

20  Q.    The woman that is seen at the bottom of State's Exhibit

21  2, do you recognize that image?

22  A.    I recognize the image from this particular case.

23  Q.    Now we're looking at State's Exhibit 21, do you

24  recognize State's Exhibit 21?

25  A.    I do, yes.

224

1  Q.    And how do you recognize State's Exhibit 21?

2  A.    This is a post, the first post that went up on the fake

3  page in regards to the homeless.

4  Q.    To your knowledge, if you know, which post garnered the

5  most attention?

6  A.    It was the first post.

7  Q.    And this was the first post?

8  A.    That's correct.

9              MS. WOODS:  Your Honor, may I have a moment?

10             THE COURT:  You may.

11 BY MS. WOODS:

12 Q.    Detective, is there any other additional follow-up you

13 did as it relates to this case?

14 A.    No, nothing that I recall.

15 Q.    After this case, did you become aware of any other

16 sites that were up in the name of the Parma Police

17 Department?

18 A.    Yes, I did.

19 Q.    How did you become aware of those?

20             MR. VICK:  Objection, Your Honor.  May we

21        approach?

22             THE COURT:  You may.

23                      -  -  -

24             (Thereupon, a discussion was had between

25              Court and Counsel at sidebar outside the

```
 1                   hearing of the jury and off the record.)

 2                              - - -

 3                   THE COURT:  Okay.   That objection is

 4        sustained.

 5                   MS. WOODS:   Thank you, Your Honor.

 6  BY MS. WOODS:

 7  Q.   Detective, were you able to determine the person behind

 8  the fake Facebook posts pretending to be the Parma Police

 9  Department?

10  A.   Yes.

11  Q.   And who was that person?

12  A.   Mr. Anthony Novak.

13  Q.   Do you see Mr. Novak present in the courtroom today?

14  A.   I do, yes.

15  Q.   And for purposes of our court reporter, could you point

16  out an article of clothing that he's wearing?

17  A.   Yes.  He has a blue dress shirt on and a silver black

18  and blue tie.

19                   MR. VICK:  So stipulate, Your Honor.

20                   THE COURT:  Okay.

21                   MS. WOODS:  Your Honor, may I have a moment?

22                   THE COURT:  You may.

23                   MS. WOODS:  No further questions.

24                   THE COURT:  All right.  Cross-examination.

25                   MR. VICK:  Thank you, Judge.
```

```
 1                          - - -

 2            CROSS-EXAMINATION OF THOMAS CONNOR

 3   BY MR. VICK:

 4   Q.   Good afternoon, Detective.

 5   A.   Good afternoon.  How are you?

 6   Q.   Well.  How are you?

 7   A.   Good.

 8   Q.   You've been a detective with the Parma Police

 9   Department for a long time, correct?

10   A.   Yes.

11   Q.   And you're very familiar with what your job duties and

12   responsibilities are, correct?

13   A.   Yes.

14   Q.   Basically, you investigate crimes; is that right?

15   A.   Yes.

16   Q.   And part of your duties in investigating a crime is to

17   document your investigation, correct?

18   A.   Yes, that is correct.

19   Q.   And you document it through either various police

20   reports or investigative reports, correct?

21   A.   Yes.

22   Q.   And would you agree with me that the information

23   contained in or that you put in that investigative report is

24   very critical to your investigation?

25   A.   Yes.
```

1   Q.    And, in fact, if it were a material element of a crime,

2   say a murder, and you had the murder weapon, you would state

3   what date you obtained that murder weapon in your report,

4   correct?

5   A.    Yes.

6   Q.    Same thing if it were a rape and you obtained a rape

7   kit, correct?

8   A.    Yes.

9   Q.    And when you were talking about the search warrant at

10  Anthony's residence, okay, and you were saying things like

11  the investigation wasn't over when Facebook returned its

12  pages, correct?

13  A.    Yes.

14  Q.    Because you have to put Anthony behind the computer,

15  right?

16  A.    That's correct.

17  Q.    And it's not really behind the computer, but it's

18  behind the Facebook page itself, right?

19  A.    Yes.

20  Q.    I mean, not that you -- you know, you can't be behind a

21  Facebook page.  But you've got to link the two together and

22  put 'em on him, right?

23  A.    That's correct.

24  Q.    Great.  And the only way you can do that, based upon

25  your prior computer experience, is to get your hands on his

228

1  computer, right?

2  A.    Well, yeah, that's the way I was taught and that's the

3  way I have done it for years.

4  Q.    I mean, you know, I don't mean just the computer,

5  computer, cell phone, tablets, any type of electronic, Xbox

6  and Play Station?

7  A.    Yes.

8  Q.    And you had said that the hard drive is one of the more

9  important things because of the volume of material it can

10  take in?

11  A.    I did testify to that, but I thought the question was

12  put in a different context.

13  Q.    Not important.

14        And you didn't just pick this case up, correct,

15  Lieutenant Riley assigned it to you, right?

16  A.    Yes, that's correct.

17  Q.    And the police department is what we refer to as a

18  paramilitary organization, correct?

19  A.    Yes, that's correct.

20  Q.    I apologize, I didn't mean to cut you off.

21        A lieutenant is higher up on the hierarchy than a

22  detective, right?

23  A.    Yes.

24  Q.    And if a lieutenant gives you an order, you have no

25  obligation to deny that order, correct?

229

1   A.    That's correct.

2   Q.    In fact, if you deny that order, you can be written up

3   on conduct charges, right?

4   A.    That's correct.

5   Q.    So you receive this case on May 2nd, correct?

6   A.    Yes.

7   Q.    And on May 2nd, I believe you testified that you

8   immediately sent that preservation letter to Facebook,

9   correct?

10  A.    Yes.

11  Q.    And after that, on May 3rd, you checked to see if that

12  Jayson Barry had responded to you, correct?

13  A.    Yes.  I can't remember -- yes, I did check on May 3rd

14  to see if -- and I don't know that I testified to it on

15  direct in regards to Mr. Barry.

16  Q.    That's correct, and let's just clear up the record.

17  Jayson Barry is the representative from Facebook, correct?

18  A.    That's correct.

19  Q.    And it will come out later, but we have stipulated to

20  the documents from Facebook in this case.  You're aware of

21  that, correct?

22  A.    Yes.

23  Q.    So there was no need just to drag Mr. Barry in here

24  from California?

25  A.    Correct.

1  Q.    But that was your main contact point from Facebook?

2  A.    Yes.

3  Q.    Okay.  Thank you.  Do you recall then on March 18th you

4  received 2,796 pages of information from Facebook?

5  A.    I do recall that, yes.

6  Q.    And on March 25th you executed the search warrant at

7  his house, correct?

8  A.    Yes.

9  Q.    So you testified that the evidence that you're going to

10  take from his house is of the utmost and vital importance to

11  your investigation, correct?

12  A.    Well, sure, yeah, I have to put, again, the perpetrator

13  or the offender behind the computer, and especially with the

14  information that I learned that there's a roommate.

15  Q.    Right.  And you're aware that, throughout the course of

16  your career as a detective, people destroy evidence,

17  correct?

18  A.    Yes.

19  Q.    They throw hard drives into the Lake, correct?

20  A.    Yes.

21  Q.    They throw guns into the Lake, correct?

22  A.    Yes.

23  Q.    So from March 2nd until March 25th you didn't feel it

24  was important to go out there and get his evidence; is that

25  correct?

1    A.    Well, no, March 2nd is the date of the incident, March

2    3rd was when I applied for a search warrant for the records

3    for Facebook, March 18th is when I received the records back

4    from Facebook; however, with the question that was

5    presented, I still didn't know where Mr. Novak lived.

6    That's one key factor in this thing in regards to a search

7    warrant.  And, again, with information I learned on or about

8    the 24th, 25th of March, that's when we applied for a search

9    warrant for the residence.

10   Q.    Yet you received back 2,796 pages on March 18th, right?

11   A.    Yes.

12   Q.    And you received back Anthony Novak's personal Facebook

13   page, correct?

14   A.    I did, yes.

15   Q.    And you had a picture of Anthony Novak from those

16   Facebook pages, correct?

17   A.    Yes, I did.

18   Q.    And if you run Anthony Novak's name in the Bureau of

19   Motor Vehicles, a license picture would have come up,

20   correct?

21   A.    Yes, I believe so.

22   Q.    And if he's registered with the Bureau of Motor

23   Vehicles, you would have been able to find his address,

24   correct?

25   A.    Oh, we did have an address for him.  We had a Pinegrove

1  address for him.

2  Q.   But you could have executed that search warrant a lot

3  earlier --

4  A.   I don't believe so.

5  Q.   -- isn't that correct?

6        Throughout the investigation in this case, again,

7  it's -- you testified to it, it's very important and

8  critical for you to document the steps you take and the

9  evidence you obtain and the key facts of the case in your

10  investigative report, correct?

11  A.   Yes.

12  Q.   And do you have that report?

13  A.   In front of me, no.

14  Q.   In your report, on March 2nd you had testified you were

15  made aware of a fake page, correct?

16  A.   Yes.

17  Q.   And then you document on March 3rd that you had checked

18  your email and found that Mr. Barry had gotten back to you,

19  correct?

20  A.   Yes.

21  Q.   And March 18th was the documentation for the Facebook

22  pages received, correct?

23  A.   Yes.

24  Q.   March 25th you note that you were advised that Anthony

25  had been arrested, right?

1   A.    Yes.

2   Q.    And March 28th is when you applied for the search

3   warrant, correct?

4   A.    Again, I don't know without my report, but it's around

5   March 25th-ish time frame.

6   Q.    And that was contained in your report, correct?

7   A.    Yes.

8   Q.    Okay.  On March 29th you were documenting things that

9   Detective Klein had given you with respect to the items that

10  were seized, correct?

11  A.    Yes.

12  Q.    And on March 30th Detective Klein advised you that the

13  computer does belong to Novak and the investigation or the

14  interrogation of the computer was complete, correct?

15  A.    Yes.

16  Q.    April 4th you stated that you went through the images

17  from Kozelka's computer, correct?

18  A.    Yes.

19  Q.    And on April 5th you were very clear to document all of

20  the calls that came into dispatch, correct?

21  A.    Yes.

22  Q.    And we're here on a charge of disrupting public

23  service, correct?

24  A.    Yes.

25  Q.    And it's the disruption of a public service or a police

234

1   function, correct?

2   A.    Yes.

3   Q.    And you testified on direct examination that because of

4   your investigation in this case you had to cancel a buccal

5   swab, correct?

6   A.    Yes.

7   Q.    Where is that in your report?

8   A.    That's not in the report.

9   Q.    Okay.  When you apply for a search warrant, that search

10  warrant has to have an affidavit, correct?

11  A.    Yes.

12  Q.    And in order for a search warrant to be granted by a

13  judge or a magistrate you have to satisfy or convince that

14  judge or magistrate that there's probable cause either that

15  a crime was committed or that the items you're looking for

16  in an investigation are where you say they are, correct?

17  A.    Yes.

18  Q.    And so the items -- strike that.

19        When you draft an affidavit, it has various numbered

20  paragraphs, correct?

21  A.    Yes.

22  Q.    And when you're done, you review that affidavit,

23  correct?

24  A.    Yes.

25  Q.    And that affidavit, in order to get notarized, it's

1  sworn testimony, right?

2  A.   Yes.

3  Q.   You have to raise your hand and take an oath before the

4  notary will stamp it, right?

5  A.   Yes.  Yes, but we don't -- a notary doesn't stamp it.

6  A judge signs it and then it goes to the clerk of courts.

7  Q.   And you would agree with me that it's very critical and

8  important to contain, or to put in the affidavit all of the

9  key facts that you have to support that a crime was

10  committed, correct?

11  A.   Yes.

12           MR. VICK:  Your Honor, may I approach?

13           THE COURT:  You may.

14           MR. VICK:  Thank you.

15  BY MR. VICK:

16  Q.   Detective, I'm going to hand you what's been previously

17  marked as Defendant's Exhibit B.  Would you take a moment

18  and look at that, please.

19  A.   Okay.

20  Q.   Detective, are you ready?

21  A.   Yes.

22  Q.   Okay.  Thank you.  And, sir, you've had an opportunity

23  to review that?

24  A.   I have, yes.

25  Q.   And if you'd go to page 1 of the actual search warrant,

1    would you agree with me that this is the search warrant and

2    attached affidavit for the search of Anthony's residence?

3    A.    Yes.

4    Q.    Okay.  And after having reviewed that, are you

5    satisfied it's a true and accurate representation and a true

6    and accurate copy of the actual search warrant and affidavit

7    you obtained?

