<u>**MEMORANDUM IN SUPPORT**</u>

## I.     PROCEDURAL HISTORY

Defendants filed motions to dismiss.  (ECF No. 12.) This court granted in part and denied in part those motions. Defendants appealed to the Sixth Circuit, which dismissed some claims and left open the possibility of summary judgment on the others.  (ECF No. 52-2, p. 1, 5.)[1] The Sixth Circuit ruled it lacked jurisdiction over the motion to dismiss of Parma.  (*Id.*)  Therefore, the remaining claims relative to the City are for *Monell* liability and a violation of the Federal Privacy Protection Act.  (*See* ECF No. 12.)  The claims remaining against Det. Connor and Capt. Riley as set forth by the Sixth Circuit are:

- Under 42 U.S.C. § 1983:
    - o  First Amendment retaliation;
    - o  Prior restraint on speech;
    - o  Unlawful search and seizure;
    - o  Malicious prosecution;
    - o  Supervisory liability against Capt. Riley;
- Conspiracy;
- Privacy Protection Act;
- State claims under Ohio Rev. Code § 2744.03(A)(6)(b).

Now that discovery has concluded it is clear that the record is devoid of evidence supporting Plaintiff's claims.

---

[1] The Sixth Circuit opinion is replete with language providing that the motion to dismiss phase was too early to consider complete dismissal, but leaving the possibility open at summary judgment, for example: "At this stage, though, Novak has alleged enough facts," "Since we accept for now," "We need not decide that now," "This claim survives, for now," "Rather, we need more facts," "These claims survive as well at this stage of the litigation," "For now, those allegations are enough," "the claim survives for now," "Here again, the stage of the proceedings informs the question,"  "At this early motion-to-dismiss stage, that is enough.…" (*Id.* at 6, 8, 11, 13, 15, 17, 18, 20.)

II.    **STATEMENT OF FACTS**

    A.    **Deposition Testimony.**

        1.    **Plaintiff creates a fake Facebook page that appears identical to the official Parma Police Facebook page.**

This matter arises out of plaintiff posting a fake Facebook page of the Parma Police Department on March 2, 2016 around 11:00 p.m. The fake page was almost identical to the official Department Facebook page.  (Deposition of Anthony Novak, ECF. No. 90, p. 57, hereafter "Plaintiff depo.")[2] Even when viewed side-by-side the pages appear identical.



(The official page is on the left and the fake one on the right.)[3]

Plaintiff readily admitted to taking pains to make the fake page look like the official one. In fact, when he initially created the fake page, he included the word "The" before "City of Parma Police Department."  He intentionally removed the word because he wanted the fake site to look more like the official one.  (*Id.* at 160.)  After that change, the *only* difference between the banners on the two pages was that the fake page states "Community" in small print under "City of Parma Police Department" and the official page states "Police Station · Government Organization."  (*Id.* at 103-06.)  The two sites are so similar that a judge and magistrate judge from the City of Parma could not tell the official one from the fake one when shown the side-by-

---

[2] The relevant pages of the deposition are attached as Exhibit A.
[3] The side-by-side was authenticated during multiple depositions, and attached as Exhibit B.

side photos at their depositions.  (Deposition of Deanna O'Donnell, ECF No. 91, p. 106-08; Deposition of Edward Fink, ECF No. 92, p. 74-78.)[4]  Former Cuyahoga County Prosecutor Tim McGinty also couldn't tell the difference. (Deposition of Tim McGinty, ECF No. 93, 87-1, p. 20.)[5]

The creation of the fake page was followed by a series of six posts written by Plaintiff. The posts, some of which borrowed from earlier posts on the official page, concerned criminalizing feeding the homeless; a robbery committed by a white male, but the police asking for help identifying a loitering African American; a police recruitment effort discouraging minorities to apply; free abortions offered by the police; a pedophile reform event; and a family stay-at-home order where people leaving their homes could be arrested.  (Plaintiff's First Amended Complaint, ECF No. 6, ¶ 45.)

People reacted, many by commenting or sharing what they saw.  There were hundreds of comments and an astounding number of shares, some 50,000 according to Facebook.  (Plaintiff depo, p. 131.)  Comments "were kind of flooding in" with some people warning that Plaintiff's page was fake. Plaintiff intentionally deleted the comments exposing his hoax.  (*Id.* at 104.)