8    A.    Yes.

9    Q.    Thank you.  And can you go to paragraph 5 of your

10   affidavit, please.

11                   MS. WOODS:  Objection.  May we approach?

12                   THE COURT:  You may.

13                             - - -

14                   (Thereupon, a discussion was had between

15                   Court and Counsel at sidebar outside the

16                   hearing of the jury and off the record.)

17                             - - -

18                   THE COURT:  That objection is overruled.

19                   MS. WOODS:  Thank you, Your Honor.

20                   MR. VICK:  Thanks, Judge.

21   BY MR. VICK:

22   Q.    Thank you, Detective, and I would like to point your

23   attention to paragraph 5.  Do you see that paragraph?

24   A.    I do, yes.

25   Q.    And it states, "Affiant" -- and affiant would be you,

1  correct?

2  A.    Yes.

3  Q.    "Affiant avers that the user who was posting this

4  information purported himself to be a representative of the

5  Parma Police Department, as exact images used on the real

6  Facebook page were used on the fake Facebook page.  The user

7  further disrupted and impaired the function of the Parma

8  Police Department by knowingly posting false information,"

9  correct?

10 A.    Yes.

11 Q.    And that's what it says word for word, right?

12 A.    Yes.

13 Q.    No evidence of a missed buccal swab appointment in that

14 affidavit paragraph, correct?

15 A.    No.

16 Q.    Can you read paragraph 6 for me.

17 A.    It states, "Affiant avers that as a result of this fake

18 account being created, Parma City Hall, Parma Law Department

19 and Parma Police Department received numerous calls and

20 complaints regarding the content.  There were also numerous

21 amounts of comments posted on the fake page, including 'fuck

22 the Parma Police'."

23 Q.    And what you detail in that paragraph are the calls

24 that dispatch took, right?

25 A.    No, not only the calls to Parma dispatch, but the calls

1    to the law department and to the safety department.

2    Q.    And you also make a comment in there about people using

3    a horrible word against the Parma Police, right?

4    A.    Yes.

5    Q.    And that wasn't Anthony's -- those were not Anthony's

6    words, correct?

7    A.    They were not.

8    Q.    Just some moron comment under one of the posts,

9    correct?

10   A.    Yes.

11   Q.    And you took offense to that, didn't you?

12   A.    I didn't take offense to it.

13   Q.    Why did you put it in your affidavit?

14   A.    It's putting an example of comments that were left

15   behind, that's all it was.

16   Q.    Well, there were comments that we went through over

17   here that were more pertinent to your investigation that

18   Anthony had like, I deleted the comments that were fake,

19   right?

20   A.    Yes.

21   Q.    Okay.   And there were more pertinent comments like, I'm

22   proud of my actions, correct?

23   A.    Yes.

24   Q.    But you chose the one that was disparaging of the Parma

25   Police Department, didn't you?

1  A.    I just put that in as an example of comments that were

2  being posted.

3  Q.    Detective, I would like to take you back to March 2nd,

4  if that's okay with you.  When you looked -- strike that.

5       When you were made aware of the fake page, and we

6  keep calling it a fake page, it was a real Facebook page,

7  but we're calling it the fake Parma Police page?

8  A.    Yes.

9  Q.    Did you review all of the posts that Anthony put on

10  there when Lieutenant Riley assigned you this case?

11  A.    Yes.

12  Q.    So you saw the homeless post?

13  A.    Yes.

14  Q.    And then we went backwards all the way through abortion

15  and pedophiles, all the way to the top one, correct?

16  A.    Yes.

17  Q.    So it was apparent immediately to you when you looked

18  at this that it was fake?

19  A.    I guess two-fold here.  Was it apparent?  No, it's not

20  apparent until you start reading the posts.  But when I

21  initially opened it, I go, wow, this is our page, but not

22  until you start reading the posts.

23  Q.    And once you start reading the posts, the absurd nature

24  of the actual content of the posts comes through, correct?

25  A.    Yes.

240

1   Q.   And throughout the course of your investigation, you

2 know, and I'm trying not to be too duplicative with this,

3 but there was no evidence that your real page was harmed,

4 correct?

5   A.   There was not.

6   Q.   Yeah, Anthony didn't hack the real page, right?

7   A.   He did not.

8   Q.   And some other, you know, anti-police person didn't

9 hack the real page, correct?

10   A.   No, the real page was not hacked.

11   Q.   Okay.  And the website was okay?

12   A.   Yes.

13   Q.   And because Lieutenant Riley assigned this case to you,

14 you had to go through thousands of documents, correct?

15   A.   Yes.

16   Q.   And those documents were the Facebook documents, right?

17   A.   That's right.

18   Q.   And we went through a lot of comments and messages that

19 Anthony had on there, correct?

20   A.   Yes.

21   Q.   Anthony never made a single threat to the Parma Police

22 Department, did he?

23   A.   No.

24   Q.   And there was no content on there or messages that, I

25 did this to shut down the Parma Police Department, correct?

241

1  A.    No.

2  Q.    And on the loitering and robbery post, which we're all

3  familiar with, okay?

4  A.    Yes.

5  Q.    He said, Call Detective Tremble, correct?

6  A.    Yes.

7  Q.    And I apologize, I don't remember, who's your real

8  detective?

9  A.    Duganier.

10  Q.    Okay.  And on the Parma Police Department's real page

11  it listed Detective -- either Detective Duganier's number or

12  the general police number, correct?

13  A.    Yes.

14  Q.    And in Anthony's post he didn't have any numbers on

15  there, correct?

16  A.    I don't recall that, just the Detective Joe Tremble.

17  Q.    And I apologize, no telephone numbers, correct?

18  A.    Yes.

19  Q.    In fact, nowhere on Anthony's fake page was there ever

20  any telephone numbers listed, right?

21  A.    No, I don't think so.

22  Q.    In the dispatch calls, you downloaded eleven phone

23  calls, correct?

24  A.    Yes.  Yes, there were eleven phone calls.  In my notes

25  I -- it's actually ten calls, because the one person was two

242

1  phone calls.

2  Q.    Right, it was kind of split into two.  Okay.  Ten phone

3  calls, you and I can agree on that?

4  A.    Yes.

5  Q.    Would you have any reason to disagree with me if I told

6  you the total length of those ten phone calls was 11.3

7  minutes?

8  A.    I would not.

9  Q.    And those calls didn't come in like they were played in

10  court, one after another, correct?

11  A.    Correct.

12  Q.    And I think you did a good job of documenting the times

13  that the call was received, correct?

14  A.    Yes.

15  Q.    And they came in over a 12-hour time period, correct?

16  A.    Yes.  All ten calls in totality came in over a 12-hour

17  time period; however, there was six calls in a

18  three-and-a-half-hour time period.

19  Q.    And there was not a flood of phone calls sufficient to

20  shut down the non-emergency line, correct?

21  A.    The non-emergency line was not shut down.

22  Q.    9-1-1 wasn't shut down, correct?

23  A.    To my knowledge, no.

24  Q.    And, again, throughout the course of your

25  investigation, especially when you think or when the website

1   is still active, you didn't send any cars to either

2   Giant Eagle or St. Anthony's, did you?

3   A.   I did not.

4   Q.   You certainly didn't assemble a SWAT team, did you?

5   A.   No.

6   Q.   Any protesters show up?

7   A.   To my knowledge, no.

8   Q.   And you said all of your search warrants in this case

9   were approved by the law department, correct?

10  A.   Yes.

11  Q.   And your involvement in this really started with

12  Lieutenant Riley, correct?

13  A.   Yes.

14  Q.   And you're following orders from Tim Dobeck and the law

15  department, correct?

16  A.   Yes.

17                  MR. VICK:  One moment, Your Honor.

18  Q.   Do you know how long the fake Facebook page was up?

19  A.   No, I don't.  Off the top of my head, I couldn't give

20  you an exact time.

21  Q.   And throughout the course of your investigation, did

22  you come to learn that the fake page had the same email

23  address tied to it as Anthony's real page?

24  A.   Yes, I did.

25  Q.   And you had testified, and I apologize if it wasn't

1   you, but one of the detectives testified that he took his

2   real page down, too, correct?

3   A.    That who took his real page down?

4   Q.    That Anthony's real page was also down.

5   A.    Yeah.  Yes.

6   Q.    Okay.  Do you know who took down the fake page?

7   A.    No, I don't.  And, frankly, my report indicates that I

8   had sent the preservation letter out to Facebook requesting

9   that they remove it.  Going through content on Mr. Novak's

10  page, there's discussion he has with somebody, I can't

11  recall who it is now, that he was going to delete the page.

12  I know through my own research that we can all delete our

13  own Facebook pages, it takes up to 14 days to delete so long

14  as you don't log back into that account.  So exactly what

15  caused it to be taken down or who's responsible ultimately

16  for that being taken down, I don't know.

17  Q.    You don't know.  Okay.  Thank you very much.

18               MR. VICK:  Your Honor, I don't have any

19        further questions.  Thank you.

20               THE COURT:  Okay.  Thank you.  Redirect.

21                         -  -  -

22

23

24

25

```
 1              REDIRECT EXAMINATION OF THOMAS CONNOR
 2   BY MS. WOODS:
 3   Q.    Detective, Mr. Vick asked you could you have gotten the
 4   search warrant earlier, and what was your answer?
 5   A.    I believe I stated I don't think I could have.
 6   Q.    And why was that?
 7   A.    Because I didn't know where Mr. Novak was living at.
 8   We had information that he was on Pinegrove, but I also had
 9   information that he wasn't on Pinegrove, so I didn't have
10   enough to get inside of a residence.
11   Q.    Is there harm in executing a search warrant on a wrong
12   address?
13   A.    Oh, absolutely.
14   Q.    And what harm is that?
15   A.    Oh, my goodness.  I could just imagine myself if that's
16   my house, you know, that the police hit the wrong house,
17   whether that's an officer safety issue.  We've all read the
18   articles in the paper where police have hit the wrong house
19   and somebody ends up being killed because they had the wrong
20   address.  Yeah, it's a huge risk.
21   Q.    So the day you executed the search warrant was the
22   soonest available day to execute the search warrant?
23   A.    Yes.
24   Q.    Did people believe this fake Parma Police Department
25   Facebook page was a real Facebook page?
```

```
 1  A.    Yes.

 2  Q.    To your knowledge and in the course of your

 3  investigation, did you find that people believed this to be

 4  a true page?

 5                  MR. VICK:  Objection, Your Honor.

 6                  THE COURT:  Sustained.

 7                  MS. WOODS:  Thank you, Your Honor.  No

 8           further questions.

 9                  MR. VICK:  I'm sorry.  Nothing, Your Honor.

10                  THE COURT:  All right.  You may step down.

11                  THE WITNESS:  Thank you.

12                          - - -

13                  (Thereupon, the witness was excused.)

14                          - - -

15                  THE WITNESS:  Judge, do you want us to take

16           this back, this table and all this stuff?

17                  THE COURT:  If you don't mind, that would

18           probably be helpful, since our jurors won't be able

19           to get out.

20                  Okay.  You may call your next witness.

21                  MS. WOODS:  Thank you, Your Honor.  The State

22           would rest, pursuant to the admission of its

23           exhibits.

24                  THE COURT:  All right.  Do the lawyers want

25           to approach for a minute?
```

```
 1                        -  -  -
 2              (Thereupon, a discussion was had between
 3              Court and Counsel at sidebar outside the
 4              hearing of the jury and off the record.)
 5                        -  -  -
 6              THE COURT:  Ladies and gentlemen, we're going
 7    to take a little bit longer of a break right now.
 8    We're going to take about half-an-hour, so if you
 9    would like -- would anybody like to go back to the
10    fourth floor?
11              A JUROR:  Is there a soda machine on this
12    floor?
13              THE COURT:  No.  I am going to have all of
14    you go to the fourth floor.  Really, you have to go
15    together.  You can't be separated.  So I'll have you
16    go down to the fourth floor, and we'll call you up
17    in a half-hour, like at 3:35.  All right?
18              Again, you are not to discuss the case
19    amongst yourselves.  Do not discuss it with anyone
20    or form an opinion on this case until it is finally
21    submitted to you.  Do not permit anyone to discuss
22    it in your presence.  You are not to conduct any
23    research of your own whatsoever.  You can't Google
24    anything that you've heard at all in this trial.
25    You are not permitted to read any news media,
```

1    newspaper accounts of this trial.  And you are not

2    to post anything or read anything on Facebook,

3    Twitter, SnapChat, Instagram, whatever means you use

4    to communicate with the outside world through social

5    media.

6              All right, folks?  So I'll see you back in

7    about half-an-hour.