### 2.     Citizens are confused, so Parma investigates.

Predictably, citizens called the Parma Police dispatch center, Law Department, and City Hall. Seven calls to the police dispatch center were recorded and preserved.  Some callers wanted to alert the City, some people seemed confused, and still others seemed to seek assurance that the page was indeed fake. (Deposition of Kevin Riley, ECF No 71-1.)[6]

---

[4] The relevant pages of the depositions are attached as Exhibits C and D, respectively.
[5] The relevant pages of the deposition are attached as Exhibit E.
[6] The relevant pages of the deposition are attached as Exhibit F.

The Police and Law Departments looked into the matter.  Kevin Riley (then a lieutenant, now a captain) assigned Det. Thomas Connor to investigate the fake page created by a then unknown person.  (Deposition of Thomas Connor, ECF No. 71-8, p. 20-21.)[7]  Based upon his training, Det. Connor immediately sought advice from the Law Department, specifically Timothy Dobeck, the Law Director and Prosecutor for Parma.  (*Id.* at 21, 254.)  Det. Connor asked Dobeck:  "What do we have here?  What kind of case do we have here?"  (Deposition of Timothy Dobeck on June 22, 2020, ECF No. 79-3, p. 24) [hereafter "June 22, 2020 Dobeck depo" as distinct from a July 14, 2020 Dobeck 30(b) depo.][8]  Dobeck first considered whether there was a potential impersonating police officer charge, but then examined R.C. 2901.04(B), the disrupting public service statute.  (*Id.* at 24.)  Dobeck advised Det. Connor to pursue a disrupting public service charge.  (*Id.* at 24-25, 238.)

On March 2, 2016, based on the advice of Dobeck, Det. Connor applied for a search warrant directed to Facebook for the IP address of the creator of the fake page. Parma Magistrate Judge Edward Fink issued a search warrant for that information.  (Plaintiff depo, Ex. 8.)  Det. Connor emailed that subpoena to Facebook with a cover letter asking that Plaintiff's fake page be taken down or suspended immediately.  (Connor depo, p. 335, Ex. 12.)  Det. Connor also learned that the very first person who shared the fake account on his page was "anthony.h.novak" and determined that an Anthony Novak lived in Parma, Ohio. He also discovered the following comment on Plaintiff's personal Facebook page: "I am just going to say, I woke up and feel very satisfied by my actions right now."  (*Id.* at 262, Ex. 12; Plaintiff depo, p. 123, Ex. 10.)

At no point did Det. Connor consider the First Amendment, or what a reasonable reader might think is true, because he was investigating a possible disrupting public service matter.

---

[7] The relevant pages of the deposition are attached as Exhibit G.
[8] The relevant pages of the deposition are attached as Exhibit H.

(Connor depo, p. 112-13.)  Det. Connor explained why he did not focus on any constitutional issues:  "Sir, I would think that the Law Department would know what the First Amendment is with regards to that, so I don't believe the advice sought that they would send me down a road violating First Amendment." (*Id.* at 166.)

Det. Connor's testimony is consistent with that of Dobeck.  The focus was not on the speech itself, but rather the effect of the speech. (June 22, 2020 Dobeck depo, p. 165-67.)

### 3.    Capt. Riley's limited involvement.

Also on March 2, 2016, Capt. Riley posted a warning on the official Facebook page alerting the public that a fake Parma Police Facebook page was created and clarified which page was official. (Riley depo, p. 37-38, 98.) Unabashedly, Plaintiff copied and pasted the exact warning onto his fake page.  (*Id.* at 114.)  That afternoon, Capt. Riley went on Channel 8 television, the local Fox news affiliate, to warn the public about the fake site. Capt. Riley also had an interview with Cleveland.com, the local print newspaper, to inform the public of the existence of the fake page. (*Id.* at 223.)

Capt. Riley had never seen anything like this in his entire career.  (*Id.* at 79-80.)  He, like Det. Connor, spoke to Dobeck, who advised that the matter should be investigated as a possible violation of the disrupting public services statute.  (*Id.* at 176.)  After he assigned the case to Det. Connor, Capt. Riley did not handle the case any further.  (*Id.* at 109-10.)  He had no involvement in the affidavits of Det. Connor and did not testify before the grand jury.  (*Id.* at 221, 261.) Because Det. Connor was working with Dobeck, Capt. Riley testified that it was "out of my hands and the detective is handling it; there's really no reason for me to get involved with it unless the detective brings it to my attention."  (*Id.* at 257.)  The only other involvement of Capt. Riley in the investigation was reviewing Det. Connor's police report.  (*Id.* at 217, 219, 295.)