8              All rise for the jury.

9                        - - -

10             (Thereupon, a recess was taken for the jury

11             and the following was held in open court:)

12                       - - -

13             THE COURT:  Okay.  Do the lawyers want to

14   approach for a minute, and then we can go on the

15   record.  Did you look at all of her exhibits?

16             MR. VICK:  Huh-uh.

17             THE COURT:  You didn't?

18             MR. VICK:  I don't -- we talked about them

19   before we started.

20                       - - -

21             (Thereupon, a discussion was had between

22             Court and Counsel off the record.)

23                       - - -

24             THE COURT:  So let's go on the record now

25   with these.

1              Okay.  So now we are going back on the record

2      with the exhibits.  On behalf of the State?

3              MS. WOODS:  Thank you, Your Honor.

4              The State would move to admit Exhibit 1,

5      which was the printout from Detective Connor, the

6      official Parma Police Department Facebook page.

7              Exhibit 2-B --

8              THE COURT:  One second.  So is there any

9      objection?

10             MR. VICK:  No objection.

11             THE COURT:  State's Exhibit 1 is admitted

12     without objection.

13             MS. WOODS:  Thank you, Your Honor.

14             The State would move to have 2-B, the

15     isolated text messages from Novak admitted.

16             MR. VICK:  No objection.

17             THE COURT:  All right.  So those are admitted

18     without objection.

19             Well, you know what, why don't you just go

20     through your list, and then the ones that you object

21     to, then we'll argue.  So then I can just do an

22     admitted without objection to all of them.  All

23     right?

24             MS. WOODS:  Exhibit 7, the screen shot.

25     Exhibit 8, also a screen shot.  Exhibit 9, the

1    dispatch calls.  Exhibit 10, the two Facebook

2    banners.  Exhibit 11 is the printout from Detective

3    Connor of Anthony Novak's personal Facebook page.

4    Exhibit 12, Anthony Novak's printout of the personal

5    Facebook page, also printed out by Detective Connor.

6         Exhibit 13, the printout of Anthony Novak's

7    pages that he likes or follows.  Exhibit 16, which

8    is the records received from Facebook from the fake

9    Parma Police Department page.  I believe there's a

10    stipulation to those.

11         MR. VICK:  Correct.

12         MS. WOODS:  Exhibit 17, the screen shot of

13    Anthony Novak's posts.  Exhibit 18, screen shot of

14    Anthony Novak's posts.  Exhibit 20, the complete

15    records.  Again, I believe there's a stipulation to

16    that.

17         Exhibit 21, screen shot from the fake

18    homeless posts.  Exhibits 22, 23, 24, 25, 26, 27,

19    28, 29, 30, 31, and 32 were all pictures from the

20    search warrant.  The physical evidence the State is

21    not moving to admit.  It needs to stay in police

22    custody.  The State would also move to admit Exhibit

23    19, that was testified to, it was where the

24    detective put all the images that he downloaded onto

25    a disk, some of those pictures were printed out,

1      some of the relevant ones.

2           THE COURT:  All right.  So regarding then

3      State's Exhibits 1, 2-B, 7, 8, 9, 10, 11, 12, 13,

4      16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,

5      30, 31, and 32, are there any objections to any of

6      those?

7           MR. VICK:  No, Your Honor.

8           THE COURT:  All right.  Those are all

9      admitted without objection.

10           Now regarding Exhibit 19.

11           MR. VICK:  Judge, Exhibit 19 has been

12      represented to me to be a DVD or CD containing all

13      of the images from Anthony Novak's computer.  While

14      I appreciate that the detective testified that he

15      dumped them all on here, none of them or only a few

16      of them were actually talked about or there's any

17      evidence of they were given to anybody.  We really

18      don't know what's on here.  There's been no -- they

19      didn't show them on the screen.  There's no basis

20      for them to be admitted.

21           MS. WOODS:  Your Honor, the detective

22      testified that it is an exact replica of the

23      computer as it stood when he did his interrogation

24      process.  That it -- we have pulled out only a

25      handful of the pictures.  I believe he also

```
 1          testified, and I might be wrong, that there were

 2          more pictures on the disk.

 3                  THE COURT:  Well, is there any way to exclude

 4          everything that's not relevant?

 5                  MS. WOODS:  I could dump them onto another

 6          disk.

 7                  THE COURT:  Of just the ones that are

 8          relevant to this case?

 9                  MS. WOODS:  I can't do it off of this disk,

10          Your Honor, because this is the official copy.

11                  THE COURT:  Okay.  So --

12                  MR. VICK:  I mean, the ones that you think

13          are relevant are the ones that you printed out and

14          showed the people, right?

15                  MS. WOODS:  There are several duplicates of

16          the same photo.  For one example, the picture of the

17          screen shot of the homeless, every couple hundred

18          shares and every time it got bigger and bigger,

19          there was a new screen shot of it.

20                  Your Honor, it's not the biggest deal in the

21          world that this goes in or not.  The State is asking

22          to move it in, you're asking to leave it out.

23                  THE COURT:  I'm going to say that it's not

24          admitted.

25                  MS. WOODS:  Thank you, Your Honor.
```

```
 1                 THE COURT:  So 19 stays out.

 2                 MS. WOODS:  The State is also not moving to

 3       put into evidence its Exhibit 34, which is the

 4       dispatch calls.  It's notes and it was used to

 5       refresh memory rather than --

 6                 MR. VICK:  That's your call.

 7                 MS. WOODS:  Okay.  I know it's something you

 8       had asked if it was going to go in.

 9                 MR. VICK:  Uh-huh.

10                 MS. WOODS:  And it's just the detective's

11       notes used to refresh memory, I do not plan to admit

12       that one.

13                 THE COURT:  Okay.  All right.  So are you

14       making a motion?

15                 MR. VICK:  Yes, Your Honor.  Thank you.  And

16       I know we have briefly discussed these.  Out of an

17       abundance of caution, or to make sure I don't waive

18       anything on appeal, to make sure I don't commit

19       malpractice, I am renewing the motion to dismiss and

20       asking this Court to find the Revised Code Section

21       that Mr. Novak has been charged under to be

22       unconstitutional for all of the reasons we stated in

23       our motion to dismiss, the written motion to

24       dismiss, and I would incorporate in its entirety

25       that motion and every single argument in there into
```

1   my renewed motion to dismiss at the close of their

2   case.

3           With respect to Criminal Rule 29, we would

4   ask this Court to enter a judgment of acquittal for

5   Mr. Novak at this point in time because there's been

6   no evidence that anything was disrupted by dispatch

7   or Detective Connor. There was some evidence, and I

8   know this Court is unable to weigh that evidence,

9   that he had to cancel a buccal swab appointment.

10  But Detective Connor did nothing other than that

11  which he was supposed to do in this case,

12  investigate crimes. That's what he was doing,

13  that's his function. The Facebook page didn't

14  interfere with his function as a police detective,

15  and there was absolutely no evidence that it

16  interfered, disrupted, or impaired dispatch.

17          There's been no evidence whatsoever that the

18  sole purpose that Anthony set this page up, that he

19  knowingly used a computer or the Internet so as to,

20  which is akin to the reason I did it was to disrupt

21  the police. I think it's clear that this is,

22  regardless of what people think about the posts,

23  it's clear that this was a joke.

24          And for those reasons, and the lack of any

25  evidence at this point in time for which the State

```
 1    has rested, we would ask that the Criminal Rule 29
 2    motion be granted.  Thank you.
 3              THE COURT:  All right.  On behalf of the
 4    State?
 5              MR. MIRANDA:  Thank you, Your Honor, may it
 6    please the Court.  In response to the motion to
 7    dismiss, the State would incorporate the arguments
 8    it submitted in its brief in opposition and
 9    discussed at the hearing on the motion to dismiss.
10              With respect to the Rule 29 motion, obviously
11    the Court's aware that the motion requires that you
12    take the evidence in the light most favorable to the
13    State.  I don't think there's any question, based on
14    the evidence, that Mr. Novak created this page, that
15    he used the Internet to create the page.  I think
16    it's -- I think the evidence does support the idea
17    that he knew the page was disrupting.  The evidence
18    established that he, himself, became aware that the
19    Parma Police had put out a warning and that he
20    copied the warning onto the fake page.
21              There's testimony about five dispatchers who
22    fielded calls, multiple detectives who worked on
23    this case.  Detective Connor, in particular, who had
24    to obtain search warrants, who missed an appointment
25    on another case that he had.  And so we think
```

256

```
 1              there's ample evidence that there was disruption and
 2              that he knew his actions were disrupting the police
 3              department.
 4                   For that reason, we would ask the Court to
 5              deny the motion.  Thank you.
 6                   THE COURT:  Okay.  Thank you.  Anything
 7              further?
 8                   MR. VICK:  No, Your Honor.
 9                   THE COURT:  So your motion for Rule 29 is
10              denied.
11                   MR. VICK:  Thank you.
12                   THE COURT:  All right.  And at this time
13              would you like to argue your jury instructions?
14                   MR. VICK:  Yes, Judge.  We had submitted a
15              proposed jury instruction on the First Amendment.  I
16              think that -- and, again, this was all laid out and
17              none of it was a surprise to the prosecutors,
18              because we used the same law and the same First
19              Amendment argument and First Amendment language that
20              was in the motion to dismiss.
21                   We would argue that Reno v. ACLU in 1997 from
22              the United States Supreme Court clearly established
23              that speech on the Internet is absolutely protected
24              under the First Amendment.  Not only is it
25              absolutely protected, but it is given the highest
```

1    level of protection akin to print and news media and

2    journalism.

3         We would submit that the evidence in this

4    case that has come through is that Anthony used the

5    Internet, he set up a Facebook page.  He made

6    statements and comments through the Facebook page

7    and set up these posts.  Whether they were real or

8    fake, the First Amendment doesn't -- the imports of

9    the First Amendment don't differentiate between real

10   and fake.  The First Amendment applies to all

11   speech, except fighting words, incitement,

12   obscenity, and child pornography.  There's been no

13   evidence that any of these were fighting words.

14   There's no evidence that these incited any citizen

15   or police officer to imminent, which means right

16   now, unlawful action.  And there's been no evidence

17   that -- and obviously obscenity doesn't apply,

18   neither does child pornography.

19        We would submit to this Court that under

20   Criminal Rule 30, that the Court has a duty and an

21   obligation, and shall provide jury instructions to

22   the jury that are relevant and necessary for them to

23   fully weigh the evidence and discharge their duty as

24   a fact-finder.

25        The uncontroverted evidence, as we stipulated

```
 1              to all the Facebook messages, is that this Internet
 2              speech and the First Amendment absolutely applies.
 3              And we did file a motion, and I can send it in for
 4              the record as well, we attached a proposed jury
 5              instruction on First Amendment protected speech
 6              where we stated that unless the jury were to find
 7              that the speech and the content were fighting words,
 8              incitement, obscenity, and/or true threats, that
 9              they have to find him not guilty, due to his
10              constitutional -- constitutionally protected First
11              Amendment right.
12                  We did cite to a case to analogize this issue
13              to a flag burning case where the court did not give
14              a First Amendment instruction and the Supreme Court
15              stated that it was reversible error.  And I know
16              there's going to be a counter argument that this
17              isn't a flag burning case and that this Internet
18              page mimicked a real police department page.
19              There's going to be an argument that he impersonated
20              the real police department.  This is not an
21              impersonating a police officer case.  He hasn't been
22              charged with a misdemeanor.  The indictment in this
23              case was for disrupting public service.
24                  The avenue that they charged him with within
25              which to disrupt the public service was the speech.
```

```
 1              And I think it's very telling that the press
 2         releases and the affidavits for the search warrant
 3         mention content, inflammatory and derogatory, F the
 4         Parma Police.  He was prosecuted because of the
 5         content.  No question about it.  And even if there
 6         is a question about it, it's reversible error not to
 7         give the jury, or not to make it a question of fact
 8         for them to apply the First Amendment.
 9              We would ask the Court to include in the
10         general instructions, which make no mention of First
11         Amendment, our instruction.  Thank you.
12              THE COURT:  Okay.  Thank you.  On behalf of
13         the State.
14              MR. MIRANDA:  Thank you, Your Honor.  May it
15         please the Court.  The State was in receipt of
16         Defendant's motion today, obviously the Defendant is
17         relying on State versus Lessin, L-e-s-s-i-n, 67 Ohio
18         State 3d, 487.  That case dealt with a situation of
19         flag burning, and the Ohio Supreme Court in that
20         case cited to Texas versus Johnson, in which the
21         United States Supreme Court recognized that flag
22         burning is constitutionally protected under the
23         First Amendment.  So in that case the Ohio Supreme
24         Court held that a jury instruction was appropriate.
25              In contrast to that case, and I think the
```

```
 1        Court has found State versus Frazier, F-r-a-z-i-e-r,
 2        2011-Ohio-3189, a decision from the Ninth District,
 3        paragraph 20 of that decision, the Ninth District
 4        distinguishes Lessin because that -- because
 5        Frazier's case did not involve a situation where it
 6        was uncontroverted that the speech in that case was
 7        protected.  The facts of that case were there was a
 8        person who was yelling at police and a crowd of 30
 9        or 40 people had amassed, so the Court determined
10        that an instruction wasn't necessary in that case.
11             There's been no case cited directly on point
12        establishing that you can pretend to be a police
13        officer online and to knowingly disrupt public
14        services and that that would be constitutionally
15        protected.
16             Defendant cites Reno, R-e-n-o, which stands
17        for the proposition that the Internet receives as
18        much protection as other speech does.  That's not
19        what the State is arguing.  Of course, if this
20        content had been posted on Mr. Novak's personal
21        page, no one would be here.  It's because it was
22        posted in the name of the Parma Police Department
23        that it caused the disruption.  And for that reason,
24        because it's not a content based restriction here,
25        it's not a content based prosecution, the State
```

1      submits that a jury instruction is not appropriate.