**4.     Plaintiff doubles down on deliberately fooling readers and causing confusion and outrage.**

Plaintiff exchanged messages with one of his friends, Seth Kopchu, to whom Plaintiff sent a link to his fake page. Kopchu, who describes Plaintiff as an internet troll, i.e. someone who "messes with people," thought the page was funny.  (Deposition of Seth Kopchu, ECF. No. 94 p. 34, 37, 53.)[9]  Kopchu said that while Plaintiff originally created the page as a parody, it soon became apparent that the goal was to purposefully fool the readers.  Plaintiff kept the page up "just to screw with people" and "to see who was dumb enough to fall for that."  (*Id.* at 54.) Indeed, in Kopchu's view Plaintiff was trying to "fool people and get a reaction from them…that was part of the joke, to see who was dumb enough to fall for that."  (*Id.* at 54-55.)  Kopchu questioned if Plaintiff had broken a law. (Plaintiff depo.  p. 263.)  Plaintiff responded: "Should I delete this page?  Hahaha."  Kopchu responded: "You could possibly face charges."  (*Id.* at 266.)

Plaintiff also involved his roommate, Andrew Kozelka. Kozelka testified that the page was originally to poke fun at the Parma Police, but then Plaintiff began purposefully trying to create confusion and "messing with people."  (Deposition of Andrew Kozelka, ECF No. 97, p. 45-51.)[10]  Plaintiff was "stoking the fire…by deleting comments clarifying what was real." (*Id.* at 150.)  Kozelka and Plaintiff thought it was funny that "people would blindly follow something just because it had a picture."  (*Id.* at 107, 127–28.)  They realized soon after it was posted that clearly some people took it seriously and "some of these people really believe this is real…we had a discussion that this is out of hand and wanted to take it down." (*Id.* at 111–12.)  Once

---

[9] The relevant pages of the deposition are attached as Exhibit I.
[10] The relevant pages of the deposition are attached as Exhibit J.

Plaintiff learned about the Fox 8 broadcast he took down the page. (Plaintiff depo, p. 124-26.) This was about twelve hours after he made it, before any interaction with the police. (*Id.*)[11]

### 5.    Connor again seeks legal guidance with affidavits and warrants.

On March 3, 2016, Det. Connor again conferred with Dobeck, who reviewed and approved an affidavit seeking records from Facebook regarding the fake account.   In fact, Dobeck reviewed and approved all the affidavits, search warrants, and arrest warrants prepared by Det. Connor. Dobeck found nothing to be incorrect, false, or misleading. (Dobeck June 22, 2020  depo, p. 126; 142-43; 158-59; Connor depo, p. 78, 276, Exhibits 5, 6, 7, 8, and 31.)   On March 3, 2016 at 12:45 p.m. Parma Municipal Judge Kenneth Spanagel issued a search warrant for Facebook.  (Plaintiff depo, Ex. 9.)

On March 18, 2016, Det. Connor reviewed 2,796 pages of documents produced by Facebook in response to the subpoena.  (Connor depo, p. 288.)  Det. Connor gave Dobeck a disc of those materials.  (Dobeck June 22, 2020 depo, p. 51-52.)   Dobeck noted that there were dozens of comments of people who were misled and believed Plaintiff's page was the official Parma Police page, especially about the very first post about the homeless.  (*Id.* at 52-57.)[12]  He

---

[11] Plaintiff was not "100 sure" if he had violated Facebook's protocol. (Plaintiff depo, p. 135.)  A review of the Statement of Rights and Responsibilities produced by Facebook, however, suggests numerous violations, viz.: You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory; You will not facilitate or encourage any violations of this Statement or our policies; You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law; If you collect information from users, you will obtain their consent, make it clear you (and not Facebook) are the one collecting information, and post a privacy policy explaining what information you collect and how you will use it. (Haessly Affidavit, attached as Exhibit K.)

[12] Posted comments included ones from Zach Hosier, saying he will make it his number one priority to feed the homeless; Sabrina Weber, commenting that the homeless are people, not rodents; Alan Shriner, observing that the City could give services and aid to those who need it; Rob Moses, commenting (amidst multiple expletives) that he would do jail time for feeding the homeless; Tammy Andrews, writing "I think I may just go looking for the homeless in Parma,

concluded there was not only *confusion* but also *disruption*.  People *confused* the fake page with the real one. (The real one is used for road closures, crimes, tips, and safety, so the City hopes that the public maintains confidence in that official page.)  (*Id.* at 58.)  Dobeck believed the disruption consisted of the phone calls received at the Parma Police dispatch center, Law Department, and Safety Department.  (*Id.* at 57, 59.)  Although there were calls to those three offices, only seven to dispatch were recorded. (*Id.* at 142-43.)