2           THE COURT:  Okay.  Thank you.

3           MR. MIRANDA:  Thank you.

4           THE COURT:  So I have had an opportunity to

5      review at the break your motion, the instruction

6      that you are proposing and the case law.  And I find

7      that the instruction that you're proposing is not

8      warranted in this case.  So I'm not going to give

9      any instruction on the First Amendment.  All right.

10     Okay.

11          Now, Mr. Proctor and Mr. Vick, have you had

12     an opportunity to discuss with your client whether

13     or not he wishes to testify?

14          MR. VICK:  Thank you, Judge.  And with great

15     consideration of this Court, we were granted about

16     20 minutes or a half-hour to have discussions with

17     our client.  Obviously, based on my duty of

18     confidentiality and attorney/client privilege,

19     there's no need to go into those, and I will not go

20     into those, but we have had an opportunity to

21     discuss that with him.  Thank you.

22          THE COURT:  All right.  And so, Mr. Novak,

23     have you had an opportunity to discuss with your

24     attorneys your decision whether or not you will be

25     testifying in this case?

262

```
 1                    THE DEFENDANT:  Yes, I have.

 2                    THE COURT:   Okay.   And have you had enough

 3          opportunity to discuss with them your decision

 4          whether or not to testify?

 5                    THE DEFENDANT:  Yes, I have.

 6                    THE COURT:  And what is your decision?

 7                    THE DEFENDANT:  No.

 8                    THE COURT:  You are not going to testify?

 9                    THE DEFENDANT:  No.

10                    THE COURT:  All right.  So are you -- you'll

11          rest in front of the jury.

12                    Well, do you have any other witnesses that

13          you intend to call?

14                    MR. VICK:  No, Your Honor.

15                    THE COURT:  So you will rest in front of the

16          jury when I bring them out, and then we'll conclude

17          this session for today.  So then Monday we will

18          start at 8:45 and go right into closing arguments.

19          And I permit you to select if you would like me to

20          charge first or close first.  And if you want the

21          jury to be charged first, then the charge has to be

22          in perfect condition before we start.  So if I say

23          we're going to start at 8:45, the charge, as you

24          agree to it, has to be ready to go at 8:45, not at

25          8:50 or 8:55 or 9 o'clock.
```

```
 1              So I don't know, has anybody reviewed the
 2        charge?
 3              MS. WOODS:  We have.
 4              THE COURT:  Are there any changes, deletions,
 5        corrections?
 6              MR. VICK:  Just to pull out the page he did
 7        not testify.
 8              THE COURT:  And then the stipulations,
 9        correct?
10              MR. VICK:  Yes.
11              THE COURT:  The stipulations.  So I will have
12        my secretary then tomorrow type in the stipulations
13        and then email them to you.  Do we have your email?
14              MR. VICK:  Uh-huh.
15              THE COURT:  Okay.  And email them to both
16        sides.  If there's any changes then, I know she gets
17        here really early Monday, and so do I, so you can
18        email what your agreed changes are.
19              All right.  So if you're ready to go and you
20        want me to charge them first and then you argue,
21        then I can do that.
22              MS. WOODS:  The State has no preference, Your
23        Honor.
24              THE COURT:  Would you like to argue and then
25        charge?
```

1          MR. VICK:  I would like to charge then argue.

2          THE COURT:  Okay.  All right.  So I'm going

3     to bring them out, and then you can rest on the

4     record.

5          Now, before we line them up, since you are

6     resting now, I guess you can renew your Rule 29

7     motion.

8          MR. VICK:  Yeah, and I have two exhibits that

9     I would like to offer.

10         THE COURT:  So why don't we do that.

11         MR. VICK:  And obviously, you know, all I

12    will do is renew for all the reasons I just set

13    forth.

14         THE COURT:  All right.  So would you like to

15    renew your Rule 29?

16         MR. VICK:  Yes.  Just for purposes of the

17    record, the renewal of the motion to dismiss with

18    the same arguments and incorporation as before, and

19    the renewal of the Rule 29.

20         THE COURT:  Okay.  And you've rested, right?

21         MR. VICK:  Yes.

22         THE COURT:  All right.  And what exhibits do

23    you have?

24         MR. VICK:  We have two exhibits.  One is the

25    press release, which I discussed with Detective

```
1          Riley, that he authenticated, that we were given in
2          discovery, the press release on March 25th, 2016.
3                 MS. WOODS:  No objection from the State to
4          either exhibit, Your Honor.
5                 MR. VICK:  Thank you.
6                 THE COURT:  So Defendant's Exhibit --
7                 MR. VICK:  I'm sorry, that's F.
8                 THE COURT:  F?
9                 MR. VICK:  Yes.
10                THE COURT:  And what's the other one?  It's
11         admitted without objection.
12                MR. VICK:  The other one -- that was Exhibit
13         B, the search warrant I discussed at length with
14         Detective Connor, that he testified was a true and
15         accurate copy of his actual search warrant and
16         accompanying affidavit.
17                THE COURT:  Is there any objection to that?
18                MS. WOODS:  I'm sorry.  No, Your Honor.  I
19         thought I was clear to both, that there's no
20         objection from the State.
21                MR. VICK:  Oh, thank you.
22                THE COURT:  So Defendant's Exhibits F and B
23         are admitted without objection.
24                MR. VICK:  Yes.  And I'm dropping them on the
25         court reporter's table.
```

```
 1                    THE COURT:  Okay.
 2                    MS. WOODS:  I'm sorry, Your Honor, that was
 3          my fault.  I thought I had said before he started
 4          the second one that there was no objection from the
 5          State to either one.  That was my fault.
 6                    THE COURT:  All right.  Okay.  So we can
 7          bring them back out.
 8                    THE BAILIFF:  Okay.
 9                               - - -
10                    (Thereupon, proceedings were resumed within
11                    the presence of the jury as follows:)
12                               - - -
13                    THE COURT:  Okay.  You may be seated.
14                    All right.  Mr. Vick, on behalf of the
15          Defendant.
16                    MR. VICK:  Thank you, Your Honor.
17                    Based upon the hearing that was previously
18          held and things that were put on the record,
19          Mr. Novak, at this point in time, we are not calling
20          any witnesses and we will rest.
21                    THE COURT:  Okay.  Thank you.
22                    MR. VICK:  Thank you.
23                    THE COURT:  All right.  Do the lawyers just
24          want to come up for a brief second?
25                               - - -
```

```
 1              (Thereupon, a discussion was had between

 2          Court and Counsel at sidebar outside the

 3          hearing of the jury and off the record.)

 4                    -  -  -

 5          THE COURT:  All right.  Ladies and gentlemen,

 6      as I indicated and thought I would tell you before

 7      now, but where we are right now in the trial is that

 8      I will give you the charge, the law that you are to

 9      apply in this case, and then we have closing

10      arguments.  So I am not available tomorrow.  It's

11      due to my scheduling, I have something that I

12      scheduled a couple months ago and I can't

13      reschedule.  So I will not be here tomorrow, which

14      means you won't be here either tomorrow, because I

15      think in the interest of time, it being 4 o'clock,

16      we'll just continue this on Monday.

17          Now, I normally would stay till 5:30, but

18      that might be pushing it.  How does everybody feel

19      about that?

20          A JUROR:  Great.

21          A JUROR:  Let's get it done.

22          THE COURT:  You'd rather go forward?

23          A JUROR:  Yes.

24          THE COURT:  Okay.  Do you want to come up for

25      a second?
```

1                    - - -

2                (Thereupon, a discussion was had between

3            Court and Counsel at sidebar outside the

4            hearing of the jury and off the record.)

5                    - - -

6            THE COURT:  All right.  Then, ladies and

7    gentlemen, first you will hear closing arguments.

8    You will first hear from the State of Ohio, then you

9    will hear from Mr. Vick, representing the Defendant,

10   and then, since the burden rests with the State of

11   Ohio, the State of Ohio will have one final time to

12   speak to you.  Once we are concluded with our

13   closing arguments, then I will give you the law that

14   you are to apply to this case.

15           Now, when I read you the law, it will take

16   about half-an-hour, half-an-hour to 35 minutes for

17   me to charge you with the law.  So we'll have the

18   closing arguments and then we'll have the law that I

19   will read to you.  Okay?

20           All right.  So first on behalf of the State.

21           MR. MIRANDA:  Thank you, Your Honor.

22                    - - -

23

24

25

```
 1    FINAL ARGUMENT ON BEHALF OF THE STATE OF OHIO
 2            MR. MIRANDA:   Thank you all for your time and
 3        patience.   I promise to be relatively brief.
 4            At the beginning of the case the Court read
 5        to you the charge, which is what the Defendant is
 6        accused of doing.  And the Court is going to read
 7        you that charge again.  You might recall the
 8        elements, but what the State has to prove is that
 9        Mr. Novak knowingly used an electronic device or the
10        Internet to disrupt, interrupt, impair, a police
11        function.  Okay.
12            So let's get some of the easy things out of
13        the way.  Identity.  There's no real dispute in this
14        case that Mr. Novak created the page.  This is not a
15        whodunit.  I think the evidence pretty fairly
16        establishes that Mr. Novak had the images on his
17        computer, he was sharing the page, and there's been
18        no -- that really hasn't been contested at all.
19            I think you'll also agree that to create the
20        Facebook page you would need to use the Internet or
21        an electronic device.  So I think those elements are
22        fairly established by the evidence.
23            Let's talk about knowledge.  First, there's
24        the appearance of the page.  And we put up Exhibit
25        10 on the screen of the side by side of the real
```

1    page and the fake page. And I submit they look

2    pretty similar. The background was identical. The

3    profile picture with the badge was identical. And

4    the dissimilarities were in the headings, one said

5    "Police" and the other said "Community." So I

6    think the appearance by itself establishes or

7    suggests knowledge, that the Defendant knew people

8    were going to interpret this as the real page.

9         Second is the nature or the content of those

10   pages. The pages touch upon sensitive and divisive

11   issues, like abortion, homelessness, how police

12   interact with racial minorities. I submit to you

13   that they were purposely divisive in nature. That

14   was the point, to communicate in the guise of the

15   Parma Facebook page something which was going to be

16   controversial, that was going to generate public

17   response, in the form of calls, in the form of

18   shares, et cetera.

19        I think that you -- I think you would agree

20   that given the nature of the appearance of the page

21   and the nature of the content, the creator of that

22   page would know a likely result is that people would

23   contact the Parma Police Department about the

24   content on that page.

25        Third, you heard testimony that Mr. Novak

1    communicated with people about deleting comments,

2    about when people would post on the fake page, this

3    is fake, he would delete those comments.  Okay.  And

4    I think that establishes that this was not a joke,

5    this was not something that was done for humor.

6    This was done to fool people, to give the impression

7    that this was the real page.  And that establishes

8    knowledge.

9        Fourth, I think you heard testimony that when

10   Parma put out its warning to the public about the

11   fake page, that warning was copied onto the fake

12   page.  So an additional step that the Defendant took

13   to cast doubt on the authenticity of the real page.

14   And this is, again, this is something that happens

15   late into the day.  Now he's aware of how it's being

16   received, he's aware that the Parma Police are aware

17   of it and they're disturbed by it, and he's still

18   continuing with the fake page.