Dobeck concluded it was reasonably foreseeable that people would be confused and call the city believing a post that purports to be the official page of the Parma Police Department is genuine.  (*Id.* at 59.)  He also concluded that Plaintiff intended to disrupt public services because he changed posts, deleted posts of those saying the site was fake, and copied the identical warning banner that Capt. Riley placed on the official page warning the public of the fake site. (*Id.* at 60-61.)

Also on March 18, 2016, Det. Connor came before Magistrate Judge Edward Fink seeking an arrest warrant.  Magistrate Fink always found Det. Connor to be "credible and forthright," "honest," "always professional," and not "thin skinned or hot headed." (Fink depo, p. 81-82.)  According to Magistrate Fink, Det. Connor did not seem upset or angry and did not pressure him into signing a warrant.  (*Id.* at 82.)  Magistrate Fink did issue an arrest warrant for Plaintiff based on a violation of the disruption public service statute.  (*Id.* at p. 13, Ex. 6.)

Plaintiff was arrested and waived a preliminary hearing on March 25, 2016. (*Id.* at p. 88.) On that same day, Det. Connor applied for a warrant to search Plaintiff's apartment.  Judge Deanna O'Donnell found probable cause to conduct a search and signed a search warrant.

---

take them to a restaurant in Parma and feed them.  If compassion lands me in jail, so be it."; and Vanessa Theso, stating "Glad I moved out of Parma, and I'm never coming back." (*Id.* at 53-57.)

(Deposition of Deanna O'Donnell, ECF No. 91, p. 29-31.)[13]  Judge O'Donnell, like Magistrate Judge Fink, believes that Det. Connor is professional, honest, truthful, and not thin skinned and does not recall Det. Connor being upset with Plaintiff or agitated.  (O'Donnell depo, p. 80, 118.)

Plaintiff's roommate, Andrew Kozelka, was present in the apartment when the search warrant was executed.  Plaintiff was not present.  Kozelka testified that Det. Connor was perfectly polite, telling other officers not to seize weapons that were not in the warrant.  (Kozelka depo, p. 173-75.)  On March 28, 2016 Det. Connor again appeared before Judge O'Donnell and sought a warrant for the contents of electronic devices seized at Plaintiff's residence. (O'Donnell depo, p. 35.)  Judge O'Donnell signed that warrant as well.  (*Id*. 35, Ex. 8.)

**6.      The case is bound over to the county, which pursued charges.**

Because R.C. 2901.4(B), disrupting public services, is a felony, the matter was bound over to Cuyahoga County.  At that point, the Parma Law Department's involvement was over.  (Dobeck June 22, 2020 depo, p. 238-39.)   Assistant County Prosecutor Terese McKenna assigned the case to another assistant prosecutor, who presented it to a grand jury.  On April 11, 2016, the grand jury returned a true bill. (*Id.* at 65-66, 240.)

Prior to trial, in June of 2016, there was a meeting at the office of County Prosecutor Timothy McGinty that included Det. Connor, the prosecutor handling the case, and Dobeck.  (McGinty depo, p. 51-52.)  McGinty could not recall the exact purpose of the meeting, but Dobeck clearly remembers that the criminal defense attorney filed a subpoena for Dobeck's personnel record and the prosecutor's office called a meeting on June 8 to discuss the subpoena.  (Dobeck June 22, 2020 depo, p. 68-71.)

---

[13] The relevant pages of the deposition are attached as Exhibit C.

McGinty looked at the fake page himself. He does recall having the impression that he could not distinguish between the fake and the real page and he, too, would have thought it was real if he had looked at it. (McGinty depo, p. 20-21.) McGinty stated: "I mean I had never seen anything like this. I've been around for forty some years and I never saw anyone, anybody, anywhere try to pull something like this off on the public before around the Police Department." (*Id.* at 44.) He believed Plaintiff's conduct was serious, as some people were angry, confused, and upset. McGinty did not want to see the misleading conduct repeated. (*Id.* at 22.) Indeed, the fake page attacked the community's confidence in the Police Department and the policies of the City, which concerned him. (*Id.* at 22, 41–42.) When asked if Det. Connor exerted any influence over him, McGinty said: "Hardly, you know, nope. I don't take pressure well from any police officer or any attorney. There was no pressure whatsoever." The same was true of Dobeck: "Tim Dobeck has never tried to pressure me on any case at any time." (*Id.* at 55.)