19       Additionally, you heard the -- you heard the

20   dispatcher calls.  Now, some of those dispatcher

21   calls came in and there was, you know, Hey, I think

22   that you've been hacked, this is a fake page.  But

23   some of those calls, there was a back and forth

24   about, is this page real?  And I think that that

25   also tends to establish knowledge.

1           So let's talk about the words disrupt,

2       interrupt, or impair.  You heard testimony that five

3       dispatchers took calls in relation to this fake

4       page.  This wasn't one isolated person who can't

5       take a joke or just calls to complain about

6       everything.  This was ten calls.  And that's five

7       dispatchers whose tasks were being interrupted.  Did

8       the interruption result in a murder not getting

9       investigated?  No.  Did a 9-1-1 emergency, was there

10      a failure to respond to a 9-1-1 emergency?  No.  But

11      I submit to you that impairment does not mean

12      complete impairment.  Their days were interrupted.

13      Their tasks were interrupted.  And we're not talking

14      about one interruption.  This was sustained, and it

15      was significant.  We're talking about five calls.

16          The one call in particular, I'd ask you to

17      recall, you can actually hear the frustration in the

18      dispatcher's voice in explaining, at one point I

19      think the caller says, Shame on you, and then the

20      dispatcher says, No, not shame on us, it's fake.  I

21      mean, this is -- she's trying, the dispatcher is

22      trying to explain to the caller that it was not a

23      real page.

24          You heard testimony that Detective Connor was

25      assigned to investigate this.  Lieutenant Riley

1    testified yesterday that his worry was that the

2    mistaken fact, the fact that people didn't know the

3    fake site was real might lead to large gatherings,

4    and he mentioned the specific locations that were

5    talked about on the fake post, Giant Eagle and

6    St. Anthony's.  So he was worried there was going to

7    be large gatherings there, protesters, that would

8    require police response.

9        He also mentioned the need to maintain the

10   authenticity of the real site.  You will recall that

11   he testified that the Parma Police Department will

12   use the Facebook site to solicit information.

13   They'll put video surveillance up on the Facebook

14   site and say, Hey, has anybody seen this person?

15   Can you let us know if you have any clues about this

16   crime.  And he also communicated about how the page

17   could be used in emergency situations.

18       So Connor, Detective Connor is assigned, and

19   he testified that he has active cases that he's

20   working.  In fact, he specifically testified that he

21   had to change his day around.  He was supposed to

22   execute a DNA search warrant, and so he had to

23   reschedule that to the end of the week.  He

24   testified to all the steps he took to investigate

25   this crime, he contacted Facebook, he sent a

1     preservation letter, he obtained a search warrant

2     for the residence.  When he executed the search

3     warrant, he had to seize items.  He had to

4     photograph all of the items that were there.

5          He obtained a search warrant to search the

6     computers, which was eventually done by Detective

7     Klein.  Those search warrants are reviewed by the

8     city law department.  The search warrants were then

9     signed and approved by a judge or magistrate.  And

10    Detective Klein testified that he performed an

11    analysis of the electronic devices in this case.

12         You heard from Detective Heinz that he was

13    involved in identifying early on Mr. Novak on this

14    case.  So you have five dispatchers, you have a

15    lieutenant, you have three detectives in the bureau,

16    all of which who are occupying their time on this

17    case.

18         And lastly, I would remind you that

19    Lieutenant Riley indicated he issued a press release

20    in order to warn the public about the existence of

21    the fake page.  So the department is spending a lot

22    of time and resources on something it shouldn't have

23    to be doing.  It should be investigating real

24    crimes, but it needs to take down this fake page and

25    to restore the authenticity of the real page.

| | |
|---|---|
| 1 | And so I would submit to you, when you take a |
| 2 | look at all the evidence, when you consider all the |
| 3 | testimony, that it's clear Mr. Novak knew he was |
| 4 | creating a page that was being perceived as the real |
| 5 | page, and he knew that the likely result of doing |
| 6 | that was that it would cause disruption, |
| 7 | interruption, or impairment to the Parma Police |
| 8 | forces.  And so that's why we're going to ask you to |
| 9 | return a guilty verdict in this case. |
| 10 | THE COURT:  All right.  Thank you. |
| 11 | MR. MIRANDA:  Thank you. |
| 12 | THE COURT:  On behalf of the Defendant, |
| 13 | Mr. Vick. |
| 14 | MR. VICK:  Thank you, Your Honor.  Gary Vick |
| 15 | is going to do the closing. |
| 16 | - - - |
| 17 | CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT |
| 18 | MR. VICK:  It's not what the evidence will |
| 19 | show, but what the evidence won't show.  Ladies and |
| 20 | gentlemen of the jury, I told you that in my opening |
| 21 | argument, and I trust that at the conclusion of this |
| 22 | case you'll agree with me that this case is going to |
| 23 | rest on what the evidence didn't show. |
| 24 | On behalf of myself and Anthony, and his |
| 25 | family in the back, we do want to thank you.  Thank |

1     you for pushing us to get this over with today, and

2     thank you for being so attentive.  I think this jury

3     was remarkably attentive throughout this process.

4          I also want to say that in the dozens of

5     cases that I have tried from this table, and just a

6     handful over here, because these cases don't really

7     go to trial unless absolutely necessary a lot of

8     times, the voir dire that we conducted and engaged

9     in was probably one of my favorite voir dires that

10    I've ever done, and I do mean that sincerely.  And

11    as I was debating how to construct this closing

12    argument, you know, I was thinking of coming up with

13    something funny from Carlin or a comedian or some

14    type of quote, but the time for quotes and the time

15    for comedy is over.  Okay.  This needs to end now.

16         This case that the government brought against

17    Anthony, it's over, it needs to end now.  Please

18    remember what I told you early on about all of these

19    amorphous concepts: he doesn't have to testify and

20    it can't be held against him; we don't have to do

21    anything or introduce any evidence; innocent; every

22    element beyond a reasonable doubt.  It doesn't work

23    unless you put it into effect.  And we are going to

24    submit, not only is there reasonable doubt, but

25    there's no evidence.  None whatsoever.

No person shall knowingly use a computer or
the Internet so as to, in order to, the purpose of,
disrupting, interrupting, or impairing the functions
of the police.  They spent a good day, witness after
witness, treating this as a whodunit.  I told you in
opening argument he did it.  He never hid from that.
It's his page.  It's his real page, and the fake
page that he put up.  Okay.  But there was no
evidence that the only reason he did this was to get
the police.  No evidence that the only reason he did
this was to interfere with the dispatchers, or to
interfere with Detective Connor, or to interrupt or
disrupt Detective Connor.

I talked about what you're going to have, and
I'm going to discuss right now two exhibits, that's
the press release from Lieutenant Riley and
Detective Connor's sworn testimony, his affidavit.
Make no mistake about it, this case is solely,
one-hundred percent about the content of the posts.
They got mad.  That's why they prosecuted him, not
because he disrupted anything, not because he
interfered with anything.

Throughout the entirety of this case, and
look how they set it up, Lieutenant Riley takes the
stand, then the two detectives, and we had a

1    dispatcher, a nice dispatcher sat up here and talked

2    to you. They introduced into evidence ten, it was

3    eleven, eleven dispatch calls from ten people who

4    called. That's what they were relying on. Make no

5    mistake, that's what they claim the disruption was

6    at the start of this case and almost to the end of

7    it, but we're going to get into that.

8        The calls that they put up there, the

9    disruption to dispatch was that dispatch had to take

10    ten calls, 11.3 total minutes of those calls over a

11    12-hour period, less than one minute on average per

12    hour. But that's not the important part. Please

13    remember the function of dispatch is to do just

14    that. That's what it's for. That's what it exists

15    to do, to deal with farcical comments or farcical

16    concerns from the public, to deal with real concerns

17    from the public.

18        Okay. Lieutenant Riley stood up there and he

19    said, no question it is mine. And you can tell from

20    the dispatch audio tapes and the people that called,

21    he said the public was confused. Fantastic. You

22    are not going to see the words public and confused

23    anywhere in the jury instructions or from the

24    Court's mouth. Don't care. Doesn't matter. Not an

25    element of the crime. But they made a big deal out

1    of that, public confusion.

2         What they didn't spend any time on was police

3    disruption, or police impairment, or police

4    interference.  They diverted the attention away from

5    the true issues in this case and went to all these

6    Facebook posts and all of this other evidence

7    instead of focusing on the job that we now have to

8    do.  Okay.

9         Dispatch's job, its function, its purpose, is

10   to take calls, to direct officers to where they need

11   to go, to put people in place, to deal with 9-1-1

12   calls, to deal with the poor man whose cat's in the

13   tree, okay, and that's what she told you.  She also

14   told you that they're taking on more dispatchers.

15   It has nothing to do with Anthony.  They're bringing

16   on a new city.  Cities are consolidating their

17   resources.  Money's tight.  That's why they're

18   getting more dispatchers.

19        This dispatcher didn't testify that she was

20   interrupted, disrupted, or impaired.  Her function

21   -- there can be no evidence and there can be no

22   claim that she was disrupted or interfered with,

23   because that's her job.  You can't interfere or

24   disrupt that which she's hired and paid to do, which

25   is to take calls from the public.  There's no

280

1     evidence that dispatch, as a police function, was

2     interfered with, interrupted, disrupted, or

3     impaired.

4          In the event you think there may be, where is

5     the evidence that any dispatcher was unable to do

6     something?  I asked her, and she said, this didn't

7     prevent me from taking another call.  I didn't have

8     to quit, I didn't have to leave my job, we didn't

9     have to call anybody else in.  She wasn't prevented

10    from doing anything.

11         Then, after they set their whole case up

12    around this dispatcher and all these calls and rely

13    on all of that information to craft their case

14    around that function being impaired, then we get to

15    Detective Connor who comes up here after sitting

16    through all the witnesses and seeing the dispatcher

17    was terrible, after seeing how poorly she testified

18    for their case, Detective Connor comes up and throws

19    in the buccal swab right in the middle of the case.

20    Never heard of it before.  First time we heard about

21    it was on the stand.  And I submit to you that I

22    don't even have to give any argument on that, but

23    for the fact that he's a detective.  If this

24    situation arose from a plain clothes civilian, you

25    would have thrown it out a long time ago.  And I

1      trust that you've already thrown it out in your

2      heads.

3           Focus back, with respect to the buccal swab,

4      to what I talked to him about.  His report, his

5      investigative report, it covered about a month-and-

6      a-half's worth of time, a month-and-a-half's worth

7      of work, a month-and-a-half's worth of

8      investigation.  And he told me, the important things

9      go in there.  Okay.  The elements of a crime go in

10     there.  Okay.  The material facts of a case, they go

11     in there.  That's not in there.  It's nowhere to be

12     found.  And he admitted it.  Okay.

13          More importantly is the search warrant, which

14     you'll have, the search warrant affidavit.  And

15     Detective Connor testified that these are very

16     important.  And they are important, because if a

17     judge or a magistrate doesn't think you have enough,

18     you're not getting it.  And if you don't get that

19     search warrant for the house, you're not getting the

20     equipment, you're not getting the computer, you're

21     not getting the DVDs, or the Play Station, or the

22     Xbox.  And you heard him say how important those

23     items are, because there's no case unless he can put

24     him in front of that computer or behind the cell

25     phone.  The Facebook pages are nice, they're very

1    handy.  Okay.  They tell this amorphous Anthony
2    Novak, but they got to put him there, they got to
3    tie him in with those pages.  Hey, they waited
4    forever to go do it.  Okay.
5         And B, to prove the probable cause of the
6    crime, the key facts and elements are in here.  Yet,
7    what does he say in paragraph 5?  "The user further
8    disrupted and impaired the function of the Parma
9    Police Department by knowingly posting false
10   information."  Content again.  Not any action, not
11   any knowledge or intent.  That's content.  No
12   mention of buccal swab.  Come on, we're all
13   reasonable people, use your common sense.  If the
14   buccal swab thing really happened, it would be
15   somewhere, it would be in this report, it would be
16   in the affidavit to the search warrant.  Trust me on
17   that one.
18        If the buccal swab thing really happened, he
19   would have produced a calendar.  They would have
20   walked the kid in here and said, yeah, he canceled
21   on me, I was ready to go, I was ready to have my
22   mouth swabbed.  You would have seen the search
23   warrant.  Okay.  But more importantly, remember what
24   Detective Connor said in his direct, I didn't have
25   anything else to do that day.  Yet, after sitting

1    through the witnesses and seeing how the case was

2    coming in, that thing comes out at the eleventh

3    hour.  That didn't happen.