### 7. The trial court independently concludes the charge was warranted and based on probable cause, overruling a motion to dismiss.

Before the criminal trial, Plaintiff's counsel filed a motion to dismiss based on his First Amendment rights. Oral argument was conducted on August 2, 2016. The prosecutor argued that the effect – not the content – of the speech was at issue, so no constitutional right was implicated. Judge Maureen Clancy agreed and denied the motion. (First Amended Complaint, ECF No.6-1, Ex. A, p. 5–17, 30.)

The case was tried in August of 2016. A renewal of the First Amendment motion, a Rule 29 motion for acquittal, and a request for a First Amendment jury instruction all were denied. (*Id.* at 253–62.) Plaintiff was acquitted on August 11, 2016. (*Id.* at 317.) While Plaintiff was not convicted, there is no dispute that the grand jury, Cuyahoga County Prosecutor's Office, and the trial judge reached independent conclusions that there was probable cause for the charge.

10

Indeed, after the case was tried and lost, McGinty sent an email to Assistant Prosecutor Anna Woods stating that he had no second thoughts and would charge Plaintiff again for his outrageous and criminal conduct.  (McGinty depo, p. 48.)

Plaintiff's counsel asked Dobeck whether he had any regrets, and replied in his June 22, 2020 deposition that he "made the best call I could and I acted with good faith."  (Dobeck June 22, 2020 depo, p. 315.)  He was also asked why he did not simply decide to let the matter be when Plaintiff removed the page, and answered that all crimes are prosecuted after-the-fact: "You know, if someone goes through the line and steals something and then decides that they want to bring it back or didn't mean to steal it or had some remorse that they stole it, it still happened."  (*Id*. at 244-45.)

### B.    The Only Expert Opinion In This Case, Which Is Unrebutted.

The sole, unrebutted expert in this matter is Jack Ryan. His report, attached as Ex. L, includes the following unrebutted opinions summarized by paragraph:

138.  The investigations of Capt. Riley and Det. Connor were consistent with generally accepted policies, practices, training and legal mandates trained to officers.

139.  Capt. Riley did not play any role in the charging decision, arrest decision, or the search warrants.

140. Police are trained to seek the advice of prosecutors when they are uncertain about legal principles. Capt. Riley and Det. Connor did so in this case. Indeed, Prosecutor Dobeck affirmed that he had received all necessary information from Det. Connor.

141.  Officers are trained to seek an arrest warrant before making an arrest. Det. Connor did so and consulted with the prosecutor before seeking a warrant from Magistrate Fink.

142.  Dispatch personnel who answered the calls prompted by the fake page were drawn away from other duties, including answering emergency calls. Det. Connor acted in keeping with generally accepted policy, practices, training, and legal mandates trained to officer for application in field operations.

\* \* \*

11

145. While officers have a duty to disclose known exculpatory evidence to the prosecutor before trial, their training and courts indicate that they need not seek out exculpatory evidence or investigate alibis or defenses.

146. The depositions included many questions about the reasonable reader standard. Ryan knows of no training offered to officers anywhere in the country on the application of the reasonable reader standard. Additionally, Det. Connor and Dobeck testified that the enforcement was based on the disruption caused by the posts, not their content.

147. While the content does not appear to be a determining factor in motivating the charging or arrest decision, some of the posts were not so absurd as to establish a reasonable reader would conclude the post is not real, but instead satire or parody. Indeed, numerous cities have been criticized and even sued for enacting legislation creating civil or criminal sanctions for feeding the homeless.

148. A pretrial motion to dismiss based on the First Amendment was denied. At each stage of the proceeding, probable cause was affirmed. Even after acquittal, County Prosecutor McGinty said he would charge Novak again if he committed similar conduct.

149. Throughout the proceedings educated attorneys and jurists determined that the charges were appropriate. Clearly any reasonable and well-trained officer, based on the advice of a prosecutor and the agreement of a magistrate and judge, would conclude that the arrests and warrants were proper and consistent with generally accepted policies, practices, and training.

150. The training, practice, and policy of Parma and its police department are consisted with best practices. Ryan has never seen an agency that trains police on the reasonable reader test. Instead, they are trained to seek counsel from the prosecutor if they are facing unfamiliar legal issues.