4         And you're going to have the Defendant's

5    exhibits back there.  This case is about content,

6    about vulgarity towards the police and the fact that

7    they didn't like the posts.  Detective Riley's own

8    words in the press release, nothing with, our

9    dispatch was overwhelmed, Detective Connor couldn't

10   do a buccal swab, nobody could do their job, we were

11   impaired, functions were all in haywire.  No.  He

12   posted derogatory and inflammatory information.

13   Nothing with respect to the elements you have to

14   find that they proved beyond a reasonable doubt.

15   The search warrant affidavit, nothing about buccal

16   swabs, nothing about phone calls, just a conclusion

17   that in the detective's mind these things were

18   impaired or disrupted.

19        This is content based.  How do you know it's

20   content based?  "Fuck the Parma Police."  That's

21   what he put in there.  The important things go in

22   there.  Ladies and gentlemen, you are all smart

23   people.  The important things in this case, no

24   mention of buccal swab, vulgarity towards the

25   police.  They didn't like it, he took the picture

from theirs, and they went after him and they got
him.

You heard the testimony, when they executed
the search warrant, the poor roommate's on the
toilet.  They come in, guns ablaze, looking for all
the evidence they can get, three weeks after the
charge -- three weeks after they had the Facebook
documents as it was.

They had already arrested him coming out of a
store.  Sent him to jail.  They then, without any
evidence like we discussed, decided to charge him
with disrupting public service.  Their computer
systems were all intact.  Their page was intact.
Security system is intact.  Phone system is intact.
9-1-1 is intact.  Nothing was hacked.  No large
crowds.  No one showed up at the church, either
pedophile or against pedophiles.  No one showed up
to have an abortion.  No Right-to-Lifers showed up.

Riley's concerned that his officers are in
danger.  Riley's concerned that all these people are
going to show up.  Really?  You heard him say, no
reasonable department could ever put this
information out.  And they made a big deal about,
Detectives, did you ever have a law that you can't
feed the homeless?  Really?  Again, it's a horrible

1    word, but nobody ever accused them of having an

2    actual law where they're going to give abortions or

3    not to feed the homeless.  That's the absurdity of

4    the posts.  Okay.

5            The fact that the posts or information from

6    his page were taken from the real page, or borrowed

7    from the real page, and we talked about it in voir

8    dire, that's the definition of a good parody.

9            As Anthony sits here, okay, you may not like

10   the way he looks.  You may not like what he did.

11   Okay.  Comedy is offensive.  Some people listen to

12   it, some people don't.  You may not like the way I

13   handled the case.  Okay.  You may not like the fact

14   that Mr. Proctor didn't get up and do anything.

15   But, please, look at the evidence, look at the lack

16   of evidence.  The lack of evidence in this case, I

17   told you that, and I knew I could prove it.  Okay.

18   Not what the evidence will show, but what the

19   evidence won't show.

20           Just because he didn't testify doesn't mean

21   we didn't fight like hell.  I think we did.

22           Ladies and gentlemen, at the end of the day,

23   I -- Anthony is asking you, put into effect these

24   amorphous concepts.  It's now in your hands.  Stop

25   this behavior from the government.  They can't get

1    offended when people make fun of them.  There's no

2    law like that you're going to hear.  There's no

3    disruption, interruption, or impairment.  Please --

4    innocent.  They proved nothing, let alone beyond a

5    reasonable doubt.  Please find him not guilty.

6    Thank you.

7            THE COURT:  Thank you.  And now for your

8    final argument, on behalf of the State.

9            MS. WOODS:  Thank you, Your Honor.

10                   - - -

11   FINAL CLOSING ARGUMENT ON BEHALF OF THE STATE OF OHIO

12           MS. WOODS:  Ladies and gentlemen of the jury,

13   it's been expressed once from the State and once

14   from the Defense attorney, but again, thank you.

15   This was a long, tedious process over the last

16   couple days with a lot of information thrown at you,

17   and a lot of words, and a lot of sitting around

18   where it would be easy to doze off, but you didn't.

19   And we greatly appreciate that from the State as

20   well.

21           The Defense wants you to think that just

22   because we weren't in a state of an emergency that

23   they weren't interrupted, that the dispatchers

24   couldn't be interrupted.  Ladies and gentlemen, they

25   were interrupted, they were taking calls about a

1  person who had created a page claiming to be the

2  Parma Police Department, arguing about laws that

3  were put into effect.

4         Ladies and gentlemen, you will get to take

5  back with you State's Exhibit 10.  And, ladies and

6  gentlemen of the jury, you can see it is the same.

7  It's not the content.  Sure we can see the joke now,

8  but in the moment the dispatchers couldn't see the

9  joke, because there was no joke.  It wasn't a widely

10  spread -- it wasn't a tightly held secret that this

11  was a joke, or in amongst friends, no.  The

12  Defendant took action to confuse and to make this.

13  As soon as he made the page to make it look exactly

14  like the Parma Police Department's page, he took the

15  integrity from the Parma Police Department's page.

16  He disrupted their ability by changing posts about

17  real crimes.  He took an aggravated robbery post,

18  where somebody was held at knifepoint, and changed

19  it into a racial claim.

20         Ladies and gentlemen, he took -- when there

21  was a difference, he had the word "The" up there,

22  which would have distinguished it, maybe not well,

23  but it would have distinguished it.  No.  The

24  Defendant took action and made it exactly the same.

25         Ladies and gentlemen, he took action, when

1    people would say this is a fake site, to delete

2    those comments.  And he would take action by saying,

3    Is it a legit site, when he was asked on his page,

4    the answer, from his own mouth, Yeah.

5         He wanted the people to think that was the

6    Parma Police Department, and so people did.  And

7    they called, and you heard in those 9-1-1 calls, I

8    don't know who else to call, are you really doing

9    this?  Had that been a joke, and had it been obvious

10   to everybody that this is a joke and that this is

11   funny, those calls wouldn't have come in.

12        So it's the Defendant's actions in creating

13   the exact mimicking thing with nothing to

14   distinguish it that is obvious that created the

15   disruption.  Sure it's the dispatcher's job to take

16   calls, but it's for somebody who needs help.  And

17   here people are saying, I don't know who else to

18   call, did you really pass this law?  And yes, it is

19   Detective Connor's duty to investigate crimes, but

20   he had to put other things on the back burner.  He

21   told you he had three active cases that were really

22   high priority and nothing on those got done on that

23   day because he had to worry about taking down the

24   exact duplicate.

25        And sure there was a delay from the time it

```
 1    was taken down until the search warrant was
 2    executed.  As Detective Connor told you, what would
 3    happen if they hit the wrong house?
 4         Ladies and gentlemen, we've all seen jokes on
 5    Facebook, and in voir dire we talked about, what do
 6    you see when there's something offensive, and it
 7    wasn't the content of the post, it wasn't obvious.
 8         Ladies and gentlemen, you're also going to
 9    take back with you State's Exhibit No. 21.  "Due to
10    the slow increase of the homeless population in our
11    city, the Parma Police Department is pleased to
12    announce that it will be introducing a new temporary
13    law."  761 comments, over a thousand shares, ladies
14    and gentlemen.  This wasn't a joke among friends.
15    This was disseminated for the public, and the public
16    responded.  And, therefore, because of the public's
17    response to his joke, he took away the detectives
18    from their duties, he took away dispatchers from
19    entering warrants.  Sure, it's only a few seconds or
20    a few minutes at a time, but they all told you they
21    had full days planned and scheduled.
22         Ladies and gentlemen, he disrupted public
23    services.  He took away their ability to do it.  Had
24    it been obvious parody, or obvious, we wouldn't be
25    here.  In hindsight now, we can see it's obviously a
```

1    joke, but back on March 2nd nobody was laughing,

2    they were busy trying to do the jobs that we, the

3    taxpayers, pay them to do.  They're paid to be

4    dispatchers and answer calls, even if it is for

5    something frivolous about a cat up a tree, but it is

6    somebody who needs help, not answering questions as

7    to whether Parma has passed a law about homeless

8    people.

9        This could have been an easy fix on the part

10    of the Defendant, use a different picture, do

11    something once he realized that it was true.

12    Instead, he did the exact opposite.  And, ladies and

13    gentlemen, because of the Defendant's actions in

14    creating this fake Parma Police Department Facebook

15    page and taking precious time from our dispatchers,

16    our police department, and spending time doing

17    things that wouldn't have needed to be done without

18    the Defendant's actions, we request and say that you

19    find the Defendant guilty of disrupting public

20    services, because he knew what he was doing and he

21    let the joke get out of hand and continued to

22    perpetuate the joke.  761 people don't know that

23    it's a joke.

24        Thank you.

25        THE COURT:  Okay.  Thank you.

```
 1          Would the lawyers approach for one moment?
 2          MR. VICK:  Yes, Your Honor.
 3                    -  -  -
 4          (Thereupon, a discussion was had between
 5          Court and Counsel at sidebar outside the
 6          hearing of the jury and off the record.)
 7                    -  -  -
 8          THE COURT:  All right.
 9          Now, ladies and gentlemen, it is my duty to
10     instruct you on the law.
11          Members of the jury, ladies and gentlemen, at
12     this time you have heard the evidence and arguments
13     of counsel.. It now becomes my duty to instruct you
14     on the law to apply to this case.  The Court and the
15     jury have separate functions.  You decide the
16     disputed facts, and the Court provides the
17     instructions of law.
18          It is your sworn duty to accept these
19     instructions and to apply the law as it is given to
20     you.  You are to apply the law as your guide
21     throughout your entire deliberations and apply it to
22     the facts, as you find the facts to be, and then
23     render your judgment accordingly.
24          This you are required to do, independent and
25     apart from any notion or opinion which you may have
```

1    ever possessed as to what the law is or what the law

2    ought to be, concerning the facts in this particular

3    case.  Therefore, you are not permitted to change

4    the law or to apply your own idea of what you think

5    the law ought to be.

6          It also follows, that in strict keeping with

7    your oath, you refuse absolutely to be moved, swayed

8    or influenced by any consideration such as sympathy

9    for or bias or prejudice against either the State of

10   Ohio or the Defendant in this case.

11         A criminal case begins with the filing of an

12   indictment by the grand jury.  This indictment

13   informs the Defendant that he or she has been

14   charged with a crime.  The indictment may not be

15   considered for any other purpose.

16         The plea of not guilty is a denial of the

17   charge and puts into issue the essential elements of

18   the crime or crimes charged in the indictment.

19         At the very outset, the jury will understand

20   that the mere fact a defendant has been charged by

21   the grand jury of this county raises no presumption

22   of the guilt of the Defendant.  The indictment

23   itself is simply the means created by law for

24   presenting, in a formal way, a criminal charge.  You

25   will not consider the fact that the indictment has

1    been made as in any way constituting evidence of

2    guilt of the Defendant.

3        At the beginning of the trial, counsel for

4    the State and the Defense addressed the jurors in

5    opening statements.  In the opening statements both

6    counsel outlined what they believed the evidence

7    would show during trial.

8        When the presentation of all the evidence was

9    completed, counsel for the State and counsel for the

10   Defendant addressed the jury in closing arguments.

11   In those closing arguments, they set forth and

12   developed theories and conclusions which they

13   believe may reasonably be drawn from all the

14   evidence in this case.

15       The opening statements and closing arguments

16   are to assist the jury to understand and reach

17   conclusions on the issues which the jury is to

18   decide.  You are instructed that the opening

19   statements and closing arguments do not constitute

20   evidence in this case, and they will not be

21   considered as evidence by the jury.

22       The evidence does not include the grand jury

23   indictment, the opening statements, or closing

24   arguments of counsel.  Further, the evidence does

25   not include any answers to questions that I have

1    instructed you to disregard.

2           You must not speculate as to why the Court

3    sustained an objection to any question or what the

4    answer to such question might have been had I

5    permitted the witness to answer the question.  You

6    must not draw any inferences or speculate on the

7    truth of any suggestion included in a question that

8    was not answered by the witness.

9           What then is evidence in this case?  Whenever

10   reference is made to evidence upon which the case is

11   to be decided, the jury will understand that by

12   evidence we mean testimony from the witnesses, the

13   exhibits admitted during trial, and any facts agreed

14   to by counsel.

15          Evidence may be either direct or

16   circumstantial, or a combination of both.

17          Direct evidence is testimony given by a

18   witness who has seen or heard the facts to which he

19   or she has testified.  It includes the exhibits

20   accepted as evidence during the trial, and any

21   stipulations.