151. When officers are confronted with non-routine issues they should seek the advice of the prosecutor. That training and practice is consistent with generally accepted policies, practices, training, and best practices in law enforcement.

## III. LAW AND ARGUMENT

### A. Plaintiff's Claims Against The City Of Parma Fail.

A municipality may be sued directly if it is alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978). To establish municipal liability a plaintiff must prove that: (1) a constitutional

violation occurred, and (2) the city is "responsible for that violation." *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004). Governments can be liable when, and only when, their official policies cause their employees to violate another person's constitutional rights. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988).

There are only three bases for municipal liability under § 1983: (a) when an express policy causes a constitutional violation; (b) when a widespread practice or custom is so common that it has the effect of a written policy; or (c) when the constitutional injury is caused by a person with final policymaking authority. *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1120 (6th Cir. 1994).

### 1. Plaintiff's constitutional rights were not violated. His claim against the City therefore fails on its face.

Plaintiff's claim against the City fails because his constitutional rights were not violated. *County of Washtenaw*, 358 F.3d at 382. For these issues of law, the City incorporates the law and argument portions of Connor and Riley's motion for summary judgment pursuant to Fed.R.Civ.P. 10(c). As outlined therein, Plaintiff did not engage in protected speech. Plaintiff's claim against the City therefore fails as a matter of law. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### 2. The City did not have an express policy that violated Plaintiff's constitutional rights.

Case law requires that a plaintiff point to a specific policy that is allegedly deficient to satisfy the first avenue of relief in *Meyers, supra. See Jackson v. City of Highland Park*, 2015 U.S. Dist. LEXIS 68115 (E.D. Mich. May 27, 2015); *Mallin v. City of Eastlake*, 755 F. Supp. 2d 819 (N.D. Ohio 2010). The facts underlying this case are so unusual and unprecedented that there is no express policy on point, nor should there have been. The records are devoid of

evidence of any express City policy that deprived Plaintiff of his First Amendment rights.  The claim against the City fails under this prong.

### 3.    There is no evidence that the alleged constitutional injury was the result of a widespread practice or custom.

To establish liability under a *Monell* claim, the constitutional injury must be the result of a widespread practice or custom that is so common that it has the effect of written policy. Plaintiff must show the custom is the result of a "clear and persistent pattern."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir.2005). Therefore, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality op. of Rehnquist, J.); *Thomas v. City of Chattanooga*, 398 F.3d 426, 430-31 (6th Cir. 2005).  There is no §1983 municipal liability where "an otherwise sound program has occasionally been negligently administered." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

Case law is clear that vague and conclusory allegations of a deficient policy or procedure, like those in this case, are not valid claims.  In *Williams v. City of Cleveland*, 2009 U.S. Dist. LEXIS 61346, *12 (N.D. Ohio July 16, 2009), the court dismissed claims against a municipality with prejudice because the amended complaint was lacking.

Again, the record is devoid of any specific training policy that is deficient.  Plaintiff also cannot support a claim that the failure to train argument should be viewed as an allegation that there is an unwritten policy or custom of deficient or incorrect training.   "A systematic failure to train employees amounts to a custom or policy for which the employer may be subject to § 1983 liability ***only*** if such failure amounts to deliberate indifference to the rights of persons with

whom the employees come into contact.  To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'"  *Thorpe v. Breathitt County Bd. of Educ*., 8 F. Supp. 3d 932 (E.D. Ky. 2014) (citing *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (internal citations omitted; emphasis added)).

There are no allegations in the Complaint that Parma officials *knew* of a history of training problems and were clearly on notice that the training in this particular area – internet speech – was deficient and likely to cause injury.  In fact, Parma's 30(b)(6) designee testified that officers *are* trained on First Amendment issues through case law updates, and during roll call when specific issues come up, such as protesters.  (Deposition of James Blair, ECF No. 99, p. 13, 50–51; 82–84.)[14]  More importantly, officers are trained that when they recognize an issue that may be outside of what they have encountered in the past, they are trained to seek legal guidance with the law department.  (*Id.* at pp. 25–26.)  This is exactly what the Defendant Officers did in seeking guidance from Dobeck.

Plaintiff failed to produce an expert opinion that any training was flawed to an extent to give rise to a constitutional violation.  The ***only*** expert in this litigation has specifically opined in paragraphs 140 and 150–51 of his report that Parma's training on this issue is customary and best practice.  Plaintiff chose not to even depose him on these conclusions, so they stand unrebutted.