22          Stipulations.  There were certain agreements

23   known as stipulations.  These stipulations were

24   reached between the State and the Defendant and are

25   to be accepted by you as facts.

```
 1            The State of Ohio and counsel for the
 2     Defendant do stipulate and agree that the calls
 3     placed into dispatch are authentic and admissible
 4     evidence.  The calls were taken by several
 5     dispatchers and are recorded in the ordinary course
 6     of business.  Detective Connor made a copy of all
 7     the calls received.
 8            The State of Ohio and counsel for the
 9     Defendant do stipulate and agree that the records
10     obtained from Facebook are true and accurate copies
11     of the records kept in the ordinary course of
12     business.  The State and counsel for the Defendant
13     do further agree and stipulate that the records
14     provided are admissible.  The State of Ohio and
15     counsel for the Defendant do stipulate that Facebook
16     maintains in their records deleted comments and
17     posts for a period of time after deletion.
18            If a witness testified from personal
19     knowledge to the commission of an act to be proven
20     or in order to establish a defense, this is called
21     direct, positive, or eyewitness evidence.
22            It is not always possible to ascertain the
23     truth by evidence of this direct character;
24     therefore, the law permits the introduction and
25     consideration of what is called circumstantial
```

evidence.

By circumstantial evidence we mean proof of
certain facts and circumstances from which the jury
may infer other connected facts which usually and
reasonably follow according to the common experience
of mankind.

It is either by a process of reasoning or as
a result of common experience that you may conclude
that when certain facts exist, certain other facts
usually coordinate with them.  A conclusion so
deduced or drawn from a proven fact or facts is what
we refer to as an inference.

In considering the evidence in this case,
either direct or circumstantial, you may draw
inferences from proven facts.  You are instructed,
however, that you are not permitted to base one
inference upon another inference.  Each inference
must be predicated or based upon a proven fact or
set of facts.  Two or more inferences may be drawn
from the same proven facts or by adding other facts
or circumstances in evidence.

Circumstantial evidence.  You may consider
direct and circumstantial evidence.  Direct evidence
is the testimony of one who has actual knowledge of
a fact, such as an eyewitness.  If you look outside

1     the window during the night and see snow falling,

2     your observation that it is snowing is direct

3     evidence of the fact that it snowed.

4          As we've just said, circumstantial evidence

5     is evidence which tends to prove a disputed fact by

6     proof of facts which have a legitimate tendency to

7     lead the mind to a conclusion that the fact exists.

8          As an example of circumstantial evidence,

9     when you retire to go to bed at night, you look

10    outside the window, you see the ground is clear.

11    When you wake up in the morning, however, you find

12    that the ground is covered by a blanket of snow.

13    Now, you did not see it snow, but from the fact that

14    you find a blanket of snow on the ground the next

15    day, you are justified in making the reasonable

16    inference that it snowed during the night.  Your

17    conclusion that it snowed during the night is

18    circumstantial evidence of the fact that it snowed.

19          The law makes no distinction between the

20    weight to be given to either direct or

21    circumstantial evidence.  The law requires only

22    that, after weighing all the evidence, the jury must

23    be convinced of the guilt of the Defendant beyond a

24    reasonable doubt.  Circumstantial and direct

25    evidence inherently possess the same probative

1    value.  In some instances, certain facts can only be

2    established by circumstantial evidence.

3         Evidence excluded.  The evidence does not

4    include the pleadings or any statement of counsel

5    made during the trial, unless such statement was an

6    admission or agreement admitting certain facts.  The

7    opening statements and closing arguments of counsel

8    are designed to assist you and they are not

9    evidence.

10        Evidence stricken.  Statements or answers

11   ordered stricken, or to which the Court sustained an

12   objection, or which you were instructed to

13   disregard, are not evidence and must be treated as

14   though you never heard them.

15        Objections and speculation.  You must not

16   guess why the Court sustained the objection to any

17   question or what the answer to such question might

18   have been.  You must not consider as evidence any

19   suggestion included in a question that was not

20   answered.

21        Credibility.  You, the jury, are the sole

22   judges of the facts, of the credibility of

23   witnesses, and of the weight to be given to the

24   testimony of each witness.  To weigh the evidence,

25   consider the credibility or believability of each

1      person testifying.  Apply the tests for truthfulness

2      which you apply in your daily lives.

3             To determine the credibility of a witness,

4      consider the interest or bias the witness has in the

5      outcome of the verdict; the witness's appearance,

6      manner, and demeanor while testifying before you;

7      the witness's candor and frankness, or lack of

8      candor and frankness; the consistency of the

9      witness's testimony with other known facts in the

10     case; the witness's accuracy of memory, or

11     inaccuracy of memory; the witness's intelligence or

12     lack of intelligence; the reasonableness or

13     unreasonableness of the witness's testimony; the

14     opportunity the witness had to see or hear or know

15     the truth of the facts and circumstances concerning

16     the things to which the witness has testified; and

17     any or all other facts and circumstances surrounding

18     the testimony which, in your judgment, would add or

19     detract from the credibility and weight of the

20     witness's testimony.

21            Applying these tests, assign to the testimony

22     of each witness the weight which you determine to be

23     proper.  You are instructed that you are not bound

24     to believe something to be a fact simply because it

25     is testified to by a witness.  If you believe from

1     all the evidence that a witness is mistaken or

2     testifies untruthfully to a fact, you are not

3     required to believe the testimony simply because the

4     witness is under oath.

5         It is within your province as a juror to

6     determine, in the exercise of your honest and

7     impartial judgment, what testimony is worthy of

8     belief and what testimony is not worthy of belief.

9     You may believe a portion of the testimony of a

10     particular witness and disbelieve the rest of his or

11     her testimony.  You may believe all the testimony of

12     a particular witness, or you may disbelieve all the

13     testimony of a particular witness.

14         Ladies and gentlemen of the jury, in this

15     case, as in all other cases, you must give primary

16     consideration to the quality of the evidence.  The

17     quality of the evidence may or may not be the same

18     as the quantity of the evidence, that is, the number

19     of witnesses or exhibits presented in this case.

20         The burden of proof.  Every person accused of

21     an offense is presumed innocent until proven guilty

22     beyond a reasonable doubt, and that burden is on the

23     State of Ohio.

24         Reasonable doubt.  The legislature of Ohio

25     has been so concerned that in a criminal case [sic]

1  understand the correct legal meaning of the term

2  reasonable doubt that it has by statute defined that

3  term and given to the trial court the duty of

4  reading that definition verbatim to the jury in a

5  criminal case.

6      Ohio Revised Code Section 2901.05 defines

7  reasonable doubt, and it reads as follows:  "Every

8  person accused of an offense is presumed innocent

9  until proven guilty beyond a reasonable doubt, and

10  the burden of proof is upon the prosecution.

11  Reasonable doubt is present when the jurors, after

12  they have carefully considered and compared all the

13  evidence, cannot say that they are firmly convinced

14  of the truth of the charge.  It is a doubt based on

15  reason and common sense.  Reasonable doubt is not

16  mere possible doubt because everything relating to

17  human affairs or depending on moral evidence is open

18  to some possible or imaginary doubt.  Proof beyond a

19  reasonable doubt is proof of such character that an

20  ordinary person would be willing to rely and act

21  upon it in the most important of the person's own

22  affairs."

23      The Defendant does not testify.  It is not

24  necessary that the Defendant take the witness stand

25  and testify in his own defense.  He has a

1    constitutional right not to testify.  The fact that

2    he did not testify must not be considered by you for

3    any purpose whatsoever.

4         Exhibits.  A number of exhibits and testimony

5    relating to them have been introduced.  First,

6    members of the jury, the numbering or lettering of

7    the exhibits that you take to the jury room may not

8    follow consecutively.  There are several reasons for

9    this.  Some exhibits may not have ultimately been

10   introduced by the party producing it, or the Court

11   might not have accepted the exhibit because of a

12   legal or procedural reason and ruling.  Do not

13   conjecture or attempt to draw any inference because

14   you do not have a particular exhibit.

15        Photographs.  Certain photographs and

16   testimony related to them have been received into

17   evidence.  You will consider whether or not these

18   photographs accurately depict the conditions and

19   objects which they purportedly represent.  You will

20   determine what weight, if any, the photographs

21   should receive in light of all the evidence.

22        The indictment.  Disrupting public services,

23   Ohio Revised Code 2909.04(B).  The Defendant,

24   Anthony Novak, is charged in the indictment with

25   disrupting public services, in violation of Ohio

1    Revised Code section 2909.04.

2         Before you can find the Defendant guilty, you

3    must find beyond a reasonable doubt that on or about

4    the 2nd day of March, 2016, and in Cuyahoga County,

5    Ohio, the Defendant did knowingly use any computer,

6    computer system, computer network,

7    telecommunications device, or other electronic

8    device or system or the Internet so as to disrupt,

9    interrupt, or impair the functions of any police,

10   fire, educational, commercial, or governmental

11   operations.

12        Knowingly defined.  A person acts knowingly,

13   regardless of purpose, when the person is aware that

14   the person's conduct will probably cause a certain

15   result or will probably be of a certain nature.  A

16   person has knowledge of circumstances when the

17   person is aware that such circumstances probably

18   exist.  When knowledge of the existence of a

19   particular fact is an element of an offense, such

20   knowledge is established if a person subjectively

21   believes that there is a high probability of its

22   existence and fails to make inquiry or acts with a

23   conscious purpose to avoid learning the fact.

24        Computer.  "Computer" means an electronic

25   device that performs logical, arithmetic, and memory

1    functions by the manipulation of electronic or

2    magnetic impulses.  Computer includes, but is not

3    limited to, all input, output, processing, storage,

4    computer program, or communication facilities that

5    are connected, or related, in a computer system or

6    network to an electronic device of that nature.

7        Computer system.  "Computer system" means a

8    computer and related devices, whether connected or

9    unconnected, including, but not limited to, data

10    input, output, and storage devices, data

11    communications links, and computer programs and data

12    that make the system capable of performing specified

13    special purpose data processing tasks.

14        "Computer network" means a set of related or

15    remotely connected computers and communication

16    facilities that includes more than one computer

17    system that has the capability to transmit among the

18    connected computers and communication facilities

19    through the use of computer facilities.

20        Telecommunications device.

21    "Telecommunications device" means any instrument,

22    equipment, machine, or other device that facilitates

23    telecommunication, including, but not limited to, a

24    computer, computer network, computer chip, computer

25    circuit, scanner, telephone, cellular telephone,

1    pager, personal communications device, transponder,

2    receiver, radio, modem, or device that enables the

3    use of a modem.

4         Internet.  "Internet" means the international

5    computer network of both federal and nonfederal

6    interoperable packet switched data networks,

7    including the graphical subnetwork known as the

8    world wide web.

9         If you find that the State proved beyond a

10   reasonable doubt all the essential elements of the

11   offense of disrupting public services as charged in

12   the indictment, your verdict must be guilty,

13   according to your findings.

14        If you find that the State failed to prove

15   beyond a reasonable doubt any one of the essential

16   elements of the offense of disrupting public

17   services as charged in the indictment, then your

18   verdict must be not guilty, according to your

19   findings.

20        Deliberation and admonition.  The Court

21   reminds you not to discuss this case.  You are

22   reminded also not to obtain or receive information

23   concerning this case from outside the courtroom, and

24   you must not read, listen to, or watch any source of

25   information relating to this case.  You must report

1    to the bailiff or the Court any attempt by anyone to

2    discuss this case with you or in your presence.  And

3    any violation of this order could result in serious

4    penalties under the law.

5          Motive.  Proof of motive is not required.

6    The presence or absence of motive is one of the

7    circumstances bearing upon purpose or knowledge.

8    Where an act is a crime, a good motive or purpose is

9    not a defense.

10         Time.  The date the offense in this

11    indictment allegedly occurred has previously been

12    stated.  It is not necessary that the State prove

13    that the offense was committed on the exact day as

14    charged in the indictment.  It is sufficient to

15    prove that the offense took place on the date

16    reasonably near the date claimed.

17         Punishment.  You may not discuss or consider

18    the subject of punishment.  Your duty is confined to

19    the determination of the guilt or lack of guilt of

20    the Defendant.  In the event you find the Defendant

21    guilty, the duty to determine punishment is placed,

22    by law, upon the Court.

23         Unanimous verdict.  Because this is a

24    criminal case, the law requires that all 12 of you

25    be in agreement before you can consider that you

1    have reached a verdict.

2           Verdict. You have one verdict form. And I'm

3    going to show it to you and I'm going to read it to

4    you, but it is self-explanatory. It states, State

5    of Ohio versus Anthony Novak. Disrupting Public

6    Services. Jury Verdict. We, the Jury in this case,

7    being duly impaneled and sworn, do find the

8    Defendant, Anthony Novak -- there's an asterisk, and

9    you will insert in ink guilty or not guilty of

10    disrupting public services, a violation of

11    2909.04(B) of the Ohio Revised Code as charged in

12    the indictment.