---

[14] The relevant pages of the deposition are attached as Exhibit M.

15

### 4.    The City is not liable based on a final policymaker theory.

#### a.  Dobeck did not act as a final policymaker.

Generally, a single incident of misconduct is insufficient to infer a policy or custom for *Monell* liability purposes. *City of Oklahoma*, 471 U.S. at 824. Rather, a plaintiff must show the deprivation is a result of deliberate indifference or gross negligence on the part of the officials in charge, or conduct explicitly or implicitly authorized by a decision-maker. *Murray v. City of Columbus*, 2:10-CV-797, 2012 WL 4475718, at *5 (S.D. Ohio Sept. 26, 2012); citing *City of Oklahoma City*, 471 U.S. at 821–24.

Not every decision by municipal officers automatically subjects the municipality to §1983 liability. Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *City of Oklahoma*, 471 U.S., at 822–824.

Final authority may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Ultimately, whether an official had final policymaking authority is a question of state law, which may include local ordinances and regulations. *City of St. Louis*, 485 U.S. at 126. Here, nobody involved had final authority including Dobeck, and any such claim fails.

In this case, Dobeck acted in his official capacity to review an incident for possible criminal conduct, not create policy. *Pembaur **does not*** hold that all decisions by ***any*** Ohio

prosecutor give rise to a *Monell* claim.[15]  The opinion is clear that it *should not* be read to automatically impose final policymaking authority on law enforcement personnel and prosecutors, and that the particular result in that case was based on its "examination of Ohio law." *Pembaur*, 484.  The Supreme Court cited Ohio R.C. 309.09(A), which dictated that "both the County Sheriff and the County prosecutor could establish county policy under appropriate circumstances…." *Id.*  The Supreme Court noted that the county prosecutor did not render "mere 'legal advice'" to the Sheriff but rather issued a "clear command" to the Sheriff to enter the plaintiff's clinic. *Id.* at 485.

That is not the case here. Dobeck examined the law related to Plaintiff's Facebook page and ***recommended*** what the City might do in response, as demonstrated below.  The difference between issuing a *command* that must be followed and rendering only *advice* is key, and takes this case outside of the *Monell* exposure in *Pembaur. See Sipusic v. Girard*, 2004 WL 2803290, at *4–5 (Ohio Ct. App. Sept. 17, 2004) (zoning inspector could not be final policymaker under *Pembaur* because he merely *recommended* course of action)*; Stevens v. Cox*, 2009 WL 223897, at *15 (prosecutor only final policymaker because, by ordinance, she had *absolute discretion* regarding whether or not to investigate residents for violation of ordinance requiring that tax returns be filed annually regardless of whether residents had income).

There is no commensurate law providing final authority in this case.  Indeed, it is just the opposite.  In this case Dobeck does not have final policymaking authority as a matter of law with respect to an arrest.  The complaint acknowledges that Defendants had to apply for the warrant with Magistrate Edward Fink of the Parma Municipal Court, who had the "final" say in the matter.  (*Id.* at ¶ 107.)  It cannot be said, then, that Dobeck had the requisite authority to form the

---

[15] The case was cited in this Court's motion to dismiss ruling. (ECF No. 19, PageID #19330; emphasis added.)

basis of a claim.  Indeed, in *Liptak v. City of Niles, Ohio*, 198 F.3d 246 (6th Cir. 1999), the Sixth

Circuit dismissed a claim against a City alleging the law director and prosecutor had final

authority to make municipal policy with respect to an arrest, reasoning:

> Under Ohio law, a city prosecutor's determination that probable cause exists for the issuance of an arrest warrant is not binding on the court. Bennett's [the prosecutor's] authority with regard to the issuance of arrest warrants was limited to exercising his discretion to decide whether to request that the court issue a warrant.  Judge Townley was the final municipal decision maker on whether such a warrant should be issued.  The officers who executed the warrant were acting under an order issued by the court, not the city prosecutor.

*Id.* at *7.  *See,* also *Mace v. City of Akron*, 989 F. Supp. 949, 957 (N.D. Ohio 1998) ("if she did

act as an agent of the City, Sammon lacked the final authority to demote Mace, because her

decision was subject to the approval of the Akron Municipal Court judges").  This layer of

judicial review was absent in *Pembaur*, where the prosecutor ordered the officer into the home.