13           There is a line for all 12 of you to sign,

14    and your foreperson will sign first. And I will

15    explain that to you momentarily.

16           Jury deliberations. During your

17    deliberations, you will be under the control of the

18    bailiff. You will not be permitted to separate

19    without permission from the Court or the bailiff.

20    When you leave the jury room for a break, for lunch,

21    or for going home, all deliberations must cease

22    until every juror is back in the jury room and the

23    door is closed.

24           At any time your deliberations are

25    interrupted, for example, for a break, lunch, or at

1   the end of the day, any comment concerning the case

2   or the status of your deliberations would be

3   improper and could prejudice the rights of either

4   party.

5       You may take breaks in the jury room area,

6   but you may not leave the jury room area without

7   prior permission from the Court.  If you take a

8   break, all deliberations must cease until all jurors

9   are back in the jury room and the door is closed.

10      Upon your discharge for lunch or at the close

11  of the day, the foreperson is directed to deliver to

12  the bailiff all exhibits and any other papers.  The

13  bailiff will hold them until your return.

14      During any break in the deliberation process,

15  remember that you are a member of a deliberating

16  jury.  You may not investigate or attempt to gain

17  additional facts about the case in any way.  It

18  would be improper for anyone to attempt to do so,

19  and may subject the juror involved to personal

20  penalty.

21      While you are deliberating, each of you

22  should give careful consideration to the views of

23  your fellow jurors present.  Do not turn a deaf ear,

24  or without listening to their reasons or arguments,

25  obstinately stand on your own opinion.  You should

deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment.  Each of you must decide this case for yourself, but should do so only after discussion and consideration of the case with your colleague jurors.

You should not hesitate to change an opinion if you become convinced that it is wrong.  However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

Procedures in your jury room.  Upon your retirement, you will immediately proceed to select one to be the foreman or forewoman of the jury. That person will preside over your deliberations, but has no greater authority or power than any other member of the jury.  The Court charges the foreperson with the responsibility of confining the discussions in the jury room to the law and the evidence in this case.

Additionally, it is his or her responsibility to see that each member of the jury is permitted to express his or her opinion and enter fully into discussion with all other members.

The foreperson is also charged with the task

1    of returning to the courtroom all of the exhibits,

2    the completed verdict form, and any written

3    communications between the Court and the jury.

4         Also, if you receive the answer to a question

5    in writing from the Court, be certain that you save

6    the question and the answer and return it to the

7    bailiff when your deliberations are concluded.

8         Your deliberations.  You must not be

9    influenced by any consideration of sympathy or

10   prejudice.  It is your duty to carefully weigh the

11   evidence, decide all disputed questions of fact,

12   apply the instructions of the Court to your

13   findings, and give your verdict accordingly.  In

14   fulfilling your duty, your efforts must be to arrive

15   at a just verdict.  Consider all the evidence and

16   make your findings with intelligence and

17   impartiality, and without sympathy, bias, or

18   prejudice, so that the State of Ohio and the

19   Defendant will both feel that their case was fairly

20   and impartially tried.

21        If, during the course of this trial, the

22   Court said or did anything that you consider an

23   indication of my view on this case, you are

24   instructed to disregard it during your

25   deliberations.  This case is solely yours to decide.

1    If you have a question about these

2    instructions -- and I will tell you now, these

3    instructions are going back with you.  So what I

4    have just read to you is going with you.  You just

5    are not permitted to use it as scratch paper, a note

6    pad, crumble it up.  It has to come back to me in

7    the same way as it goes with you.  Okay.  So they

8    are going with you.

9        So if you have a question about these

10   instructions, it should be discussed first in the

11   privacy of your jury room.  If you disagree as to

12   the meaning of these instructions, it may be

13   possible under certain conditions to review those

14   matters by a request to the Court.

15       If you desire to address any communication to

16   the Court, you must reduce it to writing and have it

17   signed by the foreman.  The question will usually be

18   answered in open court.  If answered in writing,

19   save the question and answer with the evidence.

20       After you have reached a verdict, you will

21   contact this room through the bailiff, and your

22   verdict will be read in open court.  This Court has

23   a two-buzz system.  One buzz means you have a

24   question, and two buzzes means you have a verdict.

25   And I am sure you figured out where that buzzer is.

1     THE JURY:  Uh-huh.

2     THE COURT:  Yes.  Okay.  Please know that

3 whether you have a question or a verdict, the Court

4 is required to contact the attorneys and/or the

5 court reporter, so there may be a brief delay.

6    Now my remarks are to our alternate juror.

7 On behalf of all of us involved, we all want to

8 thank you so much for your diligence throughout this

9 entire case.  And since all of our jurors have been

10 able to attend court regularly and are here with us

11 today, you will be excused; sort of.  So what that

12 means is that while the jury is deliberating, you

13 will be on the fourth floor.  And as soon as a

14 verdict is rendered, you will be permitted to come

15 back and be in court for the reading of that

16 verdict.

17    So you will be on the schedule for this jury,

18 and don't worry because we know you're down there,

19 so you won't be forgotten.  But, again, we all want

20 to thank you so much for your faithful

21 participation.  And I have to still advise you that

22 you are to refrain from any discussion of this case

23 and from expressing any opinions that you might have

24 relative to the merits of this case until a verdict

25 of the jury has been returned in open court.

1   So, again, we want to thank you so much.

2   All right.  Jurors, when you get to the jury

3   room, you will find that you have all the exhibits

4   with you, and those are the ones that have been

5   actually admitted into evidence.  You will also have

6   with you the verdict form.  You will not be given

7   any others during your deliberations.

8   I have outlined the essential elements of the

9   offense charged in this indictment.  I could not

10  include all the law in any single part of these

11  instructions.  You must consider each part in the

12  light of and in harmony with all the instructions.

13  If you find that the State has proved beyond

14  a reasonable doubt all the essential elements of the

15  offense that has been described, then you must find

16  the Defendant guilty of the offense charged,

17  according to your findings.

18  If after considering all the evidence you

19  find that the State failed to prove beyond a

20  reasonable doubt any one or more of the essential

21  elements of the offense charged, then your verdict

22  must be not guilty of such offense, according to

23  your findings.

24  Ladies and gentlemen of the jury, after your

25  verdict is returned and you are discharged as jurors

1    in this case, you may discuss it with anyone.

2    However, whether or not you do so is a matter of

3    your own personal preference.

4         After you have reached a verdict, each of you

5    will sign the verdict form that agrees with your

6    findings.  Then you will contact the Court through

7    the bailiff.  At that time, you will be brought back

8    into court and I will read your verdict.

9         Ladies and gentlemen, you are here for one

10   purpose and one purpose only, and that is to

11   .ascertain the truth, the whole truth, and nothing

12   but the truth in this case as nearly as the truth in

13   human affairs can be found.

14        The law in constituting a jury of 12 jurors

15   contemplates that each and every one of you shall

16   give your individual consideration to and judgment

17   upon the evidence.  The rules of law which are

18   explained to you in these instructions are binding

19   upon the individual conscience and judgment of each

20   member of the jury.

21        You should have in mind two propositions of

22   equal importance.  First, the laws are enacted for

23   the benefit of all members of organized society, and

24   when a jury is convinced beyond a reasonable doubt

25   of a Defendant's guilt, the jury should so say in

1  its verdict.  And second, no defendant should be

2  convicted of a crime when the jury is not convinced

3  of such defendant's guilt beyond a reasonable doubt.

4       Having carefully weighed all the evidence in

5  this case and applied the law as stated in these

6  instructions, let your verdict be fair and

7  impartial, thus assuring that you have been mindful

8  of your oath to well and truly try and true

9  deliverance make between the State of Ohio and the

10  Defendant in this case.

11       This case is now in your hands for a verdict.

12       All rise for the jury.

13            - - -

14       (Thereupon, the jury retired to

15        consider its verdict.)

16            - - -

17  THE COURT:  All right.  So if you can just

18  collect the exhibits -- you have all of them

19  collected?

20  MS. WOODS:  They're all collected, Your

21  Honor.

22  THE COURT:  Did you review them?  And make

23  sure all the exhibits that are prepared to go to the

24  jury are those that have been admitted?

25  MR. VICK:  Yes.

```
 1              THE COURT:  You both have reviewed them?
 2              MS. WOODS:  Yes, your Honor.
 3              THE COURT:  All right.  So I am now going to
 4     have you just review the instructions that I just
 5     read to them, and that will go back as well.
 6              All right.
 7              So I'm going to have my bailiff then take
 8     those exhibits back.  What about the CD?
 9              MS. WOODS:  I do have a laptop, I have to go
10     and get it, that is totally clean.  If you're aware,
11     there are no programs on it, it does not have
12     Internet capability.
13              MR. VICK:  That's fine.
14              THE COURT:  All right.  We can go off the
15     record.
16                        -  -  -
17                   (Thereupon, a recess was taken.)
18                        -  -  -
19              THE COURT:  Okay.  Both sides have read
20     through the instructions and no one has any changes,
21     deletions or additions, so those will be going back
22     to the jury now, too.  Thank you.
23              MR. VICK:  Okay.  Thank you, Judge.
24                        -  -  -
25                   (Thereupon, a recess was taken.)
```

```
 1                        - - -
 2              THE COURT:  All rise for the jury.
 3         All right.  You may be seated.
 4         All right.  We are back on the record in the
 5    case of State of Ohio versus Anthony Novak.
 6              It's been brought to my attention that the
 7    jury has reached a verdict.  Is that correct?
 8              A JUROR:  Correct.
 9              A JUROR:  Yes, Your Honor.
10              THE COURT:  Will the foreperson please hand
11    to my bailiff the verdict forms.
12         All right.  Will the Defendant please rise.
13              State of Ohio versus Anthony Novak,
14    Disrupting Public Services, Jury Verdict.  We, the
15    Jury in this case, being duly impaneled and sworn,
16    do find the Defendant, Anthony Novak, not guilty of
17    disrupting public services, in violation of
18    2909.04(B) of the Ohio Revised Code as charged in
19    the indictment.
20              And it is signed by all 12 members of the
21    jury, with the foreperson signing first.
22              All right.  Anything further on behalf of the
23    State or the Defense?
24              MS. WOODS:  Nothing on behalf of the State,
25    Your Honor.
```

1   THE COURT:   And do you wish to have the jury

2   polled?

3       MS. WOODS:   No, Your Honor, we do not.

4       THE COURT:   Okay.   Ladies and gentlemen, this

5   now concludes your service in this case.   You are

6   free to discuss this case with whomever you shall

7   choose.   I am going to excuse you at this time and

8   ask that you go back to your jury deliberation room

9   and I will be in with you momentarily.

10      All rise for the jury.

11          - - -

12      (Thereupon, the jury was excused.)

13          - - -

14      THE COURT:   All right.   You may be seated.

15      Okay.   Is there anything anyone else needs to

16  put on the record?

17      MS. WOODS:   Nothing on behalf of the State,

18  Your Honor.

19      THE COURT:   All right.   You are now,

20  Mr. Novak, discharged of this case and you are free

21  to go.

22      MR. VICK:   Thank you, Your Honor.

23      THE COURT:   Okay.

24      MS. WOODS:   Your Honor, may we talk to the

25  jury?

319

1          THE COURT:  If you wish to.  I mean, it's

2     sort of late, so I'll see.  I'm only going to talk

3     to them very briefly, just to let them know what to

4     do next.  But I'll check, if you want to wait

5     around.

6

7                    -  -  -

8          (Thereupon, proceedings were concluded.)

9                    -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

320

```
 1                    C E R T I F I C A T E

 2

 3            We, Marguerite A. Phillips, Jeniffer L. Tokar,

 4      and Cindy M. Eiben, Official Court Reporters for the

 5      Court of Common Pleas, Cuyahoga County, Ohio, do hereby

 6      certify that we are employed as Official Court

 7      Reporters, and we took down in stenotypy all of the

 8      proceedings had in said Court of Common Pleas in the

 9      above-entitled cause; that we have transcribed our

10      said stenotype notes into typewritten form, as appears

11      in the foregoing Transcript of Proceedings; that said

12      transcript is a complete record of the proceedings

13      had in the said cause, and constitutes a true and

14      correct Transcript of Proceedings had therein.

15

16

17

18

19      _____         _____

20      Jeniffer L. Tokar, RMR         Marguerite A. Phillips, RMR
        Official Court Reporter        Official Court Reporter
        Cuyahoga County, Ohio          Cuyahoga County, Ohio
21

22      _____
        Cindy M. Eiben, RMR
23      Official Court Reporter
        Cuyahoga County, Ohio
24

25
```