Perhaps most importantly, a review of the Parma Codified Ordinances shows that the

Law Director/Prosecutor ***is not*** given carte blanche authority to direct police officers in their day-

to-day police work, unlike the County Prosecutor in *Pembaur*.  (*See* Chapter 139, "Director of

Law," providing some authority with respect to civil suits and the prosecution of criminal

matters in Parma Municipal Court.)[16]  This case was not even prosecuted in Parma Municipal

Court, but rather bound over to the Cuyahoga County Prosecutor's Office, which independently

reviewed the case and elected to pursue the charges.

> **b.    *Dobeck advised Det. Connor, he did not issue a binding command.***

Finally, the *Pembaur* decision differentiates the rendering of legal advice with

commands.  In this case, it is clear that Dobeck gave ***advice*** to the Defendant Officers.  The

---

[16] Attached as Exhibit N.

deposition testimony does not even suggest that there was a "command" like in *Pembaur*, which was found to be tantamount to county policy because it was unreviewable and non-negotiable. This notion was covered exhaustively and extensively in depositions, and Connor, Riley, and Dobeck were each clear that there was no command.  Det. Connor testified as follows:

Q: And were you, in your judgment, taking direction from [Dobeck]?

A: No.

Q: Who were you taking direction from?

A: Nobody. I sought ***advice*** from the Law Director.

*** * ****

A: I mean not a policy maker. He's who I sought ***advice*** from.

*** * ****

Q: Explain that.

A: Well, because I've been trained to seek advice from the Law Department, the Law Director for things that I don't know in the legal sense, and he will provide advice.

(Connor depo, p. 259–60; emphasis added.)  Capt. Riley testified that Dobeck only advised the officers what charges were in "his opinion" appropriate.  (Riley depo, p. 109, 172, 176, 259.) Dobeck was equally clear that his role in the process is not to issue commands or directives, but simply to render advice that an officer can choose to follow or even ignore.  (Dobeck, June 22, 2020 depo. p. 41, 50, 152, 183, 238–40, 245.)

The difference between a final, unreviewable order, like in *Pembaur*, and rendering legal advice is an important legal distinction.  The Seventh Circuit succinctly pointed out the difference, because making every "decision," or in this case mere opinion, of a top official a "policy" would be nothing more than *respondeat superior*/vicarious liability, which is clearly forbidden under § 1983.  The court held that *Monell* is "not to be sabotaged by calling the chief

19

bureaucrat who signs off on a particular action the city's "policymaker" for that action." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) (citations omitted)(emphasis added).

> **c.      Dobeck is not a named part and there is no vicarious liability flows to the City.**

"Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from respondeat superior liability." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993), quoting *City of St. Louis*, 485 U.S. at 126.    Case law is clear that determining whether a municipal employee has policymaking authority is a question of law for the judge to decide.   *Rosario v. Miami-Dade Cty.,* 490 F. Supp. 2d 1213, 1221 (S.D. Fla. 2007).  Plaintiff has blamed Dobeck for not considering the First Amendment.  Defendants do not believe that Dobeck did anything wrong.  In any event, **Dobeck is not a defendant**.  The City cannot be liable pursuant to *respondeat superior.  Monell*, 436 U.S. at 691.

## IV.      THE FEDERAL PRIVACY PROTECTION ACT CLAIM FAILS

The City adopts and incorporates by reference the PPA claim in the individual Defendants' motion to summary judgment.  The claim fails.

## V.      ANY STATE LAW CLAIMS FAIL

Defendants do not believe that any state law claims remain against the City.  To the extent Plaintiff claims otherwise, the City reserves its right to address the claims in its reply.

## VI.      CONCLUSION

All of Plaintiff's claims against the City of Parma should be dismissed as a matter of law.

Respectfully submitted,

/s/Steven D. Strang
**D JOHN TRAVIS (0011247)**
**STEVEN D. STRANG (0085444)**
GALLAGHER SHARP LLP
1215 Superior Avenue, 7th Floor
Cleveland, Ohio  44114
(216) 241-5310 (phone)
(216) 241-1608 (fax)
jtravis@gallaghersharp.com
sstrang@gallaghersharp.com
*Attorneys for Defendants City of Parma,*
*Kevin Riley, and Thomas Connor*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2020 the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/Steven D. Strang
**D JOHN TRAVIS (0011247)**
**STEVEN D. STRANG (0085444)**
*Attorneys for Defendant City of Parma, Kevin*
*Riley, and Thomas Connor*

